# Exhibit 1

**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
Washington, D.C. 20549

_____

**FORM 10-K**

**ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF**
**THE SECURITIES EXCHANGE ACT OF 1934**

For the fiscal year ended June 28, 2017                                                                                  Commission File No. 1-10275

_____

# BRINKER INTERNATIONAL, INC.

(Exact name of registrant as specified in its charter)

| | |
|---|---|
| **DELAWARE** | **75-1914582** |
| (State or other jurisdiction of incorporation or organization) | (I.R.S. Employer Identification No.) |
| **6820 LBJ Freeway, Dallas, Texas** | **75240** |
| (Address of principal executive offices) | (Zip Code) |

**(972) 980-9917**

(Registrant's telephone number, including area code)

Securities registered pursuant to Section 12(b) of the Act:

| | |
|---|---|
| | **Name of each exchange on which registered** |
| **Title of Each Class** | |
| **Common Stock, $0.10 par value** | **New York Stock Exchange** |

Securities registered pursuant to Section 12(g) of the Act: None

_____

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act.   Yes ☒   No ☐

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Act.   Yes ☐   No ☒

Indicate by check mark whether the registrant has submitted electronically and posted on its corporate Web site, if any, every Interactive Data File required to be submitted and posted pursuant to Rule 405 of Regulation S-T during the preceding 12 months (or for such shorter period that the registrant was required to submit and post such files).   Yes ☒   No ☐

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.   Yes ☒   No ☐

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K (229.405 of this chapter) is not contained herein, and will not be contained, to the best of the registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K. ☒

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer,a non-accelerated filer, smaller reporting company, or an emerging growth company. See definitions of "large accelerated filer," "accelerated filer," " smaller reporting company," and "emerging growth company" in Rule 12b-2 of the Exchange Act.

| | | | |
|---|---|---|---|
| Large accelerated filer | ☒ | Accelerated filer | ☐ |
| Non-accelerated filer | ☐ | Smaller reporting company | ☐ |
| (Do not check if a smaller reporting company) | | Emerging growth company | ☐ |

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Act).   Yes ☐   No ☒

State the aggregate market value of the voting and non-voting common equity held by non-affiliates computed by reference to the price at which the common equity was last sold, or the average bid and asked price of such common equity, as of the last business day of the registrant's most recently completed second fiscal quarter. $2,411,056,503.

Indicate the number of shares outstanding of each of the registrant's classes of common stock, as of the latest practicable date.

| **Class** | **Outstanding at August 14, 2017** |
|---|---|
| Common Stock, $0.10 par value | 48,454,974 shares |

## INTRODUCTION

**Documents Incorporated by Reference**

We have incorporated portions of our Annual Report to Shareholders for the fiscal year ended June 28, 2017 into Part II hereof, to the extent indicated herein. We have also incorporated by reference portions of our Proxy Statement for our annual meeting of shareholders on November 16, 2017, to be dated on or about September 27, 2017, into Part III hereof, to the extent indicated herein.

**Forward-Looking Statements**

Information and statements contained in this Form 10-K, in our other filings with the SEC or in our written and verbal communications that are not historical facts are forward-looking statements within the meaning of Section 27A of the Securities Act of 1933 and Section 21E of the Securities Exchange Act of 1934. Forward-looking statements are generally accompanied by words like "believes," "anticipates," "estimates," "predicts," "expects," and other similar expressions that convey uncertainty about future events or outcomes. Forward-looking statements are based on our current plans and expectations and involve risks and uncertainties that could cause actual results to differ materially from our historical results or from those projected in forward-looking statements. These risks and uncertainties are, in many instances, beyond our control. We wish to caution you against placing undue reliance on forward-looking statements because of these risks and uncertainties. Except as required by law, we expressly disclaim any obligation to update or revise any forward-looking statements, whether as a result of new information, future events, or otherwise. The forward-looking statements contained in this report are subject to the risks and uncertainties described in Item 1A below under the heading "Risk Factors," as well as the risks and uncertainties that generally apply to all businesses. We further caution that it is not possible to identify all risk and uncertainties, and you should not consider the identified factors as a complete list of all risks and uncertainties.

## PART I

Item 1                BUSINESS.

*General*

References to "Brinker," the "Company," "we," "us," and "our" in this Form 10-K are references to Brinker International, Inc. and its subsidiaries and any predecessor companies of Brinker International, Inc.

We own, develop, operate and franchise the Chili's® Grill & Bar ("Chili's") and Maggiano's Little Italy® ("Maggiano's") restaurant brands. The Company was organized under the laws of the State of Delaware in September 1983 to succeed to the business operated by Chili's, Inc., a Texas corporation, which was organized in August 1977. We completed the acquisition of Maggiano's in August 1995.

*Restaurant Brands*

*Chili's Grill & Bar*

Chili's, a recognized leader in the Bar & Grill category of casual dining, has been operating restaurants for over 40 years. Chili's enjoys a global presence with locations in 31 countries and two U.S. territories. Whether domestic or international, company-owned or franchised, Chili's and its more than 100,000 team members are dedicated to delivering fresh, high-quality food with a unique point of view, as well as dining experiences that make people feel special. Historically, Chili's menu has featured bold, kicked-up American favorites, and in recent years we have expanded our menu to include more Fresh Mex and Fresh Tex offerings. However, casual dining traffic has softened, and we believe the next generation of American consumers demand more quality and focused expertise in their restaurant offerings. We are reinvesting in the core menu platforms that first established Chili's reputation more than 40 years ago. These include burgers, ribs and fajitas, as well as our famous margaritas. We are reinvesting in each of these platforms for a new generation of guests. We believe our focused menu will allow Chili's to differentiate our food from other restaurants.

We also believe that guests are evolving not only their standards of quality but also their expectations of convenience. Chili's to-go menu is available on-line, by calling the restaurant, or through our new mobile app, and in the spring of 2017, we began offering "call ahead carryout" through an app in all our company-owned restaurants. In recent years, we also pioneered the use of tabletop devices inside the restaurants, which allow guests to order and re-order menu items, enjoy entertainment and assert more control over their dining experience by paying through the tabletop device when they choose.

During the fiscal year ended June 28, 2017, at our company-owned restaurants, entrée selections ranged in menu price from $6.00 to $18.99. The average revenue per meal, including alcoholic beverages, was approximately $15.26 per person. During this same year, food and

2

non-alcoholic beverage sales constituted approximately 85.9% of Chili's total restaurant revenues, with alcoholic beverage sales accounting for the remaining 14.1%. Our average annual sales volume per company-owned Chili's restaurant during this same year was $2.9 million.

*Maggiano's Little Italy*

Maggiano's is a full-service, national, casual dining Italian restaurant brand with a passion for making people feel special. The exterior of each Maggiano's restaurant varies to reflect local architecture; however, the interior of all locations transport our guests back to a classic Italian-American restaurant in the style of New York's Little Italy in the 1940s. Our Maggiano's restaurants feature individual and family-style menus, and most of our restaurants also have extensive banquet facilities designed to host large party business or social events. We have a full lunch and dinner menu offering chef-prepared, classic Italian-American fare in the form of appetizers and entrées with bountiful portions of pasta, chicken, seafood, veal, prime steaks and desserts. In February 2017, we also began offering weekend brunch. Our Maggiano's restaurants also offer a full range of alcoholic beverages, including a selection of handcrafted classic cocktails and premium wines. In addition, Maggiano's offers a full carryout menu as well as local delivery services.

During the fiscal year ended June 28, 2017, entrée selections ranged in menu price from $13.95 to $47.95. The average revenue per meal, including alcoholic beverages, was approximately $27.89 per person. During this same year, food and non-alcoholic beverage sales constituted approximately 84.4% of Maggiano's total restaurant revenues, with alcoholic beverage sales accounting for the remaining 15.6%. Sales from events at our banquet facilities made up 18.1% of Maggiano's total restaurant revenues for the year. Our average annual sales volume per Maggiano's restaurant during this same year was $8.3 million.

**Business Strategy**

We are committed to strategies and initiatives that we believe are centered on long-term sales and profit growth, enhancing the guest experience and team member engagement. These strategies are intended to differentiate our brands from the competition, reduce the costs associated with managing our restaurants and establish a strong presence for our brands in key markets around the world.

Growing sales and traffic continues to be a challenge with increasing competition and heavy discounting in the casual dining industry. Lower oil prices have continued to negatively impact sales in our markets with oil dependent economies. We also believe that casual dining traffic was negatively impacted by lower retail traffic in general, including during the December, 2016 holiday season. U.S. economic growth has been steady in recent years, but wage growth has been slow comparative to the post-recession economic recovery. This wage pressure and increased costs for healthcare has challenged both casual dining restaurant operators and consumers as discretionary income available for restaurant visits has been limited. More consumers are opting to eat at home as the decline in grocery costs relative to casual dining prices allows consumers to save money. Consumers are also taking advantage of discounted fast food options which has placed additional pressure on the casual dining sector. Overall, the industry was softer than we anticipated this year. In response to these economic factors and industry pressures, we have developed both short and long-term strategies that we believe are appropriate for all operating conditions and will provide a solid foundation for future earnings growth. During the third quarter of fiscal year 2017, we completed a reorganization of the Chili's restaurant operations team and certain departments at the corporate headquarters to better align staffing with our current strategies. This reorganization resulted in pre-tax savings of over $5 million in fiscal year 2017. We anticipate pre-tax savings of approximately $12 million on an annualized basis.

We regularly evaluate our processes and menu at Chili's to identify opportunities where we can improve our service quality and food. We made a commitment to simplify our menu and back of house complexity by reducing the number of menu items. We believe this initiative will improve kitchen efficiency and result in meals being delivered hotter and faster to our guests. During fiscal year 2017, we upgraded the quality of our chicken crispers to an all-natural chicken and added new flavors such as buffalo bleu cheese crispers and honey chipotle chicken and waffles. We also implemented a new "smash" burger cooking procedure across our burger platform that produces a juicier product and cuts the cooking time nearly in half. We believe that guests are responding favorably to the new products. We were also pleased with the guest preference results from the smokehouse platform added to the menu in fiscal year 2017, which features jalapeño cheese sausage, bone-in chicken and our signature baby-back ribs. Additionally, we launched our new line of craft beers in fiscal year 2017 featuring regional and national favorites and our Presidente Margarita on tap.

We remain competitive with our value offerings at both lunch and dinner and are committed to offering consistent, quality products at a compelling every day value. We offered a promotional "3 for Me™" platform in January 2017 that allowed guests to combine a salad and mini molten dessert with their choice of fajitas, burgers, smoked chicken or ribs for just $10.00. We will continue to seek opportunities to reinforce value and create interest for the Chili's brand with new and varied offerings to further enhance sales and drive incremental traffic.

The Chili's brand has leveraged technology initiatives to create a digital guest experience that we believe will help us engage our guests more effectively. We have launched a new online ordering system that expands our current capabilities and gives our guests greater control of their to-go experience. Our upgraded Chili's mobile app provides the capability for digital curbside service where guests can order, pay and notify us of their arrival all through the app. We have leveraged our tabletop technology to power our loyalty programs and anticipate that guest

loyalty programs will be a significant part of our marketing strategy going forward. We believe guest loyalty programs allow us to drive sales by creating more relevant and customized incentives for our guests.

We believe that improvements at Chili's will have the most significant impact on the business; however, our results will also benefit through additional contributions from Maggiano's and our global business. Maggiano's opened two restaurants in fiscal year 2017 based on our new prototype, which includes a flexible dining area that may be used for banquets or opened up for general seating. This new prototype allows the brand to enter new markets for which the prior model was not suited, but still accommodate smaller banquets. We introduced a new menu at Maggiano's in the third quarter of fiscal year 2017 that includes the addition of Saturday and Sunday brunch, and we believe guests are responding favorably to the new menu and brunch offering. Maggiano's is committed to delivering high quality food and a dining experience in line with this brand's heritage.

Our global Chili's business continues to grow with locations in 30 countries and two territories outside of the United States. Our international franchisees opened 30 new restaurants in fiscal year 2017.

*Company Development*

Over the past fiscal year we continued the expansion of our restaurant brands domestically through a select number of new company-owned restaurants in strategically desirable markets. We concentrate on the development of certain identified markets that are most likely to improve our competitive position and achieve the desired level of marketing potential, profitability and return on invested capital. Our domestic expansion efforts focus not only on major metropolitan areas in the United States but also on smaller market areas and non-traditional locations (such as airports and universities) that can adequately support our restaurant brands. For smaller market areas, we have developed a newer smaller prototype building that allows us to expand into these markets and serve our guests while maintaining a focus on profitability and return on invested capital.

The restaurant site selection process is critical, and we devote significant effort to the investigation of new locations utilizing a variety of sophisticated analytical techniques. Our process evaluates a variety of factors, including: trade area demographics, such as target population density and household income levels; physical site characteristics, such as visibility, accessibility and traffic volume; relative proximity to activity centers, such as shopping centers, hotel and entertainment complexes and office buildings; and supply and demand trends, such as proposed infrastructure improvements, new developments and existing and potential competition. Members of each brand's executive team inspect, review and approve each restaurant site prior to its lease or acquisition for that brand.

The specific rate at which we are able to open new restaurants is determined, in part, by our success in locating satisfactory sites, negotiating acceptable lease or purchase terms, securing appropriate local governmental permits and approvals, and by our capacity to supervise construction and recruit and train management and hourly team members.

The following table illustrates the system-wide restaurants opened in fiscal year 2017 and the projected openings in fiscal 2018:

|  | Fiscal 2017 Openings | Fiscal 2018 Projected Openings |
|---|---|---|
| Chili's domestic: |  |  |
| Company-owned | 7 | 5-6 |
| Franchise | 6 | 6-8 |
| Maggiano's: |  |  |
| Company-owned | 2 | 1 |
| Chili's international: |  |  |
| Company-owned | 1 | 0 |
| Franchise | 30 | 38-43 |
| Total | 46 | 50-58 |

We periodically re-evaluate company-owned restaurant sites to ensure attributes have not deteriorated below our minimum standards. In the event site deterioration occurs, each brand makes a concerted effort to improve the restaurant's performance by providing physical, operating and marketing enhancements unique to each restaurant's situation. If efforts to restore the restaurant's performance to acceptable minimum standards are unsuccessful, the brand considers relocation to a proximate, more desirable site, or evaluates closing the restaurant if the brand's measurement criteria, such as return on investment and area demographic trends, do not support relocation. We closed eight company-owned restaurants in fiscal year 2017 that were generally performing below our standards or were near or at the expiration of their lease terms. If local market conditions warrant, we also opportunistically evaluate company-owned restaurants to determine if relocation to a proximate, more desirable site will strengthen our presence in those trade areas or markets. We relocated one company-owned restaurant in

fiscal year 2017. Our strategic plan is targeted to support our long-term growth objectives, with a focus on continued development of those restaurant locations that have the greatest return potential for the Company and our shareholders.

*Franchise Development*

In addition to our development of company-owned restaurants, our restaurant brands pursue expansion through our franchisees and joint venture partners.

As part of our strategy to expand through our franchisees, our franchise operated locations increased in fiscal year 2017. The following table illustrates the percentages of franchise operations as of June 28, 2017 for the Company and by restaurant brand, respectively:

| | Percentage of Franchise Operated Restaurants | | |
| --- | --- | --- | --- |
| | Domestic(1) | International(2) | Overall(3) |
| Brinker | 24% | 96% | 40% |
| Chili's | 25% | 96% | 41% |
| Maggiano's | —% | —% | —% |

(1)     The percentages in this column are based on number of domestic franchised restaurants versus total domestic restaurants.
(2)     The percentages in this column are based on number of international franchised restaurants versus total international restaurants. Restaurants operated by our Mexican joint venture are included as international franchised restaurants.
(3)     The percentages in this column are based on the total number of franchised restaurants (domestic and international) versus total system-wide number of restaurants.

*International*

We continue our international growth through development agreements with new and existing franchisees and joint venture partners, introducing Chili's to new countries and expanding the brand within our existing markets. As of June 28, 2017, we had 24 total development arrangements. During fiscal year 2017, our international franchisees and joint venture partners opened 30 Chili's restaurants. We entered into new development agreements with new and existing franchisees for development in Mexico, Peru and Vietnam.

As we develop Chili's internationally, we will selectively pursue expansion through various means, including franchising, joint ventures and acquisitions. Our international agreements provide the vehicle for payment of development fees and initial franchise fees in addition to subsequent royalty fees based on the gross sales of each restaurant. We expect future agreements to remain limited to enterprises who demonstrate a proven track record as a restaurant operator and showcase financial strength that can support a multi-unit development agreement.

*Domestic*

We remain committed to also growing our number of domestic franchised restaurants. We plan to accomplish this through existing, new or renewed development and franchise agreements with new or existing franchisees. In addition, we have from time to time also sold and may sell company-owned restaurants to our franchisees (new or existing). As of June 28, 2017, four domestic development arrangements existed. Similar to our international agreements, a typical domestic agreement provides for payment of development and initial franchise fees in addition to subsequent royalty and advertising fees based on the gross sales of each restaurant. We expect future domestic agreements to remain limited to enterprises having significant experience as restaurant operators and proven financial ability to support and develop multi-unit operations.

During the year ended June 28, 2017, our domestic franchisees opened six Chili's restaurants.

*Restaurant Management*

Our Chili's and Maggiano's brands have separate designated teams who support each brand, including operations, finance, franchise, marketing, peopleworks and culinary. We believe these strategic, brand-focused teams foster the identities of the individual and uniquely positioned brands. To maximize efficiencies, brands continue to utilize common and shared infrastructure, including, among other services, accounting, information technology, purchasing, legal and restaurant development.

At the restaurant level, management structure varies by brand. A typical restaurant is led by a management team including a general manager, two to six additional managers, and for Maggiano's, an additional three to four chefs. The level of restaurant supervision depends upon the operating complexity and sales volume of individual locations.

We believe there is a high correlation between the quality of restaurant management and the long-term success of a brand. In that regard, we encourage increased experience at all management positions through various short and long-term incentive programs, which may include equity ownership. These programs, coupled with a general management philosophy emphasizing quality of life, have enabled us to attract and retain key team members, and enjoy turnover of managers and team members that is below industry averages.

We ensure consistent quality standards in our brands through the issuance of operations manuals covering all elements of operations and food and beverage manuals, which provide guidance for preparation of brand-formulated recipes. Routine visitation to the restaurants by all levels of supervision enforces strict adherence to our overall brand standards and operating procedures. Each brand is responsible for maintaining their operational training program. Depending on the brand, the training program typically includes a training period of two to three months for restaurant management trainees, as well as special training for high-potential managers. We also provide recurring management training for managers and supervisors to improve effectiveness or prepare them for more responsibility.

### Supply Chain

Our ability to maintain consistent quality and continuity of supply throughout each restaurant brand depends upon acquiring products from reliable sources. Our approved suppliers and our restaurants are required to adhere to strict product and safety specifications established through our quality assurance and culinary programs. These requirements are intended to ensure high-quality products are served in each of our restaurants. We strategically negotiate directly with major suppliers to obtain competitive prices. We also use purchase commitment contracts when appropriate to stabilize the potentially volatile pricing associated with certain commodity items. All essential products are available from pre-qualified distributors to be delivered to our restaurant brands. Additionally, as a purchaser of a variety of food products, we require our suppliers to adhere to our supplier code of conduct, which sets forth our expectation on business integrity, food safety and food ingredients, animal welfare and sustainability. Due to the relatively rapid turnover of perishable food products, inventories in the restaurants, which consist primarily of food, beverages and supplies, have a modest aggregate dollar value in relation to revenues. Internationally, our franchisees and joint venture operations may encounter cultural and regulatory differences resulting in variances with product specifications for international restaurant locations.

### Advertising and Marketing

As a "polished casual" restaurant, with just more than 50 locations, Maggiano's primarily targets affluent baby boomers who live and work around the higher-end malls where the majority of Maggiano's restaurants are located. Maggiano's relies primarily on direct marketing, social media and word of mouth to advertise to new guests. As a large, nationally penetrated bar and grill brand, Chili's appeals to a broader population. More than 50 million Americans visit Chili's every three months, ranging across all income and ethnic groups. As casual-dining traffic has softened in recent years, we have worked hard to be more precise in defining the Chili's guest target. Today our primary focus for developing menu innovation and targeting our TV and digital advertising are the Generation X and young millennial families who desire quality food, good value and a service experience that allows them to connect with family and friends. These young families represent a significant percentage of our guest base today and, we believe, will only grow in importance in the years ahead.

Our franchise agreements generally require advertising contributions to us by the franchisees. We use these contributions, in conjunction with company funds, for the purpose of retaining advertising agencies, obtaining consumer insights, developing and producing brand-specific creative materials and purchasing national or regional media to meet the brand's strategy. Some franchisees also spend additional amounts on local advertising. Any such local advertising is required to be approved by us.

### Team Members

As of June 28, 2017, we employed 57,906 team members, of which 581 were restaurant support center personnel in Dallas, and 4,416 were restaurant regional and area directors, managers, or trainees. The remaining 52,909 were employed in non-management restaurant positions. Our executive officers have an average of 23 years of experience in the restaurant industry.

We have a positive team member relations outlook and continue to focus on improving our team member turnover rate. We have a variety of tools and strong resources in place to help us recruit and retain the best talent to work in our restaurants.

The majority of our team members, outside of restaurant management and restaurant support center personnel, are paid on an hourly basis. We stand firm in the belief that we provide competitive working conditions and wages favorable with other companies in our industry. Our team members are not covered by any collective bargaining agreements.

### Trademarks

We have registered or have pending, among other marks, "Brinker International", "Chili's", "Chili's Southwest Grill & Bar", "Chili's Too", "Maggiano's", and "Maggiano's Little Italy", as trademarks with the United States Patent and Trademark Office.

*Available Information*

We maintain an internet website with the address of http://www.brinker.com. You may obtain, free of charge, at our website, copies of our reports filed with, or furnished to, the Securities and Exchange Commission (the "SEC") on Forms 10-K, 10-Q and 8-K. Any amendments to such reports are also available for viewing and copying at our internet website. These reports will be available as soon as reasonably practicable after filing such material with, or furnishing it to, the SEC. You may also view and copy such reports at the SEC's Public Reference Room at 100 F Street, N.E., Washington, D.C. 20549. You may obtain information on the operation of the SEC's Public Reference Room by calling the SEC at 1-800-SEC-0330. The SEC also maintains an internet website, the address of which is www.sec.gov, which contains reports, proxy and information statements, and other information filed electronically with the SEC. In addition, you may view and obtain, free of charge, at our website, copies of our corporate governance materials, including, Corporate Governance Guidelines, Audit Committee Charter, Compensation Committee Charter, Governance and Nominating Committee Charter, Code of Conduct and Ethical Business Policy, and Problem Resolution Procedure/Whistle Blower Policy. The information contained on our website is not a part of this Annual Report on Form 10-K.

**Item 1A.**      **RISK FACTORS.**

We wish to caution you that our business, financial condition and results of operations are subject to a number of risks and uncertainties. The risk factors listed below could cause actual results to differ materially from our historical results or from those projected in forward-looking statements contained in this report, our other filings with the SEC, our news releases, or our other verbal or written communications. Additional risks and uncertainties that are currently not known or believed by us to be immaterial may also have a material negative impact on our business, financial condition and results of operations. In any such event, the trading price of our securities could decline and you could lose all or part of your investment.

**Competition may adversely affect our operations and financial results.**

The restaurant business is highly competitive as to price, service, restaurant location, nutritional and dietary trends and food quality and is often affected by changes in consumer tastes, economic conditions, population and traffic patterns. We compete within each market with locally-owned restaurants as well as national and regional restaurant chains, some of which operate more restaurants and have greater financial resources and longer operating histories than ours. The casual dining segment of the restaurant industry has not seen any significant growth in customer traffic in recent years. If this trend continues, our ability to grow customer traffic at our restaurants will depend on our ability to increase our market share within the casual dining segment. We also face competition from quick service and fast casual restaurants; the convergence in grocery, deli and restaurant services; and meal kit and food delivery providers. We compete primarily on the quality, variety and value perception of menu items, as well as the quality and efficiency of service, the attractiveness of facilities and the effectiveness of advertising and marketing programs. Our restaurants also face competition from the introduction of new products and menu items by competitors, as well as substantial price discounting among offers. Although we may implement a number of business strategies, the success of new products, initiatives and overall strategies is highly difficult to predict. If we are unable to compete effectively, we may lose customer traffic and our gross sales and profitability may decline.

**Changes in consumer preferences may decrease demand for food at our restaurants.**

Changing health or dietary preferences may cause consumers to avoid our products in favor of alternative foods. The foodservice industry as a whole depends on consumer preferences and demographic trends at the local, regional, national and international levels, including the impact on consumer eating habits of new information regarding diet, nutrition, health and health insurance. Changes in nutritional or health insurance guidelines issued by federal or local government agencies, issuance of similar guidelines or statistical information by other federal, state or local municipalities, academic studies, or advocacy organizations, among other things, may impact consumer choice and cause consumers to select foods other than those that are offered by our restaurants. We may not be able to adequately adapt our menu offerings to keep pace with developments in current consumer preferences, which may result in reductions to the revenues generated by our company-owned restaurants and the payments we receive from franchisees.

**Food safety incidents at our restaurants or in our industry or supply chain may adversely affect customer perception of our brands or industry and result in declines in sales and profits.**

Regardless of the source or cause, any report of food-borne illnesses or other food safety issues at one of our restaurants or our franchisees' restaurants could irreparably damage our brand reputations and result in declines in customer traffic and sales at our restaurants. A food safety incident may subject us to regulatory actions and litigation, including criminal investigations, and we may be required to incur significant legal costs and other liabilities. Food safety incidents may occur in our supply chain and be out of our control. Health concerns or outbreaks of disease in a food product could also reduce demand for particular menu offerings. Even instances of food-borne illness, food tampering or food contamination occurring solely at restaurants of our competitors could result in negative publicity about the restaurant industry generally and adversely affect our sales or cause us to incur additional costs to implement food safety protocols beyond industry standards. The occurrence of food-borne illnesses or food safety issues could also adversely affect the price and availability of affected ingredients, resulting in higher costs and lower margins.

**Global and domestic economic conditions may negatively impact consumer discretionary spending and could have a material negative effect on our financial performance.**

The restaurant industry is dependent upon consumer discretionary spending, which may be negatively affected by global and domestic economic conditions, such as: slow or negative growth, unemployment, credit conditions and availability, volatility in financial markets, inflationary pressures, weakness in the housing market, and changes in government and central bank monetary policies. If economic conditions negatively affect consumer incomes, then discretionary spending for restaurant visits will be challenged, our guest traffic may deteriorate and the average amount guests spend in our restaurants may be reduced. This will negatively impact our revenues and also result in lower royalties collected, sales deleverage, spreading fixed costs across a lower level of sales, and in turn, cause downward pressure on our profitability. This could result in further reductions in staff levels, asset impairment charges and potential restaurant closures. There is no assurance that any governmental plan to restore fiscal responsibility or future plans to stimulate the economy will foster growth in consumer confidence, consumer incomes or consumer spending.

**Unfavorable publicity relating to one or more of our restaurants in a particular brand may taint public perception of the brand.**

Multi-unit restaurant businesses can be adversely affected by publicity resulting from poor food quality, customer complaints, litigation, illness or health concerns or other issues stemming from one or a limited number of restaurants, regardless of whether such events have a factual basis. In particular, since we depend heavily on the Chili's brand for a majority of our revenues, unfavorable publicity relating to one or more Chili's restaurants could have a material adverse effect on the Chili's brand, and consequently on our business, financial condition and results of operations. The speed at which negative publicity (whether or not accurate) can be disseminated has increased dramatically with the capabilities of the internet. If we are unable to quickly and effectively respond to such reports, we may suffer declines in guest traffic which could materially impact our financial performance.

**Employment and labor laws and regulations may increase the cost of labor for our restaurants.**

We are subject to various federal, state and local employment and labor laws and regulations that govern employment and labor matters, including, employment discrimination, minimum wages, work scheduling, overtime, tip credits, tax reporting, working conditions, safety standards, family leave and immigration status. Compliance with these laws and regulations can be costly, and a failure or perceived failure to comply with these laws could result in negative publicity or litigation. Many states and localities are contemplating increases to their minimum wage and tip credit wage, and such increases can have a significant impact on our labor costs. In addition, new employment or labor laws may mandate additional benefits for employees or impose additional obligations that may adversely impact the costs of labor, the availability of labor and our business operations. In addition, our suppliers may be affected by higher minimum wage standards or availability of labor, which may increase the price of goods and services they supply to us. There are no assurances that a combination of cost management and price increases can accommodate all of the costs associated with compliance.

**Governmental regulation may adversely affect our ability to maintain our existing and future operations and to open new restaurants.**

We are subject to extensive federal, state, local and international laws and regulations, which vary from jurisdiction to jurisdiction and which increase our exposure to litigation and governmental proceedings. Among other laws and regulations, we are subject to laws and regulations relating to nutritional content and menu labeling, including the Affordable Care Act, which requires restaurant companies such as ours to disclose calorie information on their menus by May 2018. Compliance with these laws and regulations may lead to increased costs and operational complexity, changes in sales mix and profitability, and increased exposure to governmental investigations or litigation. We cannot reliably anticipate any changes in guest behavior resulting from implementation of these laws.

Each of our company-owned and our franchisees' restaurants is also subject to licensing and regulation by alcoholic beverage control, health, sanitation, safety and fire agencies in the state, county and/or municipality where the restaurant is located. We generally have not encountered any material difficulties or failures in obtaining and maintaining the required licenses and approvals that could impact the continuing operations of an existing restaurant, or delay or prevent the opening of a new restaurant. Although we do not anticipate any material difficulties occurring in the future, we cannot be certain that we, or our franchisees, will not experience material difficulties or failures that could impact the continuing operations of an existing restaurant, or delay the opening of restaurants in the future.

We are also subject to federal and state environmental regulations, and although these have not had a material negative effect on our operations, we cannot ensure this will not occur in the future. In particular, the U.S. and other foreign governments have increased focus on environmental matters such as climate change, greenhouse gases and water conservation. This may lead to new initiatives directed at regulating an unspecified array of environmental matters. These efforts could result in increased taxation or in future restrictions on or increases in costs associated with food and other restaurant supplies, transportation costs and utility costs, any of which could decrease our operating profits and/or necessitate future investments in our restaurant facilities and equipment to achieve compliance. Further, more stringent and varied requirements of local and state governmental bodies with respect to zoning, land use and environmental factors could delay, prevent or make cost prohibitive the continuing operations of an existing restaurant or the development of new restaurants in particular locations.

We are subject to federal and state laws and regulations which govern the offer and sale of franchises and which may supersede the terms of franchise agreements between us and our franchisees. Failure to comply with such laws and regulations or to obtain or retain licenses or approvals to sell franchises could adversely affect us and our franchisees. Due to our international franchising, we are also subject to governmental regulations throughout the world impacting the way we do business with our international franchisees and joint venture partners. These include antitrust and tax requirements, anti-boycott regulations, import/export/customs and other international trade regulations, the USA Patriot Act and the Foreign Corrupt Practices Act. Failure to comply with any such legal requirements could subject us to monetary liabilities and other sanctions, which could adversely impact our business and financial performance.

The impact of current laws and regulations, the effect of future changes in laws or regulations that impose additional requirements and the consequences of litigation relating to current or future laws and regulations, or our inability to respond effectively to significant regulatory or public policy issues, could increase our compliance and other costs of doing business and therefore have an adverse effect on our results of operations. Failure to comply with the laws and regulatory requirements of federal, state and local authorities could result in, among other things, revocation of required licenses, administrative enforcement actions, fines and civil and criminal liability. Compliance with these laws and regulations can be costly and can increase our exposure to litigation or governmental investigations or proceedings.

**Shortages or interruptions in the availability and delivery of food and other products may increase costs or reduce revenues.**

Possible shortages or interruptions in the supply of food items and other products to our restaurants caused by inclement weather; natural disasters such as floods, drought and hurricanes; the inability of our suppliers to obtain credit in a tight credit market; food safety warnings or advisories or the prospect of such pronouncements; animal disease outbreaks; or other conditions beyond our control could adversely affect the availability, quality and cost of items we buy and the operations of our restaurants. Our inability to effectively manage supply-chain risk could increase our costs or reduce revenues and limit the availability of products critical to our restaurant operations.

**Successful strategic transactions are important to our future growth and profitability.**

We evaluate and may pursue opportunities for growth through new and existing franchise partners, joint venture investments, acquisition of restaurant concepts, expansion of our brands to other retail opportunities, and strategic mergers, acquisitions and divestitures. These strategic initiatives involve various inherent risks, including, without limitation:

- inaccurate assessment of the value, future growth potential, strengths, weaknesses, contingent and other liabilities and potential profitability of such strategic initiatives;

- damaging our reputation if the strategic initiatives result in products or services that are not of the same quality that our customers associate with our brands;

- diversion of management's attention and focus from existing operations to the strategic initiative;

- inability to achieve projected economic and operating synergies;

- challenges in successfully integrating an acquired business and instilling our company culture in new management and team members;

- potential loss of key personnel of any acquired business; and

- unanticipated changes in business and economic conditions affecting an acquired business or the completion of a divestiture.

**If we are unable to successfully design and execute a business strategy plan, our gross sales and profitability may be adversely affected.**

Our ability to increase gross sales and profitability is dependent on designing and executing effective business strategies. If we are delayed or unsuccessful in executing our strategies, or if our strategies do not yield the desired results, our business, financial condition and results of operations may suffer. Our ability to meet our business strategy plan is dependent upon, among other things, our and our franchisees' ability to:

- increase gross sales and operating profits at existing restaurants with food and beverage options desired by our guests;

- evolve our marketing and branding strategies in order to appeal to guests;

- innovate and implement technology initiatives that provide a unique digital guest experience;

- identify adequate sources of capital to fund and finance strategic initiatives, including reimaging of existing restaurants, new restaurant development and new restaurant equipment;

- grow and expand operations, including identifying available, suitable and economically viable locations for new restaurants; and

- improve the speed and quality of our service.

**Loss of key management personnel could hurt our business and limit our ability to operate and grow successfully.**

Our success depends, to a significant extent, on our leadership team and other key management personnel. These personnel serve to maintain a corporate vision for our Company, execute our business strategy, and maintain consistency in the operating standards of our restaurants. If we are unable to attract and retain sufficiently experienced and capable key management personnel, our business and financial results may suffer.

**Failure to recruit, train and retain high-quality restaurant management and team members may result in lower guest satisfaction and lower sales and profitability.**

Our restaurant-level management and team members are largely responsible for the quality of our service. Our guests may be dissatisfied and our sales may decline if we fail to recruit, train and retain managers and team members that effectively implement our business strategy and provide high quality guest service. There is active competition for quality management personnel and hourly team members. If we experience high turnover, we may experience higher labor costs and have a shortage of adequate management personnel required for future growth.

**Slow economic growth, a recession or changes in the retail industry could have a material adverse impact on our landlords or other tenants in retail centers in which we or our franchisees are located, which in turn could negatively affect our financial results.**

During slow economic growth or a recession, our landlords may be unable to obtain financing or remain in good standing under their existing financing arrangements, resulting in failures to pay required construction contributions or satisfy other lease covenants to us. In addition, other tenants at retail centers in which we or our franchisees are located or have executed leases may fail to open or may cease operations as a result of macro-economic factors or challenges specific to the retail industry, including competition from online retailers. If our landlords fail to satisfy required co-tenancies, this may result in us or our franchisees terminating leases or delaying openings in these locations. Also, decreases in total tenant occupancy in retail centers in which we are located may affect guest traffic at our restaurants. All of these factors could have a material adverse impact on our financial results.

**The success of our franchisees is important to our future growth.**

We have a significant percentage of system-wide restaurants owned and operated by our franchisees. While our franchise agreements are designed to require our franchisees to maintain brand consistency, the franchise relationship reduces our direct day-to-day oversight of these restaurants and may expose us to risks not otherwise encountered if we maintained ownership and control. These risks include: franchisee defaults in their obligations to us, such as payments to us or maintenance and improvements obligations; limitations on enforcement of franchise obligations due to bankruptcy or insolvency proceedings; franchisees' inability to participate in business strategy changes due to financial constraints; franchisees' inability to meet rent obligations on leases on which we retain contingent liability; and franchisees' failure to comply with food quality and preparation requirements.

Additionally, our international franchisees and joint venture partners are subject to risks not encountered by our domestic franchisees. These risks include:

- difficulties in achieving consistency of product quality and service as compared to U.S. operations;

- changes to recipes and menu offerings to meet cultural norms;

- challenges to obtain adequate and reliable supplies necessary to provide menu items and maintain food quality; and

- differences, changes or uncertainties in economic, regulatory, legal, cultural, social and political conditions.

**Downgrades in our credit ratings could impact our ability to access capital and materially adversely affect our business, financial condition and results of operations.**

Credit rating agencies continually review their ratings for the companies that they follow, including us. Credit rating agencies also evaluate the industries in which we and our affiliates operate as a whole and may change their credit rating for us based on their overall view of such industries. There can be no assurance that any rating assigned to our currently outstanding public debt securities will remain in effect for any given period of time or that any such ratings will not be further lowered, suspended or withdrawn entirely by a rating agency if, in that agency's judgment, circumstances so warrant.

A downgrade of our credit ratings could, among other things:

- limit our ability to access capital or otherwise adversely affect the availability of other new financing on favorable terms, if at all;

- result in more restrictive covenants in agreements governing the terms of any future indebtedness that we may incur;

- cause us to refinance indebtedness with less favorable terms and conditions, which debt may require collateral and restrict, among other things, our ability to pay distributions or repurchase shares;

- increase our cost of borrowing;

- adversely affect the market price of our outstanding debt securities; and

- impair our business, financial condition and results of operations.

**Inflation and fluctuations in energy costs may increase our operating expenses.**

We have experienced impact from inflation and fluctuations in utility and energy costs. Inflation has caused added food, labor and benefits costs and increased our operating expenses. Fluctuations and increases in utility and energy costs have also increased our operating expenses on regional or national levels, including through suppliers putting pressure on margins by passing on higher prices for petroleum-based fuels. As operating expenses rise, we, to the extent permitted by competition, recover costs by raising menu prices, or by implementing alternative products, processes or cost reduction procedures. We cannot ensure, however, we will be able to continue to recover increases in operating expenses due to inflation in this manner.

**Our sales volumes generally decrease in winter months in North America.**

Our sales volumes fluctuate seasonally and are generally higher in the summer months and lower in the winter months, which may cause seasonal fluctuations in our operating results.

**Our inability or failure to recognize, respond to and effectively manage the accelerated impact of social media could materially adversely impact our business.**

There has been a marked increase in the use of social media and similar platforms which allow individuals access to a broad audience of consumers and other interested persons. Many social media platforms immediately publish the content their subscribers and participants post, often without filters or checks on accuracy of the content posted. Information posted on such platforms at any time may be adverse to our interests and may harm our performance, prospects or business, regardless of the information's accuracy.

As part of our marketing strategy, we rely on search engine marketing, social media and new technology platforms to attract and retain guests and maintain brand relevance. Our strategy and initiatives may not be successful, resulting in expenses incurred without improvement in guest traffic or brand relevance. In addition, a variety of risks are associated with the use of social media, including the improper disclosure of proprietary information, negative comments about us, exposure of personally identifiable information, fraud, or out-of-date information. The inappropriate use of social media vehicles by our guests or employees could increase our costs, lead to litigation or result in negative publicity that could damage our reputation.

**Litigation could have a material adverse impact on our business and our financial performance.**

We are subject to lawsuits, administrative proceedings and claims that arise in the regular course of business. These matters typically involve claims by guests, team members and others regarding issues such as food-borne illness, food safety, premises liability, compliance with wage and hour requirements, work-related injuries, discrimination, harassment, disability and other operational issues common to the foodservice industry, as well as contract disputes and intellectual property infringement matters. Our franchise activity also creates a risk of us being named as a joint employer of workers of franchisees for alleged violations of labor and wage laws. We could be adversely affected by negative publicity and litigation costs resulting from these claims, regardless of their validity. Significant legal fees and costs in complex class action litigation or

11

an adverse judgment or settlement that is not insured or is in excess of insurance coverage could have a material adverse effect on our financial position and results of operations.

**We are dependent on information technology, and any material failure in the operation or security of that technology or our ability to execute a comprehensive business continuity plan could impair our ability to efficiently operate our business.**

We rely on information systems across our operations, including, for example, point-of-sale processing in our restaurants, management of our supply chain, collection of cash, payment of obligations and various other processes and procedures. Our ability to efficiently manage our business depends significantly on the reliability and capacity of these systems. The failure of these systems to operate effectively, problems with maintenance, upgrading or transitioning to replacement systems, or a breach in security of these systems could cause delays in customer service and reduce efficiency in our operations. A security breach or cyber attack could include theft of credit card data or other personal information as well as our intellectual property. Significant capital investments might be required to remediate any problems.

Additionally, our corporate systems and processes and corporate support for our restaurant operations are handled primarily at our restaurant support center. We have disaster recovery procedures and business continuity plans in place to address most events of a crisis nature, including tornadoes and other natural disasters, and back up and off-site locations for recovery of electronic and other forms of data and information. However, if we are unable to fully implement our disaster recovery plans, we may experience delays in recovery of data, inability to perform vital corporate functions, tardiness in required reporting and compliance, failures to adequately support field operations and other breakdowns in normal communication and operating procedures that could have a material adverse effect on our financial condition, results of operation and exposure to administrative and other legal claims.

**Failure to protect the integrity and security of individually identifiable data of our guests and teammates and confidential and proprietary information of the company could damage our reputation and expose us to loss of revenues and litigation.**

We receive and maintain certain personal information about our guests and team members in our information technology systems, such as point-of-sale, web and mobile platforms, including our rewards program. Use of this information is regulated at the federal and state levels, as well as by certain third party contracts. Additionally, our systems contain proprietary and confidential information related to our business. If our or our business associates' information systems are compromised as a result of a cyber attack or other external or internal method, or we fail to comply with applicable laws and regulations, it could result in a violation of the laws and regulations, and an adverse and material impact on our reputation, operations, results of operations and financial condition. Such security breaches could also result in litigation or governmental investigation against us or the imposition of penalties. These impacts could also occur if we are perceived either to have had an attack or to have failed to properly respond to an incident. Like many other retail companies, we experience frequent attempts to compromise our systems but none have resulted in a material breach. As privacy and information security laws and regulations change or cyber risks evolve pertaining to data, we may incur additional costs in technology, third-party services and personnel to remain in compliance and maintain systems designed to anticipate and prevent cyber attacks. Our security frameworks prevent breaches of our systems and data loss, but these measures cannot provide assurance that we will be successful in preventing such breaches or data loss.

**Failure to protect our service marks or other intellectual property could harm our business.**

We regard our Chili's® and Maggiano's® service marks, and other service marks and trademarks related to our restaurant businesses, as having significant value and being important to our marketing efforts. We rely on a combination of protections provided by contracts, copyrights, patents, trademarks, service marks and other common law rights, such as trade secret and unfair competition laws, to protect our restaurants and services from infringement. We have registered certain trademarks and service marks in the United States and foreign jurisdictions. However, we are aware of names and marks identical or similar to our service marks being used from time to time by other persons. Although our policy is to oppose any such infringement, further or unknown unauthorized uses or other misappropriation of our trademarks or service marks could diminish the value of our brands and adversely affect our business. In addition, effective intellectual property protection may not be available in every country in which we have or intend to open or franchise a restaurant. Although we believe we have taken appropriate measures to protect our intellectual property, there can be no assurance that these protections will be adequate, and defending or enforcing our service marks and other intellectual property could result in the expenditure of significant resources.

**We outsource certain business processes to third-party vendors that subject us to risks, including disruptions in business and increased costs.**

Some business processes are currently outsourced to third parties. Such processes include certain information technology processes, gift card tracking and authorization, credit card authorization and processing, insurance claims processing, certain payroll processing, tax filings and other accounting processes. We also continue to evaluate our other business processes to determine if additional outsourcing is a viable option to accomplish our goals. We make a diligent effort to ensure that all providers of outsourced services are observing proper internal control practices, such as redundant processing facilities and adequate security frameworks to guard against breaches or data loss; however, there are no guarantees that failures will not occur. Failure of third parties to provide adequate services could have an adverse effect on our results of operations, financial condition or ability to accomplish our financial and management reporting.

**Disruptions in the global financial markets may affect our business plan by adversely impacting the availability and cost of credit.**

We are dependent on a stable, liquid, and well-functioning financial system to fund our operations and capital investments. In particular, we have historically relied on the public debt markets and bank credit facilities to fund portions of our capital investments and share repurchase program. Our continued access to these markets depends on multiple factors, including the condition of debt capital markets. Disruptions to the global financial markets may adversely impact the availability and cost of credit. There can be no assurance that various U.S. and world government responses to disruptions in the financial markets will stabilize the markets or increase liquidity or the availability of credit.

**The large number of Company-owned restaurants concentrated in Texas, Florida and California makes us susceptible to changes in economic and other trends in those regions.**

A high concentration of our company-owned restaurants are located in Texas, Florida and California. As a result, we are particularly susceptible to adverse trends and economic conditions in those states. For example, declining oil prices has caused increased levels of unemployment and other economic pressures that have resulted in lower sales and profits at our restaurants in some oil market regions of Texas and surrounding areas. Negative publicity, local strikes, energy shortages or extreme fluctuations in energy prices, droughts, earthquakes, fires or other natural disasters in regions where our restaurants are highly concentrated could have a material adverse effect on our business and operations.

**Declines in the market price of our common stock or changes in other circumstances that may indicate an impairment of goodwill could adversely affect our financial position and results of operations.**

We perform our annual goodwill impairment tests in the second quarter of each fiscal year. Interim goodwill impairment tests are also required when events or circumstances change between annual tests that would more likely than not reduce the fair value of our reporting units below their carrying value. It is possible that a change in circumstances such as the decline in the market price of our common stock or changes in consumer spending levels, or in the numerous variables associated with the judgments, assumptions and estimates made in assessing the appropriate valuation of our goodwill, could negatively impact the valuation of our brands and create the potential for a non-cash charge to recognize impairment losses on some or all of our goodwill. If we were required to write down a portion of our goodwill and record related non-cash impairment charges, our financial position and results of operations would be adversely affected.

**Changes to estimates related to our property and equipment, or operating results that are lower than our current estimates at certain restaurant locations, may cause us to incur impairment charges on certain long-lived assets.**

We make certain estimates and projections with respect to individual restaurant operations, as well as our overall performance in connection with our impairment analyses for long-lived assets. An impairment charge is required when the carrying value of the asset exceeds the estimated fair value. The projection of future cash flows used in this analysis requires the use of judgment and a number of estimates and projections of future operating results. If actual results differ from our estimates, additional charges for asset impairments may be required in the future. If impairment charges are significant, our financial position and results of operations could be adversely affected.

**Failure to achieve and maintain effective internal controls in accordance with Section 404 of the Sarbanes-Oxley Act could have a material adverse effect on our business and operating results.**

We are subject to the ongoing internal control provisions of Section 404 of the Sarbanes-Oxley Act of 2002, which requires management and auditors to assess the effectiveness of internal controls. As further described in Item 9A of this Form 10-K, management has concluded that, because of a material weakness in internal control over financial reporting related to accounting for deferred income taxes, our disclosure controls and procedures were not effective as of June 28, 2017. If we fail to correct this material weakness in our internal controls, or having corrected such material weakness, thereafter fail to maintain the adequacy of our internal controls, we could be subjected to regulatory scrutiny, penalties or shareholder litigation. In addition, continued or future failure to maintain adequate internal controls could result in consolidated financial statements that do not accurately reflect our financial condition, cause investors to lose confidence in our reported financial information and have a negative effect on the trading price of our common stock. The process of designing and implementing effective internal controls is a continuous effort that requires us to anticipate and react to changes in our business and the economic and regulatory environments and to expend significant resources to maintain a system of internal controls that is adequate to satisfy our reporting obligations as a public company. We cannot assure you that the measures we will take will remediate any material weaknesses identified or that we may identify in the future, or that we will implement and maintain adequate controls over our financial process and reporting in the future.

Pursuant to Section 404 of the Sarbanes-Oxley Act and current SEC regulations, we are required to prepare assessments regarding internal control over financial reporting and furnish a report by our management on our internal control over financial reporting. Failure to achieve and maintain an effective internal control environment or complete our Section 404 certifications could have a material adverse effect on our stock price.

Any failure to complete our assessment of our internal control over financial reporting, to remediate any material weaknesses or to implement new or improved controls could harm our operating results, cause us to fail to meet our reporting obligations or result in material misstatements in our consolidated financial statements. Any such failure could also adversely affect the results of the periodic management evaluations of our internal controls and, in the case of a failure to remediate any material weaknesses that we may identify, would adversely affect the annual auditor attestation reports regarding the effectiveness of our internal control over financial reporting that are required under Section 404 of the Sarbanes-Oxley Act. Inadequate internal controls could also cause investors to lose confidence in our reported financial information, which could have a negative effect on the trading price of our common stock.

**We may not be able to achieve our target for growth in total return to shareholders.**

We define our total returns as earnings per share growth plus our dividend yield. Comparable restaurant sales that are below our target, slowing growth of our concepts domestically, a decline in growth of our international business, any event that substantially increases our operating costs or any event that decreases our cash flow and ability to repurchase our stock or pay dividends as expected could, negatively affect our stock price, result in lower than targeted earnings per share growth and reduce total returns to shareholders.

**Our business and operation could be negatively affected if we become subject to any securities litigation or shareholder activism, which could cause us to incur significant expense, hinder execution of investment strategy and impact our stock price.**

In the past, following periods of volatility in the market price of a company's securities, securities class action litigation has often been brought against that company. Shareholder activism, which could take many forms or arise in a variety of situations, has been increasing in publicly traded companies recently. While we are currently not subject to any securities litigation or shareholder activism, due to the potential volatility of our stock price and for a variety of other reasons, we may in the future become the target of securities litigation or shareholder activism. Securities litigation and shareholder activism, including potential proxy contests, could result in substantial costs and divert management's and our board of directors' attention and resources from our business. Additionally, such securities litigation and shareholder activism could give rise to perceived uncertainties as to our future, adversely affect our relationships with service providers and make it more difficult to attract and retain qualified personnel. Also, we may be required to incur significant legal fees and other expenses related to any securities litigation and activist shareholder matters. Further, our stock price could be subject to significant fluctuation or otherwise be adversely affected by the events, risks and uncertainties of any securities litigation and shareholder activism.

From time to time we may implement measures that make it more difficult for an activist investor or potential acquirer to purchase a large portion of our securities, to initiate a tender offer or a proxy contest, or to acquire the Company through a merger or similar transaction. These measures may discourage investment in our common stock and may delay or discourage acquisitions that would result in our stockholders receiving a premium for their shares over the then-current market price.

**Other risk factors may adversely affect our financial performance.**

Other risk factors that could cause our actual results to differ materially from those indicated in the forward-looking statements, include, without limitation, changes in financial and credit markets (including rising interest rates); increased fuel costs and availability for our team members, customers and suppliers; increased health care costs; health epidemics or pandemics or the prospects of these events; changes in consumer behaviors; changes in demographic trends; labor shortages and availability of employees; union organization; strikes; terrorist acts; energy shortages and rolling blackouts; and weather (including, major hurricanes and regional winter storms); inadequate insurance coverage; and limitations imposed by our credit agreements.

**Item 1B.**        **UNRESOLVED STAFF COMMENTS.**

None.

**Item 2.**        **PROPERTIES.**

*Restaurant Locations*

As of June 28, 2017, our system of company-owned and franchised restaurants included 1,674 restaurants located in 49 states and Washington, D.C. We also have restaurants in the U.S. territories of Guam and Puerto Rico and the countries of Bahrain, Canada, Colombia, Costa Rica, Dominican Republic, Ecuador, Egypt, El Salvador, Germany, Guatemala, Honduras, India, Indonesia, Japan, Jordan, Kuwait, Lebanon, Malaysia, Mexico, Morocco, Oman, Peru, Philippines, Qatar, Saudi Arabia, Singapore, South Korea, Taiwan, Tunisia and United Arab Emirates. We have provided you a breakdown of our portfolio of restaurants in the two tables below:

Table 1: Company-owned vs. franchise (by brand) as of June 28, 2017:

| | |
|---|---:|
| Chili's | |
| Company-owned (domestic) | 937 |
| Company-owned (international) | 14 |
| Franchise | 671 |
| Maggiano's | |
| Company-owned | 52 |
| Total | 1,674 |

Table 2: Domestic vs. foreign locations (by brand) as of June 28, 2017 (company-owned and franchised):

| | Domestic (No. of States) | Foreign (No. of countries and U.S. territories) |
|---|---:|---:|
| Chili's | 1,252(49) | 370(32) |
| Maggiano's | 52(22 & D.C.) | — |

### *Restaurant Property Information*

The following table illustrates the approximate dining capacity for a prototypical restaurant of each of our brands:

| | Chili's | Maggiano's |
|---|---:|---:|
| Square Feet | 4,500-6,000 | 8,500 - 24,000 |
| Dining Seats | 150-252 | 240-700 |
| Dining Tables | 35-54 | 35-150 |

As of June 28, 2017, we owned the land and building for 190 of our 1,003 company-owned restaurant locations (domestic and international). For these 190 restaurant locations, the net book value for the land was $143 million and for the buildings was $97 million. For the remaining 813 restaurant locations leased by us, the net book value of the buildings and leasehold improvements was $536 million. The 813 leased restaurant locations can be categorized as follows: 666 are ground leases (where we lease land only, but own the building) and 147 are retail leases (where we lease the land/retail space and building). We believe that our properties are suitable, adequate, well-maintained and sufficient for the operations contemplated. Our leased restaurants are leased for an initial lease term which is typically ten to twenty years, with one or more renewal terms typically ranging from one to 10 years. The leases typically provide for a fixed rental or a fixed rental plus percentage rentals based on sales volume.

### *Other Properties*

We own an office building containing approximately 108,000 square feet which we use for part of our corporate headquarters and menu development activities. We lease an additional office complex containing approximately 198,000 square feet for the remainder of our corporate headquarters. We entered into a lease for a new corporate headquarters office building to consist of approximately 216,300 square feet. Construction of our new corporate headquarters will not be complete until fiscal year 2019.

**Item 3.       LEGAL PROCEEDINGS.**

Evaluating contingencies related to litigation is a complex process involving subjective judgment on the potential outcome of future events and the ultimate resolution of litigated claims may differ from our current analysis.  Accordingly, we review the adequacy of accruals and disclosures pertaining to litigated matters each quarter in consultation with legal counsel and we assess the probability and range of possible losses associated with contingencies for potential accrual in the consolidated financial statements.

We are engaged in various legal proceedings and have certain unresolved claims pending. Reserves have been established based on our best estimates of our probable liability in certain of these matters. We are of the opinion that there are no matters pending or threatened which are likely to have a material adverse effect, individually or in the aggregate, on our consolidated financial condition or results of operations.

Item 4.        MINE SAFETY DISCLOSURES.

Not applicable.

PART II

Item 5.        MARKET FOR REGISTRANT'S COMMON EQUITY, RELATED STOCKHOLDER MATTERS AND ISSUER PURCHASES OF EQUITY SECURITIES.

Our common stock is traded on the New York Stock Exchange ("NYSE") under the symbol "EAT". Bid prices quoted represent inter-dealer prices without adjustment for retail markup, markdown and/or commissions, and may not necessarily represent actual transactions. The following table sets forth the quarterly high and low closing sales prices of the common stock, as reported by the NYSE.

Fiscal year ended June 28, 2017:

|  | High | | Low | |
|---|---|---|---|---|
| First Quarter | $ | 54.74 | $ | 45.03 |
| Second Quarter | $ | 55.19 | $ | 47.64 |
| Third Quarter | $ | 50.03 | $ | 41.14 |
| Fourth Quarter | $ | 45.46 | $ | 36.93 |

Fiscal year ended June 29, 2016:

|  | High | | Low | |
|---|---|---|---|---|
| First Quarter | $ | 59.90 | $ | 52.50 |
| Second Quarter | $ | 52.67 | $ | 43.42 |
| Third Quarter | $ | 51.12 | $ | 45.68 |
| Fourth Quarter | $ | 47.68 | $ | 43.83 |

As of August 14, 2017, there were 479 holders of record of our common stock.

During the fiscal year ended June 28, 2017, we continued to declare quarterly cash dividends for our shareholders. We have set forth the dividends declared for the fiscal year in the following table on the specified dates:

| Dividend Per Share of Common Stock | Declaration Date | Record Date | Payment Date |
|---|---|---|---|
| $0.34 | August 18, 2016 | September 9, 2016 | September 29, 2016 |
| $0.34 | November 15, 2016 | December 9, 2016 | December 29, 2016 |
| $0.34 | February 9, 2017 | March 10, 2017 | March 30, 2017 |
| $0.34 | May 25, 2017 | June 12, 2017 | June 29, 2017 |

The graph below matches Brinker International, Inc.'s cumulative 5-Year total shareholder return on common stock with the cumulative total returns of the S&P 500 index and the S&P Restaurants index.



**COMPARISON OF 5 YEAR CUMULATIVE TOTAL RETURN***
Among Brinker International, Inc., the S&P 500 Index
and the S&P Restaurants Index

—□— Brinker International, Inc.      ⋯△⋯ S&P 500      —○— S&P Restaurants

*$100 invested on 6/27/12 in stock or index, including reinvestment of dividends.
Indexes calculated on month-end basis.

Copyright© 2017 Standard & Poor's, a division of S&P Global. All rights reserved.

The graph assumes a $100 initial investment and the reinvestment of dividends in our stock and each of the indexes on June 27, 2012 and its relative performance is tracked through June 28, 2017. The values shown are neither indicative nor determinative of future performance.

| | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 |
|---|---|---|---|---|---|---|
| Brinker International | $ 100.00 | $ 129.67 | $ 174.36 | $ 201.23 | $ 165.78 | $ 140.99 |
| S&P 500 | $ 100.00 | $ 120.60 | $ 150.27 | $ 161.43 | $ 167.87 | $ 197.92 |
| S&P Restaurants(1) | $ 100.00 | $ 114.93 | $ 131.02 | $ 149.24 | $ 165.00 | $ 198.83 |

(1)      The S&P Restaurants Index is comprised of Chipotle Mexican Grill, Inc., Darden Restaurants, Inc., McDonald's Corp., Starbucks Corporation and Yum! Brands, Inc.

In May 2013, the Company issued $250.0 million in the aggregate principal amount at maturity of 2.600% Notes due 2018 (the "2018 Notes") and $300.0 million in the aggregate principal amount at maturity of 3.875% Notes due 2023 (the "2023 Notes", and together with the 2018 Notes, the "Notes"). J.P. Morgan Securities LLC and Merrill Lynch, Pierce, Fenner & Smith Incorporated served as the joint book-running managers for the offering. The Notes were issued in a public offering pursuant to a registration statement on Form S-3, File No. 333-188252, and are freely tradeable. The Notes are redeemable at the Company's option at any time, in whole or in part. The proceeds of the offering were used for general corporate purposes, including the redemption of the 5.75% notes due June 2014, pay down of the revolver and the repurchase of the Company's common stock pursuant to its share repurchase program.

On September 23, 2016, we completed the private offering of $350 million of our 5.0% Senior Notes due October 2024 (the "2024 Notes"). J.P. Morgan Securities LLC, Merrill Lynch, Pierce, Fenner & Smith Incorporated and Wells Fargo Securities, LLC served as joint book-running managers for the offering. The 2024 Notes were sold only to qualified institutional buyers in compliance with Rule 144A of the Securities Act of 1933, as amended (the "Securities Act"), and to non-U.S. persons outside of the United States in compliance with Regulation S of the Securities Act.  We received proceeds of $350.0 million prior to debt issuance costs of $6.2 million and utilized the proceeds to fund a $300 million accelerated share repurchase agreement and to repay $50.0 million on the amended $1 billion revolving credit facility.

During the three-year period ended on August 15, 2017, other than the 2024 Notes, we issued no securities which were not registered under the Securities Act, as amended.

We continue to maintain our share repurchase program; on August 10, 2017, our Board of Directors authorized an additional $250 million in share repurchases, bringing the total authorization to $4.6 billion. During the fourth quarter, we repurchased shares as follows (in thousands, except share and per share amounts):

| | Total Number of Shares Purchased(a) | | Average Price Paid per Share | | Total Number of Shares Purchased as Part of Publicly Announced Program | | Approximate Dollar Value that May Yet be Purchased Under the Program(b) |
|---|---|---|---|---|---|---|---|
| March 30, 2017 through May 3, 2017 | 2,089 | $ | 43.90 | | — | $ | 135,800 |
| May 4, 2017 through May 31, 2017 | — | $ | — | | — | $ | 135,800 |
| June 1, 2017 through June 28, 2017 | 530,169 | $ | 37.74 | | 529,648 | $ | 115,804 |
| Total | 532,258 | $ | 37.76 | | 529,648 | | |

(a)   These amounts include shares purchased as part of our publicly announced programs and shares owned and tendered by team members to satisfy tax withholding obligations on the vesting of restricted share awards, which are not deducted from shares available to be purchased under publicly announced programs. Unless otherwise indicated, shares owned and tendered by team members to satisfy tax withholding obligations were purchased at the average of the high and low prices of the Company's shares on the date of vesting. During the fourth quarter of fiscal year 2017, 2,610 shares were tendered by team members at an average price of $43.50.

(b)   The final amount shown is as of June 28, 2017.

## Item 6.       SELECTED FINANCIAL DATA.

The information set forth in that section entitled "Selected Financial Data" in our 2017 Annual Report to Shareholders is presented on page F-1 of Exhibit 13 to this document. We incorporate that information in this document by reference.

## Item 7.       MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS.

The information set forth in that section entitled "Management's Discussion and Analysis of Financial Condition and Results of Operations" in our 2017 Annual Report to Shareholders is presented on pages F-2 through F-14 of Exhibit 13 to this document. We incorporate that information in this document by reference.

## Item 7A.      QUANTITATIVE AND QUALITATIVE DISCLOSURES ABOUT MARKET RISK.

The information set forth in that section entitled "Quantitative and Qualitative Disclosures About Market Risk" contained within "Management's Discussion and Analysis of Financial Condition and Results of Operations" is in our 2017 Annual Report to Shareholders presented on page F-14 of Exhibit 13 to this document. We incorporate that information in this document by reference.

## Item 8.       FINANCIAL STATEMENTS AND SUPPLEMENTARY DATA.

We refer you to the Index to Financial Statements attached hereto on page 25 for a listing of all financial statements in our 2017 Annual Report to Shareholders. This report is attached as part of Exhibit 13 to this document. We incorporate those financial statements in this document by reference.

## Item 9.       CHANGES IN AND DISAGREEMENTS WITH ACCOUNTANTS ON ACCOUNTING AND FINANCIAL DISCLOSURE.

None.

**Item 9A.        CONTROLS AND PROCEDURES.**

*Evaluation of Disclosure Controls and Procedures*

We maintain disclosure controls and procedures (as that term is defined in Rules 13a-15(e) and 15d-15(e) under the Securities Exchange Act of 1934, as amended (the "Exchange Act")) that are designed to provide reasonable assurance that information required to be disclosed in our reports under the Exchange Act is recorded, processed, summarized and reported within the time periods specified in the Securities and Exchange Commission's rules and forms, and that such information is accumulated and communicated to our management, including our principal executive officer and principal financial officer and, as appropriate, to allow timely decisions regarding required disclosures.

In connection with the preparation of this Form 10-K, we carried out an evaluation under the supervision of and with the participation of management, including the principal executive officer and principal financial officer, as of June 28, 2017, of the effectiveness of the design and operation of our disclosure controls and procedures. Based upon this evaluation, the principal executive officer and principal financial officer concluded that as of June 28, 2017, our disclosure controls and procedures were not effective because of the material weakness in the internal control described below.

In connection with the preparation of the consolidated financial statements for the year ended June 28, 2017, we identified and assessed a material weakness relating to the accuracy of the deferred income tax liability, primarily related to property and equipment, as a result of immaterial errors in prior years. We are developing a remediation plan and are in the process of designing and implementing new internal controls in an effort to remediate the material weakness described below. Given the fact that these new internal controls have not been fully implemented we concluded that the material weakness was not remediated as of June 28, 2017.

In light of the material weakness in internal control over financial reporting, we engaged significant internal and external resources to perform supplemental procedures prior to filing this Annual Report on Form 10-K. These additional procedures allow us to conclude that, notwithstanding the material weakness in our internal control over financial reporting, the consolidated financial statements included in this report fairly present, in all material respects, our financial position, results of operations and cash flows for the periods presented in conformity with accounting principles generally accepted in the United States of America.

No system of controls, no matter how well designed and operated, can provide absolute assurance that the objectives of the system of controls will be met, and no evaluation of controls can provide absolute assurance that all control deficiencies or material weaknesses have been or will be detected. As described above in Item 1A: Risk Factors, - Failure to achieve and maintain effective internal controls in accordance with Section 404 of the Sarbanes-Oxley Act could have a material adverse effect on our business and operating results, if the Company's remediation efforts do not prove effective and control deficiencies and material weaknesses persist or occur in the future, the accuracy and timing of our financial reporting may be adversely affected.

*Management's Annual Report on Internal Control over Financial Reporting*

Management of the Company is responsible for establishing and maintaining adequate internal control over financial reporting as defined in Rules 13a-15(f) and 15d-15(f) under the Exchange Act. The Company's internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of consolidated financial statements for external purposes in accordance with accounting principles generally accepted in the United States of America and includes those policies and procedures that:

(1)    pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the Company;

(2)    provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the Company are being made only in accordance with authorizations of management and directors of the Company; and

(3)    provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use, or disposition of the Company's assets that could have a material effect on the financial statements.

Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. In addition, projections of any evaluation of effectiveness to future periods are subject to the risks that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

Management, including the principal executive officer and principal financial officer, has conducted an assessment, including testing, of the effectiveness of the Company's internal control over financial reporting as of June 28, 2017, based on the criteria set forth by the Committee of Sponsoring Organizations of the Treadway Commission in Internal Control - An Integrated Framework (2013). Based on this evaluation, management has identified a material weakness in our internal controls over the measurement and presentation of deferred income taxes. Specifically, the Company did not have effective controls over the completeness and accuracy of temporary taxable and deductible differences between the book carrying amount and the tax basis of the underlying assets and liabilities at interim and annual reporting dates and including

when the tax returns were filed. These process level control deficiencies resulted from a lack of skilled resources in the tax department with sufficient understanding of internal control over financial reporting.

A material weakness is a deficiency, or a combination of deficiencies, in internal control over financial reporting such that there is a reasonable possibility that a material misstatement of the annual or interim financial statements will not be prevented or detected on a timely basis.

The control deficiencies described above resulted in immaterial misstatements of the Company's provision for income taxes as well as the deferred tax liability, primarily related to property and equipment, and income taxes payable in our consolidated financial statements as at and for the year ended June 29, 2016 which was corrected in our consolidated financial statements for the year ended June 28, 2017 as further described in Note 16 to the notes to the consolidated financial statements. Moreover, these control deficiencies create a reasonable possibility that a material misstatement to our consolidated financial statements will not be prevented or detected on a timely basis. As a result, we concluded that the deficiencies represent a material weakness in our internal control over financial reporting and that our internal control over financial reporting is not effective as of June 28, 2017.

Our independent registered public accounting firm, KPMG LLP, has expressed an adverse report on the operating effectiveness of our internal control over financial reporting. KPMG LLP's report appears on page F-42 of this Form 10-K.

## Remediation

We are committed to remediating the material weakness in a timely manner. In June 2017, we hired a Senior Tax Director with significant expertise in accounting for all facets of income taxes and related internal control processes who will be responsible for the hiring and training of additional tax department personnel. In addition, we have begun to implement and monitor the following actions to accumulate adequate evidence over a reasonable period of time to determine that new or modified processes, procedures, controls and oversight relating to such controls are operating effectively:

- Engaging external tax advisors to assist with the design and implementation of a remediation plan that will enhance internal control over financial reporting for income taxes;

- Designing and implementing process and system improvements in our tax department that will simplify and improve manual reconciliation controls and enhance our ability to effectively train tax department personnel;

- Ensuring that tax department personnel effectively collaborate with financial reporting and other key departments to gain a detailed understanding of the information, analysis, and documentation necessary for the accurate presentation of deferred income taxes.

### Changes in Internal Control over Financial Reporting

Except for the Company's identification, assessment and development of a remediation plan of the material weakness described above, there were no changes in our internal control over financial reporting during our fourth fiscal quarter of 2017 that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

## Item 9B.        OTHER INFORMATION.

### Appointment of Senior Vice President and Chief Financial Officer

The Company appointed Joe Taylor as Senior Vice President and Chief Financial Officer of the Company, effective as of August 22, 2017. Mr. Taylor, 58, most recently served as the Company's Interim Chief Financial Officer from April 2017 to present, and as the Company's Vice President of Investor Relations and Treasurer from June 2016 until present. He served in various positions of increasing responsibility at the Company from 1999 until 2016, including Vice President of Investor Relations from August 2015 to June 2016, Vice President of Corporate Affairs from July 2003 to August 2015, and Vice President of Finance and Treasurer from December 1999 to July 2003.

As a result of his promotion and to reflect his increased level of responsibility, Mr. Taylor's base salary will be increased to $425,000, and he received a one-time cash award of $25,000.  Under the Company's F18 Profit Sharing Plan, Mr. Taylor will also be eligible to receive a cash bonus in the amount of 60% of his base salary upon the Company's achievement of performance goals at the target level.  In addition, Mr. Taylor will receive an annual equity grant valued at $450,000, comprised of a combination of stock options, time vested restricted stock units and performance shares. Mr. Taylor will also be party to a Change in Control Severance Agreement with the Company in the form previously filed with the Securities and Exchange Commission as an exhibit to the Company's Form 10-Q filed on March 29, 2017, and incorporated herein by reference.

*Performance Share Plan*

On August 22, 2017, the Compensation Committee of the Board of Directors of the Company (the "Committee") approved the Brinker International, Inc. F2018 Performance Share Plan (the "2018 Plan"). The 2018 Plan is adopted pursuant to the Committee's authority under the Brinker International, Inc. Stock Option and Incentive Plan (the "SOIP"), as most recently amended and re-approved by the shareholders of the Company on November 7, 2013, to provide greater incentive to officers and key employees of the Company and its affiliates to achieve the highest level of individual performance and to encourage such officers or key employees to meet or exceed specified performance goals in order to contribute to the overall success of the Company. The Plan is in all respects subject to the provisions of the SOIP. Under the Plan, officers and key employees of the Company may be granted the right to receive shares of the Company's common stock upon satisfaction of performance metrics and/or other requirements established by the Committee.

The above summary of the 2018 Plan does not purport to be complete and is qualified in its entirety by reference to the 2018 Plan, which is attached as Exhibit 10(j) to this Form 10-K.

*2018 Stock Option Award*

On August 22, 2017, the Committee approved the Brinker International, Inc. Terms of F2018 Stock Option Award (the "2018 Option Award"). The 2018 Option Award is adopted pursuant to the Committee's authority under the SOIP and is in all respects subject to the provisions of the SOIP. Pursuant to the 2018 Option Award, officers and key employees of the Company may be granted the option to purchase shares of the Company's common stock at amounts set forth in award letters, which represents the closing price per share of the Company's common stock on the trading day coinciding with the grant date. One-fourth of the options will vest on August 31st of each of 2018, 2019, 2020 and 2021, and will expire on August 31, 2025.

The above summary of the 2018 Option Award does not purport to be complete and is qualified in its entirety by reference to the 2018 Option Award, which is attached as Exhibit 10(k) to this Form 10-K.

*2018 Retention Stock Unit Award*

On August 22, 2017, the Committee approved the Brinker International, Inc. Terms of F2018 Retention Stock Unit Award (the "2018 Retention Stock Award"). The 2018 Retention Stock Award is adopted pursuant to the Committee's authority under the SOIP and is in all respects subject to the provisions of the SOIP. Pursuant to the 2018 Retention Stock Award, officers and key employees of the Company may be awarded shares of the Company's common stock, which become fully vested on the third anniversary of the award date, subject to satisfaction of all applicable terms and conditions and subject to certain provisions for early vesting.

The above summary of the 2018 Retention Stock Award does not purport to be complete and is qualified in its entirety by reference to the 2018 Retention Stock Award, which is attached as Exhibit 10(l) to this Form 10-K.

*2018 Restricted Stock Unit Award*

On August 22, 2017, the Committee approved the Brinker International, Inc. Terms of F2018 Restricted Stock Unit Award (the "2018 Restricted Stock Award"). The 2018 Restricted Stock Award is adopted pursuant to the Committee's authority under the SOIP and is in all respects subject to the provisions of the SOIP. Pursuant to the 2018 Restricted Stock Award, officers and key employees of the Company may be awarded shares of the Company's common stock, which become fully vested on the third anniversary of the award date, subject to satisfaction of all applicable terms and conditions and subject to certain provisions for early vesting.

The above summary of the 2018 Restricted Stock Award does not purport to be complete and is qualified in its entirety by reference to the 2018 Restricted Stock Award, which is attached as Exhibit 10(m) to this Form 10-K.

*CEO Special Equity Award*

On August 22, 2017, the Committee approved a CEO Special Equity Award (the "Performance-Based Agreement") in order to incentivize Wyman Roberts, President and Chief Executive Officer of the Company, to continue leading the Company during a transformative period in the industry and to further align the compensation of Mr. Roberts with Company performance and increases in shareholder value. The Performance-Based Agreement grants Mr. Roberts performance-based stock options of 500,000 shares of the Company's common stock (the "Performance-Based Options"). All or a portion of the Performance-Based Options may vest in accordance with the following terms and conditions:

(i) One-half of the Performance-Based Options will vest at the end of the 2021 fiscal year of the Company if the Company achieves EPS (as defined in the Performance-Based Agreement) equal to or greater than $4.40 (the "2021 EPS Performance Condition") for the Company's 2021 fiscal year.

(ii) One-half of the Performance-Based Options will vest at the end of the 2022 fiscal year of the Company if the Company achieves EPS equal to or greater than $5.00 for the Company's 2022 fiscal year. In the event that the 2021 EPS Performance Condition is not met in the Company's 2021 fiscal year, then all of the Performance-Based Options will vest at the end of the 2022 fiscal year of the Company if the 2022 EPS Performance Condition is satisfied during the Company's 2022 fiscal year.

The Performance-Based Options have an exercise period of eight years from the date of vesting. The Performance-Based Agreement also provides for the treatment of the Performance-Based Options granted to Mr. Roberts following certain specified terminations of employment, including in connection with a change of control, a termination without cause, retirement, death and disability.

The above summary of the Performance-Based Agreement does not purport to be complete and is qualified in its entirety by reference to the Performance-Based Agreement, which is attached as Exhibit 10(n) to this Form 10-K.

## PART III

**Item 10.          DIRECTORS, EXECUTIVE OFFICERS AND CORPORATE GOVERNANCE.**

If you would like information about:
- our executive officers,
- our Board of Directors, including its committees, and
- our Section 16(a) reporting compliance,

you should read the sections entitled "Election of Directors—Information About Nominees", "Committees of the Board of Directors", "Executive Officers", and "Section 16(a) Beneficial Ownership Reporting Compliance" in our Proxy Statement to be dated on or about September 27, 2017, for the annual meeting of shareholders on November 16, 2017. We incorporate that information in this document by reference.

The Board of Directors has adopted a code of ethics that applies to all of the members of Board of Directors and all of our team members, including, the principal executive officer, principal financial officer, principal accounting officer or controller, or persons performing similar functions. A copy of the code is posted on our internet website at the internet address: http://www.brinker.com/corp_gov/ethical_business_ policy.html. You may obtain free of charge copies of the code from our website at the above internet address. Any amendment of, or waiver from, our code of ethics will be posted on our website within four business days of such amendment or waiver. The information contained on our website is not a part of this Annual Report on Form 10-K.

**Item 11.          EXECUTIVE COMPENSATION.**

If you would like information about our executive compensation, you should read the section entitled "Executive Compensation—Compensation Discussion and Analysis" in our Proxy Statement to be dated on or about September 27, 2017, for the annual meeting of shareholders on November 16, 2017. We incorporate that information in this document by reference.

**Item 12.          SECURITY OWNERSHIP OF CERTAIN BENEFICIAL OWNERS AND MANAGEMENT AND RELATED STOCKHOLDER MATTERS.**

If you would like information about our security ownership of certain beneficial owners and management and related stockholder matters, you should read the sections entitled "Director Compensation for Fiscal 2017 ", "Compensation Discussion and Analysis", and "Stock Ownership of Certain Persons" in our Proxy Statement to be dated on or about September 27, 2017, for the annual meeting of shareholders on November 16, 2017. We incorporate that information in this document by reference.

**Item 13.          CERTAIN RELATIONSHIPS AND RELATED TRANSACTIONS, AND DIRECTOR INDEPENDENCE.**

If you would like information about certain relationships and related transactions, you should read the section entitled "Compensation Committee Interlocks and Insider Participation" in our Proxy Statement to be dated on or about September 27, 2017, for the annual meeting of shareholders on November 16, 2017. We incorporate that information in this document by reference.

If you would like information about the independence of our non-management directors and the composition of the Audit Committee, Compensation Committee and Governance and Nominating Committee, you should read the sections entitled "Director Independence" and "Committees of the Board of Directors" in our Proxy Statement to be dated on or about September 27, 2017, for the annual meeting of shareholders on November 16, 2017. We incorporate that information in this document by reference.

**Item 14.**        **PRINCIPAL ACCOUNTANT FEES AND SERVICES.**

If you would like information about principal accountant fees and services, you should read the section entitled "Ratification of Independent Auditors" in our Proxy Statement to be dated on or about September 27, 2017, for the annual meeting of shareholders on November 16, 2017. We incorporate that information in this document by reference.

**PART IV**

**Item 15.**        **EXHIBITS AND FINANCIAL STATEMENT SCHEDULES.**

(a)(1) Financial Statements.

We make reference to the Index to Financial Statements attached to this document on page 25 for a listing of all financial statements attached as Exhibit 13 to this document.

(a)(2) Financial Statement Schedules.

All schedules are omitted as the required information is inapplicable or the information is presented in the financial statements or related notes.

(a)(3) Exhibits.

We make reference to the Index to Exhibits preceding the exhibits attached hereto on page E-1 through E-2 for a list of all exhibits filed as a part of this document.

**SIGNATURES**

Pursuant to the requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized.

BRINKER INTERNATIONAL, INC.,
a Delaware corporation

By:         /S/   JOSEPH G. TAYLOR

Joseph G. Taylor
*Senior Vice President and Chief Financial Officer*

Dated: August 28, 2017

Pursuant to the requirements of the Securities Exchange Act of 1934, we have signed in our indicated capacities on August 28, 2017.

| Name | Title |
|---|---|
| /S/  WYMAN T. ROBERTS<br>Wyman T. Roberts | President and Chief Executive Officer of Brinker International (Principal Executive Officer) and Director |
| /S/   JOSEPH G. TAYLOR<br>Joseph G. Taylor | Senior Vice President and Chief Financial Officer (Principal Financial and Accounting Officer) |
| /S/   JOSEPH M. DEPINTO<br>Joseph M. DePinto | Chairman of the Board |
| /S/   ELAINE L. BOLTZ<br>Elaine L. Boltz | Director |
| /S/  HARRIET EDELMAN<br>Harriet Edelman | Director |
| /S/   MICHAEL A. GEORGE<br>Michael A. George | Director |
| /S/   WILLIAM T. GILES<br>William T. Giles | Director |
| /S/   GERARDO I. LOPEZ<br>Gerardo I. Lopez | Director |
| /S/   GEORGE R. MRKONIC<br>George R. Mrkonic | Director |
| /S/   JOSE LUIS PRADO<br>Jose Luis Prado | Director |

24

**INDEX TO CONSOLIDATED FINANCIAL STATEMENTS**

The following are attached hereto as part of Exhibit 13.

| | Page |
|---|---|
| Selected Financial Data | F-1 |
| Management's Discussion and Analysis of Financial Condition and Results of Operations | F-2 |
| Consolidated Statements of Comprehensive Income—Fiscal Years Ended June 28, 2017, June 29, 2016 and June 24, 2015 | F-15 |
| Consolidated Balance Sheets— June 28, 2017 and June 29, 2016 | F-16 |
| Consolidated Statements of Shareholders' (Deficit) Equity—Fiscal Years Ended June 28, 2017, June 29, 2016 and June 24, 2015 | F-17 |
| Consolidated Statements of Cash Flows—Fiscal Years Ended June 28, 2017, June 29, 2016 and June 24, 2015 | F-18 |
| Notes to Consolidated Financial Statements | F-19 |
| Reports of Independent Registered Public Accounting Firm | F-41 |
| Management's Responsibility for Consolidated Financial Statements | F-43 |
| Management's Report on Internal Control over Financial Reporting | F-43 |

**INDEX TO EXHIBITS**

<u>Exhibit</u>

| | |
|---|---|
| 3(a) | Certificate of Incorporation of the Registrant, as amended.(1) |
| 3(b) | Bylaws of the Registrant.(2) |
| 4(a) | Form of 2.600% Note due 2018.(3) |
| 4(b) | Form of 3.875% Note due 2023.(3) |
| 4(c) | Indenture between the Registrant and Wilmington Trust, National Association, as Trustee.(4) |
| 4(d) | First Supplemental Indenture between Registrant and Wilmington Trust, National Association.(3) |
| 4(e) | Second Supplemental Indenture between Registrant and Wilmington Trust, National Association.(3) |
| 4(f) | Form of 5.000% Senior Note due 2024.(5) |
| 4(g) | Indenture dated as of September 23, 2016, by and among the Company, the Guarantors named therein and U.S. Bank National Association, as trustee.(5) |
| 10(a) | Registrant's Stock Option and Incentive Plan.(6) |
| 10(b) | Registrant's 1999 Stock Option and Incentive Plan for Non-Employee Directors and Consultants.(7) |
| 10(c) | Registrant's Performance Share Plan Description.(8) |
| 10(d) | Credit Agreement dated as of March 12, 2015, by and among Registrant, Brinker Restaurant Corporation, Bank of America, N.A., Merrill Lynch, Pierce, Fenner & Smith Incorporated, J.P. Morgan Securities, LLC, Regions Capital Markets, a Division of Regions Bank, Wells Fargo Securities, LLC, J.P. Morgan Chase Bank, N.A., Regions Bank, Compass Bank, Wells Fargo Bank, National Association, The Bank of Tokyo - Mitsubishi UFJ, Ltd., U.S. Bank National Association and Greenstone Farm Credit Services.(9) |
| 10(e) | Second Amendment to Credit Agreement dated September 13, 2016, by and among Registrant and its wholly-owned subsidiaries, Brinker Restaurant Corporation, Brinker Florida, Inc., Brinker Texas, Inc., Bank of America, N.A., JPMorgan Chase Bank, N.A., Wells Fargo Bank, N.A., The Bank of Tokyo-Mitsubishi UFJ, Ltd., U.S. Bank National Association, Regions Bank, Compass Bank, Greenstone Farm Credit Services ACA, SunTrust Bank, and Barclays Bank PLC.(10) |
| 10(f) | Registrant's 2017 Performance Share Plan Description.(11) |
| 10(g) | Severance and Change in Control Agreement.(12) |
| 10(h) | Executive Severance Benefits Plan and Summary Plan Description.(12) |
| 10(i) | Change in Control Severance Agreement.(12) |
| 10(j) | Registrant's 2018 Performance Share Plan.(13) |
| 10(k) | Registrant's Terms of F2018 Stock Option Award.(14) |
| 10(l) | Registrant's Terms of F2018 Retention Stock Unit Award.(15) |
| 10(m) | Registrant's Terms of F2018 Restricted Stock Unit Award.(16) |
| 10(n) | Registrant's Terms of CEO Special Equity Award.(17) |
| 13 | 2017 Annual Report to Shareholders.(18) |
| 21 | Subsidiaries of the Registrant.(19) |
| 23 | Consent of Independent Registered Public Accounting Firm.(19) |
| 31(a) | Certification by Wyman T. Roberts, President and Chief Executive Officer of the Registrant, pursuant to 17 CFR 240.13a-14(a) or 17 CFR 240.15d-14(a).(19) |
| 31(b) | Certification by Joseph G. Taylor, Senior Vice President and Chief Financial Officer of the Registrant, pursuant to 17 CFR 240.13a-14(a) or 17 CFR 240.15d-14(a).(19) |
| 32(a) | Certification by Wyman T. Roberts, President and Chief Executive Officer of the Registrant, pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002.(19) |
| 32(b) | Certification by Joseph G. Taylor, Senior Vice President and Chief Financial Officer of the Registrant, pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002.(19) |
| 99(a) | Proxy Statement of Registrant.(20) |

| 101.INS | XBRL Instance Document |
|---------|------------------------|
| 101.SCH | XBRL Schema Document |
| 101.CAL | XBRL Calculation Linkbase Document |
| 101.DEF | XBRL Definition Linkbase Document |
| 101.LAB | XBRL Label Linkbase Document |
| 101.PRE | XBRL Presentation Linkbase |

_____

| (1) | Filed as an exhibit to annual report on Form 10-K for year ended June 28, 1995 and incorporated herein by reference. |
| (2) | Filed as an exhibit to current report on Form 8-K dated August 26, 2014 and incorporated herein by reference. |
| (3) | Filed as an exhibit to current report on Form 8-K dated May 15, 2013 and incorporated herein by reference. |
| (4) | Filed as an exhibit to registration statement on Form S-3 filed April 30, 2013, SEC File No. 333-188252, and incorporated herein by reference. |
| (5) | Filed as an exhibit to current report on Form 8-K dated September 23, 2016 and incorporated herein by reference. |
| (6) | Filed as an Appendix A to Proxy Statement of Registrant filed on September 17, 2013 and incorporated herein by reference. |
| (7) | Filed as an exhibit to quarterly report on Form 10-Q for the quarter ended December 28, 2005 and incorporated herein by reference. |
| (8) | Filed as an exhibit to quarterly report on Form 10-Q for the quarter March 29, 2006 and incorporated herein by reference. |
| (9) | Filed as an exhibit to current report on Form 8-K dated March 12, 2015 and incorporated herein by reference. |
| (10) | Filed as an exhibit to quarterly report on Form 10-Q for quarter ended September 28, 2016 and incorporated herein by reference. |
| (11) | Filed as an exhibit to current report on Form 8-K dated August 18, 2016 and incorporated herein by reference. |
| (12) | Filed as an exhibit to quarterly report on Form 10-Q for the quarter March 29, 2017 and incorporated herein by reference. |
| (13) | Filed herewith. |
| (14) | Filed herewith. |
| (15) | Filed herewith. |
| (16) | Filed herewith. |
| (17) | Filed herewith. |
| (18) | Portions filed herewith, to the extent indicated herein. |
| (19) | Filed herewith. |
| (20) | To be filed on or about September 27, 2017. |

E - 2

**Exhibit 10(j)**

## BRINKER INTERNATIONAL, INC.
## F2018 PERFORMANCE SHARE PLAN

Pursuant to <u>Section 3</u> of the Brinker International, Inc. Stock Option and Incentive Plan (the "SOIP"), the Compensation Committee of the Board of Directors of Brinker International, Inc. (the "Committee") may grant stock awards subject to such conditions, restrictions and contingencies as the Committee may determine.

The Brinker International, Inc. F2018 Performance Share Plan (the "Plan") is hereby adopted pursuant to the Committee's authority under the SOIP to provide greater incentive to officers and key employees of Brinker International, Inc. (the "Company") and its affiliates to achieve the highest level of individual performance and to encourage such officers or key employees to meet or exceed specified performance goals in order to contribute to the overall success of the Company.

The Plan is in all respects subject to the provisions of the SOIP, the terms of which are incorporated herein by reference.

1.      <u>Definitions</u>. For purposes of the Plan, the terms listed below are defined as follows:

a.      <u>Adjusted Diluted WAS.</u> The term "Adjusted Diluted WAS" means actual diluted weighted average shares prepared in accordance with GAAP and adjusted as set forth in the Appendix.

b.      <u>Adjusted Net Income.</u> The term "Adjusted Net Income" means the Company's actual net income prepared in accordance with GAAP and adjusted to exclude items recorded in the Company's "Other Gains and Charges" caption on the consolidated statement of comprehensive income and any other items which are excluded from the Company's net income to determine "Adjusted Net Income" as presented in the quarterly and annual earnings releases.

c.      <u>Affiliate</u>. The term "Affiliate" means (i) a subsidiary of the Company or (ii) any entity that is designated by the Committee as a participating employer under the Plan, provided that the Company directly or indirectly owns at least 20% of the combined voting power of the common stock of such entity.

d.      <u>Base Year EPS</u>. The term "Base Year EPS" means the Company's actual adjusted diluted earnings per share and is calculated as the Adjusted Net Income (modified for any applicable adjustments set forth in the Appendix) divided by the Adjusted Diluted WAS, each as determined for the most recent Company fiscal year ended prior to the beginning of the Measurement Period.

e.      <u>Board.</u> The term "Board" means the Board of Directors of the Company.

f.      <u>Cause</u>. The term "Cause" means one or more of the following:

1

(i)   An act of fraud, misappropriation or embezzlement by the Participant in connection with the Company or a Related Company as determined by the affirmative vote of at least a majority of the Board or executive committee thereof;

(ii)   Gross mismanagement or gross neglect of the Participant's duties to the Company or a Related Company and its policies, procedures or guidelines as determined by the affirmative vote of at least a majority of the Board or executive committee thereof; or

(iii)   Conviction of the Participant by a court of competent jurisdiction of a felony.

g.   Change in Control. The term "Change in Control" means:

(i)   a sale, transfer or other conveyance of all or substantially all of the assets of the Company on a consolidated basis; or

(ii)   the acquisition of beneficial ownership (as such term is defined in Rule 13d-3 promulgated under the Exchange Act) by any "person" (as such term is used in Sections 13(d) and 14(d) of the Exchange Act), other than the Company, directly or indirectly, of securities representing 50% or more of the total number of votes that may be cast for the election of directors of the Company; or

(iii)   the failure at any annual or special meetings of the Company's shareholders held during the three-year period following a "solicitation in opposition" as defined in Rule 14a-6 promulgated under the Exchange Act, of a majority of the persons nominated by the Company in the proxy material mailed to shareholders by the management of the Company to win election to seats on the Board (such majority calculated based upon the total number of persons nominated by the Company failing to win election to seats on the Board divided by the total number of Board members of the Board as of the beginning of such three-year period), excluding only those who die, retire voluntarily, are disabled or are otherwise disqualified in the interim between their nomination and the date of the meeting.

h.   CAGR. The term "CAGR" means the three-year compound annual growth rate determined using the formula:

CAGR = (Ending Year EPS /Base Year EPS)^(1/3)-1

In the event that the Measurement Period ends due to a Change in Control, the CAGR calculation shall be modified to account for the shorter time frame.

i.   Good Reason. The term "Good Reason" means the satisfaction of all of the following requirements:

(i)   One or more of the following facts and circumstances exist: (A) a reduction in the Executive Participant's then current base salary other than a general reduction in base salary that affects all similarly situated executives in substantially the same proportions; (B) a reduction in the Executive Participant's target annual bonus opportunity; (C) a relocation of the

2

principal location at which the Executive Participant is required to provide services by more than fifty (50) miles; (D) the Company's failure to obtain an agreement from any successor to the Company to assume and agree to perform the obligations under the Plan in the same manner and to the same extent that the Company would be required to perform, except where such assumption occurs by operations of law; (E) a material, adverse change in the Executive Participant's title, reporting relationship, authority, duties or responsibilities; or (F) in the case of an Executive Participant who is the Chief Executive Officer of the Company only, a failure of any successor to the Company to nominate the Executive Participant for election by shareholders to the successor company's board of directors; and

(ii)   the Executive Participant shall have provided the Company written notice within thirty (30) days of his or her knowledge or reason to know of the existence of any fact or circumstance constituting Good Reason, the Company shall have failed to cure or eliminate such fact(s) or circumstance(s) within thirty (30) days of its receipt of such notice, and the resulting termination of employment must occur within thirty (30) days following expiration of such cure period.

j.   Disability. Except as otherwise provided by the Committee, the Participant will be considered to have a "Disability" during the period in which the Participant is unable, by reason of a medically determinable physical or mental impairment, to engage in any substantial gainful activity, which condition is expected to have a duration of not less than 120 days.

k.   Ending Year EPS . The term "Ending Year EPS" means the Company's actual adjusted diluted earnings per share and is calculated as the Adjusted Net Income (modified for any applicable adjustments as set forth in the Appendix) divided by the Adjusted Diluted WAS, each as determined as of the end of the Measurement Period.

l.   Executive Participant. The term "Executive Participant" means a Participant who is the Chief Executive Officer of the Company or a member of the Brinker Leadership Team at the time an Award is granted to such Participant.

m.   Measurement Period. The term "Measurement Period" means a period of three consecutive Company fiscal years, or such other period as the Committee designates in writing prior to granting an Award pursuant to the Plan, beginning on the date described in a Participant's Award; provided, however, that in the event of a Change in Control, the Measurement Period will end on the effective date of the Change in Control.

n.   Participant. The term "Participant" means an individual who has been granted an Award under this Plan.

o.   Performance Period.    The term "Performance Period" means a period of three consecutive Company fiscal years, or such other period as the Committee designates in writing prior to granting an Award pursuant to the Plan, beginning on the date described in a Participant's Award. The Performance Period with respect to an Award will commence at the same time as the corresponding Measurement Period for the Award. The Performance Period and Measurement Period for an Award will run for the same duration unless a Change in Control occurs during the

3

Performance Period, in which case the Measurement Period, but not the Performance Period, will end as of the effective date of the Change in Control.

p.  <u>Performance Share</u>. The term "Performance Share" means the right to receive a share of Stock upon satisfaction of the performance metrics and/or other requirements established by the Committee.

q.  <u>Rule of 70</u>. The term "Rule of 70" means that the sum of the Participant's age and the Participant's years of service with the Company or an Affiliate equals or exceeds 70.

r.  <u>Code Section 409A</u>. The term "Code Section 409A" means Section 409A of the Internal Revenue Code of 1986, as amended, and all Treasury Regulations and guidance promulgated thereunder.

s.  <u>SOIP Definitions</u>. Except where the context clearly implies or indicates the contrary, a word, term, or phrase used but not defined in the Plan will have the meaning set forth in the SOIP.

2.  <u>Performance Shares</u>.

a.  <u>Awards</u>. A Participant will receive a grant of a target number of Performance Shares determined by the Committee, which will be set forth in the Participant's award letter or other notification (an "Award").

b.  <u>Achieved Shares</u>. The number of a Participant's Performance Shares that may be earned under any Award ("Achieved Shares") will be determined at the end of the applicable Measurement Period based on the Company's CAGR over the Measurement Period compared to a target CAGR of 10%, as approved by the Committee. To determine the Achieved Shares that may be earned by a Participant (subject to the other terms and conditions of this Plan), the Participant's target number of Performance Shares is multiplied by the "Distribution Percentage" corresponding to the Company's CAGR at the end of the Measurement Period (with the target CAGR of 10% equating to a 100% Distribution Percentage). The Distribution Percentage associated with attainment of above- or below-target CAGR is determined using linear interpolation between 0.1% CAGR up to 20.0% CAGR (Ex. 15.1% CAGR = 151% Distribution Percentage), as demonstrated in the table below:

| Company's CAGR | Distribution Percentage (subject to linear interpolation between the modeled CAGR achievement levels) |
|---|---|
| <=0.0% | 0% |
| 1.0% | 10% |
| 10.0% | 100% |
| 19.0% | 190% |
| >=20.0% | 200% |

3.   Earning Achieved Shares.

      a.   General Rule. In order to earn the Achieved Shares under the Plan, a Participant must remain continuously employed by the Company or an Affiliate through the last day of the applicable Performance Period, except as otherwise specifically provided in this Plan. Notwithstanding any provision of the Plan to the contrary, a Participant shall not earn any Achieved Shares following termination of employment.

      b.   Death or Disability, Notwithstanding Section 3(a), if a Participant terminates employment with the Company and its Affiliates prior to the last day of the Performance Period due to the Participant's death or Disability, the Participant will be deemed to have earned the Achieved Shares determined for the Participant at the end of the Measurement Period pursuant to Section 2, if any.

      c.   Retirement Before Age 60. Notwithstanding Section 3(a), if a Participant ceases to be employed with the Company and its Affiliates prior to the last day of the Performance Period, and as of the date of the termination the Participant has (i) satisfied the Rule of 70 and (ii) the Participant is at least age 55 but not yet age 60, the Participant will earn, as of the date of termination, a portion of the Achieved Shares determined for the Participant at the end of the Measurement Period pursuant to Section 2, if any, based on the number of complete months that the Participant was employed by the Company or an Affiliate during the Performance Period, divided by the total number of complete months in the Performance Period.

      d.   Retirement at or After Age 60. Notwithstanding Section 3(a), if a Participant ceases to be employed with the Company and its Affiliates prior to the last day of the Performance Period, and as of the date of the termination the Participant has (i) satisfied the Rule of 70 and is at least age 60, or (ii) the Participant is at least age 65 regardless of satisfaction of the Rule of 70, the Participant will earn, as of the date of termination, all of the Achieved Shares determined for the Participant at the end of the Measurement Period pursuant to Section 2, if any.

      e.   Involuntary Termination.

5

(i)     *Involuntary Terminations without Cause Not Following a Change in Control*. Notwithstanding <u>Section 3(a)</u>, if a Participant is involuntarily terminated for a reason other than for Cause prior to the last day of the Performance Period, the Participant will earn, as of the date of termination from employment, except as otherwise provided below, a portion of the Participant's Achieved Shares determined for the Participant at the end of the Measurement Period pursuant to <u>Section 2</u>, if any, based on the number of complete months that the Participant was employed by the Company or an Affiliate during the Performance Period, divided by the total number of complete months in the Performance Period.

(ii)    *Certain Involuntary Terminations without Cause or Terminations (by Executive Participants only) for Good Reason Following a Change in Control*. Notwithstanding <u>Sections 3(a)</u> and <u>3(e)(i)</u>, in the event there has been a Change in Control during the Performance Period and the Awards were not earned as of the effective date of the Change in Control pursuant to <u>Section 3(f)</u>, then if a Participant is involuntarily terminated for a reason other than Cause or if an Executive Participant terminates for Good Reason following the Change in Control and prior to the last day of the Performance Period, the Participant will earn, as of the date of termination, all of the Participant's Achieved Shares determined for the Participant at the end of the Measurement Period pursuant to <u>Section 2</u>, if any.

f.   <u>Change in Control</u>. Notwithstanding the provisions of Section 3(a), in the event of a Change in Control while the Participant remains in employment, if the Awards are not assumed or replaced with awards of substantially equal value by the acquiring entity in such a Change in Control and/or cease to remain outstanding immediately following the Change in Control, each Participant will earn, as of the effective date of the Change in Control, the Achieved Shares determined for the Participant at the end of the Measurement Period pursuant to <u>Section 2</u>, but in no event less than 100% of the target number of the Participant's Performance Shares. After a Change in Control, references to the "Company" as they relate to this Plan shall refer to the successor entity.

g.   <u>Most Favorable Provision Applies</u>. For the avoidance of doubt, if two or more of <u>Sections 3(b)</u> through <u>3(f)</u> above apply, then the applicable Section that results in the Participant earning the greatest number of Achieved Shares shall control.

4.   <u>Forfeiture</u>. Except as otherwise provided in <u>Section 3</u>, if a Participant ceases to be employed by the Company or any Affiliate prior to the last day of the Performance Period, the Participant will immediately forfeit the Performance Shares and all interest in the Award as of the date of the Participant's termination and the Participant will not be entitled to receive any payment with respect to the Performance Shares. Notwithstanding any provision of the Plan to the contrary, the Participant will forfeit any Performance Shares immediately and without notice upon (A) the termination of the Participant's employment for Cause, (B) the Participant's breach of any confidentiality agreement or similar agreement pertaining to the confidentiality and nondisclosure of proprietary information, including but not limited to trade secrets, of the Company or any Affiliate, or (C) the Participant's commission of any act of malfeasance or wrongdoing affecting the Company or any Affiliate. Furthermore, and notwithstanding <u>Section 3</u>, if subsequent to the Participant's termination of employment with the Company or any Affiliate (other than due to a

6

termination following a Change in Control without Cause or for Good Reason, as applicable) and prior to the end of the Performance Period, the Participant becomes employed by, consults with, and/or participates as an officer, director, employee, independent contractor, adviser, consultant, partner, principal, or shareholder (with more than five percent (5%) equity) with any entity which owns and/or operates (either directly or indirectly) or is engaged, or planning to be engaged (either directly or indirectly) in the ownership and /or operation of any of the "Competitive Restaurants" listed below or successors thereto, then the Participant's Award will be immediately forfeited.

| | | | |
|---|---|---|---|
| 1 | Ale House Restaurant | 29 | Landry's Seafood |
| 2 | Applebee's | 30 | Legal Sea Foods |
| 3 | Beef O'Brady's | 31 | Longhorn Steakhouse |
| 4 | Bennigan's Tavern | 32 | McCormick & Schmick's |
| 5 | BJ's Restaurant and Brewhouse | 33 | McDonald's |
| 6 | Bonefish Grill | 34 | Miller's Ale House Restaurant |
| 7 | BRAVO! Cucina Italiana | 35 | Morton's of Chicago |
| 8 | Brio Tuscan Grille | 36 | O'Charleys |
| 9 | Buca di Beppo | 37 | Olive Garden |
| 10 | Buffalo Wild Wings | 38 | On The Border |
| 11 | California Pizza Kitchen | 39 | Outback Steakhouse |
| 12 | Carino's Italian Grill | 40 | Palm Restaurant |
| 13 | Carraba's Italian Grill | 41 | Panera |
| 14 | Champps Americana | 42 | Pappadeaux Seafood Kitchen |
| 15 | Cheddar's Casual Café | 43 | PF Chang's China Bistro |
| 16 | Cheesecake Factory | 44 | Pizza Hut |
| 17 | Chipotle Mexican Grill | 45 | Red Robin |
| 18 | Chuy's | 46 | Romano's Macaroni Grill |
| 19 | Cracker Barrel | 47 | Ruby Tuesday |
| 20 | Dave & Busters | 48 | Ruth's Chris Steak House |
| 21 | Fogo De Chao | 49 | Seasons 52 |
| 22 | Fuddruckers | 50 | Taco Bell |
| 23 | Hooters | 51 | Texas Roadhouse |
| 24 | Houlihans | 52 | TGI Fridays |
| 25 | Houston's/Hillstone | 53 | Uno Chicago Grill |
| 26 | Il Fornaio Restaurant | 54 | Wendy's |
| 27 | J Alexanders | 55 | Yard House |
| 28 | KFC | | |

5.   <u>Payment of Earned Achieved Awards</u>. Each earned Achieved Share will entitle a Participant to receive one share of Stock (or other consideration of equal value, as determined by the Committee, in the event payment is made following a Change in Control). Subject to <u>Section 6</u>, shares of Stock (or other consideration, as applicable) with respect to earned Achieved Shares will be issued to each such Participant in payment of an Award during the 60-day period

immediately following the conclusion of the applicable Performance Period. The Company will issue a like number of shares of Stock (or other consideration, as applicable) to the Participant, and the Participant will own such shares of Stock (or other consideration, as applicable) free of all restrictions described herein. A Participant will not have the right to designate the taxable year of payment. At no time prior to the end of the Performance Period will any Stock (or other consideration, as applicable) be issued pursuant to an Award.

6.   Section 409A.

a.   Although the Company does not guarantee the tax treatment of any payments or benefits under the Plan, the intent of the Company is that the payments and benefits under this Plan be exempt from, or comply with, Code Section 409A and to the maximum extent permitted the Plan shall be limited, construed and interpreted in accordance with such intent. In no event whatsoever shall the Company or its Affiliates or their respective officers, directors, employees or agents be liable for any additional tax, interest or penalties that may be imposed on a Participant by Code Section 409A or damages for failing to comply with Code Section 409A.

b.   Notwithstanding the foregoing or any other provision of this Plan to the contrary, if at the time of a Participant's "separation from service" (within the meaning of Code Section 409A), the Participant is a "Specified Employee," then the Company will defer the payment of any nonqualified deferred compensation subject to Code Section 409A payable upon separation from service (without any reduction in such payments or benefits ultimately paid or provided to the Participant) until the date that is six (6) months following separation from service or, if earlier, the earliest other date as is permitted under Code Section 409A (and any amounts that otherwise would have been paid during this deferral period will be paid in a lump sum on the day after the expiration of the six (6) month period or such shorter period, if applicable). A Participant will be a "Specified Employee" for purposes of this Plan if, on the date of the Participant's separation from service, the Participant is an individual who is, under the method of determination adopted by the Company designated as, or within the category of employees deemed to be, a "Specified Employee" within the meaning and in accordance with Treasury Regulation Section 1.409A-1(i). The Company shall determine in its sole discretion all matters relating to who is a "Specified Employee" and the application of and effects of the change in such determination.

c.   Notwithstanding anything in this Plan or elsewhere to the contrary, a termination of employment shall not be deemed to have occurred for purposes of any provision of this Plan providing for the payment of any amounts or benefits that constitute "non-qualified deferred compensation" within the meaning of Code Section 409A upon or following a termination of a Participant's employment unless such termination is also a "separation from service" within the meaning of Code Section 409A and, for purposes of any such provision of this Plan, references to a "termination," "termination of employment" or like terms shall mean "separation from service" and the date of such separation from service shall be the date of termination for purposes of any such payment or benefits.

7.   Dividends and Dividend Equivalents. A Participant will have no voting rights or dividend rights with respect to the Performance Shares or any shares of Stock underlying the Performance Shares during the Performance Period. No Participant will be entitled to receive

8

any cash dividends or dividend equivalents with respect to Performance Shares during the Performance Period. However, at the same time that shares of Stock are issued under Section 5 or Section 6, the Participant (or the Participant's beneficiary determined in accordance with Section 10) will also receive a lump sum cash payment equal to the amount of cash dividends paid by the Company that were declared during the Performance Period on the number of shares of Stock issued to the Participant (or the Participant's beneficiary).

8.   Capital Adjustments and Reorganizations. The number of Performance Shares covered by an Award will be subject to equitable adjustment, as determined by the Committee, to reflect any stock dividend, stock split, share combination, separation, reorganization, liquidation or the like, of or by the Company. In the event of any such transaction or event, the Committee, in its discretion, may provide in substitution for the Award such alternative consideration as it, in good faith, may determine to be equitable in the circumstances and may require in connection with such substitution the surrender of the Award so replaced.

9.   Clawback Provisions. If the Participant is an officer of the Company ("Officer") and the Board, or an appropriate committee thereof, has determined that any fraud, negligence, or intentional misconduct by the Officer was a significant contributing factor to the Company having to restate all or a portion of its financial statement(s), the Board or committee shall take, in its discretion, such action as it deems necessary to remedy the misconduct and prevent its recurrence. In determining what remedies to pursue, the Board or committee will take into account all relevant factors, including whether the restatement was the result of fraud, negligence, or intentional misconduct. The Board will, to the extent permitted by applicable law, in all appropriate cases, require reimbursement of any bonus or incentive compensation paid to the Officer, cause the cancellation of restricted or deferred stock awards and outstanding stock options, and seek reimbursement of any gains realized on the exercise of stock options attributable to such awards, if and to the extent that (a) the amount of incentive compensation was calculated based upon the achievement of certain financial results that were subsequently reduced due to a restatement, (b) the Officer engaged in any fraud or misconduct that caused or contributed to the need for the restatement, and (c) the amount of the bonus or incentive compensation that would have been awarded to the Officer had the financial results been properly reported would have been lower than the amount actually awarded. In addition, the Board may dismiss the Officer, authorize legal action, or take such other action to enforce the Officer's obligations to the Company as it may deem appropriate in view of all the facts surrounding the particular case. The Company will not seek to recover bonuses or other compensation as detailed above paid more than three years prior to the date the applicable restatement is disclosed.

10.   Heirs and Successors. This Plan will be binding upon, and will inure to the benefit of, the Company and its successors and assigns, and upon any person acquiring, whether by merger, consolidation, purchase of assets or otherwise, all or substantially all of the Company's assets and business. Subject to the terms of the SOIP, any consideration or other benefits distributable to a deceased Participant under this Plan will be distributed to the beneficiary designated by the Participant in writing filed with the Committee in such form as the Committee will require. If a deceased Participant has failed to designate a beneficiary, or if the designated beneficiary of the deceased Participant dies before the Participant or before complete distribution

9

of consideration or other benefits due under this Plan, the consideration or other benefits to be distributed under this Plan will be distributed to the legal representative or representatives of the estate of the last to die of the Participant and the beneficiary.

11.   <u>Taxes, Transaction Costs and Withholding</u>. A Participant will be solely responsible for the payment of all taxes and transaction costs relating to the granting, vesting/earning and payment of an Award. It will be a condition to the obligation of the Company to issue or transfer shares of Stock or other applicable consideration that the Participant pay to the Company, upon its demand, such amount as may be requested by the Company for the purpose of satisfying its liability to withhold federal, state or local income or other taxes incurred in connection with the Award. If the amount requested is not paid, the Company may refuse to issue or transfer shares of Stock or other applicable consideration to the Participant (or to the Participant's beneficiary).

12.   <u>Administration</u>. The authority to interpret and administer the terms and conditions of the Plan will be vested in the Committee, and the Committee will have all powers with respect thereto as it has with respect to the SOIP. Any interpretation of the Plan by the Committee and any decision made by it with respect to the Plan is final and binding.

13.   <u>Relation to SOIP</u>. Notwithstanding anything in the Plan to the contrary, the terms of the Plan will be subject to the terms of the SOIP, a copy of which may be obtained from the office of the Secretary of the Company. Any amendment to the SOIP will be deemed to be an amendment to the Plan to the extent that the amendment is applicable hereto.

14.   <u>No Employment Contract</u>. Nothing contained in the Plan will (a) confer upon a Participant any right to be employed by or remain employed by the Company or any Affiliate, or (b) limit or affect in any manner the right of the Company or any Affiliate to terminate the employment or adjust the compensation of a Participant.

15.   <u>Unfunded Plan</u>. It is the Company's intention that the Plan be unfunded. The Company is not required to set aside any assets for payment of the benefits provided under the Plan, and no Participant will have a security interest in any Award.

16.   <u>Governing Law</u>. The interpretation, performance, and enforcement of the Plan will be governed by the laws of the State of Texas, without giving effect to the principles of conflict of laws thereof and all parties, including their successors and assigns, consent to the jurisdiction of the state and federal courts of Texas.


[Remainder of page intentionally left blank.]


10

**Appendix to the Brinker International, Inc. F2018 Performance Share Plan**

1)  <u>Adjustments to EPS</u>. The calculations of Ending Year EPS and Base Year EPS will reflect the following adjustments.

(a)      <u>Accounting and Tax Changes</u>. The Ending Year EPS and Base Year EPS calculations will be adjusted to neutralize any impacts associated with (i) changes in accounting principles pursuant to accounting pronouncements adopted during the Measurement Period and (ii) changes in tax laws and regulations (including, but not limited to, unplanned and/or unanticipated changes in tax rates) taking effect during the Measurement Period.

(b)      <u>Performance Plan Share Dilution</u>. Undistributed Performance Shares will be excluded from the Adjusted Diluted WAS calculations.

(c)      <u>Compensation Plan Expense</u>. For purposes of the Ending Year EPS and Base Year EPS calculations, the expense related to any performance share plans (including any stock option plans) of the Company (or awards thereunder) which contain performance objectives based on the Company's earnings per share (the "Applicable Performance Share Plans"), and any profit sharing plans of the Company (the "Applicable Profit Sharing Plans"), will be determined as follows: (i) the expense with respect to each Applicable Performance Share Plan will be equal to the planned expense with respect to such plan as of the beginning of each applicable measurement period thereunder; and (ii) the expense with respect to each Applicable Profit Sharing Plan will be equal to the planned expense with respect to such plan for each performance year (or other applicable performance period) thereunder, all as determined by the Company in its sole discretion. Expenses related to any performance share plans of the Company (or awards thereunder) other than the Applicable Performance Share Plans will not be adjusted in the Ending Year EPS or Base Year EPS calculation.

(d)      <u>Brand or Business Dispositions</u>. Any profit or loss associated with the disposition or sale of a brand or business will be excluded from the Ending Year EPS calculation. Any related impacts to interest expense, weighted average number of shares, and profit associated with the disposed brand or business will be reflected in Base Year EPS and/or Ending Year EPS to the extent necessary to neutralize the impact of the event in both calculations. Associated disposition costs, including but not limited to transaction, transition, disintegration or restructuring will be excluded from the Ending Year EPS calculation.

(e)      <u>Brand or Business Acquisition</u>. All profit or loss associated with the acquired brand or business, including associated changes to interest expense, as reported in the Company's Adjusted Net Income, will be included in the Ending Year EPS calculation. Associated acquisition costs, including but not limited to transaction, transition, integration or restructuring, will be excluded from Ending Year EPS calculation.

(f)      <u>Refranchised Restaurants</u>. Any gain or loss from refranchising will be excluded from the Ending Year EPS calculation. Any related impacts to interest expense, weighted average number of shares, and royalties or profit associated with the refranchised restaurants will be reflected in

11

Base Year EPS and/or Ending Year EPS to the extent necessary to neutralize the impact of the event in both calculations.

(g)    <u>Relocation of Brinker International, Inc. Restaurant Support Center</u>. Any impacts associated with relocating the Brinker International, Inc. Restaurant Support Center will be reflected in Base Year EPS and/or Ending Year EPS to the extent necessary to neutralize the impact of the event in both calculations.

(h)    <u>Strategic Events</u>. Any unplanned impact of restructurings, acquisitions and divestitures will be adjusted in Base Year EPS and/or Ending Year EPS to the extent necessary to neutralize the impact of the event in both calculations.

(i)    <u>External Events</u>. Expenses incurred in connection with extraordinary, non-recurring events (such as natural disasters, terrorist attacks, pandemics, industry-wide food-borne illness, etc.) will be adjusted in Base Year EPS and/or Ending Year EPS to the extent necessary to neutralize the impact of the event in both calculations.

[End of document.]

12

Exhibit 10(k)

**BRINKER INTERNATIONAL, INC.**
**TERMS OF F2018**
**STOCK OPTION AWARD**

**August 31, 2017**

Brinker International, Inc. (the "Company"), acting pursuant to Section 2 of the Brinker International, Inc. Stock Option and Incentive Plan (the "Plan"), has granted to you (the "Option Holder") an option to purchase such number of shares of the common stock of the Company ("Stock") as specified in your award letter (the "Award"). The Award is in all respects subject to the provisions of the Plan (the terms of which are incorporated herein by reference), these Award terms ("Award Terms") and your award letter.

1.      <u>Definitions</u>. For purposes of this Award, the terms listed below are defined as follows:

(a)  <u>Cause</u>. The term "Cause" means one or more of the following:

(i)   An act of fraud, misappropriation or embezzlement by the Option Holder in connection with the Company or a Related Company as determined by the affirmative vote of at least a majority of the Board or executive committee thereof;

(ii)   Gross mismanagement or gross neglect of the Option Holder's duties to the Company or a Related Company as determined by the affirmative vote of at least a majority of the Board or executive committee thereof; or

(iii)   Conviction of the Option Holder by a court of competent jurisdiction of a felony.

(b)  <u>Change in Control</u>. The term "Change in Control" means:

(i)   a sale, transfer or other conveyance of all or substantially all of the assets of the Company on a consolidated basis; or

(ii)   the acquisition of beneficial ownership (as such term is defined in Rule 13d-3 promulgated under the Exchange Act) by any "person" (as such term is used in Sections 13(d) and 14(d) of the Exchange Act), other than the Company, directly or indirectly, of securities representing 50% or more of the total number of votes that may be cast for the election of directors of the Company; or

(iii)   the failure at any annual or special meetings of the Company's shareholders held during the three-year period following a "solicitation in opposition" as defined in Rule 14a-6 promulgated under the Exchange Act, of a majority of the persons nominated by the Company in the proxy material mailed to shareholders by the management of the Company to win election to seats on the Board (such majority calculated based upon the total number of persons

1

nominated by the Company failing to win election to seats on the Board divided by the total number of Board members of the Board as of the beginning of such three-year period), excluding only those who die, retire voluntarily, are disabled or are otherwise disqualified in the interim between their nomination and the date of the meeting.

(c)   <u>Code Section 409A</u>. The term "Code Section 409A" means Section 409A of the Internal Revenue Code of 1986, as amended, and all Treasury Regulations and guidance promulgated thereunder.

(d)   <u>Disability</u>. Except as otherwise provided by the Committee, the Option Holder will be considered to have a "Disability" during the period in which the Option Holder is unable, by reason of a medically determinable physical or mental impairment, to engage in any substantial gainful activity, which condition is expected to have a duration of not less than 120 days.

(e)   <u>Executive Option Holder</u>. The term "Executive Option Holder" means an Option Holder who is the Chief Executive Officer of the Company or a member of the Brinker Leadership Team at the time an Award is granted to such Option Holder.

(f)   <u>Exercise Price</u>. The term "Exercise Price" means the amount set forth in the award letter associated with the Award, which represents the closing price per share of the Stock on the trading day coinciding with the grant date of the Option (or, if such day is not a trading day, the closing price per share of the Stock on the trading day immediately preceding the Option grant date). The Exercise Price shall never be less than the fair market value of a share of Stock on the grant date of the Option within the meaning of Code Section 409A.

(g)   <u>Good Reason</u>. The term "Good Reason" means the satisfaction of all of the following requirements:

(i)   One or more of the following facts and circumstances exist: (A) a reduction in the Executive Option Holder's then current base salary other than a general reduction in base salary that affects all similarly situated executives in substantially the same proportions; (B) a reduction in the Executive Option Holder's target annual bonus opportunity; (C) a relocation of the principal location at which the Executive Option Holder is required to provide services by more than fifty (50) miles; (D) the Company's failure to obtain an agreement from any successor to the Company to assume and agree to perform the obligations under this Award in the same manner and to the same extent that the Company would be required to perform, except where such assumption occurs by operations of law; (E) a material, adverse change in the Executive Option Holder's title, reporting relationship, authority, duties or responsibilities; or (F) in the case of an Executive Option Holder who is the Chief Executive Officer of the Company only, a failure of any successor to the Company to nominate the Executive Option Holder for election by shareholders to the successor company's board of directors; and

(ii)   the Executive Option Holder shall have provided the Company written notice within thirty (30) days of his or her knowledge or reason to know of the existence of any fact or circumstance constituting Good Reason, the Company shall have failed to cure or eliminate such fact(s) or circumstance(s) within thirty (30) days of its receipt of such notice, and

2

the resulting termination of employment must occur within thirty (30) days following expiration of such cure period.

(h)   Rule of 70. The term "Rule of 70" means that the sum of the Option Holder's age and the Option Holder's years of service with the Company or a Related Company equals or exceeds 70.

(i)   Plan Definitions. Except where the context clearly implies or indicates the contrary, a word, term, or phrase used but not defined in these Award Terms will have the meaning set forth in the Plan.

2.   Grant of Option. The Option Holder has been granted an option (the "Option") to purchase shares of Stock from the Company at the Exercise Price, in the amounts, during the periods and upon the terms and conditions set forth in these Award Terms and in the Option Holder's award letter.

3.   Vesting and Exercisability.

(a)   Vesting Schedule. The Option will vest in accordance with the following schedule (the "Vesting Period"):

| If Option Holder remains continuously in the employ of the Company or a Related Company through the dates below (each a "Vesting Date"): | Then the following portion of the Option will vest on each of the Vesting Dates (each portion referred to as a "Vesting Tranche"): |
|---|---|
| August 31, 2018 | 25% of Option |
| August 31, 2019 | Additional 25% of Option |
| August 31, 2020 | Additional 25% of Option |
| August 31, 2021 | Additional 25% of Option |

No unvested portion of the Option will vest after the date of the Option Holder's termination of employment, except as specifically provided in these Award Terms. For purposes of these Award Terms, "termination of employment" means the Option Holder ceases to be employed by the Company and all Related Companies.

(b)   Death or Disability. Notwithstanding Section 3(a), if an Option Holder terminates employment with the Company and the Related Companies prior to one or more Vesting Dates due to the Option Holder's death or Disability, then the unvested portion of the Option will become fully vested as of the date of such termination.

(c)   Retirement. Notwithstanding Section 3(a), if an Option Holder ceases to be employed with the Company and the Related Companies prior to one or more Vesting Dates, and as of the date of the termination the Option Holder (i) has satisfied the Rule of 70 and is at least age 55, or (ii) is at least age 65 regardless of satisfaction of the Rule of 70, then the unvested portion of the Option will become fully vested as of the date of such termination.

3

(d) <u>Involuntary Termination</u>.

(i) *Involuntary Termination Without Cause Not Following a Change in Control*. Notwithstanding the provisions of <u>Section 3(a)</u>, if the Option Holder is involuntarily terminated for a reason other than for Cause prior to one or more Vesting Dates, the Option Holder will vest, as of the date of termination, in the portion of the Option that was due to vest on the next Vesting Date following the date of termination.

(ii) *Involuntary Termination Without Cause or Termination (by Executive Option Holders only) for Good Reason Following a Change in Control*. Notwithstanding the provisions of <u>Sections 3(a)</u> and <u>3(d)(i)</u>, in the event there has been a Change in Control during the Vesting Period and the Options were not vested in connection with the Change in Control pursuant to <u>Section 3(e)</u>, then if an Option Holder is involuntarily terminated following the Change in Control for a reason other than Cause, or if an Executive Option Holder terminates for Good Reason following the Change in Control, the unvested portion of the Option will become fully vested as of the date of such termination**.**

(e) <u>Change in Control</u>. Notwithstanding the provisions of <u>Section 3(a)</u>, in the event of a Change in Control, if the Options are not assumed or replaced with awards of substantially equal value by the acquiring entity in such a Change in Control and/or cease to remain outstanding immediately following the Change in Control, the Option Holder's Option will become fully vested as of the date immediately preceding such Change in Control, provided the Option Holder has remained continuously employed by the Company or a Related Company through such date. After a Change in Control, references to the "Company" as they relate to the Option shall refer to the successor entity.

(f) <u>Most Favorable Provision Applies</u>. For the avoidance of doubt, if two or more of <u>Sections 3(a)</u> through <u>3(e)</u> above apply, then the applicable Section that results in the Option Holder vesting in the greatest portion of the Option shall control.

(g) <u>Exercisability</u>. The vested portion of the Option will be exercisable in whole or in part (but not as to any fractional shares of Stock) at any time prior to the termination of the Option pursuant to <u>Section 4</u>, provided that (i) any requisite approval or consent of any government authority of any kind that has jurisdiction over the exercise of options has been secured, and (ii) the Exercise Price is not greater than the Fair Market Value of a share of Stock on the intended date of exercise. The right to purchase shares of Stock under the Option will be cumulative, and shares not purchased in any year may be purchased in subsequent years, subject to the termination provisions contained herein.

4. <u>Termination of Option</u>. The Option will terminate on the first to occur of:

(a) <u>Expiration Date</u>. Notwithstanding any provision of these Award Terms to the contrary, in no event will the Option be exercisable after 5:00 p.m. Central Time on **August 31, 2025** ("Expiration date").

4

(b)   <u>Termination of Employment</u>. In the case of the Option Holder's termination of employment, the Option will terminate as follows:

(i)   Except as provided in <u>Section 4(d)</u>, at 5:00 p.m. Central Time on the date that is 90 days following the date of the Option Holder's termination of employment, or upon the Expiration Date, if earlier.

(ii)   Notwithstanding <u>Section 4(b)(i)</u>, if the Option Holder's employment is involuntarily terminated by the Company or a Related Company for a reason other than for Cause (including, for the avoidance of doubt, following a Change in Control), or if an Executive Option Holder terminates for Good Reason following a Change in Control, at 5:00 p.m. Central Time on the date that is 12 months after the date of the Option Holder's termination of employment, or upon the Expiration Date, if earlier.

(c)   <u>Death or Disability</u>. If the Option Holder's termination of employment occurs due to the Option Holder's death or Disability, at 5:00 p.m. Central Time on the date that is 36 months after the date of such termination, or upon the Expiration Date, if earlier. In the case of death, the vested portion of the Option may be exercised by the Option Holder's beneficiary determined in accordance with Section 11 and, in the case of Disability, the vested portion of the Option may be exercised by the Option Holder or the Option Holder's personal representative or attorney-in-fact.

(d)   <u>Retirement</u>.

(i)   If on the date of the Option Holder's termination of employment (other than due to death or Disability), the Option Holder satisfies the Rule of 70 and the Option Holder is at least age 55 but not yet 60, at 5:00 p.m. Central Time on the date that is 12 months after the date of the Option Holder's termination of employment, or upon the Expiration Date, if earlier.

(ii)   If on the date of the Option Holder's termination of employment the Option Holder satisfies the Rule of 70 and the Option Holder is at least age 60, or if the Option Holder is at least age 65 (regardless of satisfaction of the Rule of 70), 5:00 p.m. Central Time on the date that is 36 months after the date of the Option Holder's termination of employment, or upon the Expiration Date, if earlier.

(e)   <u>Most Favorable Provision Applies</u>. For the avoidance of doubt, if two or more of <u>Sections 4(b)</u> through <u>4(d)</u> above apply, then the applicable Section that results in the longest Option exercise period shall control.

(f)   <u>Forfeiture</u>. If an Option Holder ceases to be employed by the Company or any Related Company prior to one or more Vesting Dates, the unvested portion of the Award shall be forfeited as of the termination date. Notwithstanding any provision of the Plan or these Award Terms to the contrary, the Option Holder will forfeit the Award (including any vested portion) immediately and without notice upon (A) the termination of the Option Holder's employment for Cause, (B) the Option Holder's breach of any confidentiality agreement or similar agreement pertaining to the confidentiality and nondisclosure of proprietary information, including but not

5

limited to trade secrets, of the Company or any Related Company, or (C) the Option Holder's commission of any act of malfeasance or wrongdoing affecting the Company or any Related Company. Furthermore, if the Option Holder ceases to be an employee of the Company and any Related Company (other than due to a termination following a Change in Control without Cause or for Good Reason, if applicable), and within one year following such date the Option Holder becomes employed by, consults with, and/or participates as an officer, director, employee, independent contractor, adviser, consultant, partner, principal, or shareholder (with more than five percent (5%) equity) with any entity which owns and/or operates (either directly or indirectly) or is engaged, or planning to be engaged (either directly or indirectly) in the ownership and/or operation of any of the "Competitive Restaurants" listed below or any successor thereto, then the Option Holder's Award (including any vested portion) will be immediately forfeited and, to the extent the Option Holder has exercised the Award (in whole or in part), to the extent permissible under applicable law, the Participant shall be required to immediately pay to the Company the amount of gain (determined on a gross basis) on the exercise of the Option.

| | | | |
|---|---|---|---|
| 1 | Ale House Restaurant | 29 | Landry's Seafood |
| 2 | Applebee's | 30 | Legal Sea Foods |
| 3 | Beef O'Brady's | 31 | Longhorn Steakhouse |
| 4 | Bennigan's Tavern | 32 | McCormick & Schmick's |
| 5 | BJ's Restaurant and Brewhouse | 33 | McDonald's |
| 6 | Bonefish Grill | 34 | Miller's Ale House Restaurant |
| 7 | BRAVO! Cucina Italiana | 35 | Morton's of Chicago |
| 8 | Brio Tuscan Grille | 36 | O'Charleys |
| 9 | Buca di Beppo | 37 | Olive Garden |
| 10 | Buffalo Wild Wings | 38 | On The Border |
| 11 | California Pizza Kitchen | 39 | Outback Steakhouse |
| 12 | Carino's Italian Grill | 40 | Palm Restaurant |
| 13 | Carraba's Italian Grill | 41 | Panera |
| 14 | Champps Americana | 42 | Pappadeaux Seafood Kitchen |
| 15 | Cheddar's Casual Café | 43 | PF Chang's China Bistro |
| 16 | Cheesecake Factory | 44 | Pizza Hut |
| 17 | Chipotle Mexican Grill | 45 | Red Robin |
| 18 | Chuy's | 46 | Romano's Macaroni Grill |
| 19 | Cracker Barrell | 47 | Ruby Tuesday |
| 20 | Dave & Busters | 48 | Ruth's Chris Steak House |
| 21 | Fogo De Chao | 49 | Seasons 52 |
| 22 | Fuddruckers | 50 | Taco Bell |
| 23 | Hooters | 51 | Texas Roadhouse |
| 24 | Houlihans | 52 | TGI Fridays |
| 25 | Houston's/Hillstone | 53 | Uno Chicago Grill |
| 26 | Il Fornaio Restaurant | 54 | Wendy's |
| 27 | J Alexanders | 55 | Yard House |
| 28 | KFC | | |

6

5.  <u>Clawback Provisions</u>. In addition to, and not in limitation of, the restrictions set forth in <u>Section 4(f)</u> above, if the Option Holder is an officer of the Company ("Officer") and the Board, or an appropriate committee thereof, has determined that any fraud, negligence, or intentional misconduct by the Officer was a significant contributing factor to the Company having to restate all or a portion of its financial statement(s), the Board or committee shall take, in its discretion, such action as it deems necessary to remedy the misconduct and prevent its recurrence. In determining what remedies to pursue, the Board or committee will take into account all relevant factors, including whether the restatement was the result of fraud, negligence, or intentional misconduct. The Board will, to the extent permitted by applicable law, in all appropriate cases, require reimbursement of any bonus or incentive compensation paid to the Officer, cause the cancellation of restricted or deferred stock awards and outstanding stock options, and seek reimbursement of any gains realized on the exercise of stock options attributable to such awards, if and to the extent that (a) the amount of incentive compensation was calculated based upon the achievement of certain financial results that were subsequently reduced due to a restatement, (b) the Officer engaged in any fraud or misconduct that caused or contributed to the need for the restatement, and (c) the amount of the bonus or incentive compensation that would have been awarded to the Officer had the financial results been properly reported would have been lower than the amount actually awarded. In addition, the Board may dismiss the Officer, authorize legal action, or take such other action to enforce the Officer's obligations to the Company as it may deem appropriate in view of all the facts surrounding the particular case. The Company will not seek to recover bonuses or other compensation as detailed above paid more than three years prior to the date the applicable restatement is disclosed.

6.  <u>Exercise and Payment</u>. The aggregate Exercise Price for shares of Stock purchased upon exercise of the Option must be paid in cash or by check acceptable to the Company or, if the Committee so determines in its sole discretion, the Company may accept payment of the Exercise Price by the surrender to the Company of shares of Stock having an aggregate Fair Market Value equal to the aggregate Exercise Price, or by any other method that is approved by the Committee and permitted by the Plan. As a condition of exercise, the Option Holder will also execute such documents as the Company in its discretion deems necessary to comply with or satisfy the requirements of the Securities Act of 1933, or any other law, as then in effect. Upon receipt of payment and any such documents, the Company will, as expeditiously as possible, deliver to the Option Holder a certificate or certificates for such shares of Stock.

7.  <u>Assignability</u>. The Option is not assignable or transferable by the Option Holder except by will or by the laws of descent or distribution. Subject to the foregoing sentence, the Option will inure to the benefit of and be binding upon the successors and assigns of the Option Holder. The Option shall be exercisable, during the lifetime of Option Holder, only by the Option Holder.

8.  <u>Capital Adjustments and Reorganizations</u>. The number of shares of Stock covered by the Option, and the Exercise Price thereof, will be subject to equitable adjustment, as determined by the Committee, to reflect any stock dividend, stock split, share combination, separation, reorganization, liquidation or the like, of or by the Company. In the event of any such transaction or event, the Committee, in its discretion, may provide in substitution for the Option such alternative

7

consideration as it, in good faith, may determine to be equitable in the circumstances and may require in connection with such substitution the surrender of the Option so replaced.

9.   <u>Notice of Disqualifying Disposition</u>. The Option Holder must notify the Company of his or her intent to dispose of any of the shares of Stock purchased pursuant to the Option within two years of the date of the grant of the Option or one year from the date of each exercise of the Option. Promptly after such disposition the Option Holder will notify the Company of the number of shares of Stock disposed of, the dates of acquisition and disposition of such shares and the consideration, if any, received on such disposition. If, in connection with any such disposition, the Company becomes liable for withholding taxes and has no amounts owing the Option Holder with which to discharge its withholding obligation, the Option Holder will provide the Company with the amount needed to discharge the Company's withholding obligation and will indemnify the Company against any penalties it may incur through its inability to apply amounts owing the Option Holder in discharge of its withholding obligation.

10.   <u>Incentive Stock Option Qualification</u>. This Option is intended to qualify as an "incentive stock option" under Section 422 of the Code, but to the extent that the Option, or a portion thereof, fails for any reason to meet the requirements of an "incentive stock option", then it shall be treated as a non-qualified Option for all purposes under the Plan, these Award Terms or an award letter; provided, however, that nothing in these Award Terms or an award letter will be interpreted as a representation, guarantee or other undertaking on the part of the Company that the Option is or will be determined to be an "incentive stock option" within such section or any other section of the Internal Revenue Code.

11.   <u>Heirs and Successors</u>. These Award Terms will be binding upon, and will inure to the benefit of, the Company and its successors and assigns, and upon any person acquiring, whether by merger, consolidation, purchase of assets or otherwise, all or substantially all of the Company's assets and business. Subject to the terms of the Plan, the Option Holder may designate a beneficiary in writing filed with the Committee in such form as the Committee will require. If a deceased Option Holder has failed to designate a beneficiary, or if the designated beneficiary of the deceased Option Holder dies before the Option Holder, the beneficiary will be deemed to be the legal representative or representatives of the estate of the last to die of the Option Holder and the designated beneficiary.

12.   <u>Taxes, Transaction Costs and Withholding</u>. The Option Holder will be solely responsible for the payment of all taxes and transaction costs relating to the granting, vesting, exercise and payment of this Option. It will be a condition to the obligation of the Company to issue or transfer shares of Stock upon exercise of this Option that the Option Holder pay to the Company, upon its demand, such amount as may be requested by the Company for the purpose of satisfying its liability to withhold federal, state or local income or other taxes incurred in connection with the Option, including the exercise thereof. If the amount requested is not paid, the Company may refuse to issue or transfer shares of Stock upon exercise of the Option.

13.   <u>Administration</u>. The authority to interpret and administer the terms and conditions of this Award will be vested in the Committee, and the Committee will have all powers with respect

thereto as it has with respect to the Plan. Any interpretation of these Award Terms by the Committee and any decision made by it with respect to these Award Terms is final and binding.

14.   <u>Relation to Plan</u>. Notwithstanding anything in these Award Terms to the contrary, these Award Terms are subject to the terms of the Plan, a copy of which may be obtained by the Option Holder from the office of the Secretary of the Company. Any amendment to the Plan will be deemed to be an amendment to these Award Terms to the extent that the amendment is applicable hereto.

15.   <u>No Employment Contract</u>. Nothing contained in these Award Terms will (a) confer upon the Option Holder any right to be employed by or remain employed by the Company or any Related Company, or (b) limit or affect in any manner the right of the Company or any Related Company to terminate the employment or adjust the compensation of the Option Holder.

16.   <u>Governing Law</u>. The interpretation, performance, and enforcement of these Award Terms will be governed by the laws of the State of Texas, without giving effect to the principles of conflict of laws thereof and all parties, including their successors and assigns, consent to the jurisdiction of the state and federal courts of Texas.

[End of document.]

9

Exhibit 10(l)

### BRINKER INTERNATIONAL, INC.
### TERMS OF F2018
### RETENTION STOCK UNIT AWARD

_____ ("Award Date")

Brinker International, Inc. (the "Company"), acting pursuant to Section 3 of the Brinker International, Inc. Stock Option and Incentive Plan (the "Plan"), hereby awards to you (the "Participant") a grant of such number of Retention Stock Units as specified in your award letter (the "Award"). For purposes of the Award, a "Retention Stock Unit" means the right to receive a share of Stock, subject to the satisfaction of all applicable terms and conditions. The Award is in all respects subject to the provisions of the Plan (the terms of which are incorporated herein by reference), these Award terms (the "Award Terms") and your award letter.

1.    Definitions. For purposes of the Award, the terms listed below are defined as follows:

a.  Cause. The term "Cause" means one or more of the following:

(i)   An act of fraud, misappropriation or embezzlement by the Participant in connection with the Company or a Related Company as determined by the affirmative vote of at least a majority of the Board or executive committee thereof;

(ii)  Gross mismanagement or gross neglect of the Participant's duties to the Company or a Related Company and its policies, procedures or guidelines as determined by the affirmative vote of at least a majority of the Board or executive committee thereof; or

(iii) Conviction of the Participant by a court of competent jurisdiction of a felony.

b.  Change in Control. The term "Change in Control" means:

(i)   a sale, transfer or other conveyance of all or substantially all of the assets of the Company on a consolidated basis; or

(ii)  the acquisition of beneficial ownership (as such term is defined in Rule 13d-3 promulgated under the Exchange Act) by any "person" (as such term is used in Sections 13(d) and 14(d) of the Exchange Act), other than the Company, directly or indirectly, of securities representing 50% or more of the total number of votes that may be cast for the election of directors of the Company; or

(iii) the failure at any annual or special meetings of the Company's shareholders held during the three-year period following a "solicitation in opposition" as defined in Rule 14a-6 promulgated under the Exchange Act, of a majority of the persons nominated by the

1

Company in the proxy material mailed to shareholders by the management of the Company to win election to seats on the Board (such majority calculated based upon the total number of persons nominated by the Company failing to win election to seats on the Board divided by the total number of Board members of the Board as of the beginning of such three-year period), excluding only those who die, retire voluntarily, are disabled or are otherwise disqualified in the interim between their nomination and the date of the meeting.

        c.  <u>Code Section 409A</u>. The term "Code Section 409A" means Section 409A of the Internal Revenue Code of 1986, as amended, and all Treasury Regulations and guidance promulgated thereunder.

        d.  <u>Good Reason</u>. The term "Good Reason" means the satisfaction of all of the following requirements:

        (i)        One or more of the following facts and circumstances exist: (A) a reduction in the Participant's then current base salary other than a general reduction in base salary that affects all similarly situated executives in substantially the same proportions; (B) a reduction in the Participant's target annual bonus opportunity; (C) a relocation of the principal location at which the Participant is required to provide services by more than fifty (50) miles; (D) the Company's failure to obtain an agreement from any successor to the Company to assume and agree to perform the obligations under this Award in the same manner and to the same extent that the Company would be required to perform, except where such assumption occurs by operations of law; (E) a material, adverse change in the Participant's title, reporting relationship, authority, duties or responsibilities; or (F) in the case of a Participant who is the Chief Executive Officer of the Company only, a failure of any successor to the Company to nominate the Participant for election by shareholders to the successor company's board of directors; and

        (ii)      the Participant shall have provided the Company written notice within thirty (30) days of his or her knowledge or reason to know of the existence of any fact or circumstance constituting Good Reason, the Company shall have failed to cure or eliminate such fact(s) or circumstance(s) within thirty (30) days of its receipt of such notice, and the resulting termination of employment must occur within thirty (30) days following expiration of such cure period.

        e.  <u>Plan Definitions</u>. Except where the context clearly implies or indicates the contrary, a word, term, or phrase used but not defined in these Award Terms will have the meaning set forth in the Plan.

    2.  <u>Term of Retention Stock Units</u>. The "Restricted Period" for the Award is the period beginning on the Award Date and ending on the third anniversary of the Award Date. The Participant will have no voting rights with respect to the Retention Stock Units or any shares of Stock underlying the Retention Stock Units until the shares of Stock are issued in settlement of the vested Retention Stock Units.

    3.  <u>Vesting</u>.

2

a. <u>General Rule</u>. The Retention Stock Units subject to the Award will become fully vested on the last day of the Restricted Period, provided the Participant has remained continuously employed by the Company or a Related Company through such date, except as otherwise specifically provided in this Award.

b. <u>Involuntary Termination Without Cause or for Good Reason Following a Change in Control</u>. Notwithstanding the provisions of <u>Section 3(a)</u>, in the event there has been a Change in Control during the Restricted Period and the Awards were not vested in connection with the Change in Control pursuant to <u>Section 3(c)</u>, then if a Participant is involuntarily terminated for a reason other than Cause (and other than due to the Participant's death or disability), or terminates employment for Good Reason, in each case following the Change in Control and prior to the last day of the Restricted Period, all of the Retention Stock Units subject to the Participant's Award will become fully vested as of the date of such termination.

c. <u>Change in Control</u>. Notwithstanding the provisions of <u>Section 3(a)</u>, in the event of a Change in Control, if the Awards are not assumed or replaced with awards of substantially equal value by the acquiring entity in such a Change in Control and/or cease to remain outstanding immediately following the Change in Control, all of the Retention Stock Units subject to a Participant's Award will become fully vested as of the date immediately following such Change in Control, provided the Participant has remained continuously employed by the Company or a Related Company through such date. After a Change in Control, references to the "Company" as they relate to the Award shall refer to the successor entity.

4. <u>Forfeiture</u>. Except as otherwise provided in <u>Section 3</u>, if the Participant ceases to be employed prior to the end of the Restricted Period, the Participant will immediately forfeit any Retention Stock Units as of the date of the Participant's termination, and the Participant will not be entitled to any payment with respect to such Retention Stock Units. Notwithstanding any provision of the Plan or these Award Terms to the contrary, the Participant will forfeit any Retention Stock Units (including any vested portion) immediately and without notice upon (A) the termination of the Participant's employment for Cause, (B) the Participant's breach of any confidentiality agreement or similar agreement pertaining to the confidentiality and nondisclosure of proprietary information, including but not limited to trade secrets, of the Company or any Related Company, or (C) the Participant's commission of any act of malfeasance or wrongdoing affecting the Company or any Related Company, and, in each case, to the extent Stock or other applicable consideration has been issued to the Participant in settlement of the Award, to the extent permissible under applicable law, the Participant shall be required to immediately return such consideration to the Company.

5. <u>Payment</u>. Each vested Retention Stock Unit will entitle the Participant to receive one share of Stock (or other consideration of equal value, as determined by the Committee, in the event payment is made following a Change in Control). Subject to <u>Section 6</u>, shares of Stock (or other consideration, as applicable) will be issued to the Participant in full settlement of vested Retention Stock Units during the 60-day period immediately following the date on which such Retention Stock Units first became vested pursuant to <u>Section 3</u>. At no other time prior to the end of the Restricted Period will any Stock (or other consideration, as applicable) be issued for Retention Stock Units pursuant to the Award. After the issuance of Stock (or other consideration, as applicable) to the

3

Participant, the Participant will own such Stock (or other consideration, as applicable) free of all restrictions described herein. The Participant will not have the right to designate the taxable year of payment.

     6.   <u>Section 409A</u>.

       a.   Although the Company does not guarantee the tax treatment of any payments or benefits under this Award, the intent of the Company is that the payments and benefits under this Award be exempt from, or comply with, Code Section 409A and to the maximum extent permitted the Award Terms and the award letter shall be limited, construed and interpreted in accordance with such intent. In no event whatsoever shall the Company, the Related Companies, their affiliates or their respective officers, directors, employees or agents be liable for any additional tax, interest or penalties that may be imposed on a Participant by Code Section 409A or damages for failing to comply with Code Section 409A.

       b.   Notwithstanding the foregoing or any other provision of this Award to the contrary, if at the time of a Participant's "separation from service" (within the meaning of Code Section 409A), the Participant is a "Specified Employee," then the Company will defer the payment of any nonqualified deferred compensation subject to Code Section 409A payable upon separation from service (without any reduction in such payments or benefits ultimately paid or provided to the Participant) until the date that is six (6) months following separation from service or, if earlier, the earliest other date as is permitted under Code Section 409A (and any amounts that otherwise would have been paid during this deferral period will be paid in a lump sum on the day after the expiration of the six (6) month period or such shorter period, if applicable). A Participant will be a "Specified Employee" for purposes of this Award if, on the date of the Participant's separation from service, the Participant is an individual who is, under the method of determination adopted by the Company designated as, or within the category of employees deemed to be, a "Specified Employee" within the meaning and in accordance with Treasury Regulation Section 1.409A-1(i). The Company shall determine in its sole discretion all matters relating to who is a "Specified Employee" and the application of and effects of the change in such determination.

       c.   Notwithstanding anything in these Award Terms, the award letter or elsewhere to the contrary, a termination of employment shall not be deemed to have occurred for purposes of any provision of this Award providing for the payment of any amounts or benefits that constitute "non-qualified deferred compensation" within the meaning of Code Section 409A upon or following a termination of a Participant's employment unless such termination is also a "separation from service" within the meaning of Code Section 409A and, for purposes of any such provision of this Award, references to a "termination," "termination of employment" or like terms shall mean "separation from service" and the date of such separation from service shall be the date of termination for purposes of any such payment or benefits.

     7.   <u>Dividends</u>. The Participant will not be entitled to receive any cash dividends or dividend equivalents with respect to the Retention Stock Units before they are settled pursuant to <u>Section 5</u>. However, to the extent that, and at the same time as, shares of Stock are issued under <u>Section 5</u>, the Participant (or the Participant's beneficiary) will also receive a lump sum cash payment equal to the amount of cash dividends that are paid or declared by the Company during the Restricted Period (but

4

prior to the date of payment of the Award pursuant to <u>Section 5</u>) on the number of shares of Stock (if any) issued to the Participant (or the Participant's beneficiary).

8.   <u>Capital Adjustments and Reorganizations</u>. The number of Retention Stock Units covered by the Award will be subject to equitable adjustment, as determined by the Committee, to reflect any stock dividend, stock split, share combination, separation, reorganization, liquidation or the like, of or by the Company. In the event of any such transaction or event, the Committee, in its discretion, may provide in substitution for the Award such alternative consideration as it, in good faith, may determine to be equitable in the circumstances and may require in connection with such substitution the surrender of the Award so replaced.

9.   <u>Clawback Provisions</u>. If the Participant is an officer of the Company ("Officer") and the Board, or an appropriate committee thereof, has determined that any fraud, negligence, or intentional misconduct by the Officer was a significant contributing factor to the Company having to restate all or a portion of its financial statement(s), the Board or committee shall take, in its discretion, such action as it deems necessary to remedy the misconduct and prevent its recurrence. In determining what remedies to pursue, the Board or committee will take into account all relevant factors, including whether the restatement was the result of fraud, negligence, or intentional misconduct. The Board will, to the extent permitted by applicable law, in all appropriate cases, require reimbursement of any bonus or incentive compensation paid to the Officer, cause the cancellation of restricted or deferred stock awards and outstanding stock options, and seek reimbursement of any gains realized on the exercise of stock options attributable to such awards, if and to the extent that (a) the amount of incentive compensation was calculated based upon the achievement of certain financial results that were subsequently reduced due to a restatement, (b) the Officer engaged in any fraud or misconduct that caused or contributed to the need for the restatement, and (c) the amount of the bonus or incentive compensation that would have been awarded to the Officer had the financial results been properly reported would have been lower than the amount actually awarded. In addition, the Board may dismiss the Officer, authorize legal action, or take such other action to enforce the Officer's obligations to the Company as it may deem appropriate in view of all the facts surrounding the particular case. The Company will not seek to recover bonuses or other compensation as detailed above paid more than three years prior to the date the applicable restatement is disclosed.

10.   <u>Heirs and Successors</u>. This Award will be binding upon, and will inure to the benefit of, the Company and its successors and assigns, and upon any person acquiring, whether by merger, consolidation, purchase of assets or otherwise, all or substantially all of the Company's assets and business. Subject to the terms of the Plan, any benefits distributable to a deceased Participant under this Award will be distributed to the beneficiary designated by the Participant in writing filed with the Committee in such form as the Committee will require. If a deceased Participant has failed to designate a beneficiary, or if the designated beneficiary of the deceased Participant dies before the Participant or before complete distribution of benefits due under this Award, the amounts to be distributed under this Award will be distributed to the legal representative or representatives of the estate of the last to die of the Participant and the beneficiary.

11.   <u>Taxes, Transaction Costs and Withholding</u>. The Participant will be solely responsible for the payment of all taxes and transaction costs relating to the granting, vesting and payment of the

5

Award. It will be a condition to the obligation of the Company to issue or transfer shares of Stock or other applicable consideration that the Participant pay to the Company, upon its demand, such amount as may be requested by the Company for the purpose of satisfying its liability to withhold federal, state or local income or other taxes incurred in connection with the Award. If the amount requested is not paid, the Company may refuse to issue or transfer shares of Stock or other applicable consideration to the Participant (or to the Participant's beneficiary).

12.   Administration. The authority to interpret and administer the terms and conditions of this Award will be vested in the Committee, and the Committee will have all powers with respect thereto as it has with respect to the Plan. Any interpretation of these Award Terms by the Committee and any decision made by it with respect to the Award is final and binding.

13.   Relation to Plan. Notwithstanding anything in these Award Terms to the contrary, the Award will be subject to the terms of the Plan, a copy of which may be obtained by the Participant from the office of the Secretary of the Company. Any amendment to the Plan will be deemed to be an amendment to these Award Terms to the extent that the amendment is applicable hereto.

14.   No Employment Contract. Nothing contained in these Award Terms will (a) confer upon the Participant any right to be employed by or remain employed by the Company or any Related Company, or (b) limit or affect in any manner the right of the Company or any Related Company to terminate the employment or adjust the compensation of the Participant.

15.   Governing Law. The interpretation, performance, and enforcement of these Award Terms will be governed by the laws of the State of Texas, without giving effect to the principles of conflict of laws thereof and all parties, including their successors and assigns, consent to the jurisdiction of the state and federal courts of Texas.

[End of document.]

6

Exhibit 10(m)

# BRINKER INTERNATIONAL, INC.
## TERMS OF F2018
## RESTRICTED STOCK UNIT AWARD

### August 31, 2017

Brinker International, Inc. (the "Company"), acting pursuant to Section 3 of the Brinker International, Inc. Stock Option and Incentive Plan (the "Plan"), hereby awards to you (the "Participant") a grant of such number of Restricted Stock Units as specified in your award letter (the "Award"). For purposes of the Award, a "Restricted Stock Unit" means the right to receive a share of Stock, subject to the satisfaction of all applicable terms and conditions. The Award is in all respects subject to the provisions of the Plan (the terms of which are incorporated herein by reference), these Award terms (the "Award Terms") and your award letter.

1. _Definitions_. For purposes of the Award, the terms listed below are defined as follows:

   a. _Cause_. The term "Cause" means one or more of the following:

      (i)   An act of fraud, misappropriation or embezzlement by the Participant in connection with the Company or a Related Company as determined by the affirmative vote of at least a majority of the Board or executive committee thereof;

      (ii)   Gross mismanagement or gross neglect of the Participant's duties to the Company or a Related Company and its policies, procedures or guidelines as determined by the affirmative vote of at least a majority of the Board or executive committee thereof; or

      (iii)   Conviction of the Participant by a court of competent jurisdiction of a felony.

   b. _Change in Control_. The term "Change in Control" means:

      (i)   a sale, transfer or other conveyance of all or substantially all of the assets of the Company on a consolidated basis; or

      (ii)   the acquisition of beneficial ownership (as such term is defined in Rule 13d-3 promulgated under the Exchange Act) by any "person" (as such term is used in Sections 13(d) and 14(d) of the Exchange Act), other than the Company, directly or indirectly, of securities representing 50% or more of the total number of votes that may be cast for the election of directors of the Company; or

      (iii)   the failure at any annual or special meetings of the Company's shareholders held during the three-year period following a "solicitation in opposition" as defined in Rule 14a-6 promulgated under the Exchange Act, of a majority of the persons nominated by the

1

Company in the proxy material mailed to shareholders by the management of the Company to win election to seats on the Board (such majority calculated based upon the total number of persons nominated by the Company failing to win election to seats on the Board divided by the total number of Board members of the Board as of the beginning of such three-year period), excluding only those who die, retire voluntarily, are disabled or are otherwise disqualified in the interim between their nomination and the date of the meeting.

   c. <u>Code Section 409A</u>. The term "Code Section 409A" means Section 409A of the Internal Revenue Code of 1986, as amended, and all Treasury Regulations and guidance promulgated thereunder.

   d. <u>Disability</u>. Except as otherwise provided by the Committee, the Participant will be considered to have a "Disability" during the period in which the Participant is unable, by reason of a medically determinable physical or mental impairment, to engage in any substantial gainful activity, which condition is expected to have a duration of not less than 120 days.

   e. <u>Executive Participant</u>. The term "Executive Participant" means a Participant who is the Chief Executive Officer of the Company or a member of the Brinker Leadership Team at the time an Award is granted to such Participant.

   f. <u>Good Reason</u>. The term "Good Reason" means the satisfaction of all of the following requirements:

    (i) One or more of the following facts and circumstances exist: (A) a reduction in the Executive Participant's then current base salary other than a general reduction in base salary that affects all similarly situated executives in substantially the same proportions; (B) a reduction in the Executive Participant's target annual bonus opportunity; (C) a relocation of the principal location at which the Executive Participant is required to provide services by more than fifty (50) miles; (D) the Company's failure to obtain an agreement from any successor to the Company to assume and agree to perform the obligations under this Award in the same manner and to the same extent that the Company would be required to perform, except where such assumption occurs by operations of law; (E) a material, adverse change in the Executive Participant's title, reporting relationship, authority, duties or responsibilities; or (F) in the case of an Executive Participant who is the Chief Executive Officer of the Company only, a failure of any successor to the Company to nominate the Executive Participant for election by shareholders to the successor company's board of directors; and

    (ii) the Executive Participant shall have provided the Company written notice within thirty (30) days of his or her knowledge or reason to know of the existence of any fact or circumstance constituting Good Reason, the Company shall have failed to cure or eliminate such fact(s) or circumstance(s) within thirty (30) days of its receipt of such notice, and the resulting termination of employment must occur within thirty (30) days following expiration of such cure period.

   g. <u>Rule of 70</u>. The term "Rule of 70" means that the sum of the Participant's age and the Participant's years of service with the Company or a Related Company equals or exceeds 70.

2

h.   <u>Plan Definitions</u>. Except where the context clearly implies or indicates the contrary, a word, term, or phrase used but not defined in these Award Terms will have the meaning set forth in the Plan.

2.   <u>Term of Restricted Stock Units</u>. The "Restricted Period" for the Award is the period beginning on **August 31, 2017** (the "Award Date") and ending on **August 31, 2020**. The Participant will have no voting rights with respect to the Restricted Stock Units or any shares of Stock underlying the Restricted Stock Units until the shares of Stock are issued in settlement of the vested Restricted Stock Units.

3.   <u>Vesting</u>.

a.   <u>General Rule</u>. The Restricted Stock Units subject to the Award will become fully vested on the last day of the Restricted Period, provided the Participant has remained continuously employed by the Company or a Related Company through such date, except as otherwise specifically provided in this Award.

b.   <u>Death or Disability</u>. Notwithstanding <u>Section 3(a)</u>, if a Participant terminates employment with the Company and the Related Companies prior to the last day of the Restricted Period due to the Participant's death or Disability, then all of the Restricted Stock Units subject to the Participant's Award will become fully vested as of the date of such termination.

c.   <u>Retirement Before Age 60</u>. Notwithstanding <u>Section 3(a)</u>, if a Participant ceases to be employed with the Company and the Related Companies prior to the last day of the Restricted Period, and as of the date of the termination the Participant (i) has satisfied the Rule of 70 and (ii) is at least age 55 but not yet age 60, the Participant will vest, as of the date of termination, in a pro-rata number of the Restricted Stock Units subject to the Participant's Award based on the number of complete months the Participant was employed by the Company or a Related Company during the Restricted Period, divided by the total number of complete months in the Restricted Period.

d.   <u>Retirement At or After Age 60</u>. Notwithstanding <u>Section 3(a)</u>, if a Participant ceases to be employed with the Company and the Related Companies prior to the last day of the Restricted Period, and as of the date of the termination the Participant (i) has satisfied the Rule of 70 and is at least age 60, or (ii) is at least age 65 regardless of satisfaction of the Rule of 70, then all of the Restricted Stock Units subject to the Participant's Award will become fully vested as of the date of such termination.

e.   <u>Involuntary Termination</u>.

(i)   *Involuntary Termination Without Cause Not Following a Change in Control*. Notwithstanding the provisions of <u>Section 3(a)</u>, if the Participant is involuntarily terminated for a reason other than for Cause prior to the last day of the Restricted Period, the Participant will vest, as of the date of such termination, in a pro-rata number of the Restricted Stock Units subject to the Participant's Award based on the number of complete months that the Participant was employed by the Company or a Related Company during the Restricted Period, divided by the total number of complete months in the Restricted Period.

3

(ii)    *Involuntary Termination Without Cause or Termination (by Executive Participants only) for Good Reason Following a Change in Control*. Notwithstanding the provisions of <u>Sections 3(a)</u> and <u>3(e)(i)</u>, in the event there has been a Change in Control during the Restricted Period and the Awards were not vested in connection with the Change in Control pursuant to <u>Section 3(f)</u>, then if a Participant is involuntarily terminated for a reason other than Cause or if an Executive Participant terminates for Good Reason following the Change in Control and prior to the last day of the Restricted Period, all of the Restricted Stock Units subject to the Participant's Award will become fully vested as of the date of such termination.

f.    <u>Change in Control</u>. Notwithstanding the provisions of <u>Section 3(a)</u>, in the event of a Change in Control, if the Awards are not assumed or replaced with awards of substantially equal value by the acquiring entity in such a Change in Control and/or cease to remain outstanding immediately following the Change in Control, all of the Restricted Stock Units subject to a Participant's Award will become fully vested as of the date immediately preceding such Change in Control, provided the Participant has remained continuously employed by the Company or a Related Company through such date. After a Change in Control, references to the "Company" as they relate to the Award shall refer to the successor entity.

g.    <u>Most Favorable Provision Applies</u>. For the avoidance of doubt, if two or more <u>Sections 3(a)</u> through <u>3(f)</u> above apply, then the applicable Section that results in the Participant vesting in the greatest number of Restricted Stock Units shall control.

4.    <u>Forfeiture</u>. Except as otherwise provided in <u>Section 3</u>, if the Participant ceases to be employed prior to the end of the Restricted Period, the Participant will immediately forfeit any Restricted Stock Units remaining unvested as of the date of the Participant's termination, and the Participant will not be entitled to any payment with respect to such Restricted Stock Units. Notwithstanding any provision of the Plan or these Award Terms to the contrary, the Participant will forfeit any Restricted Stock Units (including any vested portion) immediately and without notice upon (A) the termination of the Participant's employment for Cause, (B) the Participant's breach of any confidentiality agreement or similar agreement pertaining to the confidentiality and nondisclosure of proprietary information, including but not limited to trade secrets, of the Company or any Related Company, or (C) the Participant's commission of any act of malfeasance or wrongdoing affecting the Company or any Related Company. Furthermore, and notwithstanding <u>Section 3</u>, if subsequent to the Participant's termination of employment with the Company or any Related Company (other than due to a termination following a Change in Control without Cause or for Good Reason, if applicable), and within one year following such date the Participant becomes employed by, consults with, and/or participates as an officer, director, employee, independent contractor, adviser, consultant, partner, principal, or shareholder (with more than five percent (5%) equity) with any entity which owns and/or operates (either directly or indirectly) or is engaged, or planning to be engaged (either directly or indirectly) in the ownership and/or operation of any of the "Competitive Restaurants" listed below or any successor thereto, then the Participant's Award (including any vested portion) will be immediately forfeited and, to the extent Stock or other applicable consideration has been issued to the Participant in settlement of the Award, to the extent permissible under applicable law, the Participant shall be required to immediately return such consideration to the Company.

4

| | | | |
|---|---|---|---|
| 1 | Ale House Restaurant | 29 | Landry's Seafood |
| 2 | Applebee's | 30 | Legal Sea Foods |
| 3 | Beef O'Brady's | 31 | Longhorn Steakhouse |
| 4 | Bennigan's Tavern | 32 | McCormick & Schmick's |
| 5 | BJ's Restaurant and Brewhouse | 33 | McDonald's |
| 6 | Bonefish Grill | 34 | Miller's Ale House Restaurant |
| 7 | BRAVO! Cucina Italiana | 35 | Morton's of Chicago |
| 8 | Brio Tuscan Grille | 36 | O'Charleys |
| 9 | Buca di Beppo | 37 | Olive Garden |
| 10 | Buffalo Wild Wings | 38 | On The Border |
| 11 | California Pizza Kitchen | 39 | Outback Steakhouse |
| 12 | Carino's Italian Grill | 40 | Palm Restaurant |
| 13 | Carraba's Italian Grill | 41 | Panera |
| 14 | Champps Americana | 42 | Pappadeaux Seafood Kitchen |
| 15 | Cheddar's Casual Café | 43 | PF Chang's China Bistro |
| 16 | Cheesecake Factory | 44 | Pizza Hut |
| 17 | Chipotle Mexican Grill | 45 | Red Robin |
| 18 | Chuy's | 46 | Romano's Macaroni Grill |
| 19 | Cracker Barrel | 47 | Ruby Tuesday |
| 20 | Dave & Busters | 48 | Ruth's Chris Steak House |
| 21 | Fogo De Chao | 49 | Seasons 52 |
| 22 | Fuddruckers | 50 | Taco Bell |
| 23 | Hooters | 51 | Texas Roadhouse |
| 24 | Houlihans | 52 | TGI Fridays |
| 25 | Houston's/Hillstone | 53 | Uno Chicago Grill |
| 26 | Il Fornaio Restaurant | 54 | Wendy's |
| 27 | J Alexanders | 55 | Yard House |
| 28 | KFC | | |

5.  <u>Payment</u>. Each vested Restricted Stock Unit will entitle the Participant to receive one share of Stock (or other consideration of equal value, as determined by the Committee, in the event payment is made following a Change in Control). Subject to <u>Section 6</u>, shares of Stock (or other consideration, as applicable) will be issued to the Participant in full settlement of vested Restricted Stock Units during the 60-day period immediately following the date on which such Restricted Stock Units first became vested pursuant to <u>Section 3</u>. At no other time prior to the end of the Restricted Period will any Stock (or other consideration, as applicable) be issued for Restricted Stock Units pursuant to the Award.  After the issuance of Stock (or other consideration, as applicable) to the Participant, the Participant will own such Stock (or other consideration, as applicable) free of all restrictions described herein. The Participant will not have the right to designate the taxable year of payment.

6.  <u>Section 409A</u>.

b.   Although the Company does not guarantee the tax treatment of any payments or benefits under this Award, the intent of the Company is that the payments and benefits under this Award be exempt from, or comply with, Code Section 409A and to the maximum extent permitted the Award Terms and the award letter shall be limited, construed and interpreted in accordance with such

5

intent. In no event whatsoever shall the Company, the Related Companies, their affiliates or their respective officers, directors, employees or agents be liable for any additional tax, interest or penalties that may be imposed on a Participant by Code Section 409A or damages for failing to comply with Code Section 409A.

        c.    Notwithstanding the foregoing or any other provision of this Award to the contrary, if at the time of a Participant's "separation from service" (within the meaning of Code Section 409A), the Participant is a "Specified Employee," then the Company will defer the payment of any nonqualified deferred compensation subject to Code Section 409A payable upon separation from service (without any reduction in such payments or benefits ultimately paid or provided to the Participant) until the date that is six (6) months following separation from service or, if earlier, the earliest other date as is permitted under Code Section 409A (and any amounts that otherwise would have been paid during this deferral period will be paid in a lump sum on the day after the expiration of the six (6) month period or such shorter period, if applicable). A Participant will be a "Specified Employee" for purposes of this Award if, on the date of the Participant's separation from service, the Participant is an individual who is, under the method of determination adopted by the Company designated as, or within the category of employees deemed to be, a "Specified Employee" within the meaning and in accordance with Treasury Regulation Section 1.409A-1(i). The Company shall determine in its sole discretion all matters relating to who is a "Specified Employee" and the application of and effects of the change in such determination.

        d.    Notwithstanding anything in these Award Terms, the award letter or elsewhere to the contrary, a termination of employment shall not be deemed to have occurred for purposes of any provision of this Award providing for the payment of any amounts or benefits that constitute "non-qualified deferred compensation" within the meaning of Code Section 409A upon or following a termination of a Participant's employment unless such termination is also a "separation from service" within the meaning of Code Section 409A and, for purposes of any such provision of this Award, references to a "termination," "termination of employment" or like terms shall mean "separation from service" and the date of such separation from service shall be the date of termination for purposes of any such payment or benefits.

       7.   <u>Dividends</u>. The Participant will not be entitled to receive any cash dividends or dividend equivalents with respect to the Restricted Stock Units before they are settled pursuant to <u>Section 5</u>. However, to the extent that, and at the same time as, shares of Stock are issued under <u>Section 5</u>, the Participant (or the Participant's beneficiary) will also receive a lump sum cash payment equal to the amount of cash dividends that are paid or declared by the Company during the Restricted Period (but prior to the date of payment of the Award pursuant to <u>Section 5</u>) on the number of shares of Stock (if any) issued to the Participant (or the Participant's beneficiary).

       8.   <u>Capital Adjustments and Reorganizations</u>. The number of Restricted Stock Units covered by the Award will be subject to equitable adjustment, as determined by the Committee, to reflect any stock dividend, stock split, share combination, separation, reorganization, liquidation or the like, of or by the Company. In the event of any such transaction or event, the Committee, in its discretion, may provide in substitution for the Award such alternative consideration as it, in good faith,

may determine to be equitable in the circumstances and may require in connection with such substitution the surrender of the Award so replaced.

9.  <u>Clawback Provisions</u>. If the Participant is an officer of the Company ("Officer") and the Board, or an appropriate committee thereof, has determined that any fraud, negligence, or intentional misconduct by the Officer was a significant contributing factor to the Company having to restate all or a portion of its financial statement(s), the Board or committee shall take, in its discretion, such action as it deems necessary to remedy the misconduct and prevent its recurrence. In determining what remedies to pursue, the Board or committee will take into account all relevant factors, including whether the restatement was the result of fraud, negligence, or intentional misconduct. The Board will, to the extent permitted by applicable law, in all appropriate cases, require reimbursement of any bonus or incentive compensation paid to the Officer, cause the cancellation of restricted or deferred stock awards and outstanding stock options, and seek reimbursement of any gains realized on the exercise of stock options attributable to such awards, if and to the extent that (a) the amount of incentive compensation was calculated based upon the achievement of certain financial results that were subsequently reduced due to a restatement, (b) the Officer engaged in any fraud or misconduct that caused or contributed to the need for the restatement, and (c) the amount of the bonus or incentive compensation that would have been awarded to the Officer had the financial results been properly reported would have been lower than the amount actually awarded. In addition, the Board may dismiss the Officer, authorize legal action, or take such other action to enforce the Officer's obligations to the Company as it may deem appropriate in view of all the facts surrounding the particular case. The Company will not seek to recover bonuses or other compensation as detailed above paid more than three years prior to the date the applicable restatement is disclosed.

10.  <u>Heirs and Successors</u>. These Award Terms will be binding upon, and will inure to the benefit of, the Company and its successors and assigns, and upon any person acquiring, whether by merger, consolidation, purchase of assets or otherwise, all or substantially all of the Company's assets and business. Subject to the terms of the Plan, any benefits distributable to a deceased Participant will be distributed to the beneficiary designated by the Participant in writing filed with the Committee in such form as the Committee will require. If a deceased Participant has failed to designate a beneficiary, or if the designated beneficiary of the deceased Participant dies before the Participant or before complete distribution of benefits due under the Plan, the amounts to be distributed under the Plan will be distributed to the legal representative or representatives of the estate of the last to die of the Participant and the beneficiary.

11.  <u>Taxes, Transaction Costs and Withholding</u>. The Participant will be solely responsible for the payment of all taxes and transaction costs relating to the granting, vesting and payment of the Award. It will be a condition to the obligation of the Company to issue or transfer shares of Stock or other applicable consideration that the Participant pay to the Company, upon its demand, such amount as may be requested by the Company for the purpose of satisfying its liability to withhold federal, state or local income or other taxes incurred in connection with the Award. If the amount requested is not paid, the Company may refuse to issue or transfer shares of Stock or other applicable consideration to the Participant (or to the Participant's beneficiary).

12.   <u>Administration</u>. The authority to interpret and administer the terms and conditions of this Award will be vested in the Committee, and the Committee will have all powers with respect thereto as it has with respect to the Plan. Any interpretation of these Award Terms by the Committee and any decision made by it with respect to the Award is final and binding.

13.   <u>Relation to Plan</u>. Notwithstanding anything in these Award Terms to the contrary, the Award will be subject to the terms of the Plan, a copy of which may be obtained by the Participant from the office of the Secretary of the Company. Any amendment to the Plan will be deemed to be an amendment to these Award Terms to the extent that the amendment is applicable hereto.

14.   <u>No Employment Contract</u>. Nothing contained in these Award Terms will (a) confer upon the Participant any right to be employed by or remain employed by the Company or any Related Company, or (b) limit or affect in any manner the right of the Company or any Related Company to terminate the employment or adjust the compensation of the Participant.

15.   <u>Governing Law</u>. The interpretation, performance, and enforcement of these Award Terms will be governed by the laws of the State of Texas, without giving effect to the principles of conflict of laws thereof and all parties, including their successors and assigns, consent to the jurisdiction of the state and federal courts of Texas.

[End of document.]

8

Exhibit 10(n)

# BRINKER INTERNATIONAL, INC.
## TERMS OF
## CEO SPECIAL EQUITY AWARD

### August 31, 2017 ("Grant Date")

Brinker International, Inc. (the "Company"), acting pursuant to Section 2 of the Brinker International, Inc. Stock Option and Incentive Plan (the "Plan"), has granted to you (the "Option Holder") an option to purchase such number of shares of the common stock of the Company ("Stock") as specified in your award letter (the "Award"). The Award is in all respects subject to the provisions of the Plan (the terms of which are incorporated herein by reference), these Award terms including any appendices hereto ("Award Terms") and your award letter.

1.　　_Definitions_. For purposes of this Award, the terms listed below are defined as follows:

(a)　_12-Month Rolling EPS_. The term "12-Month Rolling EPS" means, as of a given date, the Company's actual adjusted diluted earnings per share for the 12-month period ended on such date and is calculated as the Adjusted Net Income (modified for any applicable adjustments set forth in Appendix 1) divided by the Adjusted Diluted WAS, each as determined for the 12-month period ended on such date by the Company in its sole discretion.

(b)　_Adjusted Diluted WAS_. The term "Adjusted Diluted WAS" means actual diluted weighted average shares prepared in accordance with GAAP and adjusted as set forth in Appendix 1.

(c)　_Adjusted Net Income_. The term "Adjusted Net Income" means the Company's actual net income prepared in accordance with GAAP and adjusted to exclude items recorded in the Company's "Other Gains and Charges" caption on the consolidated statement of comprehensive income and any other items which are excluded from the Company's net income to determine "Adjusted Net Income" as presented in the quarterly and annual earnings releases.

(d)　_Cause_. The term "Cause" has the meaning set forth in the Severance and Change in Control Agreement by and between the Company and the Option Holder, dated as of June 22, 2017 (the "CIC Agreement").

(e)　_Change in Control_. The term "Change in Control" has the meaning set forth in the CIC Agreement.

(f)　_Code Section 409A_. The term "Code Section 409A" means Section 409A of the Internal Revenue Code of 1986, as amended, and all Treasury Regulations and guidance promulgated thereunder.

(g)　_Disability_. The term "Disability" shall mean "Total Disability", as such term is defined in the CIC Agreement.

1

(h)   <u>EPS</u>. The term "EPS" means, as of a given date, the Company's actual adjusted diluted earnings per share as of such date and is calculated as the Adjusted Net Income (modified for any applicable adjustments set forth in Appendix 1) divided by the Adjusted Diluted WAS, each as determined for the most recent Company fiscal year ended prior to such date by the Company in its sole discretion.

(i)   <u>Exercise Price</u>. The term "Exercise Price" means the amount set forth in the award letter associated with the Award, which represents the closing price per share of the Stock on the trading day coinciding with the Grant Date (or, if such day is not a trading day, the closing price per share of the Stock on the trading day immediately preceding the Grant Date). The Exercise Price shall never be less than the fair market value of a share of Stock on the Grant Date of the Option within the meaning of Code Section 409A.

(j)   <u>Good Reason</u>. The term "Good Reason" has the meaning set forth in the CIC Agreement.

(k)   <u>Rule of 70</u>. The term "Rule of 70" means that the sum of the Option Holder's age and the Option Holder's years of service with the Company or a Related Company equals or exceeds 70.

(l)   <u>Plan Definitions</u>. Except where the context clearly implies or indicates the contrary, a word, term, or phrase used but not defined in these Award Terms will have the meaning set forth in the Plan.

2.   <u>Grant of Option</u>. The Option Holder has been granted an option (the "Option") to purchase shares of Stock from the Company at the Exercise Price, in the amounts, during the periods and upon the terms and conditions set forth in these Award Terms and in the Option Holder's award letter.

3.   <u>Vesting and Exercisability</u>.

(a)   <u>Vesting Schedule</u>. The Option will vest in accordance with the following schedule (the period starting on the Grant Date and ending on the Vesting Date for each Vesting Tranche, the "Vesting Period"):

2

| If Option Holder remains continuously in the employ of the Company or a Related Company through the applicable dates below and the applicable performance goals set forth below are achieved (each a "Vesting Date"): | Then the following portion of the Option will vest on the applicable Vesting Date (each portion referred to as a "Vesting Tranche"): |
| --- | --- |
| **On June 30, 2021 but ONLY IF the EPS achieved as of June 30, 2021 is at least $4.40.** | 50% of Option (the "First Vesting Tranche") |
| **On June 30, 2022 but ONLY IF the EPS achieved as of June 30, 2022 is at least $5.00.** | 50% of Option (or 100% of Option if no portion of Option vested in the First Vesting Tranche) (the "Second Vesting Tranche") |

Notwithstanding any provision herein to the contrary, no unvested portion of the Option will vest after the earlier of (i) June 30, 2022 or (ii) except as specifically provided in these Award Terms, the date of the Option Holder's termination of employment.  For purposes of these Award Terms, "termination of employment" means the Option Holder ceases to be employed by the Company and all Related Companies.

(b)   <u>Death or Disability</u>.  Notwithstanding <u>Section 3(a)</u>, if the Option Holder ceases to be employed with the Company and the Related Companies prior to one or more Vesting Dates due to the Option Holder's death or Disability, then the portion of the unvested Option that will become vested as of the date of such termination is equal to the then-unvested portion of the Option multiplied by a fraction, the numerator of which is the 12-Month Rolling EPS determined as of the date of termination and the denominator of which is $5.00.

(c)   <u>Voluntary Termination</u> .  Notwithstanding <u>Section 3(a)</u>, if the Option Holder resigns from employment with the Company and the Related Companies for any reason prior to one or more Vesting Dates (other than for Good Reason following a Change in Control), the unvested portion of the Option will be forfeited as of the Option Holder's termination of employment.

(d)   <u>Involuntary Termination</u>.

(i)   *Involuntary Termination Without Cause Not Following a Change in Control* .  Notwithstanding <u>Section 3(a)</u>, if the Option Holder is involuntarily terminated for a reason other than for Cause prior to one or more Vesting Dates, then the following percentage of the unvested Option will become vested at the end of the applicable Vesting Period:

a)   **If the termination occurs prior to the second annual anniversary of the Grant Date: 0%.**

b)   **If the termination occurs on or after the second annual anniversary of the Grant Date, but prior to the third annual anniversary of the Grant Date:**

3

(1)     With respect to the First Vesting Tranche: a percentage determined by dividing the number of days in the Vesting Period for the First Vesting Tranche that the Option Holder was employed by the total number of days in the Vesting Period for the First Vesting Tranche, <u>provided</u> that the EPS target set forth for the First Vesting Tranche ($4.40) is achieved as of the Vesting Date for such tranche. For the avoidance of doubt, if the EPS target set forth for the First Vesting Tranche ($4.40) is not achieved as of the Vesting Date for such tranche, the percentage will be 0%; and

(2)     With respect to the Second Vesting Tranche: 0%.

**c)     If the termination is on or after the third annual anniversary of the Grant Date:**

(1)     With respect to the First Vesting Tranche: a percentage determined by dividing the number of days in the Vesting Period for the First Vesting Tranche that the Option Holder was employed by the total number of days in the Vesting Period for the First Vesting Tranche, <u>provided</u> that the EPS target set forth for the First Vesting Tranche ($4.40) is achieved as of the Vesting Date for such tranche; and

(2)     With respect to the Second Vesting Tranche: a percentage determined by dividing the number of days in the Vesting Period for the Second Vesting Tranche that the Option Holder was employed by the total number of days in the Vesting Period for the Second Vesting Tranche, <u>provided</u> that the EPS target set forth for the Second Vesting Tranche ($5.00) is achieved as of the Vesting Date for such tranche.

(ii)     *Involuntary Termination Without Cause or Termination for Good Reason Following a Change in Control*. Notwithstanding <u>Sections 3(a)</u> and <u>3(d)(i)</u>, in the event there has been a Change in Control during the Vesting Period and the Option was not vested in connection with the Change in Control pursuant to <u>Section 3(e)</u>, then if the Option Holder is involuntarily terminated following the Change in Control for a reason other than Cause, or if the Option Holder terminates for Good Reason following the Change in Control, in each case prior to one or more Vesting Dates, the unvested portion of the Option will become fully vested as of the date of such termination**.**

(e)     <u>Change in Control</u>. Notwithstanding <u>Section 3(a)</u>, in the event of a Change in Control prior to one or more Vesting Dates, if the Option is not assumed or replaced with awards of substantially equal value by the acquiring entity in such a Change in Control and/or ceases to remain outstanding immediately following the Change in Control, the Option Holder's Option will become fully vested as of the date immediately preceding such Change in Control, provided the

4

Option Holder has remained continuously employed by the Company or a Related Company through such date. After a Change in Control, references to the "Company" as they relate to the Option shall refer to the successor entity.

(f)   Most Favorable Provision Applies. For the avoidance of doubt, if two or more of Sections 3(b) through 3(e) above apply, then the applicable Section that results in the Option Holder vesting in the greatest portion of the Option shall control.

(g)   Exercisability. The vested portion of the Option will be exercisable in whole or in part (but not as to any fractional shares of Stock) at any time prior to the termination of the Option pursuant to Section 4, provided that (i) any requisite approval or consent of any government authority of any kind that has jurisdiction over the exercise of options has been secured, and (ii) the Exercise Price is not greater than the Fair Market Value of a share of Stock on the intended date of exercise. The right to purchase shares of Stock under the Option will be cumulative, and shares not purchased in any year may be purchased in subsequent years, subject to the termination provisions contained herein.

4.   Termination of Option. The Option will terminate on the first to occur of:

(a)   Expiration Date. Notwithstanding any provision of these Award Terms to the contrary, in no event will the Option be exercisable after 5:00 p.m. Central Time on **August 31, 2025** ("Expiration date").

(b)   Termination of Employment. In the case of the Option Holder's termination of employment, the Option will terminate as follows:

(i)   Except as provided in Section 4(b)(ii), 4(c) or 4(d), (A) at 5:00 p.m. Central Time on the date that is 90 days following the date of the Option Holder's termination of employment, or upon the Expiration Date, if earlier, or (B) in the event the Option Holder becomes vested in any portion of the Option pursuant to Section 3(d)(i)(b) or 3(d)(i)(c), at 5:00 p.m. Central Time on the date that is 90 days following the Vesting Date for the Vesting Tranche(s) that vests pursuant to  Section 3(d)(i)(b) or 3(d)(i)(c), as applicable, or upon the Expiration Date, if earlier.

(ii)   If the Option Holder's employment is involuntarily terminated by the Company or a Related Company for a reason other than Cause, or if the Option Holder terminates for Good Reason, in each case following a Change in Control, at 5:00 p.m. Central Time on the date that is 12 months after the date of the Option Holder's termination of employment, or upon the Expiration Date, if earlier.

(c)   Death or Disability. If the Option Holder's termination of employment occurs due to the Option Holder's death or Disability, at 5:00 p.m. Central Time on the date that is 36 months after the date of such termination, or upon the Expiration Date, if earlier. In the case of death, the vested portion of the Option may be exercised by the Option Holder's beneficiary determined in accordance with Section 9 and, in the case of Disability, the vested portion of the Option may be exercised by the Option Holder or the Option Holder's personal representative or attorney-in-fact.

(d)   Retirement.

(i)   If on the date of the Option Holder's termination of employment (other than due to death or Disability), the Option Holder satisfies the Rule of 70 and the Option Holder is at least age 55 but not yet 60, at 5:00 p.m. Central Time on the date that is 12 months after the date of the Option Holder's termination of employment, or upon the Expiration Date, if earlier.

(ii)   If on the date of the Option Holder's termination of employment the Option Holder satisfies the Rule of 70 and the Option Holder is at least age 60, or if the Option Holder is at least age 65 (regardless of satisfaction of the Rule of 70), 5:00 p.m. Central Time on the date that is 36 months after the date of the Option Holder's termination of employment, or upon the Expiration Date, if earlier.

(e)   Most Favorable Provision Applies. For the avoidance of doubt, if two or more of Sections 4(b) through 4(d) above apply, then the applicable Section that results in the longest Option exercise period shall control.

(f)   Forfeiture. If the Option Holder ceases to be employed by the Company or any Related Company prior to one or more Vesting Dates, the unvested portion of the Award shall be forfeited as of the termination date.  Notwithstanding any provision of the Plan or these Award Terms to the contrary, the Option Holder will forfeit the Award (including any vested portion) immediately

and without notice upon (A) the termination of the Option Holder's employment for Cause, (B) the Option Holder's breach of any restrictive covenants under the CIC Agreement or any other agreement between the Option Holder and the Company or any Related Company, or (C) the Option Holder's commission of any act of malfeasance or wrongdoing affecting the Company or any Related Company.

     5.  <u>Clawback Provisions</u>. In addition to, and not in limitation of, the restrictions set forth in <u>Section 4(f)</u> above, if the Board, or an appropriate committee thereof, has determined that any fraud, negligence, or intentional misconduct by the Option Holder was a significant contributing factor to the Company having to restate all or a portion of its financial statement(s), the Board or committee shall take, in its discretion, such action as it deems necessary to remedy the misconduct

5

and prevent its recurrence. In determining what remedies to pursue, the Board or committee will take into account all relevant factors, including whether the restatement was the result of fraud, negligence, or intentional misconduct. The Board will, to the extent permitted by applicable law, in all appropriate cases, require reimbursement of any bonus or incentive compensation paid to the Option Holder, cause the cancellation of restricted or deferred stock awards and outstanding stock options, and seek reimbursement of any gains realized on the exercise of stock options attributable to such awards, if and to the extent that (a) the amount of incentive compensation was calculated based upon the achievement of certain financial results that were subsequently reduced due to a restatement, (b) the Option Holder engaged in any fraud or misconduct that caused or contributed to the need for the restatement, and (c) the amount of the bonus or incentive compensation that would have been awarded to the Option Holder had the financial results been properly reported would have been lower than the amount actually awarded. In addition, the Board may dismiss the Option Holder, authorize legal action, or take such other action to enforce the Option Holder's obligations to the Company as it may deem appropriate in view of all the facts surrounding the particular case. The Company will not seek to recover bonuses or other compensation as detailed above paid more than three years prior to the date the applicable restatement is disclosed.

6.   <u>Exercise and Payment</u>. The aggregate Exercise Price for shares of Stock purchased upon exercise of the Option must be paid in cash or by check acceptable to the Company or, if the Committee so determines in its sole discretion, the Company may accept payment of the Exercise Price by the surrender to the Company of shares of Stock having an aggregate Fair Market Value equal to the aggregate Exercise Price, or by any other method that is approved by the Committee and permitted by the Plan. As a condition of exercise, the Option Holder will also execute such documents as the Company in its discretion deems necessary to comply with or satisfy the requirements of the Securities Act of 1933, or any other law, as then in effect. Upon receipt of payment and any such documents, the Company will, as expeditiously as possible, deliver to the Option Holder a certificate or certificates for such shares of Stock.

7.   <u>Assignability</u>. The Option is not assignable or transferable by the Option Holder except by will or by the laws of descent or distribution. Subject to the foregoing sentence, the Option will inure to the benefit of and be binding upon the successors and assigns of the Option Holder. The Option shall be exercisable, during the lifetime of Option Holder, only by the Option Holder.

8.   <u>Capital Adjustments and Reorganizations</u>. The number of shares of Stock covered by the Option, and the Exercise Price thereof, will be subject to equitable adjustment, as determined by the Committee, to reflect any stock dividend, stock split, share combination, separation, reorganization, liquidation or the like, of or by the Company. In the event of any such transaction or event, the Committee, in its discretion, may provide in substitution for the Option such alternative consideration as it, in good faith, may determine to be equitable in the circumstances and may require in connection with such substitution the surrender of the Option so replaced.

9.   <u>Heirs and Successors</u>. These Award Terms will be binding upon, and will inure to the benefit of, the Company and its successors and assigns, and upon any person acquiring, whether by merger, consolidation, purchase of assets or otherwise, all or substantially all of the Company's

6

assets and business. Subject to the terms of the Plan, the Option Holder may designate a beneficiary in writing filed with the Committee in such form as the Committee will require. If a deceased Option Holder has failed to designate a beneficiary, or if the designated beneficiary of the deceased Option Holder dies before the Option Holder, the beneficiary will be deemed to be the legal representative or representatives of the estate of the last to die of the Option Holder and the designated beneficiary.

10.   <u>Taxes, Transaction Costs and Withholding</u>. The Option Holder will be solely responsible for the payment of all taxes and transaction costs relating to the granting, vesting, exercise and payment of this Option. It will be a condition to the obligation of the Company to issue or transfer shares of Stock upon exercise of this Option that the Option Holder pay to the Company, upon its demand, such amount as may be requested by the Company for the purpose of satisfying its liability to withhold federal, state or local income or other taxes incurred in connection with the Option, including the exercise thereof. If the amount requested is not paid, the Company may refuse to issue or transfer shares of Stock upon exercise of the Option.

11.   <u>Administration</u>. The authority to interpret and administer the terms and conditions of this Award, including the authority to determine in its absolute discretion whether any performance metric hereunder has been achieved, will be vested in the Committee, and the Committee will have all powers with respect thereto as it has with respect to the Plan. Any interpretation of these Award Terms by the Committee and any decision made by it with respect to these Award Terms is final and binding.

12.   <u>Relation to Plan</u>. Notwithstanding anything in these Award Terms to the contrary, these Award Terms are subject to the terms of the Plan, a copy of which may be obtained by the Option Holder from the office of the Secretary of the Company. Any amendment to the Plan will be deemed to be an amendment to these Award Terms to the extent that the amendment is applicable hereto.

13.   <u>No Employment Contract</u>. Nothing contained in these Award Terms will (a) confer upon the Option Holder any right to be employed by or remain employed by the Company or any Related Company, or (b) limit or affect in any manner the right of the Company or any Related Company to terminate the employment or adjust the compensation of the Option Holder.

14.   <u>Governing Law</u>. The interpretation, performance, and enforcement of these Award Terms will be governed by the laws of the State of Texas, without giving effect to the principles of conflict of laws thereof and all parties, including their successors and assigns, consent to the jurisdiction of the state and federal courts of Texas.

[Remainder of page intentionally left blank.]

7

**Appendix 1**
**to the**
**Brinker International, Inc. Terms of CEO Special Equity Award**

1)        <u>Adjustments to EPS</u>. The calculations of EPS and 12-Month Rolling EPS will reflect the following adjustments.

(a)        <u>Accounting and Tax Changes</u>. The EPS and 12-Month Rolling EPS calculations will be adjusted to neutralize any impacts associated with (i) changes in accounting principles pursuant to accounting pronouncements adopted during the period to which such calculations apply and (ii) changes in tax laws and regulations (including, but not limited to, unplanned and/or unanticipated changes in tax rates) taking effect during the period to which such calculations apply.

(b)   <u>Brand or Business Dispositions</u>. Any profit or loss associated with the disposition or sale of a brand or business will be excluded from the EPS and 12-Month Rolling EPS calculation. Any related impacts to interest expense, weighted average number of shares, and profit associated with the disposed brand or business will be reflected in EPS and/or 12-Month Rolling EPS to the extent necessary to neutralize the impact of the event in both calculations. Associated disposition costs, including but not limited to transaction, transition, disintegration or restructuring will be excluded from the EPS and 12-Month Rolling EPS calculation.

(c)   <u>Brand or Business Acquisition</u>. All profit or loss associated with the acquired brand or business, including associated changes to interest expense, as reported in the Company's Adjusted Net Income, will be included in the EPS and 12-Month Rolling EPS calculation. Associated acquisition costs, including but not limited to transaction, transition, integration or restructuring, will be excluded from EPS and 12-Month Rolling EPS calculation.

(d)   <u>Refranchised Restaurants</u>. Any gain or loss from refranchising will be excluded from the EPS and 12-Month Rolling EPS calculation. Any related impacts to interest expense, weighted average number of shares, and royalties or profit associated with the refranchised restaurants will be reflected in EPS and/or 12-Month Rolling EPS to the extent necessary to neutralize the impact of the event in both calculations.

The Committee may also, in its discretion, include or exclude items to measure specific objectives, such as losses from discontinued operations, extraordinary gains or losses, the cumulative effect of accounting changes, acquisitions or divestitures, foreign exchange impacts, any unusual non-recurring gain or loss, and other items as the Committee determines to be appropriate.

[End of document.]

8

EXHIBIT 13

**BRINKER INTERNATIONAL, INC.**
**SELECTED FINANCIAL DATA**
**(in thousands, except per share amounts and number of restaurants)**

| | | Fiscal Years | | | |
|---|---|---|---|---|---|
| | 2017 | 2016 (a) (b) | 2015 (a) | 2014 | 2013 |
| **Income Statement Data:** | | | | | |
| Revenues: | | | | | |
| Company sales | $ 3,062,579 | $ 3,166,659 | $ 2,904,746 | $ 2,823,069 | $ 2,766,618 |
| Franchise and other revenues | 88,258 | 90,830 | 97,532 | 86,426 | 83,100 |
| Total revenues | 3,150,837 | 3,257,489 | 3,002,278 | 2,909,495 | 2,849,718 |
| Operating Costs and Expenses: | | | | | |
| Company restaurants (excluding depreciation and amortization) | | | | | |
| Cost of sales | 791,321 | 840,204 | 775,063 | 758,028 | 758,377 |
| Restaurant labor | 1,017,945 | 1,036,005 | 929,206 | 905,589 | 892,413 |
| Restaurant expenses | 773,510 | 762,663 | 703,334 | 686,314 | 658,834 |
| Company restaurant expenses | 2,582,776 | 2,638,872 | 2,407,603 | 2,349,931 | 2,309,624 |
| Depreciation and amortization | 156,409 | 156,368 | 145,242 | 136,081 | 131,481 |
| General and administrative | 132,819 | 127,593 | 133,467 | 132,094 | 134,538 |
| Other gains and charges | 22,655 | 17,180 | 4,764 | 49,224 | 17,300 |
| Total operating costs and expenses | 2,894,659 | 2,940,013 | 2,691,076 | 2,667,330 | 2,592,943 |
| Operating income | 256,178 | 317,476 | 311,202 | 242,165 | 256,775 |
| Interest expense | 49,547 | 32,574 | 29,006 | 28,091 | 29,118 |
| Other, net | (1,877) | (1,485) | (2,081) | (2,214) | (2,658) |
| Income before provision for income taxes | 208,508 | 286,387 | 284,277 | 216,288 | 230,315 |
| Provision for income taxes | 57,685 | 85,767 | 89,618 | 62,249 | 66,956 |
| Net income | $ 150,823 | $ 200,620 | $ 194,659 | $ 154,039 | $ 163,359 |
| | | | | | |
| Basic net income per share | $ 2.98 | $ 3.47 | $ 3.09 | $ 2.33 | $ 2.28 |
| | | | | | |
| Diluted net income per share | $ 2.94 | $ 3.42 | $ 3.02 | $ 2.26 | $ 2.20 |
| | | | | | |
| Basic weighted average shares outstanding | 50,638 | 57,895 | 63,072 | 66,251 | 71,788 |
| | | | | | |
| Diluted weighted average shares outstanding | 51,250 | 58,684 | 64,404 | 68,152 | 74,158 |
| | | | | | |
| **Balance Sheet Data:** | | | | | |
| Working capital | $ (292,036) | $ (257,209) | $ (233,304) | $ (271,426) | $ (191,796) |
| Total assets (c) | 1,413,700 | 1,458,450 | 1,421,450 | 1,485,612 | 1,444,762 |
| Long-term obligations (c) | 1,460,953 | 1,248,375 | 1,091,734 | 956,408 | 905,018 |
| Shareholders' (deficit) equity | (493,681) | (225,576) | (90,812) | 63,094 | 149,357 |
| Dividends per share | $ 1.36 | $ 1.28 | $ 1.12 | $ 0.96 | $ 0.80 |
| **Number of Restaurants Open (End of Year):** | | | | | |
| Company-owned | 1,003 | 1,001 | 888 | 884 | 877 |
| Franchise | 671 | 659 | 741 | 731 | 714 |
| Total | 1,674 | 1,660 | 1,629 | 1,615 | 1,591 |
| | | | | | |
| Revenues of franchisees (d) | $ 1,331,908 | $ 1,348,616 | $ 1,644,015 | $ 1,616,747 | $ 1,632,076 |

(a)   We discovered immaterial errors in prior years relating to the accuracy of certain tax accounts. While we concluded that the impact of these errors on our previously-issued consolidated financial statements was not material, we revised our previously-reported consolidated financial statements for the fiscal years ended June 29, 2016 and June 24, 2015. For additional information, see Note 16—Immaterial Correction of Prior Period Financial Statements in the Notes to Consolidated Financial Statements in this Form 10-K.

(b)   Fiscal year 2016 consisted of 53 weeks while all other periods presented consisted of 52 weeks.

(c)   Debt issuance costs are presented in the balance sheet as a direct deduction from the associated debt liability. Amounts presented for fiscal years prior to fiscal 2017 were reclassified from other assets to long-term debt to conform with the current year's presentation.

(d)   Royalty revenues are recognized based on the sales generated and reported to the company by franchisees.

F-1

**MANAGEMENT'S DISCUSSION AND ANALYSIS OF**
**FINANCIAL CONDITION AND RESULTS OF OPERATIONS**

## GENERAL

The following Management's Discussion and Analysis of Financial Condition and Results of Operations ("MD&A") is intended to help you understand our company, our operations, and our current operating environment. For an understanding of the significant factors that influenced our performance during the past three fiscal years, the MD&A should be read in conjunction with the consolidated financial statements and related notes included in this annual report. Our MD&A consists of the following sections:

- **Overview**—a general description of our business and the casual dining segment of the restaurant industry
- **Results of Operations**—an analysis of our consolidated statements of comprehensive income for the three years presented in our consolidated financial statements
- **Liquidity and Capital Resources**—an analysis of cash flows, including capital expenditures, aggregate contractual obligations, share repurchase activity, known trends that may impact liquidity, and the impact of inflation
- **Critical Accounting Estimates**—a discussion of accounting policies that require critical judgments and estimates

We have a 52/53 week fiscal year ending on the last Wednesday in June. Fiscal years 2017 and 2015, which ended on June 28, 2017 and June 24, 2015, respectively, each contained 52 weeks. Fiscal year 2016 ended on June 29, 2016 and contained 53 weeks. The 53rd week in fiscal 2016 contributed additional revenue of approximately $58.3 million. While certain expenses increased in direct relationship to additional revenue from the 53rd week, other expenses, such as fixed costs, are incurred on a calendar month basis.

## OVERVIEW

We are principally engaged in the ownership, operation, development, and franchising of the Chili's Grill & Bar ("Chili's") and Maggiano's Little Italy ("Maggiano's") restaurant brands. At June 28, 2017, we owned, operated, or franchised 1,674 restaurants.

We are committed to strategies and initiatives that are centered on long-term sales and profit growth, enhancing the guest experience and team member engagement. These strategies are intended to differentiate our brands from the competition, reduce the costs associated with managing our restaurants and establish a strong presence for our brands in key markets around the world.

Growing sales and traffic continues to be a challenge with increasing competition and heavy discounting in the casual dining industry. Lower oil prices have continued to negatively impact sales in our markets with oil dependent economies. We also believe that casual dining traffic was negatively impacted by lower retail traffic in general, including during the December, 2016 holiday season. U.S. economic growth has been steady in recent years, but wage growth has been slow comparative to the post-recession economic recovery. This wage pressure and increased costs for healthcare has challenged both casual dining restaurant operators and consumers as discretionary income available for restaurant visits has been limited. More consumers are opting to eat at home as the decline in grocery costs relative to casual dining prices allows consumers to save money. Consumers are also taking advantage of discounted fast food options which has placed additional pressure on the casual dining sector. Overall, the industry was softer than we anticipated this year. In response to these economic factors and industry pressures, we have developed both short and long-term strategies that we believe are appropriate for all operating conditions and will provide a solid foundation for future earnings growth.

We continually evaluate our processes and menu at Chili's to identify opportunities where we can improve our service quality and food. We plan to simplify our menu and back of house operations by reducing the number of menu items. We believe this initiative will improve kitchen efficiency and result in meals being delivered hotter and faster to our guests. During fiscal 2017, we upgraded the quality of our chicken crispers to an all-natural chicken and added new flavors such as buffalo bleu cheese crispers and honey chipotle chicken and waffles. We also implemented a new "smash" burger cooking procedure across our burger platform that produces a juicier product and cuts the cooking time nearly in half. We believe that guests are responding favorably to the new products. We were also pleased with the guest preference results from the smokehouse platform added to the menu in fiscal 2017, which features jalapeño cheese sausage, bone-in chicken and our signature baby-back ribs. Additionally, we launched our new line of craft beers in fiscal 2017 featuring regional and national favorites and our Presidente Margarita on tap.

We remain competitive with our value offerings at both lunch and dinner and are committed to offering consistent, quality products at a compelling every day value. We offered a promotional "3 for Me™" platform in January 2017 that allowed guests to combine a salad and mini molten dessert with their choice of fajitas, burgers, smoked chicken or ribs for just $10.00. We will continue to seek opportunities to reinforce value and create interest for the Chili's brand with new and varied offerings to further enhance sales and drive incremental traffic.

During the third quarter of fiscal 2017, we completed a reorganization of the Chili's restaurant operations team and certain departments at the corporate headquarters to better align staffing with our current strategy. This reorganization resulted in pre-tax savings of over $5 million in fiscal 2017. We anticipate pre-tax savings of approximately $12 million on an annualized basis.

The Chili's brand has leveraged technology initiatives to create a digital guest experience that we believe will help us engage our guests more effectively. We have launched a new online ordering system that expands our current capabilities and gives our guests greater control of their to-go experience. Our upgraded Chili's mobile app provides the capability for digital curbside service so that guests can order, pay and notify us of their arrival through the app. We have leveraged our tabletop technology to power our loyalty programs and anticipate that guest loyalty programs will be a significant part of our marketing strategy going forward. We believe guest loyalty programs allow us to drive sales and profits by creating more relevant and customized incentives for our guests.

We believe that improvements at Chili's will have a significant impact on the business; however, our results will also benefit through additional contributions from Maggiano's and our global business. Maggiano's opened two restaurants in fiscal 2017 based on our new prototype, which includes a flexible dining area that may be used for banquets or opened up for general seating. This new prototype allows the brand to enter new markets for which the prior model was not suited, but still accommodate smaller banquets. We introduced a new menu at Maggiano's in the third quarter of fiscal 2017 that includes the addition of Saturday and Sunday brunch, and we believe guests are responding favorably to the new menu and brunch offering. Maggiano's is committed to delivering high quality food and a dining experience in line with this brand's heritage.

Our global Chili's business continues to grow with locations in 30 countries and two territories outside of the United States. Our international franchisees opened 30 new restaurants in fiscal 2017.

F-3

**RESULTS OF OPERATIONS FOR FISCAL YEARS 2017, 2016, AND 2015**

The following table sets forth selected operating data as a percentage of total revenues (unless otherwise noted) for the periods indicated. All information is derived from the accompanying consolidated statements of comprehensive income:

| | Fiscal Years | | |
|---|---|---|---|
| | **2017** | **2016** | **2015** |
| Revenues: | | | |
| Company sales | 97.2 % | 97.2% | 96.8 % |
| Franchise and other revenues | 2.8 % | 2.8% | 3.2 % |
| Total revenues | 100.0 % | 100.0% | 100.0 % |
| Operating Costs and Expenses: | | | |
| Company restaurants (excluding depreciation and amortization) | | | |
| Cost of sales (a) | 25.8 % | 26.5% | 26.7 % |
| Restaurant labor (a) | 33.2 % | 32.7% | 32.0 % |
| Restaurant expenses (a) | 25.3 % | 24.1% | 24.2 % |
| Company restaurant expenses (a) | 84.3 % | 83.3% | 82.9 % |
| Depreciation and amortization | 5.0 % | 4.8% | 4.8 % |
| General and administrative | 4.2 % | 3.9% | 4.4 % |
| Other gains and charges | 0.7 % | 0.5% | 0.2 % |
| Total operating costs and expenses | 91.9 % | 90.3% | 89.6 % |
| Operating income | 8.1 % | 9.7% | 10.4 % |
| Interest expense | 1.6 % | 0.9% | 1.0 % |
| Other, net | (0.1)% | 0.0% | (0.1)% |
| Income before provision for income taxes | 6.6 % | 8.8% | 9.5 % |
| Provision for income taxes | 1.8 % | 2.6% | 3.0 % |
| Net income | 4.8 % | 6.2% | 6.5 % |

(a) As a percentage of company sales.

**REVENUES**

Revenues are presented in two separate captions on the consolidated statements of comprehensive income to provide more clarity around company-owned restaurant revenue and operating expense trends. Company sales includes revenues generated by the operation of company-owned restaurants including gift card redemptions. Franchise and other revenues includes royalties, development fees, franchise fees, Maggiano's banquet service charge income, gift card breakage and discounts, digital entertainment revenue, Chili's retail food product royalties and delivery fee income.

F-4

Total revenues for fiscal 2017 decreased to $3,150.8 million, a 3.3% decrease from the $3,257.5 million generated for fiscal 2016 driven primarily by a 3.3% decrease in company sales. The decrease in company sales for fiscal 2017 was primarily due to a decline in comparable restaurant sales as well as one less operating week in fiscal 2017, partially offset by an increase in restaurant capacity (see table below). The 53rd week in fiscal 2016 contributed additional revenue of approximately $58.3 million.

| | Fiscal Year Ended June 28, 2017 | | | | |
|---|---|---|---|---|---|
| | Comparable Sales (1) | Price Increase | Mix Shift (2) | Traffic | Restaurant Capacity (3) |
| Company-owned | (2.1)% | 1.8% | 1.6% | (5.5)% | 0.4% |
| Chili's | (2.3)% | 1.8% | 1.7% | (5.8)% | 0.3% |
| Maggiano's | (0.6)% | 2.1% | 0.3% | (3.0)% | 2.7% |
| Chili's Franchise(4) | (2.1)% | | | | |
| U.S. | (1.1)% | | | | |
| International | (3.7)% | | | | |
| Chili's Domestic(5) | (2.0)% | | | | |
| System-wide(6) | (2.1)% | | | | |

(1)   Comparable restaurant sales includes all restaurants that have been in operation for more than 18 months. Amounts are calculated based on comparable 52 weeks in each fiscal year.
(2)   Mix shift is calculated as the year-over-year percentage change in company sales resulting from the change in menu items ordered by guests.
(3)   Restaurant capacity is measured by sales weeks. Amounts are calculated based on comparable 52 weeks in each fiscal year.
(4)   Revenues generated by franchisees are not included in revenues on the consolidated statements of comprehensive income; however, we generate royalty revenue and advertising fees based on franchisee revenues, where applicable. We believe including franchise comparable restaurant sales provides investors information regarding brand performance that is relevant to current operations and may impact future restaurant development.
(5)   Chili's domestic comparable restaurant sales percentages are derived from sales generated by company-owned and franchise operated Chili's restaurants in the United States.
(6)   System-wide comparable restaurant sales are derived from sales generated by company-owned Chili's and Maggiano's restaurants in addition to the sales generated at franchise-operated Chili's restaurants.

Chili's company sales decreased 3.7% to $2,653.3 million in fiscal 2017 from $2,754.9 million in fiscal 2016. The decrease was primarily due to a decline in comparable restaurant sales as well as one less operating week in fiscal 2017, partially offset by an increase in restaurant capacity. Chili's comparable restaurant sales decreased 2.3% for fiscal 2017 compared to the prior year. Chili's company-owned restaurant capacity increased 0.3% compared to the prior year due to one net restaurant opening during fiscal 2017.

Maggiano's company sales decreased 0.6% to $409.3 million in fiscal 2017 from $411.8 million in fiscal 2016. The decrease was primarily driven by a decline in comparable restaurant sales as well as one less operating week in fiscal 2017, partially offset by an increase in restaurant capacity. Maggiano's comparable restaurant sales decreased 0.6% for fiscal 2017 compared to the prior year. Maggiano's company-owned restaurant capacity increased 2.7% compared to the prior year due one net restaurant opening during fiscal 2017.

Franchise and other revenues decreased 2.8% to $88.3 million in fiscal 2017 compared to $90.8 million in fiscal 2016 primarily driven by a decrease in royalty revenues due to a decline in domestic and international franchise comparable restaurant sales, partially offset by an increase in gift card related revenues. Our franchisees generated approximately $1,332 million in sales in fiscal 2017.

Total revenues for fiscal 2016 increased to $3,257.5 million, an 8.5% increase from the $3,002.3 million generated for fiscal 2015 driven by a 9.0% increase in company sales, partially offset by a 6.9% decrease in franchise and other revenues. The increase in company sales was driven by an increase in restaurant capacity resulting primarily from the acquisition of Pepper Dining as well as additional revenues attributed to the 53rd operating week, partially offset by a decline in comparable restaurant sales (see table below). The 53rd week contributed additional revenue of approximately $58.3 million in fiscal 2016.

| | Fiscal Year Ended June 29, 2016 | | | | |
| --- | --- | --- | --- | --- | --- |
| | Comparable Sales (1) | Price Increase | Mix Shift (2) | Traffic | Restaurant Capacity (3) |
| Company-owned | (2.4)% | 1.1% | (0.1)% | (3.4)% | 12.3% |
| Chili's[4] | (2.6)% | 1.0% | 0.1 % | (3.7)% | 12.8% |
| Maggiano's | (1.3)% | 1.9% | (1.6)% | (1.6)% | 3.6% |
| Chili's Franchise[5] | (0.7)% | | | | |
| U.S. | (1.2)% | | | | |
| International | 0.2 % | | | | |
| Chili's Domestic[6] | (2.2)% | | | | |
| System-wide[7] | (1.9)% | | | | |

_____

(1)  Comparable restaurant sales includes all restaurants that have been in operation for more than 18 months. Amounts are calculated based on comparable 52 weeks in each fiscal year.

(2)  Mix shift is calculated as the year-over-year percentage change in company sales resulting from the change in menu items ordered by guests.

(3)  Restaurant capacity is measured by sales weeks. Amounts are calculated based on comparable 52 weeks in each fiscal year.

(4)  Chili's company-owned comparable restaurant sales includes 103 Chili's restaurants acquired from a franchisee in the first quarter of fiscal 2016.

(5)  Revenues generated by franchisees are not included in revenues on the consolidated statements of comprehensive income; however, we generate royalty revenue and advertising fees based on franchisee revenues, where applicable. We believe including franchise comparable restaurant sales provides investors information regarding brand performance that is relevant to current operations and may impact future restaurant development.

(6)  Chili's domestic comparable restaurant sales percentages are derived from sales generated by company-owned and franchise operated Chili's restaurants in the United States.

(7)  System-wide comparable restaurant sales are derived from sales generated by company-owned Chili's and Maggiano's restaurants in addition to the sales generated at franchise-operated Chili's restaurants.

Chili's company sales increased to $2,754.9 million in fiscal 2016, a 10.1% increase from $2,503.1 million in fiscal 2015. The increase was primarily driven by increased restaurant capacity as well as the additional operating week, partially offset by a decline in comparable restaurant sales. Chili's company-owned restaurant capacity increased 12.8% compared to the prior year due to the acquisition of 103 Chili's restaurants on June 25, 2015 from a franchisee and to eight net restaurant openings during fiscal 2016. Comparable restaurant sales decreased 2.6% for fiscal 2016.

Maggiano's company sales increased to $411.8 million in fiscal 2016, a 2.5% increase from $401.6 million in fiscal 2015 primarily driven by increases in restaurant capacity as well as the additional operating week. Maggiano's restaurant capacity increased 3.6% for fiscal 2016 compared to the prior year due to two restaurant openings during the fiscal year.

Franchise and other revenues decreased 6.9% to $90.8 million in fiscal 2016 compared to $97.5 million in fiscal 2015 driven by a decrease in royalty revenues resulting from the acquisition of 103 Chili's restaurants from a former franchisee, partially offset by higher revenues associated with digital entertainment revenue and higher franchise and development fees. Our franchisees generated approximately $1,349 million in sales in fiscal 2016.

## COSTS AND EXPENSES

Cost of sales, as a percent of company sales, decreased 0.7% in fiscal 2017 due to increased menu pricing, favorable commodity pricing primarily related to beef and poultry and favorable menu item mix, partially offset by unfavorable commodity pricing related to avocados. Cost of sales, as a percent of company sales, decreased 0.2% in fiscal 2016 due to increased menu pricing and favorable commodity pricing related to burger meat, seafood and cheese, partially offset by unfavorable menu item mix and commodity pricing primarily related to steak and poultry.

Restaurant labor, as a percent of company sales, increased 0.5% in fiscal 2017 primarily due to higher wage rates and sales deleverage. Restaurant labor, as a percent of company sales, increased 0.7% in fiscal 2016 primarily driven by higher wage rates, partially offset by lower incentive bonus.

Restaurant expenses, as a percent of company sales, increased 1.2% in fiscal 2017 primarily due to higher advertising and marketing related expenses, sales deleverage due to a decline in comparable restaurant sales as well as one less operating week compared to the prior year, and increased workers' compensation insurance expenses. Restaurant expenses, as a percent of company sales, decreased 0.1% in fiscal 2016 primarily driven by leverage related to the additional operating week, decreased advertising and workers' compensation insurance expenses, partially offset by higher repairs and maintenance and rent expenses.

Depreciation and amortization was flat in fiscal 2017 compared to fiscal 2016. Depreciation on asset replacements and new restaurant openings was offset by an increase in fully-depreciated assets and restaurant closures. Depreciation and amortization increased $11.1 million in fiscal 2016 primarily due to depreciation on acquired restaurants, asset replacements, new restaurant openings and investments in the Chili's reimage program, partially offset by an increase in fully-depreciated assets.

General and administrative expenses increased $5.2 million in fiscal 2017 primarily due to higher performance-based compensation and professional fees, partially offset by lower payroll due to reduced headcount and lower stock-based compensation expenses. General and administrative expenses decreased $5.9 million in fiscal 2016 due to lower performance-based compensation, partially offset by the termination of accounting and information technology support fees resulting from the acquisition of 103 Chili's restaurants.

Other gains and charges were $22.7 million in fiscal 2017. We incurred $6.6 million in severance and other benefits related to organizational changes to better align our staffing with the current management strategy and resource needs. Additionally, we recorded restaurant impairment charges of $5.2 million primarily related to the long-lived assets and reacquired franchise rights of ten underperforming Chili's restaurants which will continue to operate. We also recorded restaurant closure charges of $4.1 million primarily related to lease charges and other costs associated with closed restaurants. Furthermore, we incurred $2.7 million of professional fees and severance associated with our information technology restructuring offset by a $2.7 million gain on the sale of property. We also recorded accelerated depreciation charges of $2.0 million related to long-lived assets to be disposed of and lease guarantee charges of $1.1 million related to leases that were assigned to a divested brand. Other charges primarily include $2.4 million of expenses for consulting fees related to a special project.

Other gains and charges were $17.2 million in fiscal 2016. We recorded impairment charges of $10.7 million primarily related to seven underperforming restaurants that either continue to operate or closed in fiscal 2017 and $1.0 million related to a cost method investment. We recorded restaurant closure charges of $3.8 million that primarily consisted of additional lease and other costs associated with closed restaurants. We also incurred $3.3 million in severance and other benefits related to organizational changes. We were a plaintiff in a class action lawsuit against US Foods styled as *In re U.S. Foodservice, Inc. Pricing Litigation*. A settlement agreement was fully executed by all parties in September 2015, and we received approximately $2.0 million during the second quarter of fiscal 2016 in settlement of this litigation. We also received net proceeds of $1.2 million from British Petroleum in the fourth quarter of fiscal 2016 related to the 2010 Gulf of Mexico oil spill judgment. Additionally, we recorded a $2.9 million gain on the sale of several properties and $0.7 million of transaction costs related to the acquisition of Pepper Dining. Other charges primarily included $1.4 million of expenses to reserve for royalties, rents and other outstanding amounts related to a bankrupt franchisee and $1.2 million of professional service fees associated with organizational changes.

Other gains and charges in fiscal 2015 were $4.8 million. We were a plaintiff in the antitrust litigation against Visa and MasterCard styled as *Progressive Casualty Insurance Co., et al. v. Visa, Inc., et al.* A settlement agreement was fully executed by all parties in January 2015 and we recognized a gain of approximately $8.6 million. During the second quarter of fiscal 2015, the class action lawsuit styled as *Hohnbaum, et al. v. Brinker Restaurant Corp., et al.* ("Hohnbaum case") was finalized resulting in an additional charge of approximately $5.8 million to adjust our previous estimate of the final settlement amount. In February 2015, we funded the settlement in the amount of $44.0 million against our previously established reserve. Additionally, during fiscal 2015 we recorded restaurant impairment charges of $2.3 million related to underperforming restaurants that either continue to operate or closed during fiscal 2017. We also recorded restaurant closure charges of $1.7 million primarily related to lease termination charges and a $1.1 million loss primarily related to the sale of two company-owned restaurants located in Mexico. We incurred $1.2 million in severance and other benefits related to organizational changes made during the fiscal year. The severance charges included expenses related to the accelerated vesting of stock-based compensation awards. We incurred expenses of approximately $1.1 million during fiscal 2015 related to the acquisition of 103 Chili's restaurants subsequent to the end of the year.

Interest expense increased $17.0 million in fiscal 2017 resulting from higher borrowing balances. Interest expense increased $3.6 million in fiscal 2016 resulting from higher borrowing balances, partially offset by lower interest rates.

Other, net in fiscal 2017, 2016, and 2015 includes $1.6 million, $1.2 million and $1.8 million, respectively, of sublease income primarily from franchisees as part of the respective sale agreements, as well as other subtenants.

## SEGMENT RESULTS

Chili's revenues decreased 3.7% to $2,720.0 million in fiscal 2017 from $2,823.4 million in fiscal 2016. The decrease was primarily due to a decline in comparable restaurant sales as well as one less operating week in fiscal 2017, partially offset by an increase in restaurant capacity. Chili's operating income, as a percent of total revenues, was 11.8% in fiscal 2017 compared to 13.3% in fiscal 2016. The decrease was primarily driven by sales deleverage, higher restaurant labor wage rates and higher advertising and marketing related expenses, partially offset by

F-7

increased menu pricing and favorable commodity pricing. The decrease in Chili's operating income was also due to costs incurred for severance and other benefits related to organizational changes and restaurant closure charges.

Chili's revenues increased 9.5% to $2,823.4 million in fiscal 2016 from $2,579.0 million in fiscal 2015. The increase was primarily driven by increased restaurant capacity as well as the additional operating week, partially offset by a decline in comparable restaurant sales. Chili's operating income, as a percent of total revenues, was 13.3% in fiscal 2016 compared to 14.5% in fiscal 2015. The decrease was primarily driven by higher restaurant labor wage rates, repairs and maintenance and rent expenses, depreciation related to acquired and new restaurants, and impairment charges for underperforming restaurants, partially offset by leverage related to the additional operating week and decreased advertising expenses. Cost of sales was flat due to increased menu pricing and favorable commodity prices offset by unfavorable mix.

Maggiano's revenues decreased 0.8% to $430.8 million in fiscal 2017 from $434.1 million in fiscal 2016. The decrease was primarily driven by a decline in comparable restaurant sales as well as one less operating week in fiscal 2017, partially offset by an increase in restaurant capacity. Maggiano's operating income, as a percent of total revenues, was 10.7% in fiscal 2017 compared to 10.3% in fiscal 2016. The increase was primarily due to favorable commodity pricing and increased menu pricing, partially offset by sales deleverage, higher workers' compensation insurance expenses, advertising expenses and unfavorable menu item mix. The increase in Maggiano's operating income was also due to an impairment charge in fiscal 2016 for an underperforming restaurant.

Maggiano's revenues increased 2.6% to $434.1 million in fiscal 2016 from $423.3 million in fiscal 2015 primarily driven by an increase in restaurant capacity as well as the additional operating week. Maggiano's operating income, as a percent of total revenues, was 10.3% in fiscal 2016 compared to 10.0% in fiscal 2015. The increase was primarily driven by lower cost of sales related to increased menu pricing and favorable commodity pricing and mix, leverage related to the additional operating week and decreased advertising expenses, partially offset by higher restaurant labor wage rates, repairs and maintenance expense and an impairment charge for an underperforming restaurant.

## INCOME TAXES

The effective income tax rate for fiscal 2017 decreased to 27.7% compared to 29.9% in the prior year due to the decline in profit in fiscal 2017 compared to the prior year coupled with no significant change in realized tax credits, most notably the FICA tip credit. The FICA tip credit in fiscal 2017 was consistent with prior year and therefore the decline in profit before taxes resulted in a decrease in the effective tax rate in comparison to fiscal 2016. The resolution of uncertain tax positions resulted in a net reduction in tax expense for fiscal 2017 but to a lesser extent than in fiscal 2016.

The effective income tax rate for fiscal 2016 decreased to 29.9% compared to 31.5% in the prior year due to the impact of tax benefits primarily related to permanent items in fiscal 2016 such as the FICA tax credit and state income taxes, net of Federal benefit. The decrease in the fiscal 2016 effective income tax rate is also attributable to the benefits associated with the release of the valuation allowance for state tax net operating losses and the resolution of certain tax positions.

## LIQUIDITY AND CAPITAL RESOURCES

### Cash Flows

*Cash Flows From Operating Activities*

During fiscal 2017, net cash flow provided by operating activities was $312.9 million compared to $394.7 million in the prior year. Cash flow from operations decreased due to the impact of adopting the final IRS tangible property regulations in fiscal 2016 and decreased earnings in the current year, partially offset by an increase due to the prior year impact of the acquisition of Pepper Dining in addition to lower payments related to performance-based compensation liabilities.

During fiscal 2016, net cash flow provided by operating activities was $394.7 million compared to $368.6 million in the prior year. Fiscal 2015 cash flow from operations was negatively impacted by the payment of the legal settlement in the Hohnbaum case. Fiscal 2016 cash from operations was negatively impacted by the settlement of liabilities assumed as part of the acquisition of Pepper Dining. Excluding the impact of these two items, cash flow from operations was relatively consistent between fiscal 2016 and fiscal 2015.

F-8

*Cash Flows From Investing Activities*

| Net cash used in investing activities (in thousands): | | 2017 | | 2016 | | 2015 |
|---|---|---:|---|---:|---|---:|
| Payments for property and equipment | $ | (102,573) | $ | (112,788) | $ | (140,262) |
| Proceeds from sale of assets | | 3,157 | | 4,256 | | 1,950 |
| Payment for business acquisition, net of cash acquired | | — | | (105,577) | | — |
| | $ | (99,416) | $ | (214,109) | $ | (138,312) |

Net cash used in investing activities for fiscal 2017 decreased to $99.4 million compared to $214.1 million in the prior year primarily due to the acquisition of Pepper Dining for $105.6 million in fiscal 2016. Capital expenditures decreased to $102.6 million for fiscal 2017 compared to $112.8 million for fiscal 2016 primarily due to a decrease in Chili's new restaurant construction, partially offset by the purchase of new beer taps for the new line of craft beers at Chili's.

Net cash used in investing activities for fiscal 2016 increased to $214.1 million compared to $138.3 million in the prior year primarily due to the acquisition of Pepper Dining for $105.6 million in fiscal 2016. Capital expenditures decreased to $112.8 million for fiscal 2016 compared to $140.3 million for fiscal 2015 primarily due to decreased spending on the Chili's reimage program in fiscal 2016 compared to the prior year, partially offset by increased normal asset replacements and new restaurant construction for Chili's. The reimage program was substantially completed in fiscal 2015.

*Cash Flows From Financing Activities*

| Net cash used in financing activities (in thousands): | | 2017 | | 2016 | | 2015 |
|---|---|---:|---|---:|---|---:|
| Proceeds from issuance of long-term debt | $ | 350,000 | $ | — | $ | — |
| Purchases of treasury stock | | (370,877) | | (284,905) | | (306,255) |
| Payments on revolving credit facility | | (388,000) | | (110,000) | | (177,000) |
| Borrowings on revolving credit facility | | 250,000 | | 256,500 | | 480,750 |
| Payments of dividends | | (70,771) | | (74,066) | | (70,832) |
| Payments for debt issuance costs | | (10,216) | | — | | (2,501) |
| Proceeds from issuances of treasury stock | | 5,621 | | 6,147 | | 16,259 |
| Payments on long-term debt | | (3,832) | | (3,402) | | (189,177) |
| Excess tax benefits from stock-based compensation | | 2,223 | | 5,460 | | 15,893 |
| | $ | (235,852) | $ | (204,266) | $ | (232,863) |

Net cash used in financing activities for fiscal 2017 increased to $235.9 million compared to $204.3 million in the prior year. During fiscal 2017, we changed our capital structure by increasing leverage through the issuance of long-term debt and using the majority of the proceeds to return capital to shareholders in the form of share repurchases.

In September 2016, we entered into a $300.0 million accelerated share repurchase agreement ("ASR Agreement") with Bank of America, N.A. ("BofA"). The ASR Agreement settled in January 2017. Pursuant to the terms of the ASR Agreement, we paid BofA $300.0 million in cash and received 5.9 million shares of our common stock. We also repurchased approximately 1.6 million additional shares of common stock for a total of 7.5 million shares during fiscal 2017 for a total of $370.9 million. The repurchased shares included shares purchased as part of our share repurchase program and shares repurchased to satisfy team member tax withholding obligations on the vesting of restricted shares.

On September 23, 2016, we completed the private offering of $350.0 million of our 5.0% senior notes due October 2024 (the "2024 Notes"). We received proceeds of $350.0 million prior to debt issuance costs of $6.2 million and utilized the proceeds to fund a $300 million accelerated share repurchase agreement and to repay $50.0 million on the amended $1 billion revolving credit facility. The notes require semi-annual interest payments which began on April 1, 2017.

The indenture for the 2024 Notes contains certain covenants, including, but not limited to, limitations and restrictions on the ability of the Company and its Restricted Subsidiaries (as defined in the indenture) to (i) create liens on Principal Property (as defined in the Indenture), (ii) enter into any Sale and Leaseback Transaction (as defined in the Indenture) with respect to any property, and (iii) merge, consolidate or amalgamate with or into any other person or sell, transfer, assign, lease, convey or otherwise dispose of all or substantially all of their property. These covenants are subject to a number of important conditions, qualifications, exceptions and limitations.

On September 13, 2016, we amended the revolving credit facility to increase the borrowing capacity from $750 million to $1 billion. We capitalized debt issuance costs of $4.0 million associated with the amendment of the revolving credit facility, which is included in other assets

in the consolidated balance sheet as of June 28, 2017. During fiscal 2017, net payments of $138.0 million were made on the revolving credit facility. As of June 28, 2017, $392.3 million was outstanding under the revolving credit facility. Subsequent to the end of the fiscal year, an additional $110.0 million was drawn from the $1 billion revolving credit facility.

Under the amended $1 billion revolving credit facility, the maturity date for $890.0 million of the facility was extended from March 12, 2020 to September 12, 2021 and the remaining $110.0 million remains due on March 12, 2020. The amended revolving credit facility bears interest of LIBOR plus an applicable margin, which is a function of our credit rating and debt to cash flow ratio, but is subject to a maximum of LIBOR plus 2.00%. Based on our current credit rating, we are paying interest at a rate of LIBOR plus 1.38% for a total of 2.60%. One month LIBOR at June 28, 2017 was approximately 1.22%. As of June 28, 2017, $607.8 million of credit was available under the revolving credit facility. As of June 28, 2017, we were in compliance with all financial debt covenants.

As of June 28, 2017, our credit rating by Fitch Ratings ("Fitch") and Standard and Poor's ("S&P") was BB+ and our Corporate Family Rating by Moody's was Ba1, all with a stable outlook. In August 2016, Fitch downgraded Brinker from BBB- to BB+ with a stable outlook and in September 2016 confirmed the rating. In September 2016, S&P downgraded Brinker's corporate credit rating from BBB- to BB+ with a stable outlook and Moody's downgraded Brinker's Corporate Family Rating from Baa3 to Ba1 with a stable outlook. We anticipated these credit rating downgrades as a result of the change in our capital structure in fiscal 2017. Our goal is to maintain strong free cash flow to support leverage that we believe is appropriate to allow ongoing investment in the business and return of capital to shareholders.

We paid dividends of $70.8 million to common stock shareholders in fiscal 2017 compared to $74.1 million in dividends paid in fiscal 2016. Our Board of Directors approved a 6.3% increase in the quarterly dividend from $0.32 to $0.34 per share effective with the dividend declared in August 2016. We also declared a quarterly dividend of $0.34 per share in May 2017 which was paid subsequent to the end of the fiscal year on June 29, 2017 in the amount of $16.6 million. Subsequent to the end of the fiscal year, our Board of Directors approved an 11.8% increase in the quarterly dividend from $0.34 to $0.38 per share effective with the dividend declared in August 2017.

In August 2016, our Board of Directors authorized a $150.0 million increase to our existing share repurchase program resulting in total authorizations of $4.3 billion. As of June 28, 2017, approximately $115.8 million was available under our share repurchase authorizations. Our stock repurchase plan has been and will be used to return capital to shareholders and to minimize the dilutive impact of stock options and other share-based awards. Repurchased common stock is reflected as an increase in treasury stock within shareholders' deficit. During fiscal 2017, approximately 225,000 stock options were exercised resulting in cash proceeds of approximately $5.6 million. Subsequent to the end of the fiscal year, our Board of Directors authorized a $250 million increase to our existing share repurchase program, bringing the total amount available for repurchases to approximately $365 million.

Net cash used in financing activities for fiscal 2016 decreased to $204.3 million compared to $232.9 million in the prior year primarily due to an increase in net borrowing activity and a decrease in spending on share repurchases, partially offset by decreases in proceeds from issuance of treasury stock and excess tax benefits from stock-based compensation.

We repurchased approximately 5.8 million shares of our common stock for $284.9 million during fiscal 2016, including shares purchased as part of our share repurchase program and shares repurchased to satisfy team member tax withholding obligations on the vesting of restricted shares.

During fiscal 2016, $256.5 million was drawn from the $750 million revolving credit facility primarily to fund the acquisition of Pepper Dining and for share repurchases. We repaid a total of $110.0 million of the revolving credit facility during fiscal 2016.

We paid dividends of $74.1 million to common stock shareholders in fiscal 2016 compared to $70.8 million in dividends paid in fiscal 2015. Our Board of Directors approved a 14.3% increase in the quarterly dividend from $0.28 to $0.32 per share effective with the September 2015 dividend. Additionally, we declared a quarterly dividend late in fiscal 2016 which was paid early in fiscal 2017 on June 30, 2016.

In August 2015, our Board of Directors authorized a $250.0 million increase to our existing share repurchase program resulting in total authorizations of $4.2 billion. As of June 29, 2016, approximately $333.0 million was available under our share repurchase authorizations. Repurchased common stock is reflected as an increase in treasury stock within shareholders' deficit. During fiscal 2016, approximately 234,000 stock options were exercised resulting in cash proceeds of $6.1 million.

*Cash Flow Outlook*

We believe that our various sources of capital, including future cash flow from operating activities and availability under our existing credit facility are adequate to finance operations as well as the repayment of current debt obligations. We are not aware of any other event or trend that would potentially affect our liquidity. In the event such a trend develops, we believe that there are sufficient funds available under our credit facility and from our internal cash generating capabilities to adequately manage our ongoing business.We periodically evaluate ways to monetize the value of our owned real estate and should alternatives become available that are more cost effective than our financing options currently available, we will consider execution of those alternatives.

Payments due under our contractual obligations for outstanding indebtedness, purchase obligations as defined by the Securities and Exchange Commission ("SEC"), and the expiration of the credit facility as of June 28, 2017 are as follows:

| | Total | Payments Due by Period (in thousands) | | | |
| | | Less than 1 Year | 1-3 Years | 3-5 Years | More than 5 Years |
|---|---|---|---|---|---|
| Long-term debt (a) | $ 1,292,250 | $ 250,000 | $ — | $ 392,250 | $ 650,000 |
| Interest (b) | 250,419 | 45,824 | 78,647 | 70,573 | 55,375 |
| Capital leases | 59,419 | 11,823 | 14,800 | 8,722 | 24,074 |
| Operating leases | 606,855 | 122,598 | 207,883 | 146,291 | 130,083 |
| Purchase obligations (c) | 117,698 | 30,679 | 48,415 | 31,660 | 6,944 |

| | Total Commitment | Amount of Revolving Credit Facility Expiration by Period (in thousands) | | | |
| | | Less than 1 year | 1-3 Years | 3-5 Years | More than 5 Years |
|---|---|---|---|---|---|
| Revolving credit facility | $ 1,000,000 | $ — | $ 110,000 | $ 890,000 | $ — |

(a)   Long-term debt consists of principal amounts owed on the revolver, 2.60% notes, 3.88% notes, and 5.00% notes. Obligations under our 2.60% notes, which will mature in May 2018, have been classified as long-term, reflecting our ability to refinance these notes through our existing revolving credit facility. As of June 28, 2017, $607.8 million of credit is available under the revolving credit facility.

(b)   Interest consists of remaining interest payments on the 2.60%, 3.88% and 5.00% notes totaling $207.5 million and remaining interest payments on the revolver totaling $42.9 million. The interest rates on the notes are fixed whereas the interest rate on the revolver is variable. We have assumed that the revolver balance remains outstanding at $392.3 million until the maturity date of September 12, 2021 using the interest rate as of June 28, 2017 which was approximately 2.60%.

(c)   A "purchase obligation" is defined as an agreement to purchase goods or services that is enforceable and legally binding on us and that specifies all significant terms, including: fixed or minimum quantities to be purchased; fixed, minimum or variable price provisions; and the approximate timing of the transaction. Our purchase obligations primarily consist of long-term obligations for the purchase of fountain beverages and professional services contracts and exclude agreements that are cancelable without penalty.

In addition to the amounts shown in the table above, $3.1 million of unrecognized tax benefits have been recorded as liabilities. The timing and amounts of future cash payments related to these liabilities are uncertain.

## IMPACT OF INFLATION

We have experienced impact from inflation. Inflation has caused increased food, labor and benefits costs and has increased our operating expenses. To the extent permitted by competition, increased costs are recovered through a combination of menu price increases and reviewing, then implementing, alternative products or processes, or by implementing other cost reduction procedures.

## OFF-BALANCE SHEET ARRANGEMENTS

We have obligations for guarantees on certain lease agreements and letters of credit as disclosed in Note 14 - Commitments and Contingencies, in our consolidated financial statements included in this report. Other than these items, we do not have any off-balance sheet arrangements.

## CRITICAL ACCOUNTING ESTIMATES

Our significant accounting policies are disclosed in Note 1 to our consolidated financial statements. The following discussion addresses our most critical accounting estimates, which are those that are most important to the portrayal of our financial condition and results, and that require significant judgment.

## Stock-Based Compensation

We measure and recognize compensation cost at fair value for all share-based payments. We determine the fair value of our performance shares that contain a market condition using a Monte Carlo simulation model. The Monte Carlo method is a statistical modeling technique that requires highly judgmental assumptions regarding our future operating performance compared to our plan designated peer group in the future. The simulation is based on a probability model and market-based inputs that are used to predict future stock returns. We use the historical operating performance and correlation of stock performance to the S&P 500 composite index of us and our peer group as inputs to the simulation model. These historical returns could differ significantly in the future and as a result, the fair value assigned to the performance shares could

vary significantly to the final payout. We believe the Monte Carlo simulation model provides the best evidence of fair value at the grant date and is an appropriate technique for valuing share-based awards. We determine the fair value of our stock option awards using the Black-Scholes option valuation model. The Black-Scholes model requires judgmental assumptions including expected life and stock price volatility. We base our expected life assumptions on historical experience regarding option life. Stock price volatility is calculated based on historical prices and the expected life of the options. We measure and recognize compensation expense for our performance shares granted in fiscal 2017 that contain a company-specific performance condition at the grant date fair value of the awards that are expected to vest based on management's periodic estimates of the number of shares that will ultimately be issued. Management's estimates require highly judgmental assumptions regarding our future operating performance and could result in estimates of compensation expense that vary significantly over the vesting period. Changes in estimates of compensation expense are recognized as an adjustment in the period of the change, as appropriate. We recognize compensation expense for only the portion of share-based awards that are expected to vest. Therefore, we apply estimated forfeiture rates that are derived from our historical forfeitures of similar awards.

## Income Taxes

We make certain estimates and judgments in the calculation of tax expense and the resulting tax liabilities and in the recoverability of deferred tax assets that arise from temporary differences between the tax and financial statement recognition of revenue and expense. When considered necessary, we record a valuation allowance to reduce deferred tax assets to a balance that is more likely than not to be recognized. We use an estimate of our annual effective tax rate at each interim period based on the facts and circumstances available at that time while the actual effective tax rate is calculated at year-end.

We have recorded deferred tax assets reflecting the benefit of income tax credits and state loss carryforwards, which expire in varying amounts. Realization is dependent on generating sufficient taxable income in the relevant jurisdiction prior to expiration of the income tax credits and state loss carryforwards. Although realization is not assured, management believes it is more likely than not that the recognized deferred tax assets will be realized. The amount of the deferred tax assets considered realizable, however, could be reduced in the near term if estimates of future taxable income during the carryforward period are reduced.

We record a liability for unrecognized tax benefits resulting from tax positions taken, or expected to be taken, in an income tax return. We recognize any interest and penalties related to unrecognized tax benefits in income tax expense. Significant judgment is required in assessing, among other things, the timing and amounts of deductible and taxable items. Tax reserves are evaluated and adjusted as appropriate, while taking into account the progress of audits of various taxing jurisdictions.

In addition to the risks related to the effective tax rate described above, the effective tax rate reflected in forward-looking statements is based on current tax law. Any significant changes in the tax laws could affect these estimates.

## Impairment of Long-Lived Assets

We review the carrying amount of property and equipment semi-annually or when events or circumstances indicate that the carrying amount may not be recoverable. The impairment test is a two-step process. Step one includes comparing the operating cash flows of the restaurants over their remaining service life to their carrying value. If the cash flows exceed the carrying value, then the assets are not impaired and no further evaluation is required. If the carrying value of the property and equipment exceeds its cash flows, impairment may exist and performing step two is necessary to determine the impairment loss. If the carrying amount is not recoverable, we record an impairment charge for the excess of the carrying amount over the fair value. We determine fair value based on discounted projected future operating cash flows of the restaurants over their remaining service life using a risk adjusted discount rate that is commensurate with the inherent risk. This process requires the use of estimates and assumptions, which are subject to a high degree of judgment.

## Impairment of Goodwill

We assess the recoverability of goodwill related to our restaurant brands on an annual basis or more often if circumstances or events indicate impairment may exist. We consider our restaurants brands, Chili's and Maggiano's, to be both our operating segments and reporting units. The impairment test is a two-step process. Step one includes comparing the fair value of our reporting units to their carrying value. If the fair value of the reporting unit exceeds the carrying value, then the goodwill balance is not impaired and no further evaluation is required. If the carrying value of the reporting unit exceeds its fair value, impairment may exist and performing step two is necessary to determine the impairment loss. The amount of impairment would be determined by performing a hypothetical analysis resulting in an implied goodwill value by performing a fair value allocation as if the unit were being acquired in a business combination. This implied value would be compared to the carrying value to determine the amount of impairment loss, if any.

We determine fair value based on a combination of market-based values and discounted projected future operating cash flows of the reporting units using a risk adjusted discount rate that is commensurate with the risk inherent in our current business model. We make assumptions regarding future profits and cash flows, expected growth rates, terminal values and other factors which could significantly impact the fair value calculations. In the event that these assumptions change in the future, we may be required to record impairment charges related to goodwill. The fair value of our reporting units was substantially in excess of the carrying values as of our fiscal 2017 goodwill impairment tests that were

F-12

performed at the end of the second quarter. No indicators of impairment were identified from the date of our impairment test through the end of fiscal year 2017.

**Self-Insurance**

We are self-insured for certain losses related to health, general liability and workers' compensation. We maintain stop loss coverage with third party insurers to limit our total exposure. The self-insurance liability represents an estimate of the ultimate cost of claims incurred and unpaid as of the balance sheet date. The estimated liability is not discounted and is established based upon analysis of historical data and actuarial estimates and is reviewed on a quarterly basis to ensure that the liability is appropriate. If actual trends, including the severity or frequency of claims, differ from our estimates, our financial results could be impacted.

**Gift Card Revenue**

Proceeds from the sale of gift cards are recorded as deferred revenue and recognized as revenue when the gift card is redeemed by the holder. Breakage income represents the value associated with the portion of gift cards sold that will most likely never be redeemed. Based on our historical gift card redemption patterns and considering our gift cards have no expiration dates or dormancy fees, we can reasonably estimate the amount of gift card balances for which redemption is remote and record breakage income based on this estimate. We recognize breakage income within the franchise and other revenues caption in the consolidated statements of comprehensive income. We update our breakage rate estimate periodically and, if necessary, adjust the deferred revenue balance accordingly. If actual redemption patterns vary from our estimate, actual gift card breakage income may differ from the amounts recorded. Changing our breakage-rate assumption on unredeemed gift cards by 25 basis points would result in an impact to our consolidated statement of comprehensive income of approximately $6.8 million.

**Recent Accounting Pronouncements**

In January 2017, the FASB issued ASU 2017-04, Intangibles - Goodwill and Other (Topic 350): Simplifying the Test for Goodwill Impairment. This update eliminates step two of the goodwill impairment analysis. Companies will no longer be required to perform a hypothetical purchase price allocation to measure goodwill impairment. Instead, they will measure impairment as the difference between the carrying amount and the fair value of the reporting unit. This update is effective for annual and interim periods for fiscal years beginning after December 15, 2019, which will require us to adopt these provisions in the first quarter of fiscal 2021. Early adoption is permitted for interim or annual goodwill impairment tests performed with measurement dates after January 1, 2017. The update will be applied on a prospective basis. We do not expect the adoption of this guidance to have any impact on our consolidated financial statements as the fair value of our reporting units is substantially in excess of the carrying values.

In August 2016, the FASB issued ASU 2016-15, Classification of Certain Cash Receipts and Cash Payments (Topic 230). This update provides clarification regarding how certain cash receipts and cash payments are presented and classified in the statement of cash flows. This update addresses eight specific cash flow issues with the objective of reducing the existing diversity in practice. This update is effective for annual and interim periods for fiscal years beginning after December 15, 2017, which will require us to adopt these provisions in the first quarter of fiscal 2019. Early adoption is permitted for financial statements that have not been previously issued. The update will be applied on a retrospective basis. We do not expect the adoption of this guidance to have a material impact on our consolidated financial statements or debt covenants.

In March 2016, the FASB issued ASU 2016-09, Improvements to Employee Share-Based Payment Accounting (Topic 718). This update was issued as part of the FASB's simplification initiative and affects all entities that issue share-based payment awards to their employees. The amendments in this update cover such areas as the recognition of excess tax benefits and deficiencies, the classification of those excess tax benefits on the statement of cash flows, an accounting policy election for forfeitures, the amount an employer can withhold to cover income taxes and still qualify for equity classification and the classification of those taxes paid on the statement of cash flows. This update is effective for annual and interim periods for fiscal years beginning after December 15, 2016, which will require us to adopt these provisions in the first quarter of fiscal 2018. Adoption of the new guidance will require recognition of excess tax benefits and deficiencies in the consolidated statements of comprehensive income on a prospective basis, with a cumulative effect adjustment to retained earnings for any prior year excess tax benefits or tax deficiencies not previously recorded. In addition, this guidance will require reclassification of excess tax benefits from cash flows from financing activities to cash flows from operating activities on the consolidated statements of cash flows. We expect to apply this change on a retrospective basis. Based on our current stock price, we expect the adoption of the new guidance in the first quarter of fiscal 2018 will result in the recognition of a discrete tax expense of approximately $2 million in the provision for income taxes on our fiscal 2018 consolidated statements of comprehensive income. The inclusion of excess tax benefits and deficiencies within our provision for income taxes will increase its volatility as the amount of excess tax benefits or deficiencies from share-based compensation awards depends on our stock price at the date the awards vest. We expect that adoption of the remaining provisions in the update noted above will not have a material impact on our consolidated financial statements.

In February 2016, the FASB issued ASU 2016-02, Leases (Topic 842). This update requires a lessee to recognize on the balance sheet a liability to make lease payments and a corresponding right-of-use asset for virtually all leases, other than leases with a term of 12 months

F-13

or less. The update also requires additional disclosures about the amount, timing, and uncertainty of cash flows arising from leases. This update is effective for annual and interim periods for fiscal years beginning after December 15, 2018, which will require us to adopt these provisions in the first quarter of fiscal 2020. Early adoption is permitted for financial statements that have not been previously issued. This update will be applied on a modified retrospective basis. We anticipate implementing the standard by taking advantage of the practical expedient option. The discounted minimum remaining rental payments will be the starting point for determining the right-of-use asset and lease liability. We had operating leases with remaining rental payments of approximately $606.9 million at the end of fiscal 2017. We expect that adoption of the new guidance will have a material impact on our consolidated balance sheets due to recognition of the right-of-use asset and lease liability related to our current operating leases. The process of evaluating the full impact of the new guidance on our consolidated financial statements and disclosures is ongoing, but we anticipate the initial evaluation of the impact will be completed in fiscal 2018.

In May 2014, the FASB issued ASU 2014-09, Revenue from Contracts with Customers (Topic 606). The FASB has subsequently amended this update by issuing additional ASU's that provide clarification and further guidance around areas identified as potential implementation issues. These updates provide a comprehensive new revenue recognition model that requires a company to recognize revenue to depict the transfer of goods or services to a customer at an amount that reflects the consideration it expects to receive in exchange for those goods or services. These updates also require additional disclosure about the nature, amount, timing and uncertainty of revenue and cash flows arising from customer contracts. In August 2015, the FASB issued ASU 2015-14 delaying the effective date of adoption.  These updates are now effective for annual and interim periods for fiscal years beginning after December 15, 2017, which will require us to adopt these provisions in the first quarter of fiscal 2019. Early application in fiscal 2018 is permitted. These updates permit the use of either the retrospective or cumulative effect transition method. We do not believe these updates will impact our recognition of revenue from sales generated at company-owned restaurants or our recognition of royalty fees from franchisees. We are continuing to evaluate the impact the adoption of these updates will have on the recognition of revenue related to our gift card and loyalty programs and our franchise agreements, as well as which adoption method will be used. The process of evaluating the full impact of the new guidance on our consolidated financial statements and disclosures is ongoing, but we anticipate the initial evaluation of the impact will be completed in the first half of fiscal 2018.

**QUANTITATIVE AND QUALITATIVE DISCLOSURES ABOUT MARKET RISK**

We are exposed to interest rate risk on short-term and long-term financial instruments carrying variable interest rates. The variable rate financial instruments consist of the outstanding borrowings on our revolving credit facility. At June 28, 2017, $392.3 million was outstanding under the revolving credit facility. The impact on our annual results of operations of a one-point interest rate change on the outstanding balance of these variable rate financial instruments as of June 28, 2017 would be approximately $3.9 million.

We purchase certain commodities such as beef, pork, poultry, seafood, produce, dairy and natural gas. These commodities are generally purchased based upon market prices established with vendors. These purchase arrangements may contain contractual features that fix the price paid for certain commodities. We do not use financial instruments to hedge commodity prices because these purchase arrangements help control the ultimate cost paid.

This market risk discussion contains forward-looking statements. Actual results may differ materially from this discussion based upon general market conditions and changes in domestic and global financial markets.

F-14

**BRINKER INTERNATIONAL, INC.**
**CONSOLIDATED STATEMENTS OF COMPREHENSIVE INCOME**
**(In thousands, except per share amounts)**

| | Fiscal Years | | |
| --- | --- | --- | --- |
| | 2017 | 2016 | 2015 |
| Revenues: | | | |
| Company sales | $ 3,062,579 | $ 3,166,659 | $ 2,904,746 |
| Franchise and other revenues | 88,258 | 90,830 | 97,532 |
| Total revenues | 3,150,837 | 3,257,489 | 3,002,278 |
| Operating costs and expenses: | | | |
| Company restaurants (excluding depreciation and amortization) | | | |
| Cost of sales | 791,321 | 840,204 | 775,063 |
| Restaurant labor | 1,017,945 | 1,036,005 | 929,206 |
| Restaurant expenses | 773,510 | 762,663 | 703,334 |
| Company restaurant expenses | 2,582,776 | 2,638,872 | 2,407,603 |
| Depreciation and amortization | 156,409 | 156,368 | 145,242 |
| General and administrative | 132,819 | 127,593 | 133,467 |
| Other gains and charges | 22,655 | 17,180 | 4,764 |
| Total operating costs and expenses | 2,894,659 | 2,940,013 | 2,691,076 |
| Operating income | 256,178 | 317,476 | 311,202 |
| Interest expense | 49,547 | 32,574 | 29,006 |
| Other, net | (1,877) | (1,485) | (2,081) |
| Income before provision for income taxes | 208,508 | 286,387 | 284,277 |
| Provision for income taxes | 57,685 | 85,767 | 89,618 |
| Net income | $ 150,823 | $ 200,620 | $ 194,659 |
| | | | |
| Basic net income per share | $ 2.98 | $ 3.47 | $ 3.09 |
| | | | |
| Diluted net income per share | $ 2.94 | $ 3.42 | $ 3.02 |
| | | | |
| Basic weighted average shares outstanding | 50,638 | 57,895 | 63,072 |
| | | | |
| Diluted weighted average shares outstanding | 51,250 | 58,684 | 64,404 |
| | | | |
| | | | |
| Other comprehensive loss: | | | |
| Foreign currency translation adjustment | $ (327) | $ (2,964) | $ (7,690) |
| Other comprehensive loss | (327) | (2,964) | (7,690) |
| Comprehensive income | $ 150,496 | $ 197,656 | $ 186,969 |
| | | | |
| Dividends per share | $ 1.36 | $ 1.28 | $ 1.12 |

See accompanying notes to consolidated financial statements.

F-15

**BRINKER INTERNATIONAL, INC.**
**CONSOLIDATED BALANCE SHEETS**
**(In thousands, except share and per share amounts)**

| | June 28, 2017 | June 29, 2016 |
|---|---|---|
| **ASSETS** | | |
| Current Assets: | | |
| Cash and cash equivalents | $ 9,064 | $ 31,446 |
| Accounts receivable, net | 44,658 | 45,612 |
| Inventories | 24,997 | 25,104 |
| Restaurant supplies | 46,380 | 45,455 |
| Prepaid expenses | 29,293 | 30,825 |
| Total current assets | 154,392 | 178,442 |
| Property and Equipment, at Cost: | | |
| Land | 149,098 | 147,626 |
| Buildings and leasehold improvements | 1,655,227 | 1,626,924 |
| Furniture and equipment | 713,228 | 663,472 |
| Construction-in-progress | 21,767 | 23,965 |
| | 2,539,320 | 2,461,987 |
| Less accumulated depreciation and amortization | (1,538,706) | (1,418,835) |
| Net property and equipment | 1,000,614 | 1,043,152 |
| Other Assets: | | |
| Goodwill | 163,953 | 164,007 |
| Deferred income taxes, net | 37,029 | 14,325 |
| Intangibles, net | 27,512 | 30,225 |
| Other | 30,200 | 28,299 |
| Total other assets | 258,694 | 236,856 |
| Total assets | $ 1,413,700 | $ 1,458,450 |
| **LIABILITIES AND SHAREHOLDERS' DEFICIT** | | |
| Current Liabilities: | | |
| Current installments of long-term debt | $ 9,649 | $ 3,563 |
| Accounts payable | 104,231 | 95,414 |
| Gift card liability | 126,482 | 122,329 |
| Accrued payroll | 70,281 | 70,999 |
| Other accrued liabilities | 121,582 | 121,324 |
| Income taxes payable | 14,203 | 22,022 |
| Total current liabilities | 446,428 | 435,651 |
| Long-term debt, less current installments | 1,319,829 | 1,110,693 |
| Other liabilities | 141,124 | 137,682 |
| Commitments and Contingencies (Notes 9 and 14) | | |
| Shareholders' Deficit: | | |
| Common stock—250,000,000 authorized shares; $0.10 par value; 176,246,649 shares issued and 48,440,721 shares outstanding at June 28, 2017 and 176,246,649 shares issued and 55,420,656 shares outstanding at June 29, 2016 | 17,625 | 17,625 |
| Additional paid-in capital | 502,074 | 495,110 |
| Accumulated other comprehensive loss | (11,921) | (11,594) |
| Retained earnings | 2,627,073 | 2,545,716 |
| | 3,134,851 | 3,046,857 |
| Less treasury stock, at cost (127,805,928 shares at June 28, 2017 and 120,825,993 shares at June 29, 2016) | (3,628,532) | (3,272,433) |
| Total shareholders' deficit | (493,681) | (225,576) |
| Total liabilities and shareholders' deficit | $ 1,413,700 | $ 1,458,450 |

See accompanying notes to consolidated financial statements.

**BRINKER INTERNATIONAL, INC.**
**CONSOLIDATED STATEMENTS OF SHAREHOLDERS' (DEFICIT) EQUITY**
**(In thousands)**

| | Common Stock | | Additional Paid-In Capital | Retained Earnings | Treasury Stock | Accumulated Other Comprehensive Loss | Total |
|---|---|---|---|---|---|---|---|
| | Shares | Amount | | | | | |
| Balances at June 25, 2014 | 64,559 | $ 17,625 | $ 484,320 | $ 2,306,532 | $ (2,744,443) | $ (940) | $ 63,094 |
| Correction of error (a) | — | — | — | (10,317) | — | — | (10,317) |
| Net income (a) | — | — | — | 194,659 | — | — | 194,659 |
| Other comprehensive loss | — | — | — | — | — | (7,690) | (7,690) |
| Dividends ($1.12 per share) | — | — | — | (71,543) | — | — | (71,543) |
| Stock-based compensation | — | — | 14,989 | — | — | — | 14,989 |
| Purchases of treasury stock | (5,445) | — | (4,804) | — | (301,451) | — | (306,255) |
| Issuances of common stock | 1,472 | — | (20,386) | — | 36,645 | — | 16,259 |
| Excess tax benefit from stock-based compensation | — | — | 15,992 | — | — | — | 15,992 |
| Balances at June 24, 2015 | 60,586 | 17,625 | 490,111 | 2,419,331 | (3,009,249) | (8,630) | (90,812) |
| Net income (a) | — | — | — | 200,620 | — | — | 200,620 |
| Other comprehensive loss | — | — | — | — | — | (2,964) | (2,964) |
| Dividends ($1.28 per share) | — | — | — | (74,235) | — | — | (74,235) |
| Stock-based compensation | — | — | 15,207 | — | — | — | 15,207 |
| Purchases of treasury stock | (5,842) | — | (3,796) | — | (281,109) | — | (284,905) |
| Issuances of common stock | 677 | — | (11,778) | — | 17,925 | — | 6,147 |
| Excess tax benefit from stock-based compensation | — | — | 5,366 | — | — | — | 5,366 |
| Balances at June 29, 2016 | 55,421 | 17,625 | 495,110 | 2,545,716 | (3,272,433) | (11,594) | (225,576) |
| Net income | — | — | — | 150,823 | — | — | 150,823 |
| Other comprehensive loss | — | — | — | — | — | (327) | (327) |
| Dividends ($1.36 per share) | — | — | — | (69,466) | — | — | (69,466) |
| Stock-based compensation | — | — | 14,453 | — | — | — | 14,453 |
| Purchases of treasury stock | (7,451) | — | (1,753) | — | (369,124) | — | (370,877) |
| Issuances of common stock | 471 | — | (7,404) | — | 13,025 | — | 5,621 |
| Excess tax benefit from stock-based compensation | — | — | 1,668 | — | — | — | 1,668 |
| Balances at June 28, 2017 | 48,441 | $ 17,625 | $ 502,074 | $ 2,627,073 | $ (3,628,532) | $ (11,921) | $ (493,681) |

(a)    We discovered immaterial errors in prior years relating to the accuracy of certain tax accounts. While we concluded that the impact of these errors on our previously-issued consolidated financial statements was not material, we revised our previously-reported consolidated financial statements for the fiscal years ended June 29, 2016 and June 24, 2015. The revisions to the consolidated statements of shareholder's (deficit) equity include a $10.3 million decrease to retained earnings at the beginning of fiscal 2015 and decreases to net income of $2.1 million and $0.1 million for fiscal 2015 and fiscal 2016, respectively, for a total reduction of $12.5 million. For additional information, see Note 16—Immaterial Correction of Prior Period Financial Statements.

See accompanying notes to consolidated financial statements.

**BRINKER INTERNATIONAL, INC.**
**CONSOLIDATED STATEMENTS OF CASH FLOWS**
**(In thousands)**

| | Fiscal Years | | |
|---|---|---|---|
| | 2017 | 2016 | 2015 |
| Cash Flows from Operating Activities: | | | |
| Net income | $ 150,823 | $ 200,620 | $ 194,659 |
| Adjustments to reconcile net income to net cash provided by operating activities: | | | |
| Depreciation and amortization | 156,409 | 156,368 | 145,242 |
| Stock-based compensation | 14,568 | 15,159 | 14,802 |
| Deferred income taxes, net | (22,704) | 23,902 | 14,199 |
| Restructure charges and other impairments | 14,412 | 17,445 | 5,636 |
| Net (gain) loss on disposal of assets | (377) | 87 | 4,523 |
| Undistributed loss (earnings) on equity investments | 1 | (571) | (368) |
| Other | 3,009 | 1,918 | 250 |
| Changes in assets and liabilities: | | | |
| Accounts receivable, net | 3,487 | (3,682) | 1,932 |
| Inventories | (62) | 11 | 475 |
| Restaurant supplies | (1,496) | (1,651) | 518 |
| Prepaid expenses | (1,694) | (11,479) | 3,850 |
| Other assets | 308 | 72 | (2,140) |
| Accounts payable | 2,984 | (5,783) | 1,117 |
| Gift card liability | 4,153 | 6,190 | 10,348 |
| Accrued payroll | (714) | (17,229) | 5,330 |
| Other accrued liabilities | (4,805) | 1,026 | (38,273) |
| Current income taxes | (9,915) | 9,415 | 7,260 |
| Other liabilities | 4,499 | 2,882 | (749) |
| Net cash provided by operating activities | 312,886 | 394,700 | 368,611 |
| Cash Flows from Investing Activities: | | | |
| Payments for property and equipment | (102,573) | (112,788) | (140,262) |
| Proceeds from sale of assets | 3,157 | 4,256 | 1,950 |
| Payment for business acquisition, net of cash acquired | — | (105,577) | — |
| Net cash used in investing activities | (99,416) | (214,109) | (138,312) |
| Cash Flows from Financing Activities: | | | |
| Proceeds from issuance of long-term debt | 350,000 | — | — |
| Purchases of treasury stock | (370,877) | (284,905) | (306,255) |
| Payments on revolving credit facility | (388,000) | (110,000) | (177,000) |
| Borrowings on revolving credit facility | 250,000 | 256,500 | 480,750 |
| Payments of dividends | (70,771) | (74,066) | (70,832) |
| Payments for debt issuance costs | (10,216) | — | (2,501) |
| Proceeds from issuances of treasury stock | 5,621 | 6,147 | 16,259 |
| Payments on long-term debt | (3,832) | (3,402) | (189,177) |
| Excess tax benefits from stock-based compensation | 2,223 | 5,460 | 15,893 |
| Net cash used in financing activities | (235,852) | (204,266) | (232,863) |
| Net change in cash and cash equivalents | (22,382) | (23,675) | (2,564) |
| Cash and cash equivalents at beginning of year | 31,446 | 55,121 | 57,685 |
| Cash and cash equivalents at end of year | $ 9,064 | $ 31,446 | $ 55,121 |

See accompanying notes to consolidated financial statements.

**BRINKER INTERNATIONAL, INC.**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

**1.   NATURE OF OPERATIONS AND SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES**

**(a) Nature of Operations**

We are principally engaged in the ownership, operation, development, and franchising of the Chili's Grill & Bar ("Chili's") and Maggiano's Little Italy ("Maggiano's") restaurant brands. At June 28, 2017, we owned, operated, or franchised 1,674 restaurants in the United States and 30 countries and two territories outside of the United States.

**(b) Basis of Presentation**

Our consolidated financial statements include the accounts of Brinker International, Inc. and our wholly-owned subsidiaries. All intercompany accounts and transactions have been eliminated in consolidation.

We have a 52/53 week fiscal year ending on the last Wednesday in June. Fiscal years 2017 and 2015, which ended on June 28, 2017 and June 24, 2015, respectively, each contained 52 weeks. Fiscal year 2016 ended on June 29, 2016 and contained 53 weeks. The estimated impact of the 53rd week in fiscal 2016 was an increase in revenue of approximately $58.3 million. While certain expenses increased in direct relationship to additional revenue from the 53rd week, other expenses, such as fixed costs, are incurred on a calendar month basis.

In connection with the preparation of the consolidated financial statements for the year ended June 28, 2017, we discovered immaterial errors in prior years relating to the accuracy of certain tax accounts. While we concluded that the impact of these errors on our previously-issued consolidated financial statements was not material, we revised our previously-reported consolidated financial statements for the fiscal years ended June 29, 2016 and June 24, 2015. The revisions included a net increase in the provision for income taxes of $0.1 million and $2.1 million for fiscal 2016 and 2015, respectively. These revisions for fiscal 2016 offset and therefore resulted in no change to earnings per share for fiscal 2016 and a $0.03 decrease for fiscal 2015. The cumulative effect of the changes to retained earnings at the beginning of fiscal 2015, the earliest date presented in the consolidated financial statements for the year ended June 28, 2017, was a reduction of $10.3 million. For additional information, see Note 16 - Immaterial Correction of Prior Period Financial Statements.

In April 2015, the Financial Accounting Standards Board ("FASB") issued Accounting Standards Update ("ASU") 2015-03, Simplifying the Presentation of Debt Issuance Costs. This update requires that debt issuance costs be presented in the balance sheet as a direct deduction from the associated debt liability. This update was effective for annual and interim periods for fiscal years beginning after December 15, 2015, which required us to adopt these provisions in the first quarter of fiscal 2017. Accordingly, we reclassified the debt issuance cost balances associated with the 2.60% notes and 3.88% notes of $1.0 million and $2.2 million, respectively, from other assets to long-term debt, less current installments on the consolidated balance sheet as of June 29, 2016. The reclassification did not have a material effect on our consolidated financial statements.

In April 2015, the FASB issued ASU 2015-05, Customer's Accounting for Fees Paid in a Cloud Computing Arrangement. This update provides guidance to companies that purchase cloud computing services to determine whether or not the arrangement includes a software license and the related accounting treatment. This update was effective for annual and interim periods for fiscal years beginning after December 15, 2015, which required us to adopt these provisions in the first quarter of fiscal 2017. We adopted the guidance prospectively and the adoption did not have any impact on our consolidated financial statements.

In August 2014, the FASB issued ASU 2014-15, Disclosure of Uncertainties about an Entity's Ability to Continue as a Going Concern.  This update requires management to evaluate whether there are conditions or events, considered in the aggregate, that raise substantial doubt about the entity's ability to continue as a going concern within one year after the date that the financial statements are issued. If such conditions or events exist, an entity should disclose that there is substantial doubt about the entity's ability to continue as a going concern within one year after the date that the financial statements are issued. Disclosure should include the principal conditions or events that raise substantial doubt, management's evaluation of the significance of those conditions or events in relation to the entity's ability to meet its obligations, and management's plans that are intended to mitigate those conditions or events. This update was effective for the annual period ending after December 15, 2016, and for annual and interim periods thereafter. We adopted the guidance effective June 28, 2017. Accordingly, we performed an evaluation and determined that there are no conditions or events, considered in the aggregate, that raise substantial doubt about our ability to continue as a going concern through August 28, 2018. The adoption did not have any impact on our consolidated financial statements.

Revenues are presented in two separate captions on the consolidated statements of comprehensive income to provide more clarity around company-owned restaurant revenue and operating expense trends. Company sales includes revenues generated by the operation of company-owned restaurants including gift card redemptions. Franchise and other revenues includes royalties, development fees, franchise fees, Maggiano's banquet service charge income, gift card breakage and discounts, digital entertainment revenue, Chili's retail food product royalties and delivery fee income.

We report certain labor and related expenses in a separate caption on the consolidated statements of comprehensive income titled restaurant labor. Restaurant labor includes all compensation-related expenses, including benefits and incentive compensation, for restaurant team members at the general manager level and below. Labor-related expenses attributable to multi-restaurant (or above-restaurant) supervision is included in restaurant expenses.

**(c) Use of Estimates**

The preparation of the consolidated financial statements in conformity with generally accepted accounting principles in the United States of America requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and the disclosure of contingent assets and liabilities at the date of the consolidated financial statements and the reported amounts of revenues and costs and expenses during the reporting period. Actual results could differ from those estimates.

**(d) Revenue Recognition**

We record revenue from the sale of food, beverages and alcohol as products are sold. Initial fees received from a franchisee to establish a new franchise are recognized as income when we have performed our obligations required to assist the franchisee in opening a new franchise restaurant, which is generally upon the opening of such restaurant. Fees received for development arrangements are recognized as income upon satisfaction of our obligations, generally upon the execution of the agreement when the development rights are conveyed to the franchisee. Continuing royalties, which are a percentage of net sales of franchised restaurants, are accrued as income when earned.

Proceeds from the sale of gift cards are recorded as deferred revenue and recognized as revenue when the gift card is redeemed by the holder. Breakage income represents the value associated with the portion of gift cards sold that will most likely never be redeemed. Based on our historical gift card redemption patterns and considering our gift cards have no expiration dates or dormancy fees, we can reasonably estimate the amount of gift card balances for which redemption is remote and record breakage income based on this estimate. We recognize breakage income within franchise and other revenues in the consolidated statements of comprehensive income. We update our estimate of our breakage rate periodically and, if necessary, adjust the deferred revenue balance accordingly.

**(e) Fair Value Measurements**

Fair value is defined as the price that we would receive to sell an asset or pay to transfer a liability in an orderly transaction between market participants on the measurement date. In determining fair value, the accounting standards establish a three level hierarchy for inputs used in measuring fair value, as follows:

- Level 1—inputs are quoted prices in active markets for identical assets or liabilities.
- Level 2—inputs are observable for the asset or liability, either directly or indirectly, including quoted prices in active markets for similar assets or liabilities.
- Level 3—inputs are unobservable and reflect our own assumptions.

**(f) Cash and Cash Equivalents**

Our policy is to invest cash in excess of operating requirements in income-producing investments. Income-producing investments with original maturities of three months or less are reflected as cash equivalents.

**(g) Accounts Receivable**

Accounts receivable, net of the allowance for doubtful accounts, represents their estimated net realizable value. Provisions for doubtful accounts are recorded based on management's judgment regarding our ability to collect as well as the age of the receivables. Accounts receivable are written off when they are deemed uncollectible.

**(h) Inventories**

Inventories consist of food, beverages and supplies and are valued at the lower of cost or market, using the first-in, first-out or "FIFO" method.

**(i) Property and Equipment**

Property and equipment is stated at cost. Buildings and leasehold improvements are depreciated using the straight-line method over the lesser of the life of the lease, including certain renewal options, or the estimated useful lives of the assets, which range from 5 to 20 years. Furniture and equipment are depreciated using the straight-line method over the estimated useful lives of the assets, which range from 3 to 10 years. Routine repair and maintenance costs are expensed when incurred. Major replacements and improvements are capitalized.

F-20

We review the carrying amount of property and equipment semi-annually or when events or circumstances indicate that the carrying amount may not be recoverable. We have determined the restaurant level is the lowest level of identifiable cash flows. If the carrying amount is not recoverable, we record an impairment charge for the excess of the carrying amount over the fair value. We determine fair value based on discounted projected future operating cash flows of the restaurants over their remaining service life using a risk adjusted discount rate that is commensurate with the inherent risk. Impairment charges are included in other gains and charges in the consolidated statements of comprehensive income.

**(j) Definite-lived Intangible Assets**

Definite-lived intangible assets primarily include reacquired franchise rights resulting from our acquisitions. Definite-lived intangible assets are amortized using the straight-line method over the estimated useful lives of the assets.

We determine the fair value of reacquired franchise rights based on discounted projected future operating cash flows of the restaurants associated with these franchise rights. We review the carrying amount semi-annually or whenever events or changes in circumstances indicate that the carrying amount may not be recoverable. If the carrying amount is not recoverable, we record an impairment charge for the excess of the carrying amount over the fair value. Impairment charges are included in other gains and charges in the consolidated statements of comprehensive income.

**(k) Operating Leases**

Rent expense for leases that contain scheduled rent increases is recognized on a straight-line basis over the lease term, including cancelable option periods where failure to exercise such options would result in an economic penalty such that the renewal appears reasonably assured. The straight-line rent calculation and rent expense includes the rent holiday period, which is the period of time between taking control of a leased site and the rent commencement date. Contingent rents are generally amounts due as a result of sales in excess of amounts stipulated in certain restaurant leases and are included in rent expense at the point in time we determine that it is probable that such sales levels will be achieved. Landlord contributions are recorded when received as a deferred rent liability and amortized as a reduction of rent expense on a straight-line basis over the lease term.

**(l) Advertising**

Advertising production costs are expensed in the period when the advertising first takes place. Other advertising costs are expensed as incurred. Advertising costs, net of advertising contributions from franchisees, were $103.8 million, $93.6 million and $94.3 million in fiscal 2017, 2016, and 2015, respectively, and are included in restaurant expenses in the consolidated statements of comprehensive income.

**(m) Goodwill**

Goodwill is not subject to amortization, but is tested for impairment annually or more frequently if events or changes in circumstances indicate that the asset might be impaired. Goodwill has been assigned to reporting units for purposes of impairment testing. Our two restaurant brands, Chili's and Maggiano's, are both operating segments and reporting units.

Goodwill impairment tests consist of a comparison of each reporting unit's fair value with its carrying value. We determine fair value based on a combination of market-based values and discounted projected future operating cash flows of the restaurant brands using a risk adjusted discount rate that is commensurate with the risk inherent in our current business model. If the carrying value of a reporting unit exceeds its fair value, goodwill is written down to its implied fair value. We determined that there was no goodwill impairment during our annual tests as the fair value of our reporting units was substantially in excess of the carrying values. No indicators of impairment were identified through the end of fiscal year 2017. See Note 5 for additional disclosures related to goodwill.

We occasionally acquire restaurants from our franchisees. Goodwill from these acquisitions represents the excess of the cost of the business acquired over the net amounts assigned to assets acquired, including identifiable intangible assets, primarily reacquired franchise rights. In connection with the sale of restaurants, we will allocate goodwill from the reporting unit, or restaurant brand, to the disposal group in the determination of the gain or loss on the disposition. The allocation is based on the relative fair values of the disposal group and the portion of the reporting unit that was retained. If we dispose of a restaurant brand and all related restaurants, the entire goodwill balance associated with the reporting unit or brand will be included in the disposal group for purposes of determining the gain or loss on the disposition. Additionally, if we sell restaurants with reacquired franchise rights, we will include those assets in the gain or loss on the disposition.

**(n) Liquor Licenses**

The costs of obtaining non-transferable liquor licenses from local government agencies are expensed over the specified term of the license. The costs of purchasing transferable liquor licenses through open markets in jurisdictions with a limited number of authorized liquor licenses are capitalized as indefinite-lived intangible assets and included in intangibles.

F-21

Transferable liquor licenses are tested for impairment semi-annually or more frequently if events or circumstances indicate that the asset might be impaired. Impairment charges are recognized based on the excess of carrying value over fair value. We determine fair value based on prices in the open market for licenses in same or similar jurisdictions. Impairment charges are included in other gains and charges in the consolidated statements of comprehensive income.

**(o) Sales Taxes**

Sales taxes collected from guests are excluded from revenues. The obligation is included in accrued liabilities until the taxes are remitted to the appropriate taxing authorities.

**(p) Self-Insurance Program**

We are self-insured for certain losses related to health, general liability and workers' compensation. We maintain stop loss coverage with third party insurers to limit our total exposure. The self-insurance liability represents an estimate of the ultimate cost of claims incurred and unpaid as of the balance sheet date. The estimated liability is not discounted and is established based upon analysis of historical data and actuarial estimates, and is reviewed on a quarterly basis to ensure that the liability is appropriate. If actual trends, including the severity or frequency of claims, differ from our estimates, our financial results could be impacted. Accrued and other liabilities include the estimated incurred but unreported costs to settle unpaid claims.

**(q) Income Taxes**

Income taxes are accounted for under the asset and liability method. Deferred tax assets and liabilities are recognized for the future tax consequences attributable to differences between the financial statement carrying amounts of existing assets and liabilities and their respective tax bases. Deferred tax assets and liabilities are measured using enacted tax rates expected to apply to taxable income in the years in which those temporary differences are expected to be recovered or settled. The effect on deferred tax assets and liabilities of a change in tax rates is recognized in income in the period that includes the enactment date.

We record a liability for unrecognized tax benefits resulting from tax positions taken, or expected to be taken, in an income tax return that is not more-likely-than-not to be realized. We recognize any interest and penalties related to unrecognized tax benefits in income tax expense.

We reinvest foreign earnings, therefore, United States deferred income taxes have not been provided on foreign earnings.

**(r) Stock-Based Compensation**

We measure and recognize compensation cost at fair value for all share-based payments. We record compensation expense using a graded-vesting schedule or on a straight-line basis, as applicable, over the vesting period, or to the date on which retirement eligibility is achieved, if shorter. We recognize compensation expense for only the portion of share-based awards that are expected to vest. Therefore, we apply estimated forfeiture rates that are derived from our historical forfeitures of similar awards.

Certain employees are eligible to receive stock options, performance shares, restricted stock and restricted stock units, while non-employee members of the Board of Directors are eligible to receive stock options, restricted stock and restricted stock units. Performance shares represent a right to receive shares of common stock upon satisfaction of company performance goals at the end of a three-year cycle. Vesting of performance shares granted in fiscal 2017 is contingent upon meeting company performance goals based on our rate of earnings growth at the end of the three-year period. Compensation expense for the performance shares granted in fiscal 2017 is recorded based on management's periodic estimates of the number of shares that will ultimately be issued and the fair value of the shares as determined by our closing stock price on the date of grant. A cumulative expense adjustment is recognized when that estimate changes. The fair value of our performance shares granted prior to fiscal 2017, which contain a market condition, was determined on the date of grant based on a Monte Carlo simulation model. The fair value of restricted stock and restricted stock units are based on our closing stock price on the date of grant.

Stock-based compensation expense totaled approximately $14.5 million, $15.2 million and $15.0 million for fiscal 2017, 2016 and 2015, respectively. The total income tax benefit recognized in the consolidated statements of comprehensive income related to stock-based compensation expense was approximately $5.7 million, $5.8 million and $5.5 million during fiscal 2017, 2016 and 2015, respectively.

The weighted average fair values of option grants were $9.30, $10.48 and $11.72 during fiscal 2017, 2016 and 2015, respectively. The fair value of stock options is estimated using the Black-Scholes option-pricing model with the following weighted average assumptions:

|  | 2017 | 2016 | 2015 |
|---|---|---|---|
| Expected volatility | 25.5% | 27.5% | 31.0% |
| Risk-free interest rate | 1.3% | 1.5% | 1.6% |
| Expected lives | 5 years | 5 years | 5 years |
| Dividend yield | 2.6% | 2.4% | 2.2% |

F-22

Expected volatility and the expected life of stock options are based on historical experience. The risk-free rate is based on the yield of a Treasury Note with a term equal to the expected life of the stock options. The dividend yield is based on the most recent quarterly dividend per share declared and the closing stock price on the declaration date.

**(s) Preferred Stock**

Our Board of Directors is authorized to provide for the issuance of 1.0 million preferred shares with a par value of $1.00 per share, in one or more series, and to fix the voting rights, liquidation preferences, dividend rates, conversion rights, redemption rights, and terms, including sinking fund provisions, and certain other rights and preferences. As of June 28, 2017, no preferred shares were issued.

**(t) Shareholders' Deficit**

In August 2016, our Board of Directors authorized a $150.0 million increase to our existing share repurchase program resulting in total authorizations of $4.3 billion. In September 2016, we entered into a $300.0 million accelerated share repurchase agreement ("ASR Agreement") with Bank of America, N.A. ("BofA"). The ASR Agreement settled in January 2017. Pursuant to the terms of the ASR Agreement, we paid BofA $300.0 million in cash and received 5.9 million shares of our common stock. The accelerated share repurchase transaction qualified for equity accounting treatment. Repurchased common stock is reflected as an increase in treasury stock within shareholders' deficit. We also repurchased approximately 1.6 million additional shares of common stock for a total of 7.5 million shares repurchased during fiscal 2017 for $370.9 million. The repurchased shares included shares purchased as part of our share repurchase program and shares repurchased to satisfy team member tax withholding obligations on the vesting of restricted shares. As of June 28, 2017, approximately $115.8 million was available under our share repurchase authorizations. Our stock repurchase plan has been and will be used to return capital to shareholders and to minimize the dilutive impact of stock options and other share-based awards. We evaluate potential share repurchases under our plan based on several factors, including our cash position, share price, operational liquidity, proceeds from divestitures, borrowings, and planned investment and financing needs. Additionally, during fiscal 2017, approximately 225,000 stock options were exercised resulting in cash proceeds of approximately $5.6 million.

During fiscal 2017, we paid dividends of $70.8 million to common stock shareholders, compared to $74.1 million in the prior year. Our Board of Directors approved a 6.3% increase in the quarterly dividend from $0.32 to $0.34 per share effective with the dividend declared in August 2016. We also declared a quarterly dividend of $0.34 per share in May 2017 which was paid subsequent to the end of the year on June 29, 2017 in the amount of $16.6 million. The dividend accrual was included in other accrued liabilities on our consolidated balance sheet as of June 28, 2017.

**(u) Comprehensive Income**

Comprehensive income is defined as the change in equity of a business enterprise during a period from transactions and other events and circumstances from non-owner sources. Fiscal 2017, 2016 and 2015 comprehensive income consists of net income and foreign currency translation adjustments. The foreign currency translation adjustment represents the unrealized impact of translating the financial statements of the Canadian restaurants and the Mexico joint venture with CMR, S.A.B. de C.V. from their respective functional currencies to U.S. dollars. This amount is not included in net income and would only be realized upon the sale or upon complete or substantially complete liquidation of the businesses. The accumulated other comprehensive loss is presented on the consolidated balance sheets.

**(v) Net Income Per Share**

Basic earnings per share is computed by dividing income available to common shareholders by the weighted average number of common shares outstanding for the reporting period. Diluted earnings per share reflects the potential dilution that could occur if securities or other contracts to issue common stock were exercised or converted into common stock. For the calculation of diluted net income per share, the basic weighted average number of shares is increased by the dilutive effect of stock options and restricted share awards. Stock options and restricted share awards with an anti-dilutive effect are not included in the dilutive earnings per share calculation.

Basic weighted average shares outstanding is reconciled to diluted weighted average shares outstanding as follows (in thousands):

|  | 2017 | 2016 | 2015 |
|---|---|---|---|
| Basic weighted average shares outstanding | 50,638 | 57,895 | 63,072 |
| Dilutive stock options | 192 | 316 | 569 |
| Dilutive restricted shares | 420 | 473 | 763 |
|  | 612 | 789 | 1,332 |
| Diluted weighted average shares outstanding | 51,250 | 58,684 | 64,404 |
|  |  |  |  |
| Awards excluded due to anti-dilutive effect on earnings per share | 973 | 550 | 119 |

F-23

**(w) Segment Reporting**

Operating segments are components of an enterprise about which separate financial information is available that is evaluated regularly by the chief operating decision maker in deciding how to allocate resources and in assessing operating performance. We manage our business on the basis of two operating segments, Chili's and Maggiano's. The brands operate company-owned restaurants principally in the U.S. within the full-service casual dining segment of the industry. The Chili's segment also has company-owned restaurants in Canada and franchised locations in the U.S and 30 countries and two territories outside of the U.S. Additional information about our segments, including financial information, is included in Note 15.

**2. ACQUISITION OF CHILI'S RESTAURANTS**

On June 25, 2015, we completed the stock acquisition of Pepper Dining Holding Corp. ("Pepper Dining"), a franchisee of 103 Chili's restaurants primarily located in the Northeast and Southeast United States. The purchase price of $106.5 million, excluding cash and customary working capital adjustments of $0.9 million, was funded with borrowings from our existing credit facility. The results of operations of these restaurants were included in our consolidated financial statements from the date of acquisition. The assets and liabilities of the restaurants were recorded at their respective fair values as of the date of acquisition.

The excess of the purchase price over the aggregate fair value of net assets acquired was allocated to goodwill. Of the $31.9 million recorded as goodwill, $12.8 million is expected to be deductible for tax purposes. The portion of the purchase price attributable to goodwill represents the benefits expected as a result of the acquisition, including sales and unit growth opportunities. The acquired restaurants generated approximately $259.6 million of revenue for the fifty-three week period ended June 29, 2016, approximately $2.5 million of average annual revenue per restaurant, partially offset by the loss of average annual royalty revenues of approximately $104,000 per restaurant. Pro-forma financial information of the combined entities is not presented due to the immaterial impact of the financial results of the acquired restaurants on our consolidated financial statements.

**3. EQUITY METHOD INVESTMENT**

We have a joint venture agreement with CMR, S.A.B. de C.V. to develop 50 Chili's restaurants in Mexico. At June 28, 2017, 45 Chili's restaurants were operating in the joint venture. We account for the Mexico joint venture investment under the equity method of accounting and record our share of the net income or loss of the investee within operating income since their operations are similar to our ongoing operations. These amounts have been included in restaurant expense in our consolidated statements of comprehensive income due to the immaterial nature of the amounts. The investment in the joint venture is included in other assets in our consolidated balance sheets.

**4. OTHER GAINS AND CHARGES**

Other gains and charges consist of the following (in thousands):

|  | 2017 | 2016 | 2015 |
|---|---|---|---|
| Severance and other benefits | $ 6,591 | $ 3,304 | $ 1,182 |
| Restaurant impairment charges | 5,190 | 10,651 | 2,255 |
| Restaurant closure charges | 4,084 | 3,780 | 1,736 |
| Information technology restructuring | 2,739 | — | — |
| Accelerated depreciation | 1,988 | — | — |
| Lease guarantee charges | 1,089 | — | — |
| (Gain) loss on the sale of assets, net | (2,659) | (2,858) | 1,093 |
| Impairment of investment | — | 1,000 | — |
| Acquisition costs | — | 700 | 1,100 |
| Impairment of intangible assets | — | 392 | 645 |
| Litigation | — | (3,191) | (2,753) |
| Other | 3,633 | 3,402 | (494) |
|  | $ 22,655 | $ 17,180 | $ 4,764 |

**Fiscal 2017**

During fiscal 2017, we completed a reorganization of the Chili's restaurant operations team and certain departments at the corporate headquarters to better align our staffing with the current management strategy and resource needs. This employee separation action resulted in severance charges and accelerated stock-based compensation expenses of $6.6 million. All of the severance amounts were paid by the end of fiscal 2017.

F-24

We recorded restaurant impairment charges of $5.2 million primarily related to the long-lived assets and reacquired franchise rights of ten underperforming Chili's restaurants which will continue to operate. See Note 10 for fair value disclosures. Additionally, we recorded restaurant closure charges of $4.1 million primarily related to lease charges and other costs associated with closed restaurants.

We incurred $2.7 million of professional fees and severance associated with our information technology restructuring offset by a $2.7 million gain on the sale of property. We also recorded accelerated depreciation charges of $2.0 million related to long-lived assets to be disposed of and lease guarantee charges of $1.1 million related to leases that were assigned to a divested brand. For additional lease guarantee disclosures, see Note 14 - Commitments and Contingencies. Other charges primarily include $2.4 million of expenses for consulting fees related to a special project.

**Fiscal 2016**

During fiscal 2016, we recorded impairment charges of $10.7 million primarily related to seven underperforming restaurants that either continue to operate or closed during fiscal 2017 and $1.0 million related to a cost method investment. We recorded restaurant closure charges of $3.8 million that primarily consisted of additional lease and other costs associated with closed restaurants.

We were a plaintiff in a class action lawsuit against US Foods styled as *In re U.S. Foodservice, Inc. Pricing Litigation*. A settlement agreement was fully executed by all parties in September 2015, and we received approximately $2.0 million during the second quarter of fiscal 2016 in settlement of this litigation. We also received net proceeds of $1.2 million from British Petroleum in the fourth quarter of fiscal 2016 related to the 2010 Gulf of Mexico oil spill judgment.

Additionally, we recorded a $2.9 million gain on the sale of several properties and $0.7 million of transaction costs related to the acquisition of Pepper Dining. Other charges primarily included $1.4 million of expenses to reserve for royalties, rents and other outstanding amounts related to a bankrupt franchisee and $1.2 million of professional service fees associated with organizational changes.

**Fiscal 2015**

During fiscal 2015, we were a plaintiff in the antitrust litigation against Visa and MasterCard styled as *Progressive Casualty Insurance Co., et al. v. Visa, Inc., et al*.  A settlement agreement was fully executed by all parties in January 2015 and we recognized a gain of approximately $8.6 million. Also during fiscal 2015, the class action lawsuit styled as *Hohnbaum, et al. v. Brinker Restaurant Corp., et al.* ("Hohnbaum case") was finalized resulting in an additional charge of approximately $5.8 million to adjust our previous estimate of the final settlement amount.

We recorded restaurant impairment charges of $2.3 million related to underperforming restaurants that either continue to operate or closed during fiscal 2017. We also recorded restaurant closure charges of $1.7 million primarily related to lease termination charges and a $1.1 million loss primarily related to the sale of two company-owned restaurants located in Mexico. Furthermore, we incurred $1.2 million in severance and other benefits related to organizational changes made during the fiscal year. The severance charges include expense related to the accelerated vesting of stock-based compensation awards. We also incurred expenses of approximately $1.1 million during fiscal 2015 related to the acquisition of Pepper Dining subsequent to the end of the year.

**5.   GOODWILL AND INTANGIBLES**

The changes in the carrying amount of goodwill for the fiscal years ended June 28, 2017 and June 29, 2016 are as follows (in thousands):

| | 2017 | | | 2016 | | |
|---|---|---|---|---|---|---|
| | Chili's | Maggiano's | Consolidated | Chili's | Maggiano's | Consolidated |
| Balance at beginning of year | $ 125,610 | $ 38,397 | $ 164,007 | $ 93,984 | $ 38,397 | $ 132,381 |
| | | | | | | |
| Changes in goodwill: | | | | | | |
| Additions (a) | — | — | — | 31,912 | — | 31,912 |
| Foreign currency translation adjustment | (54) | — | (54) | (286) | — | (286) |
| | | | | | | |
| Balance at end of year | $ 125,556 | $ 38,397 | $ 163,953 | $ 125,610 | $ 38,397 | $ 164,007 |

(a)      Fiscal 2016 additions reflect the goodwill acquired as a result of the acquisition of Pepper Dining. See Note 2 for additional disclosures.

Intangible assets, net for the fiscal years ended June 28, 2017 and June 29, 2016 are as follows (in thousands):

| | 2017 | | | 2016 | | |
|---|---|---|---|---|---|---|
| | Gross Carrying Amount | Accumulated Amortization | Net Carrying Amount | Gross Carrying Amount | Accumulated Amortization | Net Carrying Amount |
| Definite-lived intangible assets | | | | | | |
| Chili's reacquired franchise rights (a) | $ 16,170 | $ (4,175) | $ 11,995 | $ 17,284 | $ (3,041) | $ 14,243 |
| Chili's other | 5,985 | (1,070) | 4,915 | 5,988 | (713) | 5,275 |
| | $ 22,155 | $ (5,245) | $ 16,910 | $ 23,272 | $ (3,754) | $ 19,518 |
| | | | | | | |
| Indefinite-lived intangible assets | | | | | | |
| Chili's liquor licenses | $ 9,670 | | | $ 9,775 | | |
| Maggiano's liquor licenses | 932 | | | 932 | | |
| | $ 10,602 | | | $ 10,707 | | |

Amortization expense for all definite-lived intangible assets was $1.4 million, $1.5 million and $0.8 million in fiscal 2017, 2016 and 2015, respectively. Annual amortization expense for definite-lived intangible assets will approximate $1.5 million for each of the next five fiscal years.

_____

(a)     The gross carrying amount and accumulated amortization include the impact of foreign currency translation on existing balances of $0.1 million and $0.3 million for fiscal 2017 and 2016, respectively. We also recorded an impairment charge of $0.8 million and $0.2 million in fiscal 2017 and fiscal 2016, respectively. See Note 10 for additional disclosures.

## 6.   ACCRUED AND OTHER LIABILITIES

Other accrued liabilities consist of the following (in thousands):

| | 2017 | 2016 |
|---|---|---|
| Sales tax | $ 22,561 | $ 26,280 |
| Insurance | 17,484 | 19,976 |
| Property tax | 16,566 | 15,762 |
| Dividends | 16,649 | 17,760 |
| Other | 48,322 | 41,546 |
| | $ 121,582 | $ 121,324 |

Other liabilities consist of the following (in thousands):

| | 2017 | 2016 |
|---|---|---|
| Straight-line rent | $ 57,464 | $ 56,896 |
| Insurance | 42,532 | 38,433 |
| Landlord contributions | 26,402 | 24,681 |
| Unfavorable leases | 5,398 | 6,521 |
| Unrecognized tax benefits | 3,116 | 4,070 |
| Other | 6,212 | 7,081 |
| | $ 141,124 | $ 137,682 |

7.   **INCOME TAXES**

Income before provision for income taxes consists of the following (in thousands):

|  | 2017 | 2016 | 2015 |
|---|---|---|---|
| Domestic | $ 186,679 | $ 258,905 | $ 257,228 |
| Foreign | 21,829 | 27,482 | 27,049 |
| Total income before provision for income taxes | $ 208,508 | $ 286,387 | $ 284,277 |

The provision for income taxes consists of the following (in thousands):

|  | 2017 | 2016 | 2015 |
|---|---|---|---|
| Current income tax expense: |  |  |  |
| Federal | $ 64,407 | $ 48,896 | $ 60,575 |
| State | 13,358 | 10,843 | 11,990 |
| Foreign | 2,490 | 3,497 | 3,319 |
| Total current income tax expense | 80,255 | 63,236 | 75,884 |
| Deferred income tax (benefit) expense: |  |  |  |
| Federal | (19,647) | 21,842 | 11,674 |
| State | (3,064) | 704 | 2,156 |
| Foreign | 141 | (15) | (96) |
| Total deferred income tax (benefit) expense | (22,570) | 22,531 | 13,734 |
|  | $ 57,685 | $ 85,767 | $ 89,618 |

A reconciliation between the reported provision for income taxes and the amount computed by applying the statutory Federal income tax rate of 35% to income before provision for income taxes is as follows (in thousands):

|  | 2017 | 2016 | 2015 |
|---|---|---|---|
| Income tax expense at statutory rate | $ 72,978 | $ 100,236 | $ 99,496 |
| FICA tax credit | (20,657) | (20,497) | (18,633) |
| State income taxes, net of Federal benefit | 5,928 | 9,614 | 8,646 |
| Other | (564) | (3,586) | 109 |
|  | $ 57,685 | $ 85,767 | $ 89,618 |

F-27

The income tax effects of temporary differences that give rise to significant portions of deferred income tax assets and liabilities as of June 28, 2017 and June 29, 2016 are as follows (in thousands):

|  | 2017 | 2016 |
|---|---|---|
| Deferred income tax assets: |  |  |
| Leasing transactions | $ 32,019 | $ 32,826 |
| Stock-based compensation | 14,029 | 12,817 |
| Restructure charges and impairments | 3,533 | 2,211 |
| Insurance reserves | 19,700 | 18,015 |
| Employee benefit plans | 288 | 501 |
| Gift cards | 23,670 | 18,609 |
| State net operating losses | 2,554 | 3,030 |
| Federal credit carryover | 12,697 | 14,722 |
| State credit carryover | 3,148 | 3,238 |
| Other, net | 8,480 | 7,930 |
| Less: Valuation allowance | (5,232) | (5,315) |
| Total deferred income tax assets | 114,886 | 108,584 |
| Deferred income tax liabilities: |  |  |
| Prepaid expenses | 19,506 | 17,360 |
| Goodwill and other amortization | 30,213 | 28,659 |
| Depreciation and capitalized interest on property and equipment | 26,375 | 43,858 |
| Other, net | 1,763 | 4,382 |
| Total deferred income tax liabilities | 77,857 | 94,259 |
| Net deferred income tax asset | $ 37,029 | $ 14,325 |

We have deferred tax assets of $6.4 million reflecting the benefit of state loss carryforwards, before federal benefit and valuation allowance, which expire at various dates between fiscal 2018 and fiscal 2037. We have deferred tax assets of $12.7 million of federal and $4.8 million state tax credits, before federal benefit and valuation allowance, which expire at various dates between fiscal 2024 and fiscal 2035. The recognized deferred tax asset for the state loss carryforwards is $0.5 million and the federal tax credits is $12.7 million. The federal credit carryover is limited by Section 382 of the Internal Revenue Code.

The valuation allowance decreased by $0.1 million in fiscal 2017 to recognize certain state net operating loss benefits management believes are more-likely-than-not to be realized.

No provision was made for the United States federal and state income taxes on certain outside basis differences, which primarily relate to accumulated unrepatriated foreign earnings of approximately $3.8 million as of June 28, 2017.  It is not practicable to estimate the amount of tax that might be payable because our intent is to permanently reinvest these earnings or to repatriate earnings when it is tax effective to do so.

A reconciliation of unrecognized tax benefits for the fiscal years ended June 28, 2017 and June 29, 2016 are as follows (in thousands):

|  | 2017 | 2016 |
|---|---|---|
| Balance at beginning of year | $ 4,989 | $ 3,843 |
| Additions based on tax positions related to the current year | 402 | 1,359 |
| Additions based on tax positions related to prior years | 31 | 2,332 |
| Settlements with tax authorities | (681) | (1,963) |
| Expiration of statute of limitations | (679) | (582) |
| Balance at end of year | $ 4,062 | $ 4,989 |

The total amount of unrecognized tax benefits that would affect income tax expense if resolved in our favor was $3.1 million and $3.9 million as of June 28, 2017 and June 29, 2016, respectively. We do not expect any material changes to our liability for uncertain tax positions during the next 12 months.

We recognize accrued interest and penalties related to unrecognized tax benefits in income tax expense. During fiscal 2017, we recognized approximately $0.2 million in interest expense. During fiscal 2016 and 2015, we recognized expenses of approximately $1.3 million and $0.2

million, respectively, in interest due to the reduction of accrued interest from statute expirations and settlements, net of accrued interest for remaining positions. As of June 28, 2017, we had $0.6 million ($0.4 million net of a $0.2 million Federal deferred tax benefit) of interest and penalties accrued, compared to $0.8 million ($0.6 million net of a $0.2 million Federal deferred tax benefit) at June 29, 2016.

Our income tax returns are subject to examination by taxing authorities in the jurisdictions in which we operate. The periods subject to examination for our federal return are fiscal 2015 to fiscal 2016 and fiscal 2013 to fiscal 2016 for our Canadian returns. State income tax returns are generally subject to examination for a period of three to five years after filing. We have various state income tax returns in the process of examination or settlements. Our federal return for fiscal 2015 and 2016 are currently under examination through the Internal Revenue Service: Compliance Assurance Process (CAP) program. There are no unrecorded liabilities associated with these examinations.

## 8.   DEBT

Long-term debt consists of the following (in thousands):

|  | 2017 | 2016 |
|---|---|---|
| Revolving credit facility | $       392,250 | $       530,250 |
| 5.00% notes | 350,000 | — |
| 3.88% notes | 300,000 | 300,000 |
| 2.60% notes | 250,000 | 250,000 |
| Capital lease obligations (see Note 9) | 45,417 | 37,532 |
| Total long-term debt | 1,337,667 | 1,117,782 |
| Less unamortized debt issuance costs and discounts | (8,189) | (3,526) |
| Total long-term debt less unamortized debt issuance costs and discounts | 1,329,478 | 1,114,256 |
| Less current installments | (9,649) | (3,563) |
|  | $    1,319,829 | $    1,110,693 |

On September 23, 2016, we completed the private offering of $350.0 million of our 5.0% senior notes due October 2024 (the "2024 Notes"). We received proceeds of $350.0 million prior to debt issuance costs of $6.2 million and utilized the proceeds to fund a $300 million accelerated share repurchase agreement and to repay $50.0 million on the amended $1 billion revolving credit facility. See Note 1 for additional disclosures related to the accelerated share repurchase agreement. The notes require semi-annual interest payments which began on April 1, 2017.

The indenture for the 2024 Notes contains certain covenants, including, but not limited to, limitations and restrictions on the ability of the Company and its Restricted Subsidiaries (as defined in the indenture) to (i) create liens on Principal Property (as defined in the Indenture), (ii) enter into any Sale and Leaseback Transaction (as defined in the Indenture) with respect to any property, and (iii) merge, consolidate or amalgamate with or into any other person or sell, transfer, assign, lease, convey or otherwise dispose of all or substantially all of their property. These covenants are subject to a number of important conditions, qualifications, exceptions and limitations.

On September 13, 2016, we amended the revolving credit facility to increase the borrowing capacity from $750 million to $1 billion. We capitalized debt issuance costs of $4.0 million associated with the amendment of the revolving credit facility, which are included in other assets in the consolidated balance sheet as of June 28, 2017. During fiscal 2017, net payments of $138.0 million were made on the revolving credit facility.

Under the amended $1 billion revolving credit facility, the maturity date for $890.0 million of the facility was extended from March 12, 2020 to September 12, 2021 and the remaining $110.0 million remains due on March 12, 2020. The amended revolving credit facility bears interest of LIBOR plus an applicable margin, which is a function of our credit rating and debt to cash flow ratio, but is subject to a maximum of LIBOR plus 2.00%. Based on our current credit rating, we are paying interest at a rate of LIBOR plus 1.38% for a total of 2.60%. One month LIBOR at June 28, 2017 was approximately 1.22%.

During fiscal 2016, $256.5 million was drawn from the $750 million revolving credit facility primarily to fund the acquisition of Pepper Dining and for share repurchases. We repaid a total of $110.0 million of the revolving credit facility during fiscal 2016.

In May 2013, we issued $550.0 million of notes consisting of two tranches - $250.0 million of 2.60% notes due in May 2018 and $300.0 million of 3.88% notes due in May 2023. The notes require semi-annual interest payments which began in the second quarter of fiscal 2014.

As of June 28, 2017, $607.8 million of credit is available under the revolving credit facility. Obligations under our 2.60% notes, which will mature in May 2018, have been classified as long-term, reflecting our ability to refinance these notes through our existing revolving credit facility.

Our debt agreements contain various financial covenants that, among other things, require the maintenance of certain leverage and fixed charge coverage ratios. The financial covenants were not significantly changed as a result of the new and amended debt agreements. We are currently in compliance with all financial covenants.

Excluding capital lease obligations (see Note 9) and interest, our long-term debt maturities for the five years following June 28, 2017 and thereafter are as follows (in thousands):

| Fiscal Year | | Long-Term Debt |
|---|---|---|
| 2018 | $ | 250,000 |
| 2019 | | — |
| 2020 | | — |
| 2021 | | — |
| 2022 | | 392,250 |
| Thereafter | | 650,000 |
| | $ | 1,292,250 |

## 9.  LEASES

### (a) Capital Leases

We lease certain buildings under capital leases. The asset value of $38.8 million at June 28, 2017 and June 29, 2016, and the related accumulated amortization of $26.0 million and $24.1 million at June 28, 2017 and June 29, 2016, respectively, are included in buildings and leasehold improvements.

We also lease certain technology equipment under capital leases. The asset value of $12.4 million and $0.7 million at June 28, 2017 and June 29, 2016, and the related accumulated amortization of $0.7 million and $0.2 million at June 28, 2017 and June 29, 2016, respectively, are included in furniture and equipment. Amortization of assets under capital leases is included in depreciation and amortization expense.

### (b) Operating Leases

We lease restaurant facilities and office space under operating leases. The majority having terms expiring at various dates through fiscal 2035. The restaurant leases have cumulative renewal clauses of 1 to 30 years at our option and, in some cases, have provisions for contingent rent based upon a percentage of sales in excess of specified levels, as defined in the leases. We include other rent-related costs in rent expense, such as common area maintenance, taxes and amortization of landlord contributions.

Rent expense consists of the following (in thousands):

| | | 2017 | | 2016 | | 2015 |
|---|---|---|---|---|---|---|
| Straight-lined minimum rent | $ | 109,819 | $ | 107,776 | $ | 92,917 |
| Contingent rent | | 3,821 | | 4,408 | | 4,774 |
| Other | | 11,682 | | 11,283 | | 9,998 |
| Total rent expense | $ | 125,322 | $ | 123,467 | $ | 107,689 |

**(c) Commitments**

As of June 28, 2017, future minimum lease payments on capital and operating leases were as follows (in thousands):

| Fiscal Year | Capital Leases | | Operating Leases | |
|---|---|---|---|---|
| 2018 | $ | 11,823 | $ | 122,598 |
| 2019 | | 7,636 | | 110,238 |
| 2020 | | 7,164 | | 97,645 |
| 2021 | | 4,820 | | 82,707 |
| 2022 | | 3,902 | | 63,584 |
| Thereafter | | 24,074 | | 130,083 |
| Total minimum lease payments(a) | | 59,419 | $ | 606,855 |
| Imputed interest (average rate of 7%) | | (14,002) | | |
| Present value of minimum lease payments | | 45,417 | | |
| Less current installments | | (9,649) | | |
| | $ | 35,768 | | |

(a) Future minimum lease payments have not been reduced by minimum sublease rentals to be received in the future under non-cancelable subleases. The total of undiscounted future sublease rentals are approximately $25.0 million and $40.8 million for capital and operating subleases, respectively.

## 10. FAIR VALUE DISCLOSURES

### (a) Non-Financial Assets Measured on a Non-Recurring Basis

We review the carrying amounts of property and equipment, reacquired franchise rights and transferable liquor licenses semi-annually or when events or circumstances indicate that the fair value may not exceed the carrying amount. We record an impairment charge for the excess of the carrying amount over the fair value.

We determine the fair value of property and equipment and reacquired franchise rights based on discounted projected future cash flows of the restaurants over their remaining service life using a risk adjusted discount rate that is commensurate with the inherent risk. Based on our semi-annual review, during fiscal 2017, long-lived assets and reacquired franchise rights with carrying values of $4.5 million and $0.8 million, respectively, primarily related to ten underperforming restaurants, were determined to have a total fair value of $0.2 million resulting in an impairment charge of $5.1 million. Based on our semi-annual review, during fiscal 2016, long-lived assets and reacquired franchise rights with carrying values of $7.0 million and $0.2 million, respectively, primarily related to five underperforming restaurants, were determined to have a total fair value of $0.2 million resulting in an impairment charge of $7.0 million. During the third quarter of fiscal 2016, two restaurants were identified for closure by management with a combined carrying value of $3.4 million. We determined these restaurants had no fair value resulting in an impairment charge of $3.4 million.

We determine the fair value of transferable liquor licenses based on prices in the open market for licenses in the same or similar jurisdictions. In fiscal 2017, six transferable liquor licenses with a carrying value of $1.3 million were written down to the fair value of $1.2 million resulting in an impairment charge of $0.1 million. In fiscal 2016, four transferable liquor licenses with a carrying value of $1.1 million were written down to the fair value of $0.9 million resulting in an impairment charge of $0.2 million.

During fiscal 2016, we recorded an impairment charge of $187,000 related to a parcel of undeveloped land that we own. The land had a carrying value of $937,000 and was written down to the fair value of $750,000. The fair value was based on the sales price of comparable properties. Additionally, we recorded an impairment charge of $231,000 related to a capital lease asset that is subleased to a franchisee. The capital lease asset had a carrying value of $338,000 and was written down to the fair value of $107,000. The fair value of the capital lease asset is based on discounted projected future cash flows from the sublease. We also recorded an impairment charge of $1.0 million related to a cost method investment which we determined to have no fair value.

All impairment charges were included in other gains and charges in the consolidated statements of comprehensive income for the periods presented.

The following table presents fair values for those assets measured at fair value on a non-recurring basis at June 28, 2017 and June 29, 2016 (in thousands):

| | Fair Value Measurements Using | | | |
| | (Level 1) | (Level 2) | (Level 3) | Total |
|---|---|---|---|---|
| Long-lived assets held for use: | | | | |
| At June 28, 2017 | $ — | $ — | $ 201 | $ 201 |
| At June 29, 2016 | $ — | $ — | $ 208 | $ 208 |
| Liquor licenses: | | | | |
| At June 28, 2017 | $ — | $ 1,185 | $ — | $ 1,185 |
| At June 29, 2016 | $ — | $ 857 | $ — | $ 857 |
| Other long-lived assets: | | | | |
| At June 28, 2017 | $ — | $ — | $ — | $ — |
| At June 29, 2016 | $ — | $ 750 | $ 107 | $ 857 |

**(b) Other Financial Instruments**

Our financial instruments consist of cash and cash equivalents, accounts receivable, accounts payable and long-term debt. The fair values of cash and cash equivalents, accounts receivable and accounts payable approximate their carrying amounts because of the short maturity of these items. The carrying amount of debt outstanding related to the amended revolving credit facility approximates fair value as the interest rate on this instrument approximates current market rates (Level 2). The fair values of the 2.60% notes, 3.88% and 5.00% notes are based on quoted market prices and are considered Level 2 fair value measurements.

The carrying amounts, which are net of unamortized debt issuance costs and discounts, and fair values of the 2.60% notes, 3.88% notes and 5.00% notes are as follows (in thousands):

| | June 28, 2017 | | June 29, 2016 | |
| | Carrying Amount | Fair Value | Carrying Amount | Fair Value |
|---|---|---|---|---|
| 2.60% Notes | $ 249,495 | $ 250,480 | $ 248,918 | $ 252,445 |
| 3.88% Notes | $ 297,912 | $ 286,077 | $ 297,556 | $ 302,655 |
| 5.00% Notes | $ 344,405 | $ 347,956 | $ — | $ — |

## 11.  STOCK-BASED COMPENSATION

Our shareholders approved stock-based compensation plans including the Stock Option and Incentive Plan and the Stock Option and Incentive Plan for Non-Employee Directors and Consultants (collectively, the "Plans"). The total number of shares authorized for issuance to employees and non-employee directors and consultants under the Plans is currently 37.3 million. The Plans provide for grants of options to purchase our common stock, restricted stock, restricted stock units, performance shares and stock appreciation rights.

**(a) Stock Options**

Expense related to stock options granted to eligible employees under the Plans is recognized using a graded-vesting schedule over the vesting period or to the date on which retirement eligibility is achieved, if shorter. Stock options generally vest over a period of 1 to 4 years and have contractual terms to exercise of 8 years. Full or partial vesting of awards may occur upon a change in control (as defined in the Plans), or upon an employee's death, disability or involuntary termination.

Transactions during fiscal 2017 were as follows (in thousands, except option prices):

| | Number of Options | Weighted Average Exercise Price | Weighted Average Remaining Contractual Life (Years) | Aggregate Intrinsic Value |
|---|---|---|---|---|
| Options outstanding at June 29, 2016 | 1,217 | $ 39.12 | | |
| Granted | 546 | 53.10 | | |
| Exercised | (225) | 24.98 | | |
| Forfeited or canceled | (162) | 52.01 | | |
| Options outstanding at June 28, 2017 | 1,376 | $ 45.46 | 5.0 | $ 4,014 |
| Options exercisable at June 28, 2017 | 652 | $ 37.82 | 3.1 | $ 4,014 |

At June 28, 2017, unrecognized compensation expense related to stock options totaled approximately $1.6 million and will be recognized over a weighted average period of 1.9 years. The intrinsic value of options exercised totaled approximately $5.6 million, $5.3 million and $28.1 million during fiscal 2017, 2016 and 2015, respectively. The tax benefit realized on options exercised totaled approximately $1.6 million, $1.6 million and $9.2 million during fiscal 2017, 2016 and 2015, respectively.

**(b) Restricted Share Awards**

Restricted share awards consist of performance shares, restricted stock and restricted stock units. In fiscal 2017, eligible employees under the Plans were granted performance shares whose vesting is contingent upon meeting company performance goals based on our rate of earnings growth at the end of a three fiscal year period. Expense is recognized ratably over the vesting period, or to the date on which retirement eligibility is achieved, if shorter, based upon management's periodic estimates of the number of shares that ultimately will be issued. Prior to fiscal 2017, eligible employees under the Plans were granted performance shares containing a market condition which generally vest in full on the third anniversary of the date of grant. Most restricted stock units granted to eligible employees under the Plans generally vest in full on the third anniversary of the date of grant. Restricted stock units issued to eligible employees under our career equity plan generally vest upon each employee's retirement from the Company. Expense is recognized ratably over the vesting period, or to the date on which retirement eligibility is achieved, if shorter. Restricted stock and restricted stock units granted to non-employee directors under the Plans generally vest in full on the fourth anniversary of the date of grant or upon each director's retirement from the Board. The non-employee directors' awards are non-forfeitable and are expensed upon grant. Full or partial vesting of awards may occur upon a change in control (as defined in the Plans), or upon an employee's death, disability or involuntary termination.

Transactions during fiscal 2017 were as follows (in thousands, except fair values):

| | Number of Restricted Share Awards | Weighted Average Grant Date Fair Value Per Award |
|---|---|---|
| Restricted share awards outstanding at June 29, 2016 | 998 | $ 42.68 |
| Granted | 262 | 53.11 |
| Vested | (303) | 39.55 |
| Forfeited | (143) | 47.71 |
| Restricted share awards outstanding at June 28, 2017 | 814 | $ 46.32 |

At June 28, 2017, unrecognized compensation expense related to restricted share awards totaled approximately $9.4 million and will be recognized over a weighted average period of 2.2 years. The fair value of shares that vested during fiscal 2017, 2016 and 2015 totaled approximately $12.8 million, $23.9 million and $34.2 million, respectively.

**12. SAVINGS PLAN**

We sponsor a qualified defined contribution retirement plan covering all employees who have attained the age of twenty-one and have completed one year and 1,000 hours of service. Eligible employees are allowed to contribute, subject to IRS limitations on total annual contributions, up to 50% of their base compensation and 100% of their eligible bonuses, as defined in the plan, to various investment funds. We match in cash at a rate of 100% of the first 3% an employee contributes and 50% of the next 2% the employee contributes with immediate vesting. In fiscal 2017, 2016 and 2015, we contributed approximately $8.9 million, $8.9 million and $8.0 million, respectively.

**13.  SUPPLEMENTAL CASH FLOW INFORMATION**

Cash paid for interest and income taxes is as follows (in thousands):

|  | 2017 | 2016 | 2015 |
|---|---|---|---|
| Income taxes, net of refunds | $    89,035 | $    45,743 | $    50,437 |
| Interest, net of amounts capitalized | 39,767 | 28,989 | 26,190 |

Non-cash investing and financing activities are as follows (in thousands):

|  | 2017 | 2016 | 2015 |
|---|---|---|---|
| Retirement of fully depreciated assets | $    21,185 | $    24,806 | $    40,775 |
| Dividends declared but not paid | 17,317 | 18,442 | 18,132 |
| Accrued capital expenditures | 12,738 | 7,094 | 4,109 |
| Capital lease additions | 11,717 | — | — |

**14.  COMMITMENTS AND CONTINGENCIES**

In connection with the sale of restaurants to franchisees and brand divestitures, we have, in certain cases, guaranteed lease payments. As of June 28, 2017 and June 29, 2016, we have outstanding lease guarantees or are secondarily liable for $69.0 million and $72.9 million, respectively. This amount represents the maximum potential liability of future payments under the guarantees. These leases have been assigned to the buyers and expire at the end of the respective lease terms, which range from fiscal 2018 through fiscal 2027. In the event of default, the indemnity and default clauses in our assignment agreements govern our ability to pursue and recover damages incurred.

In July 2017, subsequent to the end of the fiscal year, we were notified that a divested brand closed several of its properties for which we are secondarily liable.   We believe a loss has been incurred based on the likely default under the lease contracts by the divested brand.  As a result, a liability was established in fiscal 2017 based on an estimate of the obligation associated with these locations.  Our total lease obligation liability recorded in accrued liabilities on the consolidated balance sheet at the end of fiscal 2017 related to divested brands was approximately $1.5 million.  We will continue to assess the potential for further changes to our liability related to the outstanding lease guarantees and will pursue recovering any damages incurred.  We have not been informed of any other lease defaults. No other liabilities have been recorded as of June 28, 2017.

We provide letters of credit to various insurers to collateralize obligations for outstanding claims. As of June 28, 2017, we had $31.2 million in undrawn standby letters of credit outstanding. All standby letters of credit are renewable annually.

Evaluating contingencies related to litigation is a complex process involving subjective judgment on the potential outcome of future events and the ultimate resolution of litigated claims may differ from our current analysis. Accordingly, we review the adequacy of accruals and disclosures pertaining to litigated matters each quarter in consultation with legal counsel and we assess the probability and range of possible losses associated with contingencies for potential accrual in the consolidated financial statements.

We are engaged in various legal proceedings and have certain unresolved claims pending. Reserves have been established based on our best estimates of our probable liability in certain of these matters. Based upon consultation with legal counsel, management is of the opinion that there are no matters pending or threatened which are expected to have a material adverse effect, individually or in the aggregate, on our consolidated financial condition or results of operations.

**15.  SEGMENT INFORMATION**

Our operating segments are Chili's and Maggiano's. The Chili's segment includes the results of our company-owned Chili's restaurants in the U.S. and Canada as well as the results from our domestic and international franchise business. The Maggiano's segment includes the results of our company-owned Maggiano's restaurants.

Company sales are derived principally from the sales of food and beverages. Franchise and other revenues primarily includes royalties, development fees, franchise fees, banquet service charge income, gift card breakage and discounts, digital entertainment revenue, Chili's retail food product royalties and delivery fee income. We do not rely on any major customers as a source of sales, and the customers and long-lived assets of our operating segments are predominantly in the U.S. There were no material transactions amongst our operating segments.

Our chief operating decision maker uses operating income as the measure for assessing performance of our segments. Operating income includes revenues and expenses directly attributable to segment-level results of operations. Company restaurant expenses include food and beverage costs, restaurant labor costs and restaurant expenses. The following tables reconcile our segment results to our consolidated results reported in accordance with GAAP (in thousands):

| | Fiscal Year Ended June 28, 2017 | | | |
| | Chili's | Maggiano's | Other | Consolidated |
|---|---|---|---|---|
| Company sales | $ 2,653,301 | $ 409,278 | $ — | $ 3,062,579 |
| Franchise and other revenues | 66,693 | 21,565 | — | 88,258 |
| Total revenues | 2,719,994 | 430,843 | — | 3,150,837 |
| | | | | |
| Company restaurant expenses (a) | 2,220,607 | 361,700 | 469 | 2,582,776 |
| Depreciation and amortization | 129,335 | 16,172 | 10,902 | 156,409 |
| General and administrative | 37,005 | 6,191 | 89,623 | 132,819 |
| Other gains and charges | 13,229 | 783 | 8,643 | 22,655 |
| Total operating costs and expenses | 2,400,176 | 384,846 | 109,637 | 2,894,659 |
| | | | | |
| Operating income | $ 319,818 | $ 45,997 | $ (109,637) | $ 256,178 |
| | | | | |
| Segment assets | $ 1,173,797 | $ 163,733 | $ 76,170 | $ 1,413,700 |
| Equity method investment | 10,171 | — | — | 10,171 |
| Payments for property and equipment | 75,992 | 13,288 | 13,293 | 102,573 |

| | Fiscal Year Ended June 29, 2016 | | | |
| | Chili's | Maggiano's | Other | Consolidated |
|---|---|---|---|---|
| Company sales | $ 2,754,904 | $ 411,755 | $ — | $ 3,166,659 |
| Franchise and other revenues | 68,484 | 22,346 | — | 90,830 |
| Total revenues | 2,823,388 | 434,101 | — | 3,257,489 |
| | | | | |
| Company restaurant expenses (a) | 2,272,771 | 364,466 | 1,635 | 2,638,872 |
| Depreciation and amortization | 131,306 | 15,046 | 10,016 | 156,368 |
| General and administrative | 35,845 | 6,225 | 85,523 | 127,593 |
| Other gains and charges | 6,973 | 3,472 | 6,735 | 17,180 |
| Total operating costs and expenses | 2,446,895 | 389,209 | 103,909 | 2,940,013 |
| | | | | |
| Operating income | $ 376,493 | $ 44,892 | $ (103,909) | $ 317,476 |
| | | | | |
| Segment assets | $ 1,218,009 | $ 163,753 | $ 76,688 | $ 1,458,450 |
| Equity method investment | 10,257 | — | — | 10,257 |
| Payments for property and equipment | 80,277 | 17,540 | 14,971 | 112,788 |

| | Fiscal Year Ended June 24, 2015 | | | |
| | Chili's | Maggiano's | Other | Consolidated |
|---|---|---|---|---|
| Company sales | $ 2,503,133 | $ 401,613 | $ — | $ 2,904,746 |
| Franchise and other revenues | 75,860 | 21,672 | — | 97,532 |
| Total revenues | 2,578,993 | 423,285 | — | 3,002,278 |
| | | | | |
| Company restaurant expenses (a) | 2,044,521 | 360,903 | 2,179 | 2,407,603 |
| Depreciation and amortization | 122,093 | 14,233 | 8,916 | 145,242 |
| General and administrative | 37,131 | 6,722 | 89,614 | 133,467 |
| Other gains and charges | 600 | (1,009) | 5,173 | 4,764 |
| Total operating costs and expenses | 2,204,345 | 380,849 | 105,882 | 2,691,076 |
| | | | | |
| Operating income | $ 374,648 | $ 42,436 | $ (105,882) | $ 311,202 |
| | | | | |
| Payments for property and equipment | $ 114,416 | $ 14,408 | $ 11,438 | $ 140,262 |

(a)  Company restaurant expenses includes cost of sales, restaurant labor and restaurant expenses, including advertising.

Reconciliation of operating income to income before provision for income taxes:

| | Fiscal Years Ended | | |
| | June 28, 2017 | June 29, 2016 | June 24, 2015 |
|---|---|---|---|
| Operating income | $ 256,178 | $ 317,476 | $ 311,202 |
| Less interest expense | (49,547) | (32,574) | (29,006) |
| Plus other, net | 1,877 | 1,485 | 2,081 |
| Income before provision for income taxes | $ 208,508 | $ 286,387 | $ 284,277 |

F-36

**16. IMMATERIAL CORRECTION OF PRIOR PERIOD FINANCIAL STATEMENTS**

In connection with the preparation of the consolidated financial statements for the year ended June 28, 2017, we discovered immaterial errors in prior years relating to the accuracy of the deferred income tax liability, primarily related to property and equipment. While we have concluded that the impact of these errors on our previously-issued consolidated financial statements was not material, we have revised our previously-reported consolidated financial statements for the years ended June 29, 2016 and June 24, 2015.

The revisions to our consolidated statements of comprehensive income for the years ended June 29, 2016 and June 24, 2015 are as follows (in thousands, except per share amounts):

|  | Fifty-Three Week Period Ended June 29, 2016 | | Fifty-Two Week Period Ended June 24, 2015 | |
|  | As Reported | As Revised | As Reported | As Revised |
|---|---|---|---|---|
| Income before provision for income taxes | $ 286,387 | $ 286,387 | $ 284,277 | 284,277 |
| Provision for income taxes | 85,642 | 85,767 | 87,583 | 89,618 |
| Net income | $ 200,745 | $ 200,620 | $ 196,694 | $ 194,659 |
| Basic net income per share | $ 3.47 | $ 3.47 | $ 3.12 | $ 3.09 |
| Diluted net income per share | $ 3.42 | $ 3.42 | $ 3.05 | $ 3.02 |
| Basic weighted average shares outstanding | 57,895 | 57,895 | 63,072 | 63,072 |
| Diluted weighted average shares outstanding | 58,684 | 58,684 | 64,404 | 64,404 |
| Other comprehensive loss: | | | | |
| Foreign currency translation adjustment | $ (2,964) | $ (2,964) | $ (7,690) | $ (7,690) |
| Other comprehensive loss | (2,964) | (2,964) | (7,690) | (7,690) |
| Comprehensive income | $ 197,781 | $ 197,656 | $ 189,004 | $ 186,969 |

The revisions to our consolidated balance sheet as of June 29, 2016 were as follows (in thousands):

|  | June 29, 2016 | |
|  | As Reported | As Revised |
|---|---|---|
| Accounts receivable, net | $ 43,944 | $ 45,612 |
| Total current assets | 176,774 | 178,442 |
| Deferred income taxes, net | 27,003 | 14,325 |
| Total other assets (a) | 249,534 | 236,856 |
| Total assets (a) | 1,469,460 | 1,458,450 |
| Income taxes payable | 18,814 | 22,022 |
| Total current liabilities | 432,443 | 435,651 |
| Other liabilities | 139,423 | 137,682 |
| Total shareholders' deficit | (213,099) | (225,576) |
| Total liabilities and shareholders' deficit | $ 1,469,460 | $ 1,458,450 |

(a)    During the first quarter of fiscal 2017, we adopted ASU 2015-03, Simplifying the Presentation of Debt Issuance Costs, on a retrospective basis. Accordingly, we reclassified the debt issuance cost balances associated with the 2.60% notes and 3.88% notes of $1.0 million and $2.2 million, respectively, from other assets to long-term debt, less current installments on the consolidated balance sheet as of June 29, 2016.

The revisions had no impact on cash flows from operating, investing, or financing activities on the consolidated statements of cash flows for fiscal years 2016 and 2015. The revisions to the consolidated statements of shareholders' deficit include the changes to net income and comprehensive income, as noted above, and a $10.3 million decrease to retained earnings at the beginning of fiscal 2015.

**17. QUARTERLY RESULTS OF OPERATIONS (UNAUDITED)**

The following table summarizes the unaudited consolidated quarterly results of operations for fiscal 2017 and 2016 (in thousands, except per share amounts):

| | Fiscal Year 2017 Quarters Ended | | | |
| --- | --- | --- | --- | --- |
| | Sept. 28 | Dec. 28 | March 29 | June 28 |
| Revenues | $ 758,492 | $ 771,043 | $ 810,641 | $ 810,661 |
| Income before provision for income taxes | $ 32,966 | $ 48,268 | $ 59,612 | $ 67,662 |
| Net income | $ 23,233 | $ 34,637 | $ 42,369 | $ 50,584 |
| Basic net income per share | $ 0.42 | $ 0.70 | $ 0.87 | $ 1.03 |
| Diluted net income per share | $ 0.42 | $ 0.69 | $ 0.86 | $ 1.02 |
| Basic weighted average shares outstanding | 54,844 | 49,833 | 48,954 | 48,917 |
| Diluted weighted average shares outstanding | 55,576 | 50,480 | 49,506 | 49,435 |

| | Fiscal Year 2016 Quarters Ended | | | |
| --- | --- | --- | --- | --- |
| | Sept. 23 | Dec. 23 | March 23 | June 29 (a) |
| Revenues | $ 762,559 | $ 788,610 | $ 824,639 | $ 881,681 |
| Income before provision for income taxes | $ 48,753 | $ 68,272 | $ 78,150 | $ 91,212 |
| Net income | $ 33,207 | $ 47,694 | $ 57,502 | $ 62,217 |
| Basic net income per share | $ 0.55 | $ 0.81 | $ 1.01 | $ 1.12 |
| Diluted net income per share | $ 0.54 | $ 0.80 | $ 1.00 | $ 1.10 |
| Basic weighted average shares outstanding | 60,225 | 59,198 | 56,673 | 55,657 |
| Diluted weighted average shares outstanding | 61,208 | 59,899 | 57,407 | 56,394 |

(a)     This unaudited financial information has been revised to reflect the effect of the revisions described in Note 16-Immaterial Correction of Prior Period Financial Statements. The impact on fiscal 2016 was a reduction to net income of $0.1 million which has been reflected as a reduction in the fourth quarter of fiscal 2016. There were no impacts to the previously-reported quarterly results in fiscal 2017.

Net income for fiscal 2017 included severance charges of $0.3 million, $5.9 million and $0.4 million in the first, third and fourth quarters of fiscal 2017, respectively. Restaurant impairment charges of $1.9 million and $3.3 million were recorded in the second and fourth quarters, respectively. We also recorded additional lease and other costs associated with closed restaurants of $2.5 million, $0.3 million, $0.8 million and $0.5 million in the first, second, third and fourth quarters of fiscal 2017, respectively. We incurred professional fees and severance expenses of $2.5 million and $0.2 million in the first and second quarters, respectively, related to our information technology restructuring. We also recorded gains on the sale of property of $2.6 million in the second quarter of fiscal 2017. Additionally, we recorded accelerated depreciation related to long-lived assets to be disposed of $0.7 million, $0.7 million and $0.6 million in the first, second and fourth quarters of fiscal 2017, respectively. Furthermore, we recorded consulting fees of $2.4 million and lease guarantee charges of $1.1 million in the fourth quarter of fiscal 2017.

Net income for fiscal 2016 included restaurant impairment charges of $0.5 million, $3.4 million and $6.7 million recorded in the second, third and fourth quarters, respectively. We also recorded additional lease and other costs associated with closed restaurants of $3.8 million in the fourth quarter of fiscal 2016 related to restaurants closed in prior years. Severance charges of $2.2 million, $0.2 million and $0.9 million were incurred in the first, second and fourth quarters of fiscal 2016, respectively. We incurred expenses of $1.2 million and $0.2 million in the second and fourth quarters, respectively, to reserve for royalties, rent and other outstanding amounts related to a bankrupt franchisee. Additionally, we recorded charges of $0.6 million and $0.1 million in the first and third quarters of fiscal 2016, respectively, for acquisition costs incurred as part of completing the acquisition of Pepper Dining. Net income also included net gains of $2.0 million and $1.2 million related to litigation in the second and fourth quarters, respectively. We also recorded gains on the sale of several properties of $1.8 million and $1.1 million in the first and third quarters of fiscal 2016, respectively.

## 18. SUBSEQUENT EVENTS

On August 10, 2017, our Board of Directors declared a quarterly dividend of $0.38 per share effective with the September 2017 dividend. Our Board of Directors also authorized a $250 million increase to our existing share repurchase program, bringing the total amount available for repurchases to approximately $365 million.

Subsequent to the end of the fiscal year, an additional $110.0 million was drawn from the $1 billion revolving credit facility.

## 19. EFFECT OF NEW ACCOUNTING STANDARDS

In January 2017, the FASB issued ASU 2017-04, Intangibles - Goodwill and Other (Topic 350): Simplifying the Test for Goodwill Impairment.  This update eliminates step two of the goodwill impairment analysis. Companies will no longer be required to perform a hypothetical purchase price allocation to measure goodwill impairment. Instead, they will measure impairment as the difference between the carrying amount and the fair value of the reporting unit. This update is effective for annual and interim periods for fiscal years beginning after December 15, 2019, which will require us to adopt these provisions in the first quarter of fiscal 2021. Early adoption is permitted for interim or annual goodwill impairment tests performed with measurement dates after January 1, 2017. The update will be applied on a prospective basis. We do not expect the adoption of this guidance to have any impact on our consolidated financial statements as the fair value of our reporting units is substantially in excess of the carrying values.

In August 2016, the FASB issued ASU 2016-15, Classification of Certain Cash Receipts and Cash Payments (Topic 230).  This update provides clarification regarding how certain cash receipts and cash payments are presented and classified in the statement of cash flows. This update addresses eight specific cash flow issues with the objective of reducing the existing diversity in practice. This update is effective for annual and interim periods for fiscal years beginning after December 15, 2017, which will require us to adopt these provisions in the first quarter of fiscal 2019. Early adoption is permitted for financial statements that have not been previously issued. The update will be applied on a retrospective basis. We do not expect the adoption of this guidance to have a material impact on our consolidated financial statements or debt covenants.

In March 2016, the FASB issued ASU 2016-09, Improvements to Employee Share-Based Payment Accounting (Topic 718).  This update was issued as part of the FASB's simplification initiative and affects all entities that issue share-based payment awards to their employees. The amendments in this update cover such areas as the recognition of excess tax benefits and deficiencies, the classification of those excess tax benefits on the statement of cash flows, an accounting policy election for forfeitures, the amount an employer can withhold to cover income taxes and still qualify for equity classification and the classification of those taxes paid on the statement of cash flows. This update is effective for annual and interim periods for fiscal years beginning after December 15, 2016, which will require us to adopt these provisions in the first quarter of fiscal 2018. Adoption of the new guidance will require recognition of excess tax benefits and tax deficiencies in the consolidated statements of comprehensive income on a prospective basis, with a cumulative effect adjustment to retained earnings for any prior year excess tax benefits or tax deficiencies not previously recorded. In addition, this guidance will require reclassification of excess tax benefits from cash flows from financing activities to cash flows from operating activities on the consolidated statements of cash flows. We expect to apply this change on a retrospective basis. Based on our current stock price, we expect the adoption of the new guidance in the first quarter of fiscal 2018 will result in the recognition of a discrete tax expense of approximately $2 million in the provision for income taxes on our fiscal 2018 consolidated statements of comprehensive income. The inclusion of excess tax benefits and deficiencies within our provision for income taxes will increase its volatility as the amount of excess tax benefits or deficiencies from share-based compensation awards depends on our stock price at the date the awards vest. We expect that adoption of the remaining provisions in the update noted above will not have a material impact on our consolidated financial statements.

In February 2016, the FASB issued ASU 2016-02, Leases (Topic 842).  This update requires a lessee to recognize on the balance sheet a liability to make lease payments and a corresponding right-of-use asset for virtually all leases, other than leases with a term of 12 months or less. The update also requires additional disclosures about the amount, timing, and uncertainty of cash flows arising from leases. This update is effective for annual and interim periods for fiscal years beginning after December 15, 2018, which will require us to adopt these provisions in the first quarter of fiscal 2020. Early adoption is permitted for financial statements that have not been previously issued. This update will be applied on a modified retrospective basis. We anticipate implementing the standard by taking advantage of the practical expedient option. The discounted minimum remaining rental payments will be the starting point for determining the right-of-use asset and lease liability. We had operating leases with remaining rental payments of approximately $606.9 million at the end of fiscal 2017. We expect that adoption of the new guidance will have a material impact on our consolidated balance sheets due to recognition of the right-of-use asset and lease liability related to our current operating leases. The process of evaluating the full impact of the new guidance on our consolidated financial statements and disclosures is ongoing, but we anticipate the initial evaluation of the impact will be completed in fiscal 2018.

In May 2014, the FASB issued ASU 2014-09, Revenue from Contracts with Customers (Topic 606). The FASB has subsequently amended this update by issuing additional ASU's that provide clarification and further guidance around areas identified as potential implementation issues. These updates provide a comprehensive new revenue recognition model that requires a company to recognize revenue to depict the transfer

of goods or services to a customer at an amount that reflects the consideration it expects to receive in exchange for those goods or services. These updates also require additional disclosure about the nature, amount, timing and uncertainty of revenue and cash flows arising from customer contracts. In August 2015, the FASB issued ASU 2015-14 delaying the effective date of adoption. These updates are now effective for annual and interim periods for fiscal years beginning after December 15, 2017, which will require us to adopt these provisions in the first quarter of fiscal 2019. Early application in fiscal 2018 is permitted. These updates permit the use of either the retrospective or cumulative effect transition method. We do not believe these updates will impact our recognition of revenue from sales generated at company-owned restaurants or our recognition of royalty fees from franchisees. We are continuing to evaluate the impact the adoption of these updates will have on the recognition of revenue related to our gift card and loyalty programs and our franchise agreements, as well as which adoption method will be used. The process of evaluating the full impact of the new guidance on our consolidated financial statements and disclosures is ongoing, but we anticipate the initial evaluation of the impact will be completed in the first half of fiscal 2018.

**Report of Independent Registered Public Accounting Firm**

The Board of Directors and Shareholders
Brinker International, Inc.:


We have audited the accompanying consolidated balance sheets of Brinker International, Inc. and subsidiaries (the Company) as of June 28, 2017 and June 29, 2016, and the related consolidated statements of comprehensive income, shareholders' (deficit) equity, and cash flows for each of the years in the three-year period ended June 28, 2017. These consolidated financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on these consolidated financial statements based on our audits.

We conducted our audits in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the financial position of Brinker International, Inc. and subsidiaries as of June 28, 2017 and June 29, 2016, and the results of their operations and their cash flows for each of the years in the three-year period ended June 28, 2017, in conformity with U.S. generally accepted accounting principles.

We also have audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States), the Company's internal control over financial reporting as of June 28, 2017, based on criteria established in *Internal Control - Integrated Framework (2013)* issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO), and our report dated August 28, 2017, expressed an adverse opinion on the effectiveness of the Company's internal control over financial reporting.


/s/ KPMG LLP

Dallas, TX

August 28, 2017

F-41

**Report of Independent Registered Public Accounting Firm**

The Board of Directors and Shareholders
Brinker International, Inc.:

We have audited Brinker International, Inc.'s (the Company) internal control over financial reporting as of June 28, 2017, based on criteria established in *Internal Control - Integrated Framework (2013)* issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO). Brinker International Inc.'s management is responsible for maintaining effective internal control over financial reporting and for its assessment of the effectiveness of internal control over financial reporting, included in the accompanying *Management's Annual Report on Internal Control over Financial Reporting*. Our responsibility is to express an opinion on the Company's internal control over financial reporting based on our audit.

We conducted our audit in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether effective internal control over financial reporting was maintained in all material respects. Our audit included obtaining an understanding of internal control over financial reporting, assessing the risk that a material weakness exists, and testing and evaluating the design and operating effectiveness of internal control based on the assessed risk. Our audit also included performing such other procedures as we considered necessary in the circumstances. We believe that our audit provides a reasonable basis for our opinion.

A company's internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles. A company's internal control over financial reporting includes those policies and procedures that (1) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the company; (2) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the company are being made only in accordance with authorizations of management and directors of the company; and (3) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use, or disposition of the company's assets that could have a material effect on the financial statements.

Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

A material weakness is a deficiency, or a combination of deficiencies, in internal control over financial reporting, such that there is a reasonable possibility that a material misstatement of the Company's annual or interim financial statements will not be prevented or detected on a timely basis. A material weakness related to ineffective internal controls over the measurement and presentation of deferred income taxes, resulting from a lack of skilled resources in the tax department with sufficient understanding of internal control over financial reporting, has been identified and included in management's assessment.

We also have audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States), the consolidated balance sheets of Brinker International, Inc. and subsidiaries as of June 28, 2017 and June 29, 2016, and the related consolidated statements of comprehensive income, shareholders' (deficit) equity, and cash flows for each of the years in the three-year period ended June 28, 2017. This material weakness was considered in determining the nature, timing, and extent of audit tests applied in our audit of the 2017 consolidated financial statements, and this report does not affect our report dated August 28, 2017, which expressed an unqualified opinion on those consolidated financial statements.

In our opinion, because of the effect of the aforementioned material weakness on the achievement of the objectives of the control criteria, Brinker International, Inc. has not maintained effective internal control over financial reporting as of June 28, 2017, based on criteria established in *Internal Control-Integrated Framework (2013)* issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO).

We do not express an opinion or any other form of assurance on management's statements referring to corrective actions taken after June 28, 2017, relative to the aforementioned material weakness in internal control over financial reporting.

/s/ KPMG LLP

Dallas, TX
August 28, 2017

F-42

**MANAGEMENT'S RESPONSIBILITY FOR THE CONSOLIDATED FINANCIAL STATEMENTS**

Management is responsible for the reliability of the consolidated financial statements and related notes, which have been prepared in conformity with U. S. generally accepted accounting principles and include amounts based upon our estimates and judgments, as required. The consolidated financial statements have been audited and reported on by our independent registered public accounting firm, KPMG LLP, who were given free access to all financial records and related data, including minutes of the meetings of the Board of Directors and Committees of the Board. We believe that the representations made to the independent registered public accounting firm were valid and appropriate.

We maintain a system of internal control over financial reporting designed to provide reasonable assurance of the reliability of the consolidated financial statements. Our internal audit function monitors and reports on the adequacy of the compliance of the internal control system and appropriate actions are taken to address control deficiencies and other opportunities for improving the system as they are identified. The Audit Committee of the Board of Directors, which is comprised solely of outside directors, provides oversight to the financial reporting process through periodic meetings with our independent registered public accounting firm, internal auditors, and management. Both our independent registered public accounting firm and internal auditors have free access to the Audit Committee.

**MANAGEMENT'S REPORT ON INTERNAL CONTROL OVER FINANCIAL REPORTING**

Management of the Company is responsible for establishing and maintaining adequate internal control over financial reporting as defined in Rules 13a-15(f) and 15d-15(f) under the Exchange Act. The Company's internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of consolidated financial statements for external purposes in accordance with accounting principles generally accepted in the United States of America and includes those policies and procedures that:

(1)   pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the Company;

(2)   provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the Company are being made only in accordance with authorizations of management and directors of the Company; and

(3)   provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use, or disposition of the Company's assets that could have a material effect on the financial statements.

Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. In addition, projections of any evaluation of effectiveness to future periods are subject to the risks that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

Management, including the principal executive officer and principal financial officer, has conducted an assessment, including testing, of the effectiveness of the Company's internal control over financial reporting as of June 28, 2017, based on the criteria set forth by the Committee of Sponsoring Organizations of the Treadway Commission in Internal Control - An Integrated Framework (2013). Based on this evaluation, management has identified a material weakness in our internal controls over the measurement and presentation of deferred income taxes. Specifically, the Company did not have effective controls over the completeness and accuracy of temporary taxable and deductible differences between the book carrying amount and the tax basis of the underlying assets and liabilities at interim and annual reporting dates and including when the tax returns were filed. These process level control deficiencies resulted from a lack of skilled resources in the tax department with sufficient understanding of internal controls over financial reporting.

A material weakness is a deficiency, or a combination of deficiencies, in internal control over financial reporting such that there is a reasonable possibility that a material misstatement of the annual or interim financial statements will not be prevented or detected on a timely basis.

The control deficiencies described above resulted in immaterial misstatements of the Company's provision for income taxes as well as the deferred tax liability, primarily related to property and equipment, and income taxes payable in our consolidated financial statements as at and for the year ended June 29, 2016 which was corrected in our consolidated financial statements for the year ended June 28, 2017 as further described in Note 16 to the notes to the consolidated financial statements. Moreover, these control deficiencies create a reasonable possibility that a material misstatement to our consolidated financial statements will not be prevented or detected on a timely basis. As a result, we concluded that the deficiencies represent a material weakness in our internal control over financial reporting and that our internal control over financial reporting is not effective as of June 28, 2017.

Our independent registered public accounting firm, KPMG LLP, has expressed an adverse report on the operating effectiveness of our internal control over financial reporting. KPMG LLP's report appears on page F-42 of this Form 10-K.

/s/ WYMAN T. ROBERTS

WYMAN T. ROBERTS
President and Chief Executive Officer

/s/ JOE TAYLOR

JOE TAYLOR
Senior Vice President and Chief Financial Officer

F-44

Exhibit 21

**BRINKER INTERNATIONAL, INC., A DELAWARE CORPORATION**
**SUBSIDIARIES**

BI INTERNATIONAL SERVICES, LLC, a Delaware limited liability company
BI MEXICO HOLDING CORPORATION, a Delaware corporation
BRINKER RESTAURANT CORPORATION, a Virginia corporation
BRINKER INTERNATIONAL PAYROLL COMPANY, L.P., a Delaware limited partnership
BRINKER AIRPORTS, LLC, a Delaware limited liability company
BRINKER ALABAMA, INC., a Virginia corporation
BRINKER ARKANSAS, INC., a Virginia corporation
BRINKER ASIA, INC., a British Virgin Islands corporation
BRINKER BRAZIL, LLC, a Delaware limited liability company
BRINKER CB, LP, a Texas limited partnership
BRINKER CB MANAGEMENT, LLC, a Delaware limited liability company
BRINKER CANADIAN HOLDING CO., ULC, a British Columbia unlimited liability company
BRINKER CANADIAN RESTAURANT CO., ULC, a British Columbia unlimited liability company
BRINKER FHC B.V., a Netherlands private company
BRINKER FLORIDA, INC., a Virginia corporation
BRINKER FREEHOLD, INC., a New Jersey corporation
BRINKER GEORGIA, INC., a Virginia corporation
BRINKER LOUISIANA, INC., a Virginia corporation
BRINKER MHC B.V., a Netherlands private company
BRINKER MICHIGAN, INC., a Virginia corporation
BRINKER MISSISSIPPI, INC., a Virginia corporation
BRINKER MISSOURI, INC., a Virginia corporation
BRINKER NEVADA, INC., a Nevada corporation
BRINKER NEW JERSEY, INC., a Virginia corporation
BRINKER NORTH CAROLINA, INC., a Virginia corporation
BRINKER OF BALTIMORE COUNTY, INC., a Maryland corporation
BRINKER OF CARROLL COUNTY, INC., a Maryland corporation
BRINKER OF CECIL COUNTY, INC., a Maryland corporation
BRINKER OKLAHOMA, INC., a Virginia corporation
BRINKER OPCO, LLC, a Virginia limited liability company
BRINKER PENN TRUST, a Pennsylvania business trust
BRINKER PURCHASING, INC., a Delaware corporation
BRINKER RHODE ISLAND, INC., a Rhode Island corporation
BRINKER SERVICES CORPORATION, a Virginia corporation
BRINKER SOUTH CAROLINA, INC., a Virginia corporation
BRINKER TEXAS, INC., a Virginia corporation
BRINKER VIRGINIA, INC., a Virginia corporation
CHILI'S BEVERAGE COMPANY, INC., a Texas corporation
CHILI'S, INC., a Delaware corporation
CHILI'S, INC., a Tennessee corporation
CHILI'S INTERNATIONAL BASES, B.V., a Netherlands private company
CHILI'S OF BEL AIR, INC., a Maryland corporation
CHILI'S OF KANSAS, INC., a Kansas corporation
CHILI'S OF MARYLAND, INC., a Maryland corporation
CHILI'S OF WEST VIRGINIA, INC., a West Virginia corporation
LAS NUEVAS DELICIAS GASTRONOMICAS, S. de R.L. de C.V.
MAGGIANO'S, INC., an Illinois corporation
MAGGIANO'S BEVERAGE COMPANY, a Texas corporation
MAGGIANO'S HOLDING CORPORATION, a Virginia corporation
MAGGIANO'S OF ANNAPOLIS, INC., a Maryland corporation
MAGGIANO'S OF HOWARD COUNTY, INC., a Maryland corporation
MAGGIANO'S OF KANSAS, INC., a Kansas corporation
MAGGIANO'S OF TYSON'S, INC., a Virginia corporation
MAGGIANO'S TEXAS, INC., a Virginia corporation
PEPPER DINING HOLDING CORP., a Virginia corporation
PEPPER DINING, INC., a Virginia corporation
PEPPER DINING VERMONT, INC., a Vermont corporation
BIPC GLOBAL PAYROLL COMPANY, LLC, a Delaware limited liability company
BIPC MANAGEMENT, LLC, a Delaware limited liability company
BIPC ME DMCC, a Dubai Free-Zone company
BIPC INVESTMENTS, LLC, a Delaware limited liability company

**Exhibit 23**

**Consent of Independent Registered Public Accounting Firm**

The Board of Directors

Brinker International, Inc.:


We consent to the incorporation by reference in the registration statements (Nos. 033-56491, 333-02201, 333-93755, 333-42224, 333-105720, 333-125289, 333-157050, and 333-201929) on Form S-8, registration statements (Nos. 333-74902 and 333-188252) on Form S-3, and registration statement (No. 333-116879) on Form S-4 of Brinker International, Inc. of our reports dated August 28, 2017, with respect to the consolidated balance sheets of Brinker International, Inc. and subsidiaries as of June 28, 2017 and June 29, 2016, and the related consolidated statements of comprehensive income, stockholders' (deficit) equity, and cash flows for each of the years in the three-year period ended June 28, 2017 and the effectiveness of internal control over financial reporting as of June 28, 2017, which reports appear in the June 28, 2017 annual report on Form 10-K of Brinker International, Inc.

Our report dated August 28, 2017, on the effectiveness of internal control over financial reporting as of June 28, 2017, expresses our opinion that Brinker International, Inc. did not maintain effective internal control over financial reporting as of June 28, 2017 because of the effect of a material weakness on the achievement of the objectives of the control criteria and contains an explanatory paragraph that states a material weakness related to the ineffective internal controls over the measurement and presentation of deferred income taxes, resulting from a lack of skilled resources in the tax department with sufficient understanding of internal control over financial reporting, has been identified and included in management's assessment.


/s/ KPMG LLP

Dallas, Texas

August 28, 2017

Exhibit 31(a)

### CERTIFICATION

I, Wyman T. Roberts, certify that:

1.        I have reviewed this Annual Report on Form 10-K of Brinker International, Inc.;

2.        Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.        Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.        The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

   a.        Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

   b.        Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally acceptable accounting principles;

   c.        Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

   d.        Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.        The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

   a.        All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

   b.        Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Dated: August 28, 2017

/S/ WYMAN T. ROBERTS
Wyman T. Roberts,
*President & Chief Executive Officer*
*(Principal Executive Officer)*

Exhibit 31(b)

**CERTIFICATION**

I, Joseph G. Taylor, certify that:

1.      I have reviewed this Annual Report on Form 10-K of Brinker International, Inc.;

2.      Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.      Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.      The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

        a.      Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

        b.      Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally acceptable accounting principles;

        c.      Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

        d.      Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.      The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

        a.      All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

        b.      Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Dated: August 28, 2017

/S/ JOSEPH G. TAYLOR
_____

Joseph G. Taylor
*Senior Vice President and Chief Financial Officer(Principal Financial and Accounting Officer)*

**Exhibit 32(a)**

**CERTIFICATION**

Pursuant to 18 U.S.C. Section 1350, the undersigned officer of Brinker International, Inc. (the "Company"), hereby certifies that the Company's Annual Report on Form 10-K for the year ended June 28, 2017 (the "Report") fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934 and that the information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

Dated: August 28, 2017

|       |                      |
|-------|----------------------|
| By:   | /S/ WYMAN T. ROBERTS |
| Name: | *Wyman T. Roberts,* |
| Title:| *President & Chief Executive Officer* |
|       | *(Principal Executive Officer)* |

**Exhibit 32(b)**

**CERTIFICATION**

Pursuant to 18 U.S.C. Section 1350, the undersigned officer of Brinker International, Inc. (the "Company"), hereby certifies that the Company's Annual Report on Form 10-K for the year ended June 28, 2017 (the "Report") fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934 and that the information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

Dated: August 28, 2017

| | |
|---|---|
| By: | /S/ JOSEPH G. TAYLOR |
| Name: | *Joseph G. Taylor* |
| Title: | *Senior Vice President and Chief Financial Officer(Principal Financial and Accounting Officer)* |