## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA

|  |  |
|---|---|
| Marlene Green-Cooper, Shenika Thomas, Fred Sanders, Daniel Summers, Christopher Lang, and Eric Steinmetz, individually and on behalf of all others similarly situated, | Case No.: 18-cv-00686-TJC-MCR |
| Plaintiffs, | **FIRST AMENDED CLASS ACTION COMPLAINT** |
| v. | **Jury Trial Demanded** |
| Brinker International, Inc., | |
| Defendant. | |

Plaintiffs, Marlene Green-Cooper, Shenika Thomas, Fred Sanders, Daniel Summers, Christopher Lang, and Eric Steinmetz ("Plaintiffs"), individually and on behalf of the Classes defined below of similarly situated persons, allege the following against Brinker International, Inc. ("Brinker") based upon personal knowledge with respect to themselves and on information and belief derived from, among other things, investigation of counsel and review of public documents as to all other matters:

<u>**NATURE OF THE CASE**</u>

1.     Plaintiffs bring this class action case against Defendant Brinker for its failures to secure and safeguard customers' credit and debit card numbers and other payment card data ("PCD"), and other personally identifiable information ("PII") which Brinker collected at the time Plaintiffs made purchases at Chili's restaurants owned and operated by Brinker, and for failing to provide timely, accurate and adequate notice to Plaintiffs and other Class members that their PCD

and PII (hereinafter, collectively, "Customer Data") had been stolen and precisely what types of information were stolen.

2.     On May 12, 2018, Brinker acknowledged that customers who from March through April 2018 used payment cards for transactions at certain corporate-owned Chili's restaurants located throughout the United States had their Customer Data stolen (the "Data Breach").  Brinker stated that "malware was used to gather payment card information including credit or debit card numbers as well as cardholder names from our payment-related systems for in-restaurant purchases at certain Chili's restaurants."[1]

3.     This private Customer Data was compromised due to Brinker's acts and omissions and its failure to properly protect the Customer Data.

4.     Brinker could have prevented this Data Breach.  Data breaches at other restaurant chains and retail establishments in the last few years have been the result of malware installed on point-of-sale ("POS") systems.   While many retailers, restaurant chains and other companies have responded to recent breaches by adopting technology that helps make transactions more secure, Brinker did not.

5.     In addition to Brinker's failure to prevent the Data Breach, Brinker also failed to detect the breach for two months.

6.     The Data Breach was the inevitable result of Brinker's inadequate approach to data security and the protection of the Customer Data that it collected during the course of its

---

[1] See Brinker International News Releases, *Notice of Unauthorized Access to Chili's Grill & Bar Guest Data*, *available a*t http://brinker.mediaroom.com/ChilisDataIncident (last visited May 16, 2018).

business.  The deficiencies in Brinker's data security were so significant that the malware installed by the hackers remained undetected and intact for months.

7.      The susceptibility of POS systems to malware is well-known throughout the restaurant industry, as well as the retail industry.  In the last five years, practically every major data breach involving retail stores or fast-food restaurant chains has been the result of malware placed on POS systems.  Accordingly, data security experts have warned companies, "[y]our POS system is being targeted by hackers.   This is a fact of 21st-century business."[2] Unfortunately, Brinker's profit-driven decisions to ignore these warning led to the damage upon which this case is based.

8.       Brinker disregarded the rights of Plaintiffs and Class members by intentionally, willfully, recklessly, or negligently failing to take adequate and reasonable measures to ensure its data systems were protected, failing to disclose to its customers the material fact that it did not have adequate computer systems and security practices to safeguard Customer Data, failing to take available steps to prevent and stop the Breach from ever happening, and failing to monitor and detect the Breach on a timely basis.

9.      As a result of the Brinker's Data Breach, the Customer Data of Plaintiffs and Class members has been exposed to criminals for misuse. The injuries suffered by Plaintiffs and Class members as a direct result of the Data Breach include:

  a.      unauthorized charges on their debit and credit card accounts;

  b.      theft of their personal and financial information;

---

[2] Datacap Systems Inc., *Point of sale security: Retail data breaches at a glance*, https://www.datacapsystems.com/blog/point-of-sale-security-retail-data-breaches-at-a-glance# (last visited May 24, 2018).

c.     costs associated with the detection and prevention of identity theft and unauthorized use of their financial accounts;

d.     damages arising from the inability to use their debit or credit card accounts because their accounts were suspended or otherwise rendered unusable as a result of fraudulent charges stemming from the Data Breach, including but not limited to foregoing cash back rewards;

e.     loss of use of and access to their account funds and costs associated with inability to obtain money from their accounts or being limited in the amount of money they were permitted to obtain from their accounts, including missed payments on bills and loans, late charges and fees, and adverse effects on their credit including decreased credit scores and adverse credit notations;

f.     costs associated with time spent and the loss of productivity or the enjoyment of one's life from taking time to address and attempt to ameliorate, mitigate and deal with the actual and future consequences of the Data Breach, including finding fraudulent charges, cancelling and reissuing cards, purchasing credit monitoring and identity theft protection services, imposition of withdrawal and purchase limits on compromised accounts, and the inconvenience, nuisance and annoyance of dealing with all issues resulting from the Data Breach;

g.     the imminent and certainly impending injury flowing from potential fraud and identify theft posed by their Customer Data being placed in the hands of criminals and already misused via the sale of Plaintiffs' and Class members' information on the Internet black market;

h.      money paid for products and services purchased at Brinker restaurants during the period of the Data Breach, in that Plaintiffs and Class members would not have dined at Chili's had Brinker disclosed that it lacked adequate systems and procedures to reasonably safeguard customers' Customer Data;

i.      damages to and diminution in value of their Customer Data entrusted to Brinker for the sole purpose of purchasing products and services from Brinker; and

j.      the loss of Plaintiffs and Class members' privacy.

10.     The injuries to Plaintiffs and Class members were directly and proximately caused by Brinker's failure to implement or maintain adequate data security measures for Customer Data.

11.     Further, Plaintiffs retain a significant interest in ensuring that their PII and PCD, which remains in the possession of Brinker, is protected from further breaches, and seek to remedy the harms they have suffered on behalf of themselves and similarly situated consumers whose Customer Data was stolen as a result of the Data Breach.

12.     Plaintiffs, on behalf of themselves and similarly situated consumers, seek to recover damages, equitable relief, including injunctive relief, to prevent a reoccurrence of the Data Breach and resulting injury, restitution, disgorgement, reasonable costs and attorneys' fees, and all other remedies this Court deems proper.

## JURISDICTION AND VENUE

13.     This Court has subject matter jurisdiction over this action under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2). The amount in controversy exceeds $5 million exclusive of interest and costs. There are more than 100 putative class members. And, at least some members of the proposed Class have a different citizenship from Brinker.

5

14.     This Court has jurisdiction over Brinker as it operates restaurants serving the public, and it is at one of the restaurants in this District that Plaintiff Marlene Green-Cooper made a purchase using her payment card which led to the damages.  Brinker also advertises in a variety of media throughout the United States, including Florida and this District. Through its business operations in this District, Brinker intentionally avails itself of the markets within this District to render the exercise of jurisdiction by this Court just and proper.

15.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(a)(1) because a substantial part of the events and omissions giving rise to this action occurred in this District, Brinker operates restaurants within this District, and Brinker has caused harm to Class members residing in this District.

## PARTIES

16.     Plaintiff Marlene Green-Cooper is a citizen of the state of Florida.

17.     Plaintiff Shenika Thomas is a citizen of the state of Texas.

18.     Plaintiff Fred Sanders is a citizen of the state of Virginia.

19.     Plaintiff Daniel Summers is a citizen of the state of California.

20.     Plaintiff Christopher Lang is a citizen of the state of California.

21.     Plaintiff Eric Steinmetz is a citizen of the state of Nevada.

22.     Defendant Brinker International, Inc. is a Delaware corporation with its principal place of business located in Dallas, Texas.

23.     Brinker "own[s], develop[s], operate[s] and franchise[s] the Chili's® Grill & Bar ('Chili's') and Maggiano's Little Italy® ('Maggiano's') restaurant brands."  *See* Brinker Int'l, Inc. 2017 Form 10-K at 2, attached hereto as **Exhibit 1**.

6

24.     Brinker's restaurant system consists of more than 1,600 restaurants and over 100,000 team members in 31 countries and two territories.[3]

25.     Brinker restaurants accept payment for goods and services through a point of sale system ("POS system"), through which customers swipe credit and debit cards to pay.

## STATEMENT OF FACTS

**A.     Plaintiffs' Transactions**

28.     On or around April 18, 2018, Plaintiff Marlene Green-Cooper purchased food at a Chili's restaurant in Fleming Island, Florida using her Chase Amazon Credit Card.

29.     Within days thereafter, Ms. Green-Cooper noticed three unauthorized charges on her account, even though she had physical possession of her card at all times. Ms. Green-Cooper then contacted her bank provider who completed an investigation and eventually issued a new Chase Credit Card. Ms. Green-Cooper continues to monitor her account on a daily basis in an effort to detect and prevent any further misuse.

28.     The Chase Amazon Credit Card used by Ms. Green-Cooper and compromised in the Data Breach is connected to a cash-back rewards program.  Whiles he was awaiting her new card, she had to use alternative methods of payment and, thus, lost the opportunity to accrue cash back rewards.

29.     Plaintiff Shenika Thomas dined at the Chili's in Garland, Texas during April 2018, paying for her purchases with her Visa debit card.

---

[3] Maggiano's accounts for only 51 of these over 1,600 locations, however.  *See* http://www.brinker.com/company/maggianos.html (last visited May 16, 2018); *see also* Exhibit 1 at 15.

7

30.    In early May 2018, Ms. Thomas noticed unauthorized charges on her debit card from locations in California, although she resides in Texas and at all times maintained physical possession of her card.  Ms. Thomas contacted her bank, which issued a new payment card and it is currently investigating the unauthorized charges on her account: three fraudulent charges amounting to approximately over $100.00. Ms. Thomas continues to monitor her account in an effort to detect and prevent any further misuse.

31.    Plaintiff Fred Sanders dined at a Chili's restaurant in mid-April 2018 in Virginia Beach, Virginia, paying for his purchases with a Visa credit card.

32.    In mid-May 2018, Mr. Sanders discovered fraudulent charges from earlier in the month of May on the Visa card account totaling $3,300.  After discovering the charges, and then learning of this breach, Mr. Sanders had fraud alerts placed on his credit files with all three credit reporting agencies.

33.    The Visa card used by Mr. Sanders and compromised in the Data Breach is connected to a cash-back rewards program.  While he was awaiting his new card, he had to use alternative methods of payment and, thus, lost the opportunity to accrue rewards. Currently, a new card has been issued but the illicitly taken funds remain in dispute with his bank.

34.    Plaintiff Daniel Summers dined at a Chili's restaurant in San Diego, California on or about April 20, 2018, paying for his purchases with his debit card which he only uses occasionally.

35.    On May 20, 2018, a fraudulent charge was made to Mr. Summers' debit card in the amount of $1,093.91. After discovering the charge, Mr. Summers contacted his bank who advised that the charge could not be removed as it was in "pending" status.  When the charge

cleared, Mr. Summers called his bank again at which time a temporary credit was issued pending the bank's investigation. The bank's investigation remains open at this time.

36.     Subsequently Mr. Summers received notice from Chili's that his personally identifiable information was at risk as the result of the Data Breach.

37.     Plaintiff Christopher Lang dined at a Chili's location in San Jose, California on April 1, 2018, paying for his purchases with a debit card.

38.     On May 21, 2018, Chili's notified Plaintiff Christopher Lang that his personally identifiable information was at risk as the result of the Data Breach.

39.     Plaintiff Eric Steinmetz purchased goods from a Chili's location in Las Vegas, Nevada on April 4, 2018, using a Wells Fargo debit card.

40.     After learning of the Data Breach, Plaintiff Eric Steinmetz called the Las Vegas Chili's location where he had dined as well as the national office of Chili's seeking answers regarding the Data Breach and the compromise of his PII.  No one at Chili's, not even the national office, could give him any information regarding the Data Breach.  Concerned that he was unable to obtain definitive answers from Chili's regarding the Data Breach, Plaintiff Eric Steinmetz procured his consumer disclosures from all three credit reporting agencies, Experian, Equifax, and TransUnion.  He also requested his bank to cancel his debit card and issue a new one.  He would not have had to take any of this action had his PII not been compromised in the Data Breach.

41.     Consequently, Plaintiff Eric Steinmetz lost time dealing with issues related to the Chili's Data Breach in cancelling his debit card, speaking on the phone to Chili's representatives regarding the Data Breach, and in procuring and considering his disclosures to determine if any

fraudulent activity was present. Plaintiff also incurred transportation costs in the form of gasoline in driving to Wells Fargo to cancel his debit card and obtain a temporary card.

42.     Plaintiffs would not have used their credit or debit cards to make purchases at Chili's—indeed, they would not have made purchases at Chili's at all during the period of the Data Breach—had Chili's told them that it lacked adequate computer systems and data security practices to safeguard customers' personally identifiable information from theft.

43.     Plaintiffs suffered actual injury from having their Customer Data stolen in and as a result of the Data Breach.

44.     Plaintiffs suffered actual injury and damages in paying money to and purchasing products from Chili's during the Data Breach, expenditures which they would not have made had Chili's disclosed that it lacked computer systems and data security practices adequate to safeguard customers' personally identifiable information from theft.

45.     Plaintiffs suffered actual injury in the form of damages to and diminution in the value of their Customer Data—a form of intangible property that Plaintiffs entrusted to Chili's for the purpose of purchasing its products and that was compromised in and as a result of the Data Breach.

46.     Plaintiffs suffered lost time, annoyance, interference, and inconvenience as a result of the Data Breach, and have concerns for the loss of their privacy.

47.     Plaintiffs have suffered imminent and impending injury arising from the substantially increased risk of fraud, identity theft, and misuse resulting from their personally identifiable information being placed in the hands of criminals.

48.    Plaintiffs have a continuing interest in ensuring that their personally identifiable information, which remains in the possession of Chili's, is protected and safeguarded from future breaches.

**B.    Brinker and Its Customer Data Collection Practices**

51.    In 2016, Brinker produced system-wide revenue of more than $3 billion.  *See* Brinker 2017 Annual Report at its exhibit 13, pp. F-1.

52.    Brinker operates Chili's Grill & Bar restaurants, a casual dining restaurant chain specializing in "Fresh Mex" and "Fresh Tex" dishes such as burgers, ribs, fajitas, and margaritas. The first Chili's restaurant opened in 1975 in Dallas, Texas and, since then, Chili's has expanded to over 1,600 restaurants worldwide, including approximately 1,000 restaurants owned and operated by Brinker (those at issue in this Data Breach) and the remainder operating under a franchisee license agreement. *See generally* Exhibit 1; *see also* Brinker, *Our Company*, *available at* http://brinker.com/company/default.html (last visited May 17, 2018); Brinker, *Our Brands – Chili's Grill & Bar*, *available at* http://brinker.com/company/chilis.html (last visited May 17, 2018).

53.    Chili's appeals to a broad population, with "[m]ore than 50 million Americans visit[ing] Chili's every three months." 2017 Annual Report at 6.

54.    Notably, Chili's has long touted its technological innovation: "we . . . pioneered the use of tabletop devices inside the restaurants, which allow guests to order and re-order menu items, enjoy entertainment and assert more control over their dining experience by paying through the tabletop device when they choose." 2017 Annual Report at 2. "The Chili's brand has leveraged technology initiatives to create a digital guest experience that we believe will help

11

us engage our guests more effectively. We have launched a new online ordering system that expands our current capabilities and gives our guests greater control of their to-go experience. Our upgraded Chili's mobile app provides the capability for digital curbside service where guests can order, pay and notify us of their arrival all through the app." *Id.* at 3.

55.    "All domestic Chili's restaurants, with the exception of airport and college locations, are now outfitted with tabletop devices, which gives us the largest network of tabletop devices in the country. The Ziosk® branded tabletop device is a multi-functional device which provides ordering, guest survey and pay-at-the-table capabilities; loyalty program functionality; and entertainment."  Brinker Int'l, Inc. 2016 Form 10-K at 3, attached hereto as **Exhibit 2**.

56.    Given this express emphasis on technology at Chili's, however, Brinker also recognized certain inherent risks:

> **We are dependent on information technology, and any material failure in the operation or security of that technology or our ability to execute a comprehensive business continuity plan could impair our ability to efficiently operate our business.**
>
> We rely on information systems across our operations, including, for example, point-of-sale processing in our restaurants . . . . A security breach or cyber attack could include theft of credit card data or other personal information as well as our intellectual property. . . .
>
> **Failure to protect the integrity and security of individually identifiable data of our guests and teammates and confidential and proprietary information of the company could damage our reputation and expose us to loss of revenues and litigation.**
>
> We receive and maintain certain personal information about our guests and team members in our information technology systems, such as point-of-sale, web and mobile platforms, including our

> rewards program. . . . Like many other retail companies, we
> experience frequent attempts to compromise our systems . . . .

Exhibit 1 at 12. (emphasis in original).

57.     Despite the recognition of these risks, however, Brinker failed to adequately secure its POS systems, placing the purchasing information of its customers at risk and resulting in the Data Breach.

58.     A significant portion of sales at Brinker are made using credit or debit cards. When customers pay using credit or debit cards, Brinker collects Customer Data related to those cards including the cardholder name, the account number, expiration date, card verification value ("CVV"), and PIN data for debit cards. Brinker stores the Customer Data in its POS system and transmits this information to a third party for processing and completion of the payment.

59.     At all relevant times, Brinker was well-aware, or reasonably should have been aware, that the Customer Data collected, maintained and stored in the POS systems is highly sensitive, susceptible to attack, and could be used for wrongful purposes by third parties, such as identity theft and fraud.

60.     It is well known and the subject of many media reports that Customer Data is highly coveted and a frequent target of hackers. Despite the frequent public announcements of data breaches at retailers and restaurant chains, Brinker maintained an insufficient and inadequate system to protect the Customer Data of Plaintiffs and Class members.

61.     Customer Data is a valuable commodity because it contains not only payment card numbers but PII as well. A "cyber blackmarket" exists in which criminals openly post stolen payment card numbers, social security numbers, and other personal information on multiple underground Internet websites. Customer Data is valuable to identity thieves because they can use

13

victims' personal data to open new financial accounts and take out loans in another person's name, incur charges on existing accounts, or clone ATM, debit, or credit cards.

62.     Legitimate organizations and the criminal underground alike recognize the value of PII contained in a merchant's data systems; otherwise, they would not aggressively seek or pay for it. For example, in "one of 2013's largest breaches . . . not only did hackers compromise the [card holder data] of three million customers, they also took registration data [containing PII] from 38 million users."[4]

63.     Professionals tasked with trying to stop fraud and other misuse know that PCD and PII have real monetary value in part because criminals continue their efforts to obtain this data.[5] In other words, if any additional breach of sensitive data did not have incremental value to criminals, one would expect to see a reduction in criminal efforts to obtain such additional data over time–yet the opposite has occurred. For example, the Identity Theft Resource Center reported 1,579 data breaches in 2017, which represents a 44.7 percent increase over the record high figures reported for 2016.[6]

64.     The PII of consumers remains of high value to identity criminals, as evidenced by the prices criminals will pay through black-market sources, or what is often called the dark web. Numerous sources cite dark web pricing for stolen identity credentials. For example, a complete set of bank account credentials can fetch a thousand dollars or more (depending on the associated

---

[4] Verizon 2014 PCI Compliance Report, available at:
https://www.cisco.com/c/dam/en_us/solutions/industries/docs/retail/verizon_pci2014.pdf(hereafter "2014 Verizon Report"), at 54 (last visited April 10, 2017).
[5] *Data Breaches Rise as Cybercriminals Continue to Outwit IT*, *CIO Magazine*, http://www.cio.com/article/2686167/data-breach/data-breaches-rise-as-cybercriminals-continue-to-outwit-it.html, October 2016.
[6] *2017 Annual Data Breach Year-End Review*, https://www.idtheftcenter.org/2017-data-breaches, accessed February 14, 2018.

credit score or balance available to criminals).[7] Experian reports that a stolen credit or debit card number can sell for $5-110 on the dark web.[8]

65.     At all relevant times, Brinker knew, or reasonably should have known, of the importance of safeguarding Customer Data and of the foreseeable consequences that would occur if its data security system was breached, including, specifically, the significant costs that would be imposed on its customers as a result of a breach.

66.     Brinker was, or should have been, fully aware of the significant volume of daily credit and debit card transactions at Chili's restaurants, amounting to tens of thousands of daily payment card transactions, and thus, the significant number of individuals who would be harmed by a breach of Brinker's systems.

67.     Unfortunately, and as alleged below, despite all of this publicly available knowledge of the continued compromises of Customer Data in the hands of other third parties, such as retailers and restaurant chains, Brinker's approach to maintaining the privacy and security of the Customer Data of Plaintiffs and Class members was lackadaisical, cavalier, reckless, or at the very least, negligent.

**C.     Brinker Had Notice of Data Breaches Involving Malware on POS Systems**

68.     A wave of data breaches causing the theft of retail payment card information has hit the United States in the last several years.[9] In 2016, the number of U.S. data breaches

---

[7] *Here's How Much Thieves Make By Selling Your Personal Data Online, Business Insider,* http://www.businessinsider.com/heres-how-much-your-personal-data-costs-on-the-dark-web-2015-5, May 27, 2015.
[8] *Here's How Much Your Personal Information Is Selling for on the Dark Web* https://www.experian.com/blogs/ask-experian/heres-how-much-your-personal-information-is-selling-for-on-the-dark-web/, accessed May 28, 2018.
[9] Identity Theft Resource Center, *Data Breaches Increase 40 Percent in 2016, Finds New Report*

surpassed 1,000, a record high and a forty percent increase in the number of data breaches from the previous year.[10] The amount of payment card data compromised by data breaches is massive. For example, it is estimated that over 100 million cards were compromised in 2013 and 2014.[11]

69. Most of the massive data breaches occurring within the last several years involved malware placed on POS systems used by merchants. A POS system is an on-site device, much like an electronic cash register, which manages transactions from consumer purchases, both by cash and card. When a payment card is used at a POS terminal, "data contained in the card's magnetic stripe is read and then passed through a variety of systems and networks before reaching the retailer's payment processor."[12] The payment processor then passes on the payment information to the financial institution that issued the card and takes the other steps needed to complete the transaction.[13]

70. Before transmitting customer data over the merchant's network, POS systems typically, and very briefly, store the data in plain text within the system's memory.[14] The stored information includes "Track 1" and "Track 2" data from the magnetic strip on the payment card, such as the cardholder's first and last name, the expiration date of the card, and the CVV (three

---

*From Identity Theft Resource Center and CyberScout* (Jan. 19, 2017), *available at* https://www.idtheftcenter.org/2016databreaches.html (last visited May 18, 2018).
[10] *Id.*
[11] Symantec, *A Special Report On Attacks On Point-of-Sale Systems*, p. 3 (Nov. 20, 2014), available at: https://origin-www.symantec.com/content/dam/symantec/docs/white-papers/attacks-on-point-of-sale-systems-en.pdf (last visited May 17, 2018).
[12] *Id.* at 6.
[13] Salva Gomzin, *Hacking Point of Sale: Payment Application Secrets, Threats, and Solutions*, 8 (Wiley 2014), *available at:* http://1.droppdf.com/files/IS0md/wiley-hacking-point-of-sale-payment-application-secrets-threats-and-solutions-2014.pdf (last visited July 18, 2017).
[14] *Id.* at 39.

number security code on the card).[15] This information is unencrypted on the card and, at least briefly, will be unencrypted in the POS terminal's temporary memory as it processes the data. [16]

71.     In order to directly access a POS device, hackers generally follow four steps: infiltration, propagation, exfiltration and aggregation.[17] In the infiltration phase, an "attacker gains access to the target environment"[18] allowing the hackers to move through a business's computer network, find an entry point into the area that handles consumer payments, and directly access the physical POS machines at in-store locations.[19] Once inside the system the attacker then infects the POS systems with malware, which "collects the desired information . . . and then exfiltrates the data to another system" called the "aggregation point."[20]

72.     A 2016 report by Verizon confirmed the vast majority of successful breaches leverage legitimate credentials to gain access to the POS environment. Once attackers gain access to the POS devices, they install malware, usually a RAM scraper, to capture payment card data.[21]

73.     Intruders with access to unencrypted Track 1 and Track 2 payment card data can physically replicate the card or use it online. Unsurprisingly, theft of payment card information via POS systems is now "one of the biggest sources of stolen payment cards."[22]  For example, in 2013, hackers infiltrated Target, Inc.'s POS system, stealing information from an estimated 40

---

[15] *Id*.  at 43-50.
[16] Symantec, *supra* note 13, at 5.
[17] *Point of Sale Systems and Security: Executive Summary*, SANS Institute, 4 (Oct. 2014), available at: https://www.sans.org/reading-room/whitepapers/analyst/point-salesystems-security-executive-summary-35622 (last visited July 18, 2017).
[18] *Id*.
[19] Symantec, *supra* note 11, at 8.
[20] SANS Institute, *supra*  note 17, at 4.
[21] Verizon, *2016 Breach Investigations Report*, at 33 *available at* https://www.verizonenterprise.com/resources/reports/rp_DBIR_2016_Report_en_xg.pdf (hereafter "2016 Verizon Report"), at 54 (last visited May 18, 2018).
[22] Symantec, *supra* note 11, at 3.

million payment cards in the United States. In 2014, over 7,500 self-checkout POS terminals at Home Depots throughout the United States were hacked, compromising roughly 56 million debit and credit cards.[23] Likewise, POS systems at more than 1,000 Wendy's restaurants were infiltrated with malware, resulting in the theft of payment cards data for approximately six-months.[24]

74. Given the numerous reports indicating the susceptibility of POS systems and consequences of a breach, Brinker was well aware or should have been aware of the need to safeguard its POS systems.

**D. Brinker Failed to Comply with Industry Standards**

75. Despite the vulnerabilities of POS systems, available security measures and reasonable businesses practices would have significantly reduced or eliminated the likelihood that hackers could successfully infiltrate business' POS systems.

76. The payment card networks (MasterCard, Visa, Discover, and American Express), data security organizations, state governments, and federal agencies have all implemented various standards and guidance on security measures designed to prevent these types of intrusions into POS systems.  However, despite Brinker's understanding of the risk of data theft via malware installed on POS systems, and the widely available resources to prevent intrusion into POS data systems, Brinker failed to adhere to these guidelines and failed to take reasonable and sufficient protective measures to prevent the Data Breach.

---

[23] Brett Hawkins, *Case Study: The Home Depot Data Breach,* 7 (SANS Institute, Jan. 2015), available at: https://www.sans.org/reading-room/whitepapers/casestudies/casestudy-home-depot-data-breach-36367 (last visited May 18, 2018).

[24] Krebs on Security, *1,025 Wendy's Locations Hit in Card Breach* (July 8, 2016), https://krebsonsecurity.com/2016/07/1025-wendys-locations-hit-in-card-breach/ (last visited May 18, 2018).

77.     Security experts have recommended specific steps that retailers should take to protect their POS systems. For example, four years ago, Symantec recommended "point to point encryption" implemented through secure card readers, which encrypt credit card information in the POS system, preventing malware that extracts card information through the POS memory while it processes the transaction.[25]  Moreover, Symantec emphasized the importance of adopting EMV chip technology. Datacap Systems, a developer of POS systems, recommended similar preventative measures.[26]

78.     The major payment card industry brands set forth specific security measures in their Card (or sometimes, Merchant) Operating Regulations. Card Operating Regulations are binding on merchants and require merchants to: (1) protect cardholder data and prevent its unauthorized disclosure; (2) store data, even in encrypted form, no longer than necessary to process the transaction; and (3) comply with all industry standards.

79.     The Payment Card Industry Data Security Standard ("PCI DSS") is a set of requirements designed to ensure that companies maintain consumer credit and debit card information in a secure environment.[27]

80.     The PCI DSS "was developed to encourage and enhance cardholder data security" by providing "a baseline of technical and operational requirements designed to protect account data."[28] PCI DSS sets the minimum level of what must be done, not the maximum.

---

[25] Symantec, *supra* note 11, at 6.
[26] *See* Datacap Systems, *supra* note 2.
[27] *Payment Card Industry Data Security Standard* v3.2, at 5 (April 2016) available at https://www.pcisecuritystandards.org/document_library?category=pcidss&document=pci_dss (last visited July 21, 2017).
[28] *Id*.

81.     PCI DSS 3.2, the version of the standards in effect at the time of the Data Breach, impose the following mandates on Brinker: [29]

| PCI Data Security Standard – High Level Overview | | |
|---|---|---|
| Build and Maintain a Secure Network and Systems | 1. | Install and maintain a firewall configuration to protect cardholder data |
| | 2. | Do not use vendor-supplied defaults for system passwords and other security parameters |
| Protect Cardholder Data | 3. | Protect stored cardholder data |
| | 4. | Encrypt transmission of cardholder data across open, public networks |
| Maintain a Vulnerability Management Program | 5. | Protect all systems against malware and regularly update anti-virus software or programs |
| | 6. | Develop and maintain secure systems and applications |
| Implement Strong Access Control Measures | 7. | Restrict access to cardholder data by business need to know |
| | 8. | Identify and authenticate access to system components |
| | 9. | Restrict physical access to cardholder data |
| Regularly Monitor and Test Networks | 10. | Track and monitor all access to network resources and cardholder data |
| | 11. | Regularly test security systems and processes |
| Maintain an Information Security Policy | 12. | Maintain a policy that addresses information security for all personnel |

82.     Among other things, PCI DSS required Brinker to properly secure and protect payment card data; not store cardholder data beyond the time necessary to authorize a transaction; maintain up-to-date antivirus software and a proper firewall; protect systems against malware; regularly test security systems; establish a process to identify and timely fix security vulnerabilities; and encrypt payment card data at the point of sale.

83.     PCI DSS also required Brinker to not store "the full contents of…the magnetic stripe located on the back of a card" or "the card verification code or value" after authorization.[30]

84.     Despite Brinker's awareness of its data security obligations, Brinker's treatment of PCD and PII entrusted to it by its customers fell far short of satisfying Brinker's legal duties and obligations, and included violations of the PCI DSS.  Brinker failed to ensure that access to its data systems was reasonably safeguarded, failed to acknowledge and act upon industry

_____

[29] *Id.*
[30] *Id.* at 38 (PCI DSS 3.2.1 and 3.2.2).

warnings and failed to use proper security systems to detect and deter the type of attack that occurred and is at issue here.

### E.      Brinker Failed to Comply With FTC Requirements

85.      Federal and State governments have likewise established security standards and issued recommendations to temper data breaches and the resulting harm to consumers and financial institutions. The Federal Trade Commission ("FTC") has issued numerous guides for business highlighting the importance of reasonable data security practices. According to the FTC, the need for data security should be factored into all business decision-making.[31]

86.      In 2016, the FTC updated its publication, *Protecting Personal Information: A Guide for Business*, which established guidelines for fundamental data security principles and practices for business.[32]  The guidelines note businesses should protect the personal customer information that they keep; properly dispose of personal information that is no longer needed; encrypt information stored on computer networks; understand their network's vulnerabilities; and implement policies to correct security problems.  The guidelines also recommend that businesses use an intrusion detection system to expose a breach as soon as it occurs; monitor all incoming traffic for activity indicating someone is attempting to hack the system; watch for large amounts of data being transmitted from the system; and have a response plan ready in the event of a breach.

---

[31] Federal Trade Commission, *Start With Security*, available at https://www.ftc.gov/system/files/documents/plain-language/pdf0205-startwithsecurity.pdf (last visited May 18, 2018).
[32] Federal Trade Commission, *Protecting Personal Information: A Guide for Business*, available at  https://www.ftc.gov/system/files/documents/plain-language/pdf-0136_proteting-personal-information.pdf (last visited May 18, 2018).

87.     The FTC recommends that companies not maintain cardholder information longer than is needed for authorization of a transaction; limit access to sensitive data; require complex passwords to be used on networks; use industry-tested methods for security; monitor for suspicious activity on the network; and verify that third-party service providers have implemented reasonable security measures.[33]

88.     The FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect customer data, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the Federal Trade Commission Act ("FTCA"), 15 U.S.C. § 45. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

89.     Brinker's failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data constitutes an unfair act or practice prohibited by Section 5 of the FTC Act, 15 U.S.C. § 45.

90.     In this case, Brinker was at all times fully aware of its obligation to protect the financial data of Brinker's customers because of its participation in payment card processing networks. Brinker was also aware of the significant repercussions if it failed to do so because Brinker collected payment card data from tens of thousands of customers daily and they knew that this data, if hacked, would result in injury to consumers, including Plaintiffs and Class members.

---

[33] FTC, *Start With Security*, *supra* note 31.

91.     Despite understanding the consequences of inadequate data security, Brinker failed to comply with PCI DSS requirements and failed to take additional protective measures beyond those required by PCI DSS.

92.     Despite understanding the consequences of inadequate data security, Brinker operated POS systems with outdated operating systems and software; failed to enable point-to-point and end-to-end encryption; and, failed to take other measures necessary to protect its data network.

**F.      The Brinker Data Breach**

93.     As early as 2009, Brinker was well-aware of the risks of a data breach:

> We are dependent on information technology and any material failure of that technology could impair our ability to efficiently operate our business.

> We rely on information systems across our operations, including, for example, point-of-sale processing in our restaurants, management of our supply chain, collection of cash, payment of obligations and various other processes and procedures. Our ability to efficiently manage our business depends significantly on the reliability and capacity of these systems. The failure of these systems to operate effectively, problems with maintenance, upgrading or transitioning to replacement systems, or a breach in security of these systems could cause delays in customer service and reduce efficiency in our operations. Significant capital investments might be required to remediate any problems.

Brinker Int'l, Inc., 2009 Form 10-k, attached as **Exhibit 3**.

94.     Further, in the years following this acknowledgment of the risks, massive data breaches plagued the restaurant industry, including national restaurant chains such as Wendy's, Arby's, Chipotle, Popeye's, Noodles & Co., and P.F. Chang's. Based on the data breaches within

the restaurant industry, and Brinker's own acknowledgment of the risks as stated above, Brinker knew or should have known that its systems were at risk for a similar malware data breach.

95.     Beginning in March 2018, hackers gained access to Brinker's data network and installed malware on Chili's POS systems.[34]   The malware allowed the thieves to download and steal copies of Brinker customers' Customer Data.

96.     The breach became public on May 12, 2018 through Brinker's announcement. The announcement came approximately two months after the breach began. Brinker, however, failed to provide any information about the scope or extent of the breach. The announcement in full was:

> On May 11th, 2018, we learned that payment card information of some of our Guests who visited certain Chili's® Grill & Bar corporate-owned restaurants have been compromised in a data incident. Currently, we believe the data incident was limited to between March – April 2018; however, we continue to assess the scope of the incident.
>
> Upon learning of this incident, we immediately activated our response plan. We are working with third-party forensic experts to conduct a thorough investigation to determine the details of what happened. Law enforcement has been notified of this incident and we will continue to fully cooperate.
>
> While the investigation is still ongoing, we believe that malware was used to gather payment card information, including credit or debit card numbers and cardholder names, from our payment-related systems for in-restaurant purchases at certain Chili's restaurants.
>
> We deeply value our relationships with our Guests and our priority remains doing what is right for them. We are committed to sharing additional information on this ongoing investigation. More details can be found at: http://brinker.mediaroom.com/ChilisDataIncident.

---

[34] http://brinker.mediaroom.com/2018-05-12-Notice-of-Unauthorized-Access-to-Chilis-R-Grill-Bar-Guest-Data

97.     This payment card data was compromised due to Brinker's acts and omissions and its failure to properly protect the Customer Data, despite being aware of recent data breaches impacting other national restaurant chains, including the one at P.F. Chang's, Arby's, Chipotle, and Wendy's.

98.     In addition to Brinker's failure to prevent the Data Breach, Brinker also failed to detect the breach for nearly two months.

99.     Intruders, therefore, had months to collect payment card data unabated. During this time, Brinker failed to recognize its systems had been breached and that intruders were stealing data on millions of payment cards. Timely action by Brinker likely would have significantly reduced the consequences of the breach. Instead, Brinker took more than two months to realize its systems had been breached, and thus contributed to the scale of the breach and the resulting damages.

100.    The Data Breach occurred because Brinker failed to implement adequate data security measures to protect its POS networks from the potential danger of a data breach, and failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the Customer Data compromised in the Data Breach.

101.    While many merchants and vendors have responded to recent breaches by adopting technology and security practices that help make transactions and stored data more secure, Brinker has not done so.

102.    The Data Breach was caused and enabled by Brinker's knowing violation of their obligations to abide by best practices and industry standards in protecting Customer Data.

**G.      The Brinker Data Breach Caused Harm and Will Result in Additional Fraud**

103.      Without detailed disclosure to Chili's customers, consumers, including Plaintiffs and Class members, have been left exposed, unknowingly and unwittingly, for months to continued misuse and ongoing risk of misuse of their personal information without being able to take necessary precautions to prevent imminent harm.

104.      The ramifications of Brinker's failure to keep Plaintiffs' and Class members' data secure are severe.

105.      Consumer victims of data breaches are much more likely to become victim of identity fraud. This finding results from an analysis of four years of data that correlated each year's victims of data breaches with those who also reported being victims of identity fraud[35].

106.      The FTC defines identity theft as "a fraud committed or attempted using the identifying information of another person without authority."[36]  The FTC describes "identifying information" as "any name or number that may be used, alone or in conjunction with any other information, to identify a specific person."[37]

107.      Personal identifying information is a valuable commodity to identity thieves once the information has been compromised.  As the FTC recognizes, once identity thieves have personal information, "they can drain your bank account, run up your credit cards, open new utility accounts, or get medical treatment on your health insurance."[38]

---

[35] 2014 LexisNexis True Cost of Fraud Study,
https://www.lexisnexis.com/risk/downloads/assets/true-cost-fraud-2014.pdf, (last visited July 26, 2018).
[36] 17 C.F.R § 248.201 (2013).
[37] *Id.*
[38] Federal Trade Commission, *Warning Signs of Identity Theft*, available at:
https://www.consumer.ftc.gov/articles/0271-warning-signs-identity-theft (last visited April 10,

108.    Identity thieves can use personal information, such as that of Plaintiffs and Class members, which Brinker failed to keep secure, to perpetrate a variety of crimes that harm victims. For instance, identity thieves may commit various types of government fraud such as: immigration fraud; obtaining a driver's license or identification card in the victim's name but with another's picture; using the victim's information to obtain government benefits; or filing a fraudulent tax return using the victim's information to obtain a fraudulent refund.

109.    Analysis of a 2016 survey of 5,028 consumers found "The quicker a financial institution, credit card issuer, wireless carrier or other service provider is notified that fraud has occurred on an account, the sooner these organizations can act to limit the damage. Early notification can also help limit the liability of a victim in some cases, as well as allow more time for law enforcement to catch the fraudsters in the act."[39]

110.    As a result of Brinker's delay in notifying consumers, the risk of fraud for Plaintiffs and Class members has been driven even higher.

111.    Javelin Strategy and Research reports that identity thieves have stolen $112 billion in the past six years.[40]

112.    Reimbursing a consumer for a financial loss due to fraud does not make that individual whole again. On the contrary, identity theft victims must spend numerous hours and their own money repairing the impact to their credit.  After conducting a study, the Department

---

2017).

[39] *Identity Fraud Hits Record High with 15.4 Million U.S. Victims in 2016, Up 16 Percent According to New Javelin Strategy & Research Study*, https://www.javelinstrategy.com/press-release/identity-fraud-hits-record-high-154-million-us-victims-2016-16-percent-according-new , February 1, 2017.

[40] *See* https://www.javelinstrategy.com/coverage-area/2016-identity-fraud-fraud-hits-inflection-point (last visited April 10, 2017).

of Justice's Bureau of Justice Statistics ("BJS") found that identity theft victims "reported spending an average of about 7 hours clearing up the issues" and resolving the consequences of fraud in 2014.[41]

113.    An independent financial services industry research study conducted for BillGuard–a private enterprise that automates the consumer task of finding unauthorized transactions that might otherwise go undetected–calculated the average per-consumer cost of all unauthorized transactions at roughly US $215 per cardholder incurring these charges[42], some portion of which could go undetected and thus must be paid entirely out-of-pocket by consumer victims of account or identity misuse.

114.    There may be a time lag between when harm occurs versus when it is discovered, and also between when PII or PCD is stolen and when it is used. According to the U.S. Government Accountability Office ("GAO"), which conducted a study regarding data breaches:

> [L]aw enforcement officials told us that in some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data have been sold or posted on the Web, fraudulent use of that information may continue for years. As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm.[43]

115.    Thus, Plaintiffs and Class members now face years of constant surveillance of their financial and personal records, monitoring, and loss of rights. The Class is incurring and

---

[41] Victims of Identity Theft, 2014 (Sept. 2015) available at: http://www.bjs.gov/content/pub/pdf/vit14.pdf (last visited April 10, 2017).

[42] Hadley Malcom, *Consumers rack up $14.3 billion in gray charges, research study commissioned for Billguard by Aite Research, USA Today* (July 25, 2013), available at: https://www.usatoday.com/story/money/personalfinance/2013/07/25/consumers-unwanted-charges-in-billions/2568645/ (last visited July 26, 2018).

[43] GAO, Report to Congressional Requesters, at 29 (June 2007), available at http://www.gao.gov/new.items/d07737.pdf (last visited April 10, 2017).

will continue to incur such damages in addition to any fraudulent credit and debit card charges incurred by them and the resulting loss of use of their credit and access to funds, whether or not such charges are ultimately reimbursed by the credit card companies.

**H.     Plaintiffs and Class Members Suffered Damages**

116.    The Customer Data of Plaintiffs and Class members is private and sensitive in nature and was left inadequately protected by Brinker. Brinker did not obtain Plaintiff's and Class members' consent to disclose their Customer Data to any other person as required by applicable law and industry standards.

117.    The Data Breach was a direct and proximate result of Brinker's failure to properly safeguard and protect Plaintiffs' and Class members' Customer Data from unauthorized access, use, and disclosure, as required by various state and federal regulations, industry practices, and the common law, including Brinker's failure to establish and implement appropriate administrative, technical, and physical safeguards to ensure the security and confidentiality of Plaintiffs' and Class members' Customer Data to protect against reasonably foreseeable threats to the security or integrity of such information.

118.    Brinker had the resources to prevent a breach. Brinker made significant expenditures to market its products, but neglected to adequately invest in data security, despite the growing number of POS intrusions and several years of well-publicized data breaches.

119.    Had Brinker remedied the deficiencies in its POS systems, followed PCI DSS guidelines, and adopted security measures recommended by experts in the field, Brinker would have prevented intrusion into its POS systems and, ultimately, the theft of its customers' confidential payment card information.

120.    As a direct and proximate result of Brinker's wrongful actions and inaction and the resulting Data Breach, Plaintiffs and Class members have been placed at an imminent, immediate, and continuing increased risk of harm from identity theft and identity fraud, requiring them to take the time which they otherwise would have dedicated to other life demands such as work and effort to mitigate the actual and potential impact of the Data Breach on their lives including, inter alia, by placing "freezes" and "alerts" with credit reporting agencies, contacting their financial institutions, closing or modifying financial accounts, closely reviewing and monitoring their credit reports and accounts for unauthorized activity, and filing police reports. This time has been lost forever and cannot be recaptured.  In all manners of life in this country, time has constantly been recognized as compensable, for many consumers it is the way they are compensated, and even if retired from the work force, consumers should be free of having to deal with the consequences of a retailer's slippage, as is the case here.

121.    Brinker's wrongful actions and inaction directly and proximately caused the theft and dissemination into the public domain of Plaintiffs' and Class members' Customer Data, causing them to suffer, and continue to suffer, economic damages and other actual harm for which they are entitled to compensation, including:

a.    theft of their personal and financial information;

b.    unauthorized charges on their debit and credit card accounts;

c.    the imminent and certainly impending injury flowing from potential fraud and identity theft posed by their credit/debit card and personal information being placed in the hands of criminals and already misused via the sale of Plaintiffs' and Class members' information on the Internet card black market;

30

d.  the untimely and inadequate notification of the Data Breach;

e.  the improper disclosure of their Customer Data;

f.  loss of privacy;

g.  money paid for food purchased at Chili's restaurants during the period of the Data Breach in that Plaintiffs and Class members would not have dined at Chili's, or at least would not have used their payment cards for purchases, had Brinker disclosed that it lacked adequate systems and procedures to reasonably safeguard customers' financial and personal information and had Brinker provided timely and accurate notice of the Data Breach;

h.  ascertainable losses in the form of out-of-pocket expenses and the value of their time reasonably incurred to remedy or mitigate the effects of the Data Breach;

i.  ascertainable losses in the form of deprivation of the value of their PII and PCD, for which there is a well-established national and international market;

j.  ascertainable losses in the form of the loss of cash back or other benefits as a result of their inability to use certain accounts and cards affected by the Data Breach;

k.  loss of use of, and access to, their account funds and costs associated with the inability to obtain money from their accounts or being limited in the amount of money they were permitted to obtain from their accounts, including missed payments on bills and loans, late charges and fees, and adverse effects on their credit including adverse credit notations; and,

l.      the loss of productivity and value of their time spent to address, attempt to ameliorate, mitigate, and deal with the actual and future consequences of the Data Breach, including finding fraudulent charges, cancelling and reissuing cards, purchasing credit monitoring and identity theft protection services, imposition of withdrawal and purchase limits on compromised accounts, and the inconvenience, nuisance and annoyance of dealing with all such issues resulting from the Data Breach.

122.    While the Customer Data of Plaintiffs and members of the Class has been stolen, Brinker continues to hold Customer Data of consumers, including Plaintiffs and Class members. Particularly because Brinker has demonstrated an inability to prevent a breach or stop it from continuing even after being detected, Plaintiffs and members of the Class have an undeniable interest in insuring that their Customer Data is secure, remains secure, is properly and promptly destroyed and is not subject to further theft.

## CLASS ALLEGATIONS

123.    Plaintiffs seek relief on behalf of themselves and as representatives of all others who are similarly situated. Pursuant to Rule 23(a), (b)(2), (b)(3) and (c)(4), Fed. R.Civ. P., Plaintiffs seek certification of a Nationwide class defined as follows:

All persons residing in the United States who made a credit or debit card purchase at any affected Chili's location during the period of the Data Breach (the "Nationwide Class").

124.    Pursuant to Rule 23, and in the alternative to claims asserted on behalf of the Nationwide Class, Plaintiffs assert claims under the laws of the individual States of Florida,

California, Virginia, Nevada and Texas, and on behalf of separate statewide classes, defined as follows:

> All persons residing in [California, Florida, Virginia, Nevada or Texas] who made a credit or debit card purchase at any affected Chili's location during the period of the Data Breach (the "Statewide Classes").

125.   Excluded from each of the above Classes are Brinker and any of its affiliates, parents or subsidiaries; all employees of Brinker; all persons who make a timely election to be excluded from the Class; government entities; and the judges to whom this case is assigned and their immediate family and court staff.

126.   Plaintiffs hereby reserve the right to amend or modify the class definition with greater specificity or division after having had an opportunity to conduct discovery.

127.   Each of the proposed Classes meets the criteria for certification under Rule 23(a), (b)(2), (b)(3) and (c)(4).

128.   **Numerosity. Fed. R. Civ. P. 23(a)(1).**   Consistent with Rule 23(a)(1), the members of the Class are so numerous and geographically dispersed that the joinder of all members is impractical.  While the exact number of Class members is unknown to Plaintiffs at this time, the proposed Class include potentially millions of customers whose data was compromised in the Data Breach. Class members may be identified through objective means. Class members may be notified of the pendency of this action by recognized, Court-approved notice dissemination methods, which may include U.S. mail, electronic mail, internet postings, and/or published notice.

129.   **Commonality. Fed. R. Civ. P. 23(a)(2) and (b)(3).**   Consistent with Rule 23(a)(2) and with 23(b)(3)'s predominance requirement, this action involves common questions

of law and fact that predominate over any questions affecting individual Class members. The common questions include:

a. Whether Brinker had a duty to protect Customer Data;

b. Whether Brinker knew or should have known of the susceptibility of its POS systems to a data breach;

c. Whether Brinker's security measures to protect their POS systems were reasonable in light of the PCI DSS requirements, FTC data security recommendations, and best practices recommended by data security experts;

d. Whether Brinker was negligent in failing to implement reasonable and adequate security procedures and practices;

e. Whether Brinker's failure to implement adequate data security measures allowed the breach of its POS data systems to occur;

f. Whether Brinker's conduct constituted unfair or deceptive trade practices;

g. Whether Brinker's conduct, including its failure to act, resulted in or was the proximate cause of the breach of its systems, resulting in the loss of the Customer Data of Plaintiffs and Class members;

h. Whether Plaintiffs and Class members were injured and suffered damages or other acceptable losses because of Brinker's failure to reasonably protect its POS systems and data network; and,

i. Whether Plaintiffs and Class members are entitled to relief.

130. **Typicality. Fed. R. Civ. P. 23(a)(3).** Consistent with Rule 23(a)(3), Plaintiffs' claims are typical of those of other Class members.  Plaintiffs are consumers who used their

payment cards at affected Chili's locations and had their cards compromised as a result of the Data Breach. Plaintiffs' damages and injuries are akin to other Class members and Plaintiffs seek relief consistent with the relief of the Class.

131. **Adequacy. Fed. R. Civ. P. 23(a)(4).** Consistent with Rule 23(a)(4), Plaintiffs are adequate representatives of the Class because Plaintiffs are members of the Class and are committed to pursuing this matter against Brinker to obtain relief for the Class. Plaintiffs have no conflicts of interest with the Class. Plaintiffs' Counsel are competent and experienced in litigating class actions, including privacy litigation. Plaintiffs intend to vigorously prosecute this case and will fairly and adequately protect the Class's interests.

132. **Superiority. Fed. R. Civ. P. 23(b)(3).** Consistent with Rule 23(b)(3), a class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. The quintessential purpose of the class action mechanism is to permit litigation against wrongdoers even when damages to individual plaintiffs may not be sufficient to justify individual litigation. Here, the damages suffered by Plaintiffs and the Class are relatively small compared to the burden and expense required to individually litigate their claims against Brinker, and thus, individual litigation to redress Brinker's wrongful conduct would be impracticable. Individual litigation by each Class member would also strain the court system. Individual litigation creates the potential for inconsistent or contradictory judgments, and increases the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties and provides the benefits of a single adjudication, economies of scale, and comprehensive supervision by a single court.

133.    **Injunctive and Declaratory Relief.** Class certification is also appropriate under Rule 23(b)(2) and (c). Defendant, through its uniform conduct, acted or refused to act on grounds generally applicable to the Class as a whole, making injunctive and declaratory relief appropriate to the Class as a whole.

134.    Likewise, particular issues under Rule 23(c)(4) are appropriate for certification because such claims present only particular, common issues, the resolution of which would advance the disposition of this matter and the parties' interests therein.  Such particular issues include, but are not limited to:

a.    Whether Brinker failed to timely notify the public of the Breach;

b.    Whether Brinker owed a legal duty to Plaintiffs and the Class to exercise due care in collecting, storing, and safeguarding their Customer Data;

c.    Whether Brinker's security measures to protect is POS systems were reasonable in light of the PCI DSS requirements, FTC data security recommendations, and other best practices recommended by data security experts;

d.    Whether Brinker's failure to adequately comply with PCI DSS standards and/or to institute protective measures beyond PCI DSS standards amounted to negligence;

e.    Whether Brinker failed to take commercially reasonable steps to safeguard the Customer Data of Plaintiffs and the Class members; and,

f.    Whether adherence to PCI DSS requirements, FTC data security recommendations, and measures recommended by data security experts would have reasonably prevented the Data Breach.

135.    Finally, all members of the proposed Classes are readily ascertainable. Brinker has access to information regarding which of its restaurants were affected by the Data Breach, the time period of the Data Breach, and which customers were potentially affected.  Using this information, the members of the Class can be identified and their contact information ascertained for purposes of providing notice to the Class.

**COUNT I**
**BREACH OF IMPLIED CONTRACT**
**(ON BEHALF OF PLAINTIFFS AND**
**THE NATIONWIDE CLASS, OR, ALTERNATIVELY, PLAINTIFFS AND THE**
**SEPARATE STATEWIDE CLASSES)**

136.    Plaintiffs restate and reallege Paragraphs 1 through 1355 as if fully set forth herein.

137.    Brinker solicited and invited Plaintiffs and Class members to eat at its restaurants and make purchases using their credit or debit cards as form of payment. Plaintiffs and Class members accepted Brinker's offers and used their credit or debit cards to make purchases at Chili's restaurants during the period of the Data Breach.

138.    When Plaintiffs and Class members purchased and paid for Brinker's services and food products at Chili's using payment cards, they provided their Customer Data, including but not limited to the PII and PCD contained on the face of, and embedded in the magnetic strip of, their debit and credit cards. In so doing, Plaintiffs and Class members entered into mutually agreed-upon implied contracts with Brinker pursuant to which Brinker agreed to safeguard and protect such information and to timely and accurately notify Plaintiffs and Class members if their data had been breached and compromised.

139.    Plaintiffs and Class members would not have provided and entrusted their PII and PCD, including all information contained in the magnetic stripes of their credit and debit cards, to Brinker to eat at its restaurants and make purchases in the absence of the implied contract between them and Brinker.

140.    Plaintiffs and Class members fully performed their obligations under the implied contracts with Brinker.

141.    Brinker breached the implied contracts it made with Plaintiffs and Class members by failing to safeguard and protect the PII and PCD of Plaintiffs and Class members and by failing to provide timely and accurate notice to them that their Customer Data was compromised as a result of the Data Breach.

142.    As a direct and proximate result of Brinker's breaches of the implied contracts between Brinker and Plaintiffs and Class members, Plaintiffs and Class members sustained actual losses and damages as described in detail above.

<u>COUNT II</u>
**NEGLIGENCE**
**(ON BEHALF OF PLAINTIFFS AND**
**THE NATIONWIDE CLASS, OR, ALTERNATIVELY, PLAINTIFFS AND THE**
**SEPARATE STATEWIDE CLASSES)**

143.    Plaintiffs restate and reallege Paragraphs 1 through 135 as if fully set forth herein.

144.    Upon accepting and storing the Customer Data of Plaintiffs and Class members in its computer systems and on its networks, Brinker undertook and owed a duty to Plaintiffs and Class members to exercise reasonable care to secure and safeguard that information and to use commercially reasonable methods to do so. Brinker knew that the Customer Data was private and confidential and should be protected as private and confidential.

145.    Brinker owed a duty of care not to subject Plaintiffs and Class members, along with their Customer Data, to an unreasonable risk of harm because they were foreseeable and probable victims of any inadequate security practices.

146.    Brinker owed numerous duties to Plaintiffs and to members of the Nationwide Class, including the following:

a.    to exercise reasonable care in obtaining, retaining, securing, safeguarding, deleting and protecting Customer Data in its possession;

b.    to protect Customer Data using reasonable and adequate security procedures and systems that are compliant with industry-standard practices; and

c.    to implement processes to quickly detect a data breach and to timely act on warnings about data breaches.

147.    Brinker also breached its duty to Plaintiffs and the Class members to adequately protect and safeguard Customer Data by knowingly disregarding standard information security principles, despite obvious risks, and by allowing unmonitored and unrestricted access to unsecured Customer Data. Furthering their dilatory practices, Brinker failed to provide adequate supervision and oversight of the Customer Data with which they were and are entrusted, in spite of the known risk and foreseeable likelihood of breach and misuse, which permitted an unknown third party to gather Customer Data of Plaintiffs and Class members, misuse the Customer Data and intentionally disclose it to others without consent.

148.    Brinker knew, or should have known, of the risks inherent in collecting and storing Customer Data, the vulnerabilities of POS systems, and the importance of adequate security. Brinker knew about numerous, well-publicized data breaches within the restaurant industry.

149.     Brinker knew, or should have known, that its data systems and networks did not adequately safeguard Plaintiffs' and Class members' Customer Data.

150.     Brinker breached its duties to Plaintiffs and Class Members by failing to provide fair, reasonable, or adequate computer systems and data security practices to safeguard Customer Data of Plaintiffs and Class members.

151.     Because Brinker knew that a breach of its systems would damage hundreds of thousands, if not millions, of Brinker customers, including Plaintiffs and Class members, Brinker had a duty to adequately protect its data systems and the Customer Data contained thereon.

152.     Brinker had a special relationship with Plaintiffs and Class members.  Plaintiffs' and Class members' willingness to entrust Brinker with their Customer Data was predicated on the understanding that Brinker would take adequate security precautions.  Moreover, only Brinker had the ability to protect its systems and the Customer Data it stored on them from attack.

153.     Brinker's own conduct also created a foreseeable risk of harm to Plaintiffs and Class members and their Customer Data.  Brinker's misconduct included failing to: (1) secure its point-of-sale systems, despite knowing their vulnerabilities, (2) comply with industry standard security practices, (3) implement adequate system and event monitoring, and (4) implement the systems, policies, and procedures necessary to prevent this type of data breach.

154.     Brinker also had independent duties under state and federal laws that required Brinker to reasonably safeguard Plaintiffs' and Class members' Customer Data and promptly notify them about the Data Breach.

155.     Brinker breached its duties to Plaintiffs and Class members in numerous ways, including:

a.    by failing to provide fair, reasonable, or adequate computer systems and data security practices to safeguard Customer Data of Plaintiffs and Class members;

b.    by creating a foreseeable risk of harm through the misconduct previously described;

c.    by failing to implement adequate security systems, protocols and practices sufficient to protect Plaintiffs' and Class members' Customer Data both before and after learning of the Data Breach;

d.    by failing to comply with industry standard data security standards during the period of the Data Breach; and

e.    by failing to timely and accurately disclose that Plaintiffs' and Class members' Customer Data had been improperly acquired or accessed.

156.    Through Brinker's acts and omissions described in this Complaint, including Brinker's failure to provide adequate security and its failure to protect Customer Data of Plaintiffs and Class members from being foreseeably captured, accessed, disseminated, stolen and misused, Brinker unlawfully breached its duty to use reasonable care to adequately protect and secure Customer Data of Plaintiff and Class members during the time it was within Brinker's possession or control.

157.    The law further imposes an affirmative duty on Brinker to timely disclose the unauthorized access and theft of the Customer Data to Plaintiffs and the Class so that Plaintiffs and Class members can take appropriate measures to mitigate damages, protect against adverse consequences, and thwart future misuse of their Customer Data.

158.    Brinker breached its duty to notify Plaintiff and Class Members of the unauthorized access by waiting to notify Plaintiff and Class members and then by failing to provide Plaintiff and Class members sufficient information regarding the breach. To date, Brinker has not provided sufficient information to Plaintiff and Class members regarding the extent of the unauthorized access and continues to breach its disclosure obligations to Plaintiff and the Class.

159.    Through Brinker's acts and omissions described in this Complaint, including Brinker's failure to provide adequate security and its failure to protect Customer Data of Plaintiffs and Class members from being foreseeably captured, accessed, disseminated, stolen and misused, Brinker unlawfully breached its duty to use reasonable care to adequately protect and secure Customer Data of Plaintiffs and Class members during the time it was within Brinker's possession or control.

160.    Further, through its failure to provide timely and clear notification of the Data Breach to consumers, Brinker prevented Plaintiffs and Class members from taking meaningful, proactive steps to secure their financial data and bank accounts.

161.    Upon information and belief, Brinker improperly and inadequately safeguarded Customer Data of Plaintiffs and Class members in deviation of standard industry rules, regulations, and practices at the time of the unauthorized access. Brinker's failure to take proper security measures to protect sensitive Customer Data of Plaintiffs and Class members as described in this Complaint, created conditions conducive to a foreseeable, intentional criminal act, namely the unauthorized access of Customer Data of Plaintiffs and Class members.

162. Brinker's conduct was grossly negligent and departed from all reasonable standards of care, including, but not limited to: failing to adequately protect the Customer Data; failing to conduct regular security audits; failing to provide adequate and appropriate supervision of persons having access to Customer Data of Plaintiffs and Class members; and failing to provide Plaintiff and Class members with timely and sufficient notice that their sensitive Customer Data had been compromised.

163. Neither Plaintiffs nor the other Class members contributed to the Data Breach and subsequent misuse of their Customer Data as described in this Complaint.

164. As a direct and proximate cause of Brinker's conduct, Plaintiffs and the Class suffered damages including, but not limited to: damages arising from the unauthorized charges on their debit or credit cards or on cards that were fraudulently obtained through the use of the Customer Data of Plaintiffs and Class members; damages arising from Plaintiffs' inability to use their debit or credit cards because those cards were cancelled, suspended, or otherwise rendered unusable as a result of the Data Breach and/or false or fraudulent charges stemming from the Data Breach, including but not limited to late fees charged and foregone cash back rewards; damages from lost time and effort to mitigate the actual and potential impact of the Data Breach on their lives including, inter alia, by placing "freezes" and "alerts" with credit reporting agencies, contacting their financial institutions, closing or modifying financial accounts, closely reviewing and monitoring their credit reports and accounts for unauthorized activity, and filing police reports and damages from identity theft, which may take months if not years to discover and detect, given the far-reaching, adverse and detrimental consequences of identity theft and loss of privacy. The nature of other forms of economic damage and injury may take years to

detect, and the potential scope can only be assessed after a thorough investigation of the facts and events surrounding the theft mentioned above.

## COUNT III
## NEGLIGENCE PER SE
## (ON BEHALF OF PLAINTIFFS AND
## THE NATIONWIDE CLASS, OR, ALTERNATIVELY, PLAINTIFFS AND THE
## SEPARATE STATEWIDE CLASSES)

165.     Plaintiffs restate and reallege Paragraphs 1 through 135 as if fully set forth herein.

166.     Section 5 of the FTC Act prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair act or practice by businesses, such as Brinker, of failing to use reasonable measures to protect Customer Data.  The FTC publications and orders described above also form part of the basis of Brinker's duty in this regard.

167.     Brinker violated Section 5 of the FTC Act by failing to use reasonable measures to protect Customer Data and not complying with applicable industry standards, as described in detail herein.  Brinker's conduct was particularly unreasonable given the nature and amount of Customer Data it obtained and stored, and the foreseeable consequences of a data breach at a restaurant chain as large as Chili's, including, specifically, the immense damages that would result to Plaintiffs and Class members.

168.     Brinker's violation of Section 5 of the FTC Act constitutes negligence *per se*.

169.     Plaintiffs and Class members are within the class of persons that the FTC Act was intended to protect.

170.     The harm that occurred as a result of the Data Breach is the type of harm the FTC Act was intended to guard against.  The FTC has pursued enforcement actions against businesses,

which, as a result of their failure to employ reasonable data security measures and avoid unfair and deceptive practices, caused the same harm as that suffered by Plaintiffs and the Class.

171.    As a direct and proximate result of Brinker's negligence *per se*, Plaintiffs and the Class have suffered, and continue to suffer, injuries damages arising from Plaintiffs' inability to use their debit or credit cards because those cards were cancelled, suspended, or otherwise rendered unusable as a result of the Data Breach and/or false or fraudulent charges stemming from the Data Breach, including but not limited to late fees charged and foregone cash back rewards; damages from lost time and effort to mitigate the actual and potential impact of the Data Breach on their lives including, inter alia, by placing "freezes" and "alerts" with credit reporting agencies, contacting their financial institutions, closing or modifying financial accounts, closely reviewing and monitoring their credit reports and accounts for unauthorized activity, and filing police reports and damages from identity theft, which may take months if not years to discover and detect, given the far-reaching, adverse and detrimental consequences of identity theft and loss of privacy.

### COUNT IV
### UNJUST ENRICHMENT
### (ON BEHALF OF PLAINTIFFS AND
### THE NATIONWIDE CLASS, OR, ALTERNATIVELY, PLAINTIFFS AND THE
### SEPARATE STATEWIDE CLASSES)

172.    Plaintiffs restate and reallege Paragraphs 1 through 13535 as if fully set forth here.

173.    Plaintiffs and Class members conferred a monetary benefit on Brinker. Specifically, they purchased goods and services from Brinker and provided Brinker with their payment information.  In exchange, Plaintiffs and Class members should have received from

Brinker the goods and services that were the subject of the transaction and should have been entitled to have Brinker protect their Customer Data with adequate data security.

174.     Brinker knew that Plaintiffs and Class members conferred a benefit on Brinker and accepted and has accepted or retained that benefit. Brinker profited from the purchases and used the Customer Data of Plaintiffs and Class members for business purposes.

175.     Brinker failed to secure the Customer Data of Plaintiffs and Class members and, therefore, did not provide full compensation for the benefit Plaintiffs and Class members provided.

176.     Brinker acquired the Customer Data through inequitable means in that it failed to disclose the inadequate security practices previously alleged.

177.     If Plaintiffs and Class members knew that Brinker would not secure their Customer Data using adequate security, they would not have made purchases at Chili's restaurants.

178.     Plaintiffs and Class members have no adequate remedy at law.

179.     Under the circumstances, it would be unjust for Brinker to be permitted to retain any of the benefits that Plaintiffs and Class members conferred on it.

180.     Brinker should be compelled to disgorge into a common fund or constructive trust, for the benefit of Plaintiffs and Class members, proceeds that it unjustly received from them. In the alternative, Brinker should be compelled to refund the amounts that Plaintiffs and Class members overpaid.

**COUNT V**
**DECLARATORY JUDGMENT**
**(ON BEHALF OF PLAINTIFFS AND**
**THE NATIONWIDE CLASS, OR, ALTERNATIVELY, PLAINTIFFS AND THE**
**SEPARATE STATEWIDE CLASSES)**

181.    Plaintiffs restate and reallege Paragraphs 1 through 13535 as if fully set forth here.

182.    As previously alleged, Plaintiffs and Class members entered into an implied contract that required Brinker to provide adequate security for the Customer Data it collected from their payment card transactions. As previously alleged, Brinker owes duties of care to Plaintiffs and Class members that require it to adequately secure Customer Data.

183.    Brinker still possesses Customer Data pertaining to Plaintiffs and Class members.

184.    Brinker has made no announcement or notification that it has remedied the vulnerabilities in its computer data systems, and, most importantly, its POS systems.

185.    Accordingly, Brinker has not satisfied its contractual obligations and legal duties to Plaintiffs and Class members.  In fact, now that Brinker's lax approach towards data security has become public, the Customer Data in its possession is more vulnerable than previously.

186.    Actual harm has arisen in the wake of the Data Breach regarding Brinker's contractual obligations and duties of care to provide data security measures to Plaintiffs and Class members.

187.    Plaintiffs, therefore, seek a declaration that (a) Brinker's existing data security measures do not comply with its contractual obligations and duties of care, and (b) in order to comply with its contractual obligations and duties of care, Brinker must implement and maintain reasonable security measures, including, but not limited to:

47

a.    engaging third-party security auditors/penetration testers as well as internal security personnel to conduct testing, including simulated attacks, penetration tests, and audits on Brinker's systems on a periodic basis, and ordering Brinker to promptly correct any problems or issues detected by such third-party security auditors;

b.    engaging third-party security auditors and internal personnel to run automated security monitoring;

c.    auditing, testing, and training its security personnel regarding any new or modified procedures;

d.    segmenting customer data by, among other things, creating firewalls and access controls so that if one area of Brinker is compromised, hackers cannot gain access to other portions of Brinker systems;

e.    purging, deleting, and destroying in a reasonable secure manner Customer Data not necessary for its provisions of services;

f.    conducting regular database scanning and securing checks;

g.    routinely and continually conducting internal training and education to inform internal security personnel how to identify and contain a breach when it occurs and what to do in response to a breach; and

h.    educating its customers about the threats they face as a result of the loss of their financial and personal information to third parties, as well as the steps Brinker customers must take to protect themselves.

<u>**COUNT VI**</u>
**VIOLATIONS OF THE OF THE FLORIDA UNFAIR AND DECEPTIVE TRADE**
**PRACTICES ACT, FLA. STAT. §§ 501.201,** *et seq.*
**(ON BEHALF OF THE FLORIDA STATEWIDE CLASS)**

188.    Plaintiff Green-Cooper ("Florida Plaintiff"), individually and on behalf of the other

Florida Class members, restates and realleges Paragraphs 1 through 135 as if fully set forth here.

189.    Florida Plaintiff and Florida Class members are consumers who used their credit or

debit cards to purchase food and drink products and services at Chili's restaurants.    These

purchases were made primarily for personal, family, or household purposes.

190.    Brinker engaged in the conduct alleged in this Complaint entering into transactions

intended to result, and which did result, in the sale of food and drink products to consumers,

including Florida Plaintiff and Florida Class members.

191.    Brinker engaged in, and its acts and omissions affect, trade and commerce.

Brinker's acts, practices, and omissions were done in the course of Brinker's business of

marketing, offering to sell, and selling food and drink products and services throughout the United

States.

192.    Brinker, operating in Florida, engaged in deceptive, unfair, and unlawful trade acts

or practices in the conduct of trade or commerce, in violation of Fla. Stat. § 501.204(1), including

but not limited to the following:

    a.    failure to maintain adequate computer systems and data security practices to

        safeguard Customer Data;

    b.    failure to disclose that its computer systems and data security practices were

        inadequate to safeguard Customer Data from theft;

    c.       failure to timely and accurately disclose the Data Breach to Florida Plaintiff and Florida Class members;

    d.       continued acceptance of credit and debit card payments and storage of other personal information after Brinker knew or should have known of the security vulnerabilities of the POS systems that were exploited in the Data Breach; and

    e.       continued acceptance of credit and debit card payments and storage of other personal information after Brinker knew or should have known of the Data Breach and before it allegedly remediated the Breach.

193.     These unfair acts and practices violated duties imposed by laws including by not limited to the FTCA and Fla. Stat. § 501.171(2).

194.     As a direct and proximate result of Brinker's violation of the Florida Unfair and Deceptive Trade Practices Act, Florida Plaintiff and Florida Class members suffered damages including, but not limited to: damages arising from the unauthorized charges on their debit or credit cards or on cards that were fraudulently obtained through the use of the Customer Data of Florida Plaintiffs and Florida Class members; damages arising from Florida Plaintiffs' inability to use their debit or credit cards because those cards were cancelled, suspended, or otherwise rendered unusable as a result of the Data Breach and/or false or fraudulent charges stemming from the Data Breach, including but not limited to late fees charged and foregone cash back rewards; damages from lost time and effort to mitigate the actual and potential impact of the Data Breach on their lives including, *inter alia*, by placing "freezes" and "alerts" with credit reporting agencies, contacting their financial institutions, closing or modifying financial accounts, closely reviewing and monitoring their credit reports and accounts for unauthorized activity, and filing

police reports and damages from identity theft, which may take months if not years to discover and detect, given the far-reaching, adverse and detrimental consequences of identity theft and loss of privacy. The nature of other forms of economic damage and injury may take years to detect, and the potential scope can only be assessed after a thorough investigation of the facts and events surrounding the theft mentioned above.

195.     Also as a direct result of Brinker's knowing violation of the Florida Unfair and Deceptive Trade Practices Act, Florida Plaintiff and Florida Class members are entitled to damages as well as injunctive relief, including, but not limited to:

   A.    Ordering that Brinker engage third-party security auditors/penetration testers as well as internal security personnel to conduct testing, including simulated attacks, penetration tests, and audits on Brinker's systems on a periodic basis, and ordering Brinker to promptly correct any problems or issues detected by such third-party security auditors;

   B.    Ordering that Brinker engage third-party security auditors and internal personnel to run automated security monitoring;

   C.    Ordering that Brinker audit, test, and train its security personnel regarding any new or modified procedures;

   D.    Ordering that Brinker segment customer data by, among other things, creating firewalls and access controls so that if one area of Brinker is compromised, hackers cannot gain access to other portions of Brinker systems;

   E.    Ordering that Brinker purge, delete, and destroy in a reasonable secure manner Customer Data not necessary for its provisions of services;

F.      Ordering that Brinker conduct regular database scanning and securing checks;

G.      Ordering that Brinker routinely and continually conduct internal training and education to inform internal security personnel how to identify and contain a breach when it occurs and what to do in response to a breach; and

H.      Ordering Brinker to meaningfully educate its customers about the threats they face as a result of the loss of their financial and personal information to third parties, as well as the steps Brinker customers must take to protect themselves.

196.    Florida Plaintiff brings this action on behalf of herself and Florida Class Members for the relief requested above and for the public benefit in order to promote the public interests in the provision of truthful, fair information to allow consumers to make informed purchasing decisions and to protect Florida Plaintiff and Florida Class Members and the public from Brinker's unfair methods of competition and unfair, deceptive, fraudulent, unconscionable and unlawful practices. Brinker's wrongful conduct as alleged in this Complaint has had widespread impact on the public at large.

197.    The above unfair and deceptive practices and acts by Brinker were immoral, unethical, oppressive, and unscrupulous. These acts caused substantial injury to Florida Plaintiff and Florida Class Members that they could not reasonably avoid; this substantial injury outweighed any benefits to consumers or to competition.

198.    Brinker knew or should have known that its computer systems and data security practices were inadequate to safeguard Florida Class Members' Personal Information and that the risk of a data breach or theft was high.

199.     Brinker's actions and inactions in engaging in the unfair practices and deceptive acts described herein were negligent, knowing and willful, and/or wanton and reckless.

200.     Florida Plaintiff and Florida Class Members seek relief under Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. §§ 501.201, *et seq*, including, but not limited to, damages, restitution, injunctive relief, and/or attorneys' fees and costs, and any other just and proper relief.

<div align="center">

**COUNT VII**
**TEXAS DECEPTIVE TRADE PRACTICES—CONSUMER PROTECTION ACT,**
**Texas Bus. & Com. Code §§ 17.41, et seq.**
**(ON BEHALF OF THE TEXAS CLASS)**

</div>

201.     Plaintiff Thomas ("Texas Plaintiff"), individually and on behalf of the other Texas Class members, restates and realleges Paragraphs 1 through 135 as if fully set forth here.

202.     Brinker is a "person," as defined by Tex. Bus. & Com. Code § 17.45(3).

203.     Texas Plaintiff and the Texas Class members are "consumers," as defined by Tex. Bus. & Com. Code § 17.45(4).

204.     Brinker advertised, offered, or sold goods or services in Texas and engaged in trade or commerce directly or indirectly affecting the people of Texas, as defined by Tex. Bus. & Com. Code § 17.45(6).

205.     Brinker engaged in false, misleading, or deceptive acts and practices, in violation of Tex. Bus. & Com. Code § 17.46(b), including:

> a. Representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits or quantities that they do not have;

     b.  Representing that goods or services are of a particular standard, quality or grade, if they are of another;

     c.  Advertising goods or services with intent not to sell them as advertised.

206.    Brinker's false, misleading, and deceptive acts and practices include:

     a.  Failing to implement and maintain reasonable security and privacy measures to protect Texas Plaintiff and Texas Class members' Personal Information, which was a direct and proximate cause of the Brinker data breach;

     b.  Failing to identify foreseeable security and privacy risks, remediate identified security and privacy risks, and adequately improve security and privacy measures, which was a direct and proximate cause of the Data Breach;

     c.  Failing to comply with common law and statutory duties pertaining to the security and privacy of Texas Plaintiff and Texas Class members' Customer Data, including duties imposed by the FTC Act, 15 U.S.C. § 45, and Texas's data security statute, Tex. Bus. & Com. Code § 521.052, which was a direct and proximate cause of the Data Breach;

     d.  Misrepresenting that it would protect the privacy and confidentiality of Texas Plaintiff and Texas Class members' Customer Data, including by implementing and maintaining reasonable security measures;

     e.  Misrepresenting that it would comply with common law and statutory duties pertaining to the security and privacy of Texas Plaintiff and Texas

Class members' Customer Data, including duties imposed by the FTC Act, 15 U.S.C. § 45 and Texas's data security statute, Tex. Bus. & Com. Code § 521.052;

f.  Omitting, suppressing, and concealing the material fact that it did not reasonably or adequately secure Texas Plaintiff's and Texas Class members' Customer Data; and

g.  Omitting, suppressing, and concealing the material fact that it did not comply with common law and statutory duties pertaining to the security and privacy of Texas Plaintiff's and Texas Class members' Customer, including duties imposed by the FTC Act, 15 U.S.C. § 45 and Texas's data security statute, Tex. Bus. & Com. Code § 521.052.

207.    Brinker intended to mislead Texas Plaintiff and Texas Class members and induce them to rely on its misrepresentations and omissions.

208.    Brinker's representations and omissions were material because they were likely to deceive reasonable consumers about the adequacy of Brinker's data security and ability to protect the confidentiality of consumers' Customer Data.

209.    Had Brinker disclosed to Texas Plaintiff and Texas Class members that its data systems were not secure and, thus, vulnerable to attack, Brinker would have been unable to continue in business and it would have been forced to adopt reasonable data security measures and comply with the law. Instead, Brinker held itself out as secure and Brinker was trusted with sensitive and valuable Customer Data regarding millions of consumers, including Texas Plaintiff and the Texas Class. Brinker accepted the responsibility of being a "steward of data" while

keeping the inadequate state of its security controls secret from the public. Accordingly, because Brinker held itself out as secure with a corresponding duty of trustworthiness and care, Texas Plaintiff and the Texas Class members acted reasonably in relying on Brinker's misrepresentations and omissions, the truth of which they could not have discovered.

210.    Brinker had a duty to disclose the above facts due to the circumstances of this case, the sensitivity and breadth of the Customer Data in its possession, and the generally accepted industry standards. This duty arose because members of the public, including Texas Plaintiff and the Texas Class, repose a trust and confidence in Brinker. In addition, such a duty is implied by law due to the nature of the relationship between consumers, including Texas Plaintiff and the Texas Class, and Brinker because consumers are unable to fully protect their interests with regard to their data, and placed trust and confidence in Brinker. Brinker's duty to disclose also arose from its:

    a.   Possession of exclusive knowledge regarding the security of the data in its systems;

    b.   Active concealment of the state of its security; and/or

    c.   Incomplete representations about the security and integrity of its computer and data systems, while purposefully withholding material facts from Texas Plaintiff and the Texas Class that contradicted these representations.

211.    Brinker engaged in unconscionable actions or courses of conduct, in violation of Tex. Bus. & Com. Code Ann. § 17.50(a)(3). Brinker engaged in acts or practices which, to

consumers' detriment, took advantage of consumers' lack of knowledge, ability, experience, or capacity to a grossly unfair degree.

212. Consumers, including Texas Plaintiff and Texas Class members, lacked knowledge about deficiencies in Brinker's data security because this information was known exclusively by Brinker. Consumers also lacked the ability, experience, or capacity to secure the Customer Data in Brinker's possession or to fully protect their interests with regard to their data. Plaintiffs and Texas Class members lack expertise in information security matters and do not have access to Brinker's systems in order to evaluate its security controls. Brinker took advantage of its special skill and access to the Customer Data to hide its inability to protect the security and confidentiality of Texas Plaintiff's and Texas Class members' Customer Data.

213. Brinker intended to take advantage of consumers' lack of knowledge, ability, experience, or capacity to a grossly unfair degree, with reckless disregard of the unfairness that would result. The unfairness resulting from Brinker's conduct is glaringly noticeable, flagrant, complete, and unmitigated. The Data Breach, which resulted from Brinker's unconscionable business acts and practices, exposed Texas Plaintiff and Texas Class members to a wholly unwarranted risk to the safety of their Customer Data and the security of their identity or credit, and worked a substantial hardship on a significant and unprecedented number of consumers. Texas Plaintiff and Texas Class members cannot mitigate this unfairness because they cannot undo the Data Breach.

214. Brinker acted intentionally, knowingly, and maliciously to violate Texas's Deceptive Trade Practices-Consumer Protection Act, and recklessly disregarded Texas Plaintiff's and Texas Class members' rights.

215.    As a direct and proximate result of Brinker's unconscionable and deceptive acts or practices, Texas Plaintiff and Texas Class members have suffered and will continue to suffer injury, ascertainable losses of money or property, and monetary and non-monetary damages, including from fraud and identity theft; time and expenses related to monitoring their financial accounts for fraudulent activity; an increased, imminent risk of fraud and identity theft; and loss of value of their Customer Data. Brinker's unconscionable and deceptive acts or practices were a producing cause of Texas Plaintiff's and Texas Class members' injuries, ascertainable losses, economic damages, and non-economic damages, including their mental anguish.

216.    Brinker's violations present a continuing risk to Texas Plaintiff and Texas Class members as well as to the general public.

217.    Texas Plaintiff and the Texas Class seek all monetary and non-monetary relief allowed by law, including economic damages; damages for mental anguish; treble damages for each act committed intentionally or knowingly; court costs; reasonably and necessary attorneys' fees; injunctive relief; and any other relief which the court deems proper.

**COUNT VIII**
**VIRGINIA CUSTOMER DATA BREACH NOTIFICATION ACT,**
**Va. Code. Ann. §§ 18.2-186.6, et seq.**
**(ON BEHALF OF THE VIRGINIA CLASS)**

218.    Plaintiff Sanders ("Virginia Plaintiff"), individually and on behalf of the other Virginia Class members, restates and realleges Paragraphs 1 through 13535 as if fully set forth here.

219.    Brinker is required to accurately notify Plaintiff and Virginia Class members following discovery or notification of a breach of its data security system if unencrypted or unredacted Customer Data was or is reasonably believed to have been accessed and acquired by

58

an unauthorized person who will, or it is reasonably believed who will, engage in identify theft or another fraud, without unreasonable delay under Va. Code Ann. § 18.2-186.6(B).

220.    Brinker is an entity that owns or licenses computerized data that includes Customer Data as defined by Va. Code Ann. § 18.2-186.6(B).

221.    Virginia Plaintiff's and Virginia Class members' Customer Data includes "Personal Information" as covered under Va. Code Ann. § 18.2-186.6(A).

222.    Because Brinker discovered a breach of its security system in which unencrypted or unredacted Personal Information was or is reasonably believed to have been accessed and acquired by an unauthorized person, who will, or it is reasonably believed who will, engage in identify theft or another fraud, Brinker had an obligation to disclose the data breach in a timely and accurate fashion as mandated by Va. Code Ann. § 18.2-186.6(B).

223.    By failing to disclose the Brinker data breach in a timely and accurate manner, Brinker violated Va. Code Ann. § 18.2-186.6(B).

224.    As a direct and proximate result of Brinker's violations of Va. Code Ann. § 18.2-186.6(B), Virginia Plaintiff and Virginia Class members suffered damages, as described above.

225.    Virginia Plaintiff and Virginia Class members seek relief under Va. Code Ann. § 18.2-186.6(I), including actual damages.

## COUNT IX
### VIRGINIA CONSUMER PROTECTION ACT,
### Va. Code Ann. §§ 59.1-196, et seq.
### (ON BEHALF OF THE VIRGINIA CLASS)

226.    Plaintiff Sanders ("Virginia Plaintiff"), individually and on behalf of the other Virginia Class members, restates and realleges Paragraphs 1 through 1355 as if fully set forth here.

227.    The Virginia Consumer Protection Act prohibits "[u]sing any . . . deception, fraud, false pretense, false promise, or misrepresentation in connection with a consumer transaction." Va. Code Ann. § 59.1-200(14).

228.    Brinker is a "person" as defined by Va. Code Ann. § 59.1-198.

229.    Brinker is a "supplier," as defined by Va. Code Ann. § 59.1-198.

230.    Brinker engaged in the complained-of conduct in connection with "consumer transactions" with regard to "goods" and "services," as defined by Va. Code Ann. § 59.1-198. Brinker advertised, offered, or sold goods or services used primarily for personal, family or household purposes.

231.    Brinker engaged in deceptive acts and practices by using deception, fraud, false pretense, false promise, and misrepresentation in connection with consumer transactions, including:

a.  Failing to implement and maintain reasonable security and privacy measures to protect Virginia Plaintiff's and Virginia Class members' Customer Data, which was a direct and proximate cause of the Brinker data breach;

b.  Failing to identify foreseeable security and privacy risks, remediate identified security and privacy risks, and adequately improve security and privacy measures, which was a direct and proximate cause of the Brinker data breach;

c.  Failing to comply with common law and statutory duties pertaining to the security and privacy of Virginia Plaintiff's and Virginia Class members'

Customer Data, including duties imposed by the FTC Act, 15 U.S.C. § 45, which was a direct and proximate cause of the Brinker data breach;

d. Misrepresenting that it would protect the privacy and confidentiality of Virginia Plaintiff's and Virginia Class members' Customer Data, including by implementing and maintaining reasonable security measures;

e. Misrepresenting that it would comply with common law and statutory duties pertaining to the security and privacy of Virginia Plaintiff's and Virginia Class members' Customer Data, including duties imposed by the FTC Act, 15 U.S.C. § 45;

f. Omitting, suppressing, and concealing the material fact that it did not reasonably or adequately secure Virginia Plaintiff's and Virginia Class members' Customer Data; and

g. Omitting, suppressing, and concealing the material fact that it did not comply with common law and statutory duties pertaining to the security and privacy of Virginia Plaintiff's and Virginia Class members' Customer Data, including duties imposed by the FTC Act, 15 U.S.C. § 45.

232. Brinker intended to mislead Virginia Plaintiff and Virginia Class members and induce them to rely on its misrepresentations and omissions.

233. Brinker's representations and omissions were material because they were likely to deceive reasonable consumers, including Virginia Plaintiff and Virginia Class members, about the adequacy of Brinker's computer and data security and the quality of the Brinker brand.

234.    Had Brinker disclosed to Virginia Plaintiff and Virginia Class members that its data systems were not secure and, thus, vulnerable to attack, Brinker would have been unable to continue in business and it would have been forced to adopt reasonable data security measures and comply with the law. Instead, Brinker held itself out as secure and Brinker was trusted with sensitive and valuable Customer Data regarding millions of consumers, including Virginia Plaintiff and the Virginia Class. Virginia Plaintiff and the Virginia Class members acted reasonably in relying on Brinker's misrepresentations and omissions, the truth of which they could not have discovered.

235.    Brinker had a duty to disclose these facts due to the circumstances of this case, the sensitivity and breadth of the Customer Data in its possession, and the generally accepted industry standards.  In addition, such a duty is implied by law due to the nature of the relationship between consumers—including Virginia Plaintiff and the Virginia Class—and Brinker, because consumers are unable to fully protect their interests with regard to their Customer Data, and placed trust and confidence in Brinker. Brinker's duty to disclose also arose from its:

> a.  Possession of exclusive knowledge regarding the security of the Customer Data in its systems;
>
> b.  Active concealment of the state of its security; and/or
>
> c.  Incomplete representations about the security and integrity of its computer and data systems, while purposefully withholding material facts from Virginia Plaintiff and the Virginia Class that contradicted these representations.

236.    The above-described deceptive acts and practices also violated the following provisions of VA Code § 59.1-200(A):

      a.  Misrepresenting that goods or services have certain quantities, characteristics, ingredients, uses, or benefits;

      b.  Misrepresenting that goods or services are of a particular standard, quality, grade, style, or model; and

      c.  Advertising goods or services with intent not to sell them as advertised, or with intent not to sell them upon the terms advertised.

237.    Brinker acted intentionally, knowingly, and maliciously to violate Virginia's Consumer Protection Act, and recklessly disregarded Virginia Plaintiff's and Virginia Class members' rights.

238.    As a direct and proximate result of Brinker's deceptive acts or practices, Virginia Plaintiff and Virginia Class members have suffered and will continue to suffer injury, ascertainable losses of money or property, and monetary and non-monetary damages, including from fraud and identity theft; time and expenses related to monitoring their financial accounts for fraudulent activity; an increased, imminent risk of fraud and identity theft; and loss of value of their Customer Data.

239.    Brinker's violations present a continuing risk to Virginia Plaintiff and Virginia Class members as well as to the general public.

240.    Virginia Plaintiff and Virginia Class members seek all monetary and non-monetary relief allowed by law, including actual damages; statutory damages in the amount of $1,000 per

violation if the conduct is found to be willful or, in the alternative, $500 per violation; restitution, injunctive relief; and attorneys' fees and costs.

## COUNT X

### VIOLATION OF CALIFORNIA'S UNFAIR COMPETITION LAW
### CAL. BUS. & PROF. CODE §17200 – UNLAWFUL BUSINESS PRACTICES
### (ON BEHALF OF THE CALIFORNIA CLASS)

241.    Plaintiffs Daniel Summers and Christopher Lang ("California Plaintiffs"), individually and on behalf of the other California Class members, restates and realleges Paragraphs 1 through 135 as if fully set forth here.

242.    Brinker has violated Cal. Bus. and Prof. Code §17200 *et seq.* by engaging in unlawful, unfair or fraudulent business acts and practices and unfair, deceptive, untrue or misleading advertising that constitute acts of "unfair competition" as defined in Cal. Bus. Prof. Code §17200 with respect to the credit card payment services provided to the California Class.

243.    Brinker engaged in unlawful acts and practices with respect to the credit card payment services by establishing the sub-standard security practices and procedures described herein; by soliciting and collecting California Plaintiffs' and California Class Members' Private Information with knowledge that the information would not be adequately protected; and by storing California Plaintiffs' and California Class Members' Private Information in an unsecure electronic environment in violation of California's data breach statute, Cal. Civ. Code § 1798.81.5, which requires Brinker to take reasonable methods of safeguarding the Private Information of California Plaintiffs and the California Class Members.

244. By using their payment cards as methods of payment, which Brinker accepted, California Plaintiffs and California Class Members entrusted Brinker with their private Customer Data.

245. Brinker stored the PII and PCD of California Plaintiffs and California Class Members in Brinker's electronic and consumer information databases. Brinker knew or should have known they did not employ reasonable, industry standard, and appropriate security measures that complied "with federal regulations" and that would have kept the Customer Data of California Plaintiffs and California Class Members secure and prevented the loss or misuse of the Customer Data. Brinker did not disclose to California Plaintiffs and California Class Members that its data systems were not secure.

246. California Plaintiffs and California Class Members were entitled to assume, and did assume, Brinker would take appropriate measures to keep their Customer Data safe. Brinker did not disclose at any time that Customer Data was vulnerable to hackers because Brinker's data security measures were inadequate, and Brinker was the only one in possession of that material information, which they had a duty to disclose.

247. Brinker violated the UCL by misrepresenting, both by affirmative conduct and by omission, the safety of its many systems and services, specifically the security thereof, and its ability to safely store the Customer Data of California Plaintiffs and California Class Members. Brinker also violated the UCL by failing to implement reasonable and appropriate security measures or follow industry standards for data security, and by failing to immediately notify California Plaintiffs and California Class Members of the Data Breach. If Brinker had complied

with these legal requirements, California Plaintiffs and California Class Members would not have suffered the damages related to the Data Breach.

248.    In addition, Brinker engaged in unlawful acts and practices with respect to credit card payment services by failing to disclose the Data Breach to California Plaintiffs and California Class Members in a timely and accurate manner, contrary to the duties imposed by Cal. Civ. Code § 1798.82. To date, Brinker has still not provided such information to California Plaintiffs and the California Class Members.

249.    Furthermore, as alleged above, Brinker's failure to secure consumers' Customer Data violates the FTCA and therefore violates the UCL.

250.    Because Brinker accepted credit and debit cards as methods of payment, California Plaintiffs and California Class Members relied upon Brinker to advise customers if its POS and data systems were not secure and, thus, Customer Data could be compromised.

251.    California Plaintiffs and California Class Members were not afforded by Brinker equal or ample opportunity to make any inspection to determine Brinker's data security or to otherwise ascertain the truthfulness of Defendant's direct and indirect representations regarding data security, including Brinker's failure to alert customers that its POS and data systems were not secure and, thus, were vulnerable to attack.

252.    In deciding to use their payment cards for their purchases at Brinker, California Plaintiffs and California Class Members relied upon Brinker's direct and indirect representations regarding data security, including Brinker's failure to alert customers that its POS and data systems were not secure and, thus, were vulnerable to attack.

253.    Had Brinker disclosed to California Plaintiffs and California Class Members that its POS and data systems were not secure and, thus, vulnerable to attack, Plaintiffs and Class members would not have used their payment cards at Brinker, and very well may not have made purchases at all at Brinker stores.

254.    California Plaintiffs and California Class Members would not have given their Customer Data to Brinker if Brinker had disclosed the security issues.

255.    As a direct result of their reliance upon Brinker to be truthful in its disclosures and non-disclosures regarding the vulnerability of its POS and data systems, California Plaintiffs and California Class Members used their payment cards to make purchases at Brinker during the Data Breach period and their Customer Data was compromised causing California Plaintiffs and California Class Members to suffer damages.

256.    As a direct result of Brinker's refusal to disclose that its data systems were not secure, California Plaintiffs and California Class Members:

      a.   surrendered more in their transactions that they otherwise would have had;

      b.   entered into transactions costing money or property that they otherwise would not have entered;

      c.   had the value of their Customer Data diminished; and,

      d.   had their Customer Data compromised causing losses and damages, and thus were deprived of money and property

257.    As a direct and proximate result of Brinker's violation of the UCL, California Plaintiffs and California Class Members suffered damages including, but not limited to: diminution of their Customer Data, damages arising from the unauthorized charges on their debit

or credit cards or on cards that were fraudulently obtained through the use of the Customer Data of California Plaintiffs and California Class Members; damages arising from the' inability to use their debit or credit cards because those cards were cancelled, suspended, or otherwise rendered unusable as a result of the Data Breach and/or false or fraudulent charges stemming from the Data Breach, including but not limited to late fees charged and foregone cash back rewards; damages from lost time and effort to mitigate the actual and potential impact of the Data Breach on their lives including, inter alia, by placing "freezes" and "alerts" with credit reporting agencies, contacting their financial institutions, closing or modifying financial accounts, closely reviewing and monitoring their credit reports and accounts for unauthorized activity, and filing police reports and damages from identity theft, which may take months if not years to discover and detect, given the far-reaching, adverse and detrimental consequences of identity theft and loss of privacy. In addition, their PII was taken and is in the hands of those who will use it for their own advantage, or is being sold for value, making it clear that the hacked information is of tangible value. The nature of other forms of economic damage and injury may take years to detect, and the potential scope can only be assessed after a thorough investigation of the facts and events surrounding the theft mentioned above.

258.   As a direct and proximate result of Brinker's unlawful practices and acts, California Plaintiffs and the California Class Members were injured and lost money or property, including but not limited to the price received by Brinker for the credit card payment services, the loss of their legally protected interest in the confidentiality and privacy of their Private Information, and additional losses described above.

259.     Brinker knew or should have known that its computer systems and data security practices were inadequate to safeguard California Class Members' Private Information and that the risk of a data breach or theft was highly likely. Brinker's actions in engaging in the above-named unlawful practices and acts were negligent, knowing and willful, and/or wanton and reckless with respect to the rights of members of the California Class.

260.     California Class Members seek relief under Cal. Bus. & Prof. Code § 17200, et. seq., including, but not limited to, restitution to California Plaintiffs and California Class Members of money or property that Brinker may have acquired by means of its unlawful, and unfair business practices, restitutionary disgorgement of all profits accruing to Brinker because of its unlawful and unfair business practices, declaratory relief, attorney's fees and costs (pursuant to Cal. Code Civ. Proc. §1021.5), and injunctive or other equitable relief.

## COUNT XI

**VIOLATION OF CALIFORNIA'S UNFAIR COMPETITION LAW
CAL. BUS. & PROF. CODE §17200 – UNFAIR BUSINESS PRACTICES
(ON BEHALF OF THE CALIFORNIA CLASS)**

261.     Plaintiffs Daniel Summers and Christopher Lang ("California Plaintiffs"), individually and on behalf of the other California Class members, restates and realleges Paragraphs 1 through 13535 as if fully set forth here.

262.     Brinker engaged in unfair acts and practices with respect to the credit card payment services by establishing the sub-standard security practices and procedures described herein; by soliciting and collecting California Plaintiffs' and California Class Members' Private Information with knowledge that the information would not be adequately protected; and by storing California Plaintiffs' and California Class Members' Private Information in an unsecure

electronic environment. These unfair acts and practices were immoral, unethical, oppressive, unscrupulous, unconscionable, and/or substantially injurious to California Plaintiffs and California Class Members. They were likely to deceive the public into believing their Private Information was securely stored, when it was not. The harm these practices caused to California Plaintiffs and the California Class Members outweighed their utility, if any.

263.    Brinker engaged in unfair acts and practices with respect to the provision of credit card payment services by failing to take proper action following the Data Breach to enact adequate privacy and security measures and protect California Class Members' Private Information from further unauthorized disclosure, release, data breaches, and theft. These unfair acts and practices were immoral, unethical, oppressive, unscrupulous, unconscionable, and/or substantially injurious to California Plaintiffs and California Class Members. They were likely to deceive the public into believing their Private Information was securely stored, when it was not. The harm these practices caused to California Plaintiffs and the California Class Members outweighed their utility, if any.

264.    As a direct and proximate result of Brinker's acts of unfair practices and acts, California Plaintiffs and the California Class Members were injured and lost money or property, including but not limited to the price received by Brinker for the credit card payment services, the loss of their legally protected interest in the confidentiality and privacy of their Private Information, and additional losses described above.

265.    Defendants stored the PII of California Plaintiffs and the California Class Members in Brinker' electronic and consumer information databases. Brinker knew or should have known they did not employ reasonable, industry standard, and appropriate security measures

that complied "with federal regulations" and that would have kept California Plaintiffs' and the California Class Members' Customer Data secure and prevented the loss or misuse of the Customer Data of California Plaintiffs and the California Class Members. Brinker did not disclose to California Plaintiffs and the California Class Members that its data systems were not secure.

266.    California Plaintiffs and the California Class Members were entitled to assume, and did assume, Brinker would take appropriate measures to keep their Customer Data safe. Brinker did not disclose at any time that Customer Data was vulnerable to hackers because Brinker' data security measures were inadequate, and Brinker were the only ones in possession of that material information, which they had a duty to disclose.

267.    Brinker knew or should have known that its computer systems and data security practices were inadequate to safeguard California Class Members' Private Information and that the risk of a data breach or theft was highly likely. Brinker's actions in engaging in the above-named unlawful practices and acts were negligent, knowing and willful, and/or wanton and reckless with respect to the rights of members of the California Class.

268.    Because Brinker accepted credit and debit cards as methods of payment, California Plaintiffs and the California Class Members relied upon Brinker to advise customers if its POS and data systems were not secure and, thus, Customer Data could be compromised.

269.    California Plaintiffs and the California Class Members were not afforded by Brinker equal or ample opportunity to make any inspection to determine Brinker's data security or to otherwise ascertain the truthfulness of Defendants' direct and indirect representations regarding data security, including Brinker's failure to alert customers that its POS and data systems were not secure and, thus, were vulnerable to attack.

71

270.    In deciding to use their payment cards for their purchases at Brinker, California Plaintiffs and the California Class Members relied upon Brinker's direct and indirect representations regarding data security, including Brinker's failure to alert customers that its POS and data systems were not secure and, thus, were vulnerable to attack.

271.    Had Brinker disclosed to California Plaintiffs and the California Class Members that its POS and data systems were not secure and, thus, vulnerable to attack, California Plaintiffs and the California Class Members would not have used their payment cards at Brinker, and very well may not have made purchases at all at Brinker stores.

272.    As a direct result of their reliance upon Brinker to be truthful in its disclosures and non-disclosures regarding the vulnerability of its POS and data systems, California Plaintiffs and the California Class Members used their payment cards to make purchases at Brinker s during the Data Breach period and their Customer Data was compromised causing California Plaintiffs and the California Class Members to suffer damages.

273.    As a direct and proximate result of Brinker's violation of the UCL, California Plaintiffs and the California Class Members suffered damages including, but not limited to: damages arising from the unauthorized charges on their debit or credit cards or on cards that were fraudulently obtained through the use of the Customer Data of California Plaintiffs and the California Class Members; damages arising from their inability to use their debit or credit cards because those cards were cancelled, suspended, or otherwise rendered unusable as a result of the Data Breach and/or false or fraudulent charges stemming from the Data Breach, including but not limited to late fees charged and foregone cash back rewards; damages from lost time and effort to mitigate the actual and potential impact of the Data Breach on their lives including, inter alia, by

placing "freezes" and "alerts" with credit reporting agencies, contacting their financial institutions, closing or modifying financial accounts, closely reviewing and monitoring their credit reports and accounts for unauthorized activity, and filing police reports and damages from identity theft, which may take months if not years to discover and detect, given the far-reaching, adverse and detrimental consequences of identity theft and loss of privacy. The nature of other forms of economic damage and injury may take years to detect, and the potential scope can only be assessed after a thorough investigation of the facts and events surrounding the theft mentioned above.

274.     California Class Members seek relief under Cal. Bus. & Prof. Code § 17200, et. seq., including, but not limited to, restitution to California Plaintiffs and California Class Members of money or property that the Brinker may have acquired by means of its unfair business practices, restitutionary disgorgement of all profits accruing to Brinker because of its unfair business practices, declaratory relief, attorney's fees and costs (pursuant to Cal. Code Civ. Proc. §1021.5), and injunctive or other equitable relief.

<div align="center">

**COUNT XII**
**Violation of California's Unfair Competition Law**
**Cal. Bus. & Prof. Code §17200 – Fraudulent/Deceptive Business Practices**
**(On Behalf of the California Class)**

</div>

275.     Plaintiffs Daniel Summers and Christopher Lang ("California Plaintiffs"), individually and on behalf of the other California Class members, restates and realleges Paragraphs 1 through 135 as if fully set forth herein.

276.     Brinker engaged in fraudulent and deceptive acts and practices with regard to the credit card payment services provided to the California Class by representing and advertising that it would maintain adequate data privacy and security practices and procedures to safeguard

<div align="center">73</div>

California Class Members' Private Information from unauthorized disclosure, release, data breaches, and theft; and representing and advertising that it did and would comply with the requirements of relevant federal and state laws pertaining to the privacy and security of California Class Members' Private Information.  These representations were likely to deceive members of the public, including California Plaintiffs and the California Class Members, into believing their Private Information was securely stored, when it was not, and that Brinker was complying with relevant law, when it was not.

277.    Brinker engaged in fraudulent and deceptive acts and practices with regard to the credit card payment services provided to the California Class by omitting, suppressing, and concealing the material fact of the inadequacy of the privacy and security protections for California Class Members' Private Information. At the time that California Class members were using Brinker's credit card payment services, Brinker failed to disclose to California Class Members that its data security systems failed to meet legal and industry standards for the protection of their Private Information. California Plaintiffs would not have selected Brinker to provide credit card payment services if they had known about its substandard data security practices.  These representations were likely to deceive members of the public, including Plaintiff and the California Class Members, into believing their Private Information was securely stored, when it was not, and that Brinker was complying with relevant law and industry standards, when it was not.

278.    As a direct and proximate result of Brinker's deceptive practices and acts, California Plaintiffs and the California Class Members were injured and lost money or property, including but not limited to the price received by Brinker for the credit card payment services, the

loss of their legally protected interest in the confidentiality and privacy of their Private Information, and additional losses described above.

279.    Brinker knew or should have known that its computer systems and data security practices were inadequate to safeguard California Class Members' Private Information and that the risk of a data breach or theft was highly likely. Brinker's actions in engaging in the above-named unlawful practices and acts were negligent, knowing and willful, and/or wanton and reckless with respect to the rights of members of the California Class.

280.    California Class Members seek relief under Cal. Bus. & Prof. Code § 17200, et. seq., including, but not limited to, restitution to California Plaintiffs and California Class Members of money or property that the Brinker may have acquired by means of its fraudulent and deceptive business practices, restitutionary disgorgement of all profits accruing to Brinker because of its fraudulent and deceptive business practices, declaratory relief, attorney's fees and costs (pursuant to Cal. Code Civ. Proc. §1021.5), and injunctive or other equitable relief.

<div style="text-align:center">

**COUNT XII**
**Violation of Nevada's Consumer Fraud Act**
**Nevada Revised Statutes 41.600**
**(On Behalf of the Nevada Class)**

</div>

281.    Plaintiff Eric Steinmetz ("Nevada Plaintiff") individually and on behalf of the other Nevada Class members, restates and realleges Paragraphs 1 through 135 as if fully set forth herein.

282.    Chili's engaged in unfair and unlawful acts and practices by failing to maintain adequate procedures to avoid a data breach, and permitting access to consumer reports by data thieves, for whom Chili's had no reasonable grounds to believe would be used for a proper

purpose. Nevada Plaintiff and Nevada Class members relied on Chili's' implied promise of data security when providing their PII to Chili's to purchase Chili's' goods.

283.   Chili's' conduct violated NRS 598.0917(7) because it constituted a tender of "goods advertised for sale . . . or tendering terms of sale or lease less favorable than the terms advertised," i.e., goods offered for sale by credit card without the corresponding promise that a consumer's PII would be kept reasonably safe from harm.

284.   Chili's' violations of NRS 598.0917(7) constituted "consumer fraud" for purposes of NRS 41.600(2)(e).

285.   Chili's also breached its duty under NRS 603A.210, which requires any data collector "that maintains records which contain personal information" of Nevada residents to "implement and maintain reasonable security measures to protect those records from unauthorized access, acquisition, . . . use, modification or disclosure." Chili's did not take such reasonable security measures, as shown by a system-wide breach of payment processing systems.

286.   Chili's also breached its duty under NRS 603A.215, which requires any data collector doing business in Nevada who accept payment cards in connection with a sale of goods or services to "comply with the current version of the . . . PCI Security Standards Council . . . with respect to those transactions." On information and belief, Chili's failed to adhere to PCI standards, and was grossly negligent because the violation occurred in multiple stores across the United States.

287.   Chili's' violations of NRS 598.0923(3) constituted "consumer fraud" for purposes of NRS 41.600(2)(e).

288.     Additionally, NRS 598.0923(3) provides that a violation of any federal or Nevada law constitutes consumer fraud. Thus, Chili's violations of the FTC Act, NRS 598.0917(7), and NRS 603A violated NRS 598.0923(3).

289.     Chili's' violations of NRS 598.0923(3), NRS 598.0917(7), and NRS 603A in turn constituted "consumer fraud" for purposes of NRS 41.600(2)(e).

290.     Chili's engaged in an unfair practice by engaging in conduct that is contrary to public policy, unscrupulous, and caused injury to Nevada Plaintiff and Nevada Class members.

291.     As a direct and proximate result of the foregoing, Nevada Plaintiff and Nevada Class members have suffered injuries including, but not limited to actual damages, and in being denied a benefit conferred on them by the Nevada legislature.

292.     As a result of these violations, Nevada Plaintiff and Nevada Class members are entitled to an award of actual damages, equitable injunctive relief preventing Chili's to continue to violate the PCI DSS standards, as well as an award of reasonable attorney's fees and costs. Nevada Plaintiff and Nevada Class members also seek declaratory relief pursuant to 28 U.S.C. § 2201, specifically an order declaring that Chili's' data security procedures failed to meet the PCI DSS standards, which led to the exposure of the PII of Nevada Plaintiff and Nevada Class members in the Data Breach.

## REQUEST FOR RELIEF

**WHEREFORE**, Plaintiffs, individually and on behalf of all Class members proposed in this Complaint, respectfully request that the Court enter judgment in their favor and against Brinker as follows:

a.      For an Order certifying the Classes, as defined herein, and appointing Plaintiffs and their Counsel to represent the Nationwide Class, or in the alternative the separate Statewide Classes;

b.      For equitable relief enjoining Brinker from engaging in the wrongful conduct complained of herein pertaining to the misuse and/or disclosure of Plaintiffs' and Class members' Customer Data, and from refusing to issue prompt, complete and accurate disclosures to the Plaintiffs and Class members;

c.      For equitable relief compelling Brinker to use appropriate cyber security methods and policies with respect to consumer data collection, storage and protection and to disclose with specificity to Class members the type of Customer Data compromised;

d.      For an award of damages, including nominal damages, as allowed by law in an amount to be determined;

e.      For an award of attorneys' fees costs and litigation expenses, as allowable by law;

f.      For prejudgment interest on all amounts awarded; and

Such other and further relief as this court may deem just and proper.

## JURY TRIAL DEMAND

Plaintiff demands a jury trial on all issues so triable.

This Thursday, August 16, 2018.

*Attorneys for the Plaintiffs and
the Putative Class*

/s/ John A. Yanchunis
JOHN A. YANCHUNIS
Florida Bar No. 324681

jyanchunis@ForThePeople.com
PATRICK A. BARTHLE II
Florida Bar No. 99286
pbarthle@ForThePeople.com
**MORGAN & MORGAN**
**COMPLEX LITIGATION GROUP**
201 N. Franklin Street, 7th Floor
Tampa, Florida 33602
Telephone: (813) 223-5505
Facsimile: (813) 223-5402

JEAN SUTTON MARTIN
jean@jsmlawoffice.com
**LAW OFFICE OF JEAN SUTTON**
**MARTIN PLLC**
2018 Eastwood Road, Suite 225
Wilmington, North Carolina 28403
Tel:  (910) 292-6676
jean@jsmlawoffice.com

DAVID H. KRIEGER*
davidkrieger@hainesandkrieger.com
**HAINES & KRIEGER, LLC**
8985 S. Eastern Ave., Suite 350
Henderson, NV 89123

MATTHEW I. KNEPPER*
matthew.knepper@knepperclark.com
MILES N. CLARK*
miles.clark@knepperclark.com
**KNEPPER & CLARK LLC**
10040 W. Cheyenne Ave., Suite 170-109
Las Vegas, NV 89129

KEVIN S. HANNON*
khannon@hannonlaw.com
**THE HANNON LAW FIRM, LLC**
1641 Downing Street
Denver, CO 80218
Telephone: (303) 861-8800

JOSEPH G. SAUDER*
jgs@sstriallawyers.com
JOSEPH B. KENNEY

79

jbk@sstriallawyers.com
**SAUDER SCHELKOPF LLC**
555 Lancaster Avenue
Berwyn, Pennsylvania 19312
Telephone: 610.200.0580

*Pro Hac Vice to be submitted*

## CERTIFICATE OF SERVICE

I hereby certify that, I caused **PLAINTIFFS' FIRST AMENDED CLASS ACTION COMPLAINT**, to be served via the Court's CM/ECF system, which will automatically send notice of such filing to all attorneys of record.

This the 16th day of August, 2018

<div style="margin-left: 40%;">

Respectfully submitted,


_s/ John A. Yanchunis_
John A. Yanchunis
**MORGAN & MORGAN**
**COMPLEX LITIGATION GROUP**
201 North Franklin Street, 7th Floor
Tampa, Florida 33602
Tel:  (813) 223-5505
Fax:  (813) 223-5402
jyanchunis@forthepeople.com

</div>