**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**JACKSONVILLE DIVISION**

**In re: Brinker Data Incident Litigation**

**Case No.: 3:18-cv-00686-TJC-MCR**

_____ /

**DEFENDANT BRINKER INTERNATIONAL, INC.'S MOTION TO EXCLUDE**
**EXPERT OPINIONS AND TESTIMONY OF DANIEL J. KORCZYK AND**
**MEMORANDUM OF LAW IN SUPPORT**

# TABLE OF CONTENTS

I. Introduction ............................................................................................... 1

II. Legal Standards ....................................................................................... 5

III. Korczyk's Methodologies Are Flawed, Unreliable, and Unhelpful, and Accordingly
His Opinions Should be Excluded ........................................................................ 8

    A.  Value of Lost Rewards Points.........................................................10

    B.  Value of Stolen Payment Card Information....................................16

    C.  Value of Time ................................................................................20

    D.  Out-of-Pocket Damages.................................................................23

IV. Korczyk's Methodology Should Be Excluded Because It Does Not Provide the Court
with an Administratively Feasible Class-wide Model ......................................... 24

V. Conclusion ............................................................................................... 25

## <u>TABLE OF AUTHORITIES</u>

**Cases**                                                                                                    **Page(s)**

*Adkins v. Facebook, Inc.*,
   424 F. Supp. 3d 686 (N.D. Cal. 2019) ........................................................................17

*Bellwether Cmty. Credit Union v. Chipotle Mexican Grill, Inc.*,
   353 F. Supp. 3d 1070 (D. Colo. 2018) ........................................................................17

*Boca Raton Cmty. Hosp., Inc. v. Tenet Health Care Corp.*,
   582 F.3d 1227 (11th Cir. 2009) ....................................................................8, 11, 19

*Brown v. Electrolux Home Prods., Inc.*,
   817 F.3d 1225 (11th Cir. 2016) ....................................................................................24

*Burrows v. Purchasing Power, LLC*,
   No. 1:12-cv-22800-UU, 2012 WL 9391827 (S.D. Fla. Oct. 18, 2012) ......................17

*Chapman v. Proctor & Gamble Distrib., LLC*,
   766 F.3d 1296 (11th Cir. 2014) ..............................................................................7, 9

*Clarke v. Schofield*,
   632 F. Supp. 2d 1350 (M.D. Ga. 2009) ........................................................................7

*Clena Invs., Inc. v. XL Specialty Ins. Co.*,
   280 F.R.D. 643 (S.D. Fla. 2012) ....................................................................................6

*Comcast Corp. v. Behrend*,
   569 U.S. 27 (2013) ........................................................................................................24

*Cordoba v. DIRECTV, LLC*,
   942 F.3d 1259 (11th Cir. 2019) ..........................................................................13, 14

*Cordoves v. Miami-Dade Cnty.*,
   104 F. Supp. 3d 1350 (S.D. Fla. 2015) ..........................................................................6

*Daubert v. Merrell Down Pharm., Inc.*,
   509 U.S. 579 (1993) ..........................................................................2, 5, 7, 8, 9

*Gastaldi v. Sunvest Resort Cmtys., LC*,
   709 F. Supp. 2d 1299 (S.D. Fla. 2010) ..........................................................................7

*Grupo Televisa S.A. v. Telemundo Commc'ns Grp., Inc.*,
   No. 04-20073-CIV, 2005 WL 5955701 (S.D. Fla. Aug. 17, 2005) ......................7, 18

*Guillory v. Domtar Indus. Inc.*,
   95 F.3d 1320 (5th Cir. 1996) ........................................................................................8

*Guinn v. AstraZeneca Pharms. LP*,
  602 F.3d 1245 (11th Cir. 2010) ................................................................11

*Jordan v. Celebrity Cruises, Inc.*,
  No. 1:17-20773, 2018 WL 3584702 (S.D. Fla. July 25, 2018) ....................8

*Klay v. Humana, Inc.*,
  382 F.3d 1241 (11th Cir. 2004) ................................................................24

*Lebron v. Sec'y of Fla. Dep't of Child. & Fams.*,
  772 F.3d 1352 (11th Cir. 2014) ..................................................................6

*Lee-Bolton v. Koppers Inc.*,
  319 F.R.D. 346 (N.D. Fla. 2017) ................................................................5

*Leeward v. Cablevision of Marion Cnty., LLC*,
  No. 5:05-cv-303-Oc-10GRJ, 2006 WL 5163931 (M.D. Fla. Oct. 19,
  2006) ................................................................................7, 15, 19, 22, 24

*McClain v. Metabolife Int'l, Inc.*,
  401 F.3d 1233 ........................................................................................11

*Pierson v. Orlando Health*,
  No. 6:08-cv-466-Orl-28GJK, 2010 WL 3447496 (M.D. Fla. Aug. 30,
  2010) ...........................................................................7, 8, 15, 19, 22, 24

*Randolph v. J.M. Smucker Co.*,
  303 F.R.D. 679 (S.D. Fla. 2014)................................................................24

*Rink v. Cheminova, Inc.*,
  400 F.3d 1286 (11th Cir. 2005) ..............................................................5, 6

*Sher v. Raytheon Co.*,
  419 F. App'x 887 (11th Cir. 2011) ..............................................................5

*Sun Ins. Mktg. Network, Inc. v. AIG Life Ins. Co.*,
  254 F. Supp. 2d 1239 (M.D. Fla. 2003)......................................................6

*Webb v. Carnival Corp.*,
  321 F.R.D. 420 (S.D. Fla. 2017)................................................................6

**Rules and Statutes**

Fed. R. Evid. 702 ........................................................................................6, 7

Fed. R. Evid. 702(b) ................................................................................10, 11

Defendant Brinker International, Inc. ("Brinker") moves to exclude the opinions and testimony of Plaintiffs Shenika Theus' ("Theus"), Michael Franklin's ("Franklin"), and Eric Steinmetz's ("Steinmetz") (collective, "Plaintiffs") expert witness, Daniel J. Korczyk ("Korczyk"), and in support shows as follows:

## I.
## INTRODUCTION

Plaintiffs seek to certify two facially and impermissibly overbroad putative classes that include all people who used payment cards at any of approximately 900 different Chili's locations throughout March and April of 2018—regardless of whether any particular patron's card information was exposed to malware, exfiltrated from Brinker's data security system, posted for sale on the dark web, purchased on the dark web, or used to make fraudulent purchases. The myriad fatal defects plaguing these one-size-fits-all class definitions are detailed in Brinker's Opposition to Plaintiffs' Motion for Class Certification (the "Opposition") [Dtk. 141].[1]

In support of their Motion for Class Certification, Plaintiffs submitted the Declaration of Daniel J. Korczyk, a business valuation expert with *no experience* calculating damages on behalf of cardholders in data breach cases. In fact, Korczyk has never provided expert testimony in *any* class action case, much less a consumer class action involving a data incident (like this one).[2] His prior exposure to this particular field—which is tangential at best—is limited to having worked on a handful of expert reports authored

---

[1] Unless otherwise defined herein, all capitalized terms have that meaning ascribed to them in the Opposition.

[2] Ex. A-1, Korczyk Depo. at 52:1–3, 52:21–24.

by other people in data breach cases brought by non-consumers (e.g., banks).[3] None of that work had anything to do with the evaluation of economic damages ***on behalf of cardholders***.[4]

Despite his inexperience, Korczyk failed to conduct any meaningful research into how experts in the data breach field typically attempt to assess harm to cardholders. In reaching his opinions, Korczyk admitted he (i) did not study any treatises, (ii) relied on no peer-reviewed studies, and (iii) failed to read a single book or article explaining the economic principles typically applied in this context.[5] Worse yet, Korczyk admits that he made virtually ***no effort to learn the actual facts*** involved this case before developing his damages methodologies. He read no depositions, studied no interrogatories, interviewed no witnesses, and reviewed no motions on file with the Court.[6]

Armed with neither experience nor case-specific evidence, Korczyk crafted (seemingly from whole cloth) a four-pronged damages methodology that is unreliable, contradicted by the evidence, and woefully shy of meeting the exacting demands of *Daubert v. Merrell Down Pharm., Inc.*, 509 U.S. 579, 589 (1993) and its Eleventh Circuit progeny. His four "damages elements" include:

- **Value of Lost Reward Points**: Korczyk opines that ***every*** putative class member is entitled to $2.44 as compensation for the opportunity they lost to accrue credit card reward points while waiting on a replacement card after the Data Incident.[7] As detailed herein, several irredeemable fatal flaws exist in Korczyk's reward points

---

[3] Ex. A-1, Korczyk Depo. at 117:2–6.

[4] Ex. A-1, Korczyk Depo. at 117:7–12.

[5] Ex. A-1, Korczyk Depo. at 106:7–107:21, 108:15–25, 111:2–6, 176:13–22, 214:3–10.

[6] Ex. A-1, Korczyk Depo. at 14:4–7, 94:2–6, 98:9–12, 98:22–24, 99:3–18.

[7] Ex. A-2, Korczyk Dec. at ¶¶ 44–45.

methodology and render it unreliable as a basis to calculate uniform class-wide damages. To start, Korczyk ignores the fact that innumerable putative class members used payment cards that did not offer any sort of rewards program (e.g., two-thirds of the current Named Plaintiffs). Next, he ignores the fact that many of the putative class members did not cancel their cards after making a Chili's purchase in March or April 2018 (e.g., Franklin) such that there was never a time when they were without the card-at-issue. Further, Korczyk's defective methodology fails to account for wide variations in spending habits among the millions of putative class members. Finally, the entire premise of the calculations he performed to arrive at his "illustrative" $2.44 figure is wrong and does not "fit" with the damages being sought on behalf of the putative class because he focused on the cost of reward programs *to the card issuing company* (who is not a plaintiff) instead of the alleged diminution in value *to the cardholder* (who is a plaintiff).

- **Value of Stolen Payment Card Information**: Korczyk opines that *every* putative class member is entitled to $12 in damages, which he says represents "the median price for stolen payment card information" listed for sale on the dark web.[8] The data underlying this figure comes from five internet articles he found on Google. Korczyk admits that he "didn't vet [the Googled] information that carefully" and that, as a result, the median he calculated turned out to be wrong.[9] The inherent lack of reliability of just Googling stuff notwithstanding, Korczyk's methodology underpinning this particular damages element is further flawed and unreliable as a means to calculate uniform class-wide damages because (i) it focuses solely on the price at which *a third party criminal* would be willing to sell the card data rather than on the alleged diminution in value of the data *to the cardholder-plaintiff*; and (ii) courts have consistently held that damages for purported diminution in the value of payment card data are not recoverable as a matter of law. Finally, Korczyk's methodology should also be stricken because it fails to account for the fact that at least some (and likely many) putative class members' cards were already in the public domain prior to the Brinker Data Incident due to other, unrelated data breaches (e.g., Franklin's payment card information).

- **Lost Value of Cardholder Time**: Korczyk would also award *every* putative class member $25 for each hour that person spent dealing with the alleged fallout from the Data Incident.[10] According to Korczyk, he used a "standardized" per-hour rate applicable to all putative class members because the tasks required are "administrative" in nature, and $25 per hour is what it costs to employ a full-time administrative assistant. This methodology is unreliable as a measure of uniform class-wide damages because it ignores bedrock economic principles underlying

---

[8] Ex. A-2, Korczyk Dec. at ¶ 24.

[9] Ex. A-1, Korczyk Depo. at 144:11–145:4.

[10] Ex. A-2, Korczyk Dec. at ¶¶ 38–39.

how to calculate the lost opportunity cost of time, which necessarily turns not on the nature of the task-at-hand but on the amount of money each individual putative class member could have been earning in his or her profession if he or she was not dealing with the Data Incident. Korczyk violates this principle by purporting to compensate high-wage-earning putative class members (e.g., brain surgeons) and low- or even non-wage-earning putative class members (e.g., unemployed high school students) *at the same rate*.

- **<u>Out-of-Pocket Expenses</u>**: Lastly, Korczyk postulates that *any* putative class member who "avers" that he or she incurred *any* unreimbursed costs as a result of the Data Incident should automatically receive a flat $38 payment. Korczyk concedes that he did not calculate that figure but rather simply saw it cited in a study he found on the internet regarding the "average" amount of out-of-pocket expenses incurred by cardholders affected by data breaches (never mind that this same study indicates that *81% of all respondents reported no out of pocket costs*, reinforcing the unreliability of Korczyk's methodology to calculate uniform class-wide damages). Korczyk's methodology is further flawed because awarding $38 to everyone with out-of-pocket expenses necessarily results in a systematic over- and under-assignment of alleged damages to putative class members. Indeed, Korczyk admits that it would result in a windfall to any putative class member who incurred between $0.01 and $37.99 in out-of-pocket expenses.[11]

This litany of fatal flaws aside, Korczyk's opinions and testimony should also be excluded because his methodologies do not accomplish the requisite purpose of class action damages models—which is to provide the Court with an administratively feasible and reliable way to calculate and award uniform damages on a class-wide basis. Indeed, Korczyk admits that, for at least two of the damages elements, the nature of the alleged injury is so inherently individualistic it would require scores of putative class members to—in some unspecified way and at some unspecified time—submit individualized proof

---

[11] Notably, Korczyk has also conceded that *none* of the numerical figures used in his Declaration (including the ones discussed above) should be considered *definitive* or *reliable*. Ex. A-1, Korczyk Depo. at 132:5–21, 136:12–18, 138:19–139:18, 145:9–22, 147:8–19, 175:2–176:12, 195:12–20, 203:5–11, 217:7–11, 222:2–8. According to Korczyk, they are, instead, "just examples" intended to help him describe how his methodology would work if were ever asked to calculate damages. Ex. A-1, Korczyk Depo. at 132:22–134:4, 136:12–18, 138:19–139:18, 147:8–19, 175:2–176:12, 203:5–11, 217:7–11, 222:2–8. Brinker has, nonetheless, used in this Motion the admittedly unreliable figures that appear in his Declaration, since that is all he has provided.

of their particular circumstances. He further admits that Brinker necessarily would be entitled to test the veracity of those submissions, but he offers no information about how, where, or when that could occur.

For these and other reasons detailed below, Korczyk's opinions are neither relevant nor reliable and, accordingly, the Court should exclude all of Korczyk's opinions and testimony as a matter of law pursuant to Rule 702 of the Federal Rules of Civil Evidence.[12]

## II.
## LEGAL STANDARDS

When, as here, an expert's opinions are relevant to any of the requirements for class certification, the Court must conduct a *Daubert* analysis and conclusively rule on any challenges to expert opinions before determining whether to certify the class. *Sher v. Raytheon Co.*, 419 F. App'x 887, 890–91 (11th Cir. 2011); *Lee-Bolton v. Koppers Inc.*, 319 F.R.D. 346, 370 (N.D. Fla. 2017).

Under *Daubert*, the Court is charged with acting as a "gatekeeper" and admitting expert testimony only when it is both relevant and reliable. *Daubert*, 509 U.S. at 589. Plaintiffs bear the burden of establishing the admissibility of Korczyk's opinions by a preponderance of the evidence. *Rink v. Cheminova, Inc.*, 400 F.3d 1286, 1292 (11th Cir. 2005). Specifically, Plaintiffs must show that (1) Korczyk is qualified to testify on the matters that are the subject of his opinions, (2) the methodologies by which he reached his conclusions are sufficiently reliable, (3) and his testimony will assist the trier of fact in

---

[12] To assist the Court in evaluating the merits of this Motion (and the flaws in Mr. Korczyk's opinions), Brinker has attached the Declaration of Dr. Bruce Strombom—a nationally renowned economist with extensive experience evaluating the impact of data breaches on various stakeholders and classes and in assessing the validity of various damages methodologies in data breach cases. *See* Ex. B.

understanding the evidence or determining a fact in issue through the application of scientific, technical, or specialized expertise. *Id.* at 1291–92.

*Qualifications.* A witness qualifies as an expert witness by virtue of his "knowledge, skill, experience, training, or education." FED. R. EVID. 702. In determining whether an expert witness is qualified, a district court must "examine the credentials of the proposed expert in light of the subject matter of the proposed testimony." *Webb v. Carnival Corp.*, 321 F.R.D. 420, 427 (S.D. Fla. 2017) (quoting *Clena Invs., Inc. v. XL Specialty Ins. Co.*, 280 F.R.D. 643, 661 (S.D. Fla. 2012)). This is necessary because "[e]xpertise in one field does not qualify a witness to testify about others." *Lebron v. Sec'y of Fla. Dep't of Child. & Fams.*, 772 F.3d 1352, 1368 (11th Cir. 2014). "In other words, expert testimony regarding matters outside the witness's expertise is inadmissible, even if the expert is qualified to testify about other matters." *Cordoves v. Miami-Dade Cnty.*, 104 F. Supp. 3d 1350, 1358 (S.D. Fla. 2015); *see also Sun Ins. Mktg. Network, Inc. v. AIG Life Ins. Co.*, 254 F. Supp. 2d 1239, 1245 (M.D. Fla. 2003) (excluding expert who had experience valuing insurance companies but not the specific type of insurance company he was designated to evaluate, and he did not conduct any research or analysis of the long-term care market for the specific case but instead "only read some articles his staff pulled from the internet and [did] not know what searches his staff performed to come up with those particular articles").

*Reliability.* Expert testimony is only reliable if it is based on sufficient facts or data, is the product of reliable principles and methods, and the expert witness reliably applied those principles and methods to the facts of the case. FED. R. EVID. 702. An expert's

opinion "must be supported by appropriate validation—*i.e.,* 'good grounds,' based on what is known." *Daubert*, 509 U.S. at 590; *see also Clarke v. Schofield*, 632 F. Supp. 2d 1350, 1360 (M.D. Ga. 2009) (before admitting an expert opinion, the court must find that the expert "uses a valid methodology based on reliable data to reach his opinions"). In determining whether a methodology is reliable, courts consider whether the methodology can be and has been tested; whether the methodology has been subjected to peer review and publication; the known or potential rate of error and the existence and maintenance of standards controlling operation of the methodology; and whether the methodology has gained general acceptance in the relevant field. *See Chapman v. Proctor & Gamble Distrib., LLC*, 766 F.3d 1296, 1305 (11th Cir. 2014); *Gastaldi v. Sunvest Resort Cmtys., LC*, 709 F. Supp. 2d 1299, 1303 (S.D. Fla. 2010); *see also Grupo Televisa S.A. v. Telemundo Commc'ns Grp., Inc.*, No. 04-20073-CIV, 2005 WL 5955701, at *4–5 (S.D. Fla. Aug. 17, 2005) (excluding expert opinion on methodology for calculating damages that had not been used in any other case and had not been reviewed by any other expert, and the expert witness could not explain the reliability of the data used in the methodology derived from a website, nor could he explain the margin of error to be expected in the methodology). When a methodology fails to account for important facts and data bearing directly on the subject of the expert opinion, the opinion is unreliable. *Pierson v. Orlando Health*, No. 6:08-cv-466-Orl-28GJK, 2010 WL 3447496, at *3 (M.D. Fla. Aug. 30, 2010); *Leeward v. Cablevision of Marion Cnty., LLC*, No. 5:05-cv-303-Oc-10GRJ, 2006 WL 5163931, at *2–3 (M.D. Fla. Oct. 19, 2006).

   ***Helpfulness.*** The helpfulness inquiry "goes primarily to relevance." *Daubert*, 509

U.S. at 590. The party proffering the expert must show that the opinions are "relevant to the task at hand and logically advance[ ] a material aspect of its case." *Boca Raton Cmty. Hosp., Inc. v. Tenet Health Care Corp.*, 582 F.3d 1227, 1232 (11th Cir. 2009) (internal quotations omitted). Although the basic standard of relevance is liberal, an expert opinion that does not have a valid connection to the relevant inquiry is inadmissible because there is no "fit." *Id.* Expert opinions should be excluded as unhelpful "because they are contradicted by the underlying record and '[e]xpert evidence based on a fictitious set of facts is just as unreliable as evidence based on no research at all.'" *Jordan v. Celebrity Cruises, Inc.*, No. 1:17-20773, 2018 WL 3584702, at *8 (S.D. Fla. July 25, 2018) (quoting *Guillory v. Domtar Indus. Inc.*, 95 F.3d 1320, 1331 (5th Cir. 1996)). If an opinion is unreliable, it is necessarily unhelpful. *Pierson*, 2010 WL 3447496, at *5.

### III.
### KORCZYK'S METHODOLOGIES ARE FLAWED, UNRELIABLE, AND UNHELPFUL, AND ACCORDINGLY HIS OPINIONS SHOULD BE EXCLUDED

As previewed above, Korczyk sets forth methodologies for calculating four "damages elements": (a) the value of any lost opportunity to accrue reward points; (b) the value of stolen payment card data; (c) the value of cardholder time; and (d) out-of-pocket damages.[13] The first three damages elements are, according to Korczyk, applicable to ***all*** putative class members, defined to include anyone who made a purchase at a Chili's restaurant in March or April 2018.[14] The fourth, out-of-pocket damages, would be available

---

[13] Ex. A-2, Korczyk Dec. at ¶ 18.

[14] Ex. A-1, Korczyk Depo. at 126:12–24.

to anyone who "avers" that he or she incurred out-of-pocket expenses.[15]

As shown below, **Korczyk's "methodologies" are really no methodologies at all**. They are largely (and impermissibly) predicated on his review of random, unverified, non-peer reviewed internet articles that his staff located for him through basic Google searches.[16] For each damages element, he then took the numbers he read in these internet articles (e.g., articles about the price at which payment cards were sold on the dark web) and, **without doing anything to verify their reliability**, used them to calculate the "illustrative" damages figures that appear in his Declaration.[17] Given this haphazard approach, it is perhaps not surprising that Korczyk was forced to concede that **none** of the numbers or figures contained in his Declaration are accurate, reliable, or even necessarily representative of the damages numbers he may later proffer if this case proceeds past the certification stage.[18]/[19]

The numerous fatal defects inherent in each aspect of Korczyk's methodology are discussed below.

---

[15] Ex. A-2, Korczyk Dec. at ¶ 47.

[16] Ex. A-1, Korczyk Depo. at 104:25–105:11, 107:19–21.

[17] Ex. A-1, Korczyk Depo. at 132:5–134:4, 136:12–18, 138:19–139:18, 145:9–22, 147:8–19, 175:2–176:12, 195:12–20, 203:5–11, 217:7–11, 222:2–8.

[18] Ex. A-1, Korczyk Depo. at 134:13–25, 136:12–18, 138:8–18, 139:8–18, 145:18–22, 147:8–19, 175:2–176:12, 195:12–20, 201:25–203:11, 203:23–204:3.

[19] Notably, Korczyk's methodologies fail to satisfy **any** of the four *Daubert* factors adopted by the Eleventh Circuit for purposes of assessing their reliability. Indeed, (i) none of Korczyk's methodologies have been tested or are capable of being tested; (2) none of his methodologies have been subjected to peer review and publication; (3) there is no known or potential error rate for any of his methodologies; and (4) none of his methodologies have been generally accepted in the relevant community of economists. *See Daubert*, 509 U.S. at 593–94; *Chapman*, 766 F.3d. at 1305.

A.    <u>**Value of Lost Rewards Points**</u>

Korczyk opines that every putative class member is entitled to recover $2.44 as compensation for the lost opportunity to accrue reward points during the time period between when the putative class member cancelled his/her card and a replacement card arrived in the mail.[20] His methodology works like this:

- <u>Step 1</u>: He starts with the proposition that "each reward card costs a card issuing company an annual average of $167," which equates to approximately $0.45 per day.

- <u>Step 2</u>: Based on his review of an internet website (WalletHub), he determines that "a standard timeframe to receive a replacement card is about 7 days."

- <u>Step 3</u>: He multiplies the per-day cost of a reward card to the card issuing company ($0.45) by the seven days it takes a replacement card to arrive in the mail to get to a total of $3.21.

- <u>Step 4</u>: He then multiplies the $3.21 figure by 76% because a different website (creditcards.com) said that approximately 76% of Americans own a rewards card. This yields a $2.44 figure.

- <u>Step 5</u>: He then concludes that every class member is "entitled to recover $2.44 as compensation for the lost reward points," ***regardless of whether the class member's own payment card offered any type of rewards***.[21]

No aspect of this methodology is reliable, and it suffers from at least six fatal flaws.

First, the opinion is not based on sufficient facts or data. *See* FED. R. EVID. 702(b). Here, Korczyk has taken the data underlying each step in his methodology from ***random internet websites***. He has done nothing to verify the reliability of the data reflected on the varying websites, nor was he even careful when interpreting the data. For example, he did not actually calculate the true "average" amount of time it takes a replacement card to arrive

---

[20] Ex. A-2, Korczyk Dec. at ¶¶ 40–45.

[21] Ex. A-1, Korczyk Depo. at 205:16–21; Ex. A-2, Korczyk Dec. at ¶¶ 44–45.

in the mail (according to the unverified, anecdotal data on WalletHub.com); rather, he just glanced at the chart listed on the website and picked a seven-day figure because he thought that was "close enough."[22] When, as here, an expert opinion is not based on sufficiently reliable data, the opinion necessarily fails. FED. R. EVID. 702(b); *see McClain v. Metabolife Int'l, Inc.*, 401 F.3d 1233, 1250 (excluding an expert opinion based on unreliable, "[u]ncontrolled anecdotal information").

Second, Korczyk's entire analysis is premised upon the daily cost of administering reward cards **to the card issuers**.[23] Yet the card issuers are not the plaintiffs in this case, and the rewards-related expenses card issuers incur are irrelevant to any method for calculating class-wide monetary damages allegedly sustained by the **cardholders**.[24] This logical disconnect renders Korczyk's opinion regarding the loss of opportunity to accrue rewards points damages element inadmissible. *See Guinn v. AstraZeneca Pharms. LP*, 602 F.3d 1245, 1255 (11th Cir. 2010) (upholding exclusion of an expert opinion "not logically supported by the facts of [the] case"); *Boca Raton Cmty. Hosp., Inc.*, 582 F.3d at 1232 (excluding an expert opinion regarding damages when the methodology did not measure the damages actually recoverable).

Third, **despite acknowledging that at least 24% of Americans do not own a cash-back or rewards card**, Korczyk nonetheless opines that "every single class member" is entitled to receive the same amount of damages for lost reward points.[25] He acknowledges

---

[22] Ex. A-1, Korczyk Depo. at 203:23–204:3.

[23] Ex. A-2, Korczyk Dec. at ¶ 40.

[24] *See* Ex. B, Strombom Dec. at ¶ 44.

[25] Ex. A-1, Korczyk Depo. at 204:10–16, 205:16–206:5.

that his novel approach necessarily means that class members whose cards were not enrolled in any cash-back or reward programs will be receiving damages for a type of harm they did not suffer.[26] In the face of this damning, dispositive admission, Korczyk remarkably suggests that class-wide damages on this element are still appropriate simply because he believes that "the vast majority of cards that are out there are reward cards."[27] Korczyk's belief in this regard, however, is belied by the actual evidence adduced in this case. Indeed, neither Franklin's nor Steinmetz's payment cards were attached to any sort of rewards or cash-back programs.[28] The same is likewise true for several of the former named Plaintiffs whose putative claims have been dismissed by the Court, including former Plaintiffs Christopher Lang ("Lang"), Peter Alamillo ("Alamillo"), and Daniel Summers ("Summers")—none of whom used a rewards card to make their purchases-at-issue at Chili's.[29] As such, using Korczyk's methodology, two of the three Named Plaintiffs and at least three former named Plaintiffs (all of whom fall within Plaintiffs' putative classes, as defined)—and every other similarly-situated putative class member—would receive a damages windfall for "lost" reward points that they never could have used their cards to earn in the first place. This violates the Eleventh Circuit's well-established prohibition against certifying a class when the damages model would result in uninjured class members receiving compensation. *Cordoba v. DIRECTV, LLC*, 942 F.3d 1259, 1273–74 (11th Cir.

---

[26] Ex. A-1, Korczyk Depo. at 206:11–208:14; *see also* Ex. B, Strombom Dec. at ¶¶ 36, 40.

[27] Ex. A-1, Korczyk Depo. at 208:4–6.

[28] Ex. A-3, Franklin Depo. pt. 2 at 27:9–28:5; Ex. A-4, Steinmetz Depo. at 168:8–17.

[29] Ex. A-5, Lang Response to Brinker's Interrogatory No. 13; Ex. A-6, Alamillo Response to Brinker's Interrogatory No. 13; Ex. A-7, Summers Response to Brinker's Interrogatory No. 13.

2019) (affirming denial of class certification when uninjured class members would be compensated).

Fourth, Korczyk's analysis wrongfully assumes that every putative class member actually cancelled his or her payment card after the Data Incident (otherwise there would be no seven-day period when that person was without his or her card).[30] This flawed assumption is directly contradicted by the evidence in this case. Indeed, Franklin has admitted that he did not cancel his debit card after the Data Incident:

> Q:   Mr. Franklin, I'm just going to ask this as an open-ended question: Following the 2018 data incident, did you cancel your debit card ending in 1605?
>
> A:   No, I didn't.
>
> Q:   You confirmed, sir, that at your prior – at your prior deposition that, in fact, you're still using your debit card ending in 1605 to this day, correct, sir?
>
> A:   Correct.[31]

And the Ponemon Institute study that Korczyk relies upon throughout his Declaration suggests that approximately 32% of people who receive a data breach notification simply ignore it, which means that Franklin is certainly not the only putative class member who did not cancel his card after the Data Incident.[32] Thus, in addition to overcompensating all putative class members whose payment cards did not offer rewards, Korczyk's reward points methodology likewise provides a windfall to every putative class member who did

---

[30] Ex. A-1, Korczyk Depo. at 208:21–209:2, 210:20–25; *see also* Ex. B, Strombom Dec. at ¶¶ 36, 39,

[31] Ex. A-3, Franklin Depo. pt. 2 at 20:16–25.

[32] Ex. A-8, The Aftermath of a Data Breach: Consumer Sentiment, Ponemon Institute LLC, at p. 5; *see also* Ex. B, Strombom Dec. at ¶ 39.

not cancel his/her card following the Data Incident.[33] This, again, renders Korczyk's opinion unreliable and illustrates why a class cannot be certified based upon his damages methodology. *See Cordoba*, 942 F.3d at 1273–74.

Fifth, Korczyk's opinion fails to account for differences in the types of reward programs available in the marketplace.[34]  For example, Theus—the only current Named Plaintiff whose card was connected to a rewards program—used a payment card with a rewards program where the only benefit was to receive cash back for purchases made at Walmart and Murphy USA gas stations.[35] Theus' limited payment card rewards program differs materially, as an example, from the payment card rewards program offered by American Express, which includes at least one point per dollar spent on almost all purchases, as well as extra points for certain purchases.[36] A putative class member whose payment card was associated with extremely limited rewards opportunities (e.g., Theus) may have accrued, at most, very few rewards points if he or she made the purchases necessary to accrue those points—an inquiry which would necessarily require individualized proof.[37] Meanwhile, a putative class member with, for example, an American Express card, may have been subject to fewer restrictions (per the terms and conditions of the card) and accordingly able to accrue many more rewards points.[38]

---

[33] *See* Ex. B, Strombom Dec. at ¶¶ 36, 39.

[34] Ex. A-1, Korczyk Depo. at 214:24–215:12; *see also* Ex. B, Strombom Dec. at ¶¶ 36, 41–44.

[35] Ex. A-9, Theus000052 at Theus000059.

[36] Ex. A-10, Terms and Conditions for American Express Rewards Program.

[37] *See* Ex. B, Strombom Dec. at ¶ 43.

[38] *See* Ex. B, Strombom Dec. at ¶ 43.

Korczyk's analysis disregards these critical differences among putative class members and the varying terms and conditions associated with the numerous reward point cards available in the marketplace. *See Pierson*, 2010 WL 3447496, at *3 (excluding expert conclusions reached by a methodology that failed to consider important facts and data "directly bearing" on the damages claim that was the subject of the conclusions); *Leeward*, 2006 WL 5163931, at *2–3 (excluding an expert opinion when the methodology "either ignored or intentionally excluded" relevant facts and data).

Sixth, Korczyk ignores the fact that there would be wide variation in the spending habits amongst the scores of putative class members, which impacts the number, method of calculating, and value of any reward points they may have foregone while waiting for their replacement cards.[39] Whereas high spenders ostensibly would have lost more points (again depending on the terms and conditions of their respective cards), low spenders theoretically would have lost fewer points. Korczyk's attempt to jam these vastly differently-situated putative class members into a single uniform class-wide damages methodology renders his opinion unreliable, irrelevant and inadmissible. *See Pierson*, 2010 WL 3447496, at *3 (excluding expert conclusions reached by methodology that failed to consider important facts and data "directly bearing" on the damages claim that was the subject of the conclusions); *Leeward*, 2006 WL 5163931, at *2–3 (excluding expert opinion when methodology "either ignored or intentionally excluded" relevant facts and data).

---

[39] *See* Ex. B, Strombom Dec. at ¶ 40.

In light of these fatal flaws, it should come as no surprise that Korczyk could not identify a single study, book, treatise, or other peer-reviewed authority that approved of the novel "methodology" he proffered for calculating the value of lost reward points.[40]  Brinker likewise is not aware of a single court in the country that has approved of this approach. For all these reasons, the Court should strike Korczyk's opinions regarding reward points as unreliable and unhelpful under Rule 702.

**B.**    **Value of Stolen Payment Card Information**

Korczyk opines that all putative class members are entitled to $12 to compensate them for the lost value of the information that appears on the face of their payment cards.[41] Korczyk arrived at that $12 figure by reading five different internet articles (located through Google searches) that listed the prices at which certain cardholder data was listed for sale on the dark web.[42] Without doing anything to verify the information reflected in the internet articles, Korczyk then purported to calculate the "median" of the sales prices listed in those five articles.[43] This approach suffers from at least four fatal methodological flaws that render it unreliable and inadmissible.

First, Korczyk's "market based" approach focuses on the value of the information to ***the third party criminals—not to the actual payment cardholder*** seeking damages for the lost information.[44] As Korczyk readily admits, no cardholder would actually sell his or

---

[40] Ex. A-1, Korczyk Depo. at 214:3–10.

[41] Ex. A-2, Korczyk Dec. at ¶¶ 22–24.

[42] Ex. A-2, Korczyk Dec. at ¶¶ 22–24; Ex. A-1, Korczyk Depo. at 146:11–15. Notably, none of those articles appear to relate to cardholder data obtained through the Brinker Data Incident.

[43] Ex. A-1, Korczyk Depo. at 139:2–18.

[44] *See* Ex. B, Strombom Dec. at ¶ 27.

her payment card information unless under duress, and the market approach does not look at parties buying or selling something under duress.[45] In light of this reality, it should come as no surprise that courts have held, as a matter of law, that cardholder information has no independent value. *See, e.g.*, *Bellwether Cmty. Credit Union v. Chipotle Mexican Grill, Inc.*, 353 F. Supp. 3d 1070, 1087 (D. Colo. 2018) (holding that, while the numbers and information on a payment card may provide access to funds, "payment card data has no independent economic value."); *see also Burrows v. Purchasing Power, LLC*, No. 1:12-cv-22800-UU, 2012 WL 9391827, at \*3 (S.D. Fla. Oct. 18, 2012) ("Personal data does not have an apparent monetary value . . . ."); *Adkins v. Facebook, Inc.*, 424 F. Supp. 3d 686, 697 (N.D. Cal. 2019) (denying certification of a Rule 23(b)(3) class when damages were sought for diminution in value of personal information and loss of privacy because the calculation of such damages was "too speculative"). Consistent with these holdings, Korczyk admits he cannot identify any economic or industry-based authorities sanctioning his novel methodology for calculating the value of payment card information or any courts that have ever approved it.[46] To be sure, Brinker conducted a comprehensive review of data breach cases and has not come across any opinion approving this type of analysis. This is, therefore, simply not a valid methodology to calculate uniform class-wide damages.

Second, the methodology Korczyk used to calculate this measure of damages is patently unreliable. Indeed, Korczyk merely takes information from random internet articles that his team found through Google searches regarding the "average" sales price of

---

[45] Ex. A-1, Korczyk Depo. at 146:4–10, 152:7–11; *see also* Ex. B, Strombom Dec. at ¶ 27.

[46] Ex. A-1, Korczyk Depo. at 152:22–153:25.

card information on the dark web without doing anything to validate or verify the reliability of the data or articles.[47] Korczyk's "Google some key words and blindly rely on the results returned" approach is so unreliable that he accidentally counted the same data twice (because there were two articles written about the same dataset), which skewed his median upward.[48] Pressed on this, Korczyk testified that the numbers he used in his Declaration were never intended to be reliable but were, instead, just examples of how he would calculate cardholder value if he were to do a more fulsome analysis.[49] Regardless of whether Korczyk might do a more careful analysis in the future, pulling data from random, unverified internet articles to calculate the supposed "median" price for payment card information on the dark web is not a reliable way to calculate the alleged value of payment card information on a class-wide basis, even if such damages were legally cognizable (which they are not). *See Grupo Televisa*, 2005 WL 5955701, at *4–5 (excluding an expert opinion using data from a website when the expert could not establish the reliability of that website or whether that website was relied upon by other experts in the same industry, nor could he explain why he used that website instead of another one).[50]

Third, Korczyk's methodology for calculating these alleged damages is likewise unreliable because it fails to account for significant variations among putative class

---

[47] Ex. A-1, Korczyk Depo. at 104:25–105:11, 107:19–21.

[48] Ex. A-2, Korczyk Dec. at ¶ 22; Ex. A-1, Korczyk Depo. at 142:7–144:22; Ex. A-11, "Wawa Breach: A Hacker is Selling 30 Million Stolen Credit Cards on the Dark Web, Cyber Experts Say", Fortune Magazine (Exhibit 5 to Korczyk's Deposition); Ex. A-12, "Over 30 Million Stolen Credit Card Records Being Sold on the Dark Web", Trend Micro (Exhibit 6 to Korczyk's Deposition); *see also* Ex. B, Strombom Dec. at ¶ 29.

[49] Ex. A-1, Korczyk Depo. at 139:8–18, 144:20–145:22, 147:8–19.

[50] *See also* Ex. B, Strombom Dec. at ¶ 29.

members and how those variations would affect recovery under this damages element. Among others, these would include highly individualized inquiries to determine if a putative class member's card (a) was used at Chili's but not exfiltrated (either because it was not used at a Chili's location while the malware was affecting that location or because the malware did not exfiltrate the card), (b) was exfiltrated but never sold, and (c) was already in the public domain (like Franklin's).[51] Korczyk's failure to consider these material facts is yet another reason why his opinions must be excluded. *See Pierson*, 2010 WL 3447496, at *3; *Leeward*, 2006 WL 5163931, at *2–3.

Fourth, Korczyk's flawed methodology does not fit with any of the damages sought by the putative class. Nowhere in Plaintiffs' Third Amended Complaint do Plaintiffs purport to seek damages in an amount equal to the price at which their payment card data may have been sold on the dark web. The only damages sought in connection with the value of payment card data are losses related to the alleged diminution in value of payment card information.[52] Korczyk unequivocally testified he is ***not*** opining on how to calculate damages in the form of diminution in value of cardholder information.[53] Thus, Korczyk's opinion and methodology on how to calculate lost value of payment card information does not "fit" with the case and should be excluded. *See Boca Raton Cmty. Hosp.*, 582 F.3d at 1232 (excluding an expert opinion regarding damages when the methodology did not measure the damages actually recoverable).

---

[51] *See* Ex. B, Strombom Dec. at ¶ 29.

[52] Third Amended Complaint [Dkt. No. 95] at ¶¶ 9(i), 48, 133(i), 163, 241(c).

[53] Ex. A-1, Korczyk Depo. at 158:6–13.

For all these reasons, Korczyk's opinions related to lost value of payment card information should be excluded.

**C.**   **Value of Time**

Korczyk opines that every putative class member is entitled to recover approximately $25 for each hour he or she spent dealing with the fallout from the Data Incident.[54] Korczyk arrived at that figure by calculating the "average" per-hour salary (inclusive of benefits) for an administrative assistant.[55] According to Korczyk, "what administrative assistants make in the way of a salary is a good proxy for the amount that should be used to compensate these individuals for doing administrative type work to resolve your data breach problems."[56]

The core problem with this opinion is that, once again, Korczyk's "market-based" methodology fails to approach the issue through the lens of the person seeking to recover damages—i.e., the cardholder-plaintiff.[57] As Korczyk acknowledges, "the vast, vast majority of individuals who get caught up in a data breach do not go out in the real world and hire administrative assistants solely to deal with the fallout from the data breach."[58] Indeed, Korczyk cannot identify "any person in the history of the United States who has

---

[54] Ex. A-2, Korczyk Dec. at ¶¶ 32–39. Notably, in his Declaration, Mr. Korczyk indicated that a putative class member would need to self-report the number of hours he or she spent dealing with the Data Incident. *See id.* at ¶ 39. At his deposition, however, he indicated that "every single class member" would be entitled to damages for lost time. Ex. A-1, Korczyk Depo. at 126:12–20.

[55] Ex. A-2, Korczyk Dec. at ¶¶ 32–38.

[56] Ex. A-1, Korczyk Depo. at 184:7–12.

[57] Ex. B, Strombom Dec. at ¶ 33.

[58] Ex. A-1, Korczyk Depo. at 186:14–24; *see also* Ex. B, Strombom Dec. at ¶ 33.

hired an administrative assistant solely to deal with the fallout from a data breach."[59] That is, of course, because that does not happen in the real world.

To the contrary, the vast majority of people affected by a data incident personally spend whatever time it takes them to review their account statements, cancel their cards, etc.[60] They do this at a per-hour cost that is inherently tied to their own highly individualized earning power.[61] Under recognized economic principles, this is referred to as the opportunity cost of time, and it varies from person to person.[62] For example, the opportunity cost of a brain surgeon having to skip work for the day to deal with a data incident is much greater than the opportunity cost to a retiree who was not planning on earning any income that day.[63] Korczyk admits that he has not sought to apply these bedrock economic principles in this case.[64] Moreover, whereas numerous economics authorities explain and endorse the individualized notion of opportunity cost of time,[65] Korczyk cannot identify a single "study or textbook or treatise or article or other publication that supports the proposition that a reasonable way to value the time spent by a putative class member is to look at the rate that the class member would have had to pay an administrative assistant to deal with the fallout of a data breach."[66] That is because this

---

[59] Ex. A-1, Korczyk Depo. at 180:13–21.

[60] Ex. B, Strombom Dec. at ¶ 33.

[61] Ex. B, Strombom Dec. at ¶¶ 33–34

[62] *See* Ex. B, Strombom Dec. at ¶¶ 33–34.

[63] Ex. B, Strombom Dec. at ¶ 15.

[64] Ex. A-1, Korczyk Depo. at 192:6–194:11.

[65] Ex. B, Strombom Dec. at ¶ 33.

[66] Ex. A-1, Korczyk Depo. at 176:13–22.

novel approach—which is entirely divorced from reality—is not reliable.

Further, Korczyk admits that some putative class members will not have spent any time dealing with any alleged fallout from the Data Incident, and that admission is bolstered by a study he relied upon, which indicates that many people do nothing after their card was potentially exposed in a data breach.[67] Recognizing this inherent problem, Korczyk proposes that each putative class member should submit an affidavit saying how much time he or she spent.[68] Brinker would, of course, have a due process right to test the veracity of the allegations contained in any such affidavits—a concept with which Korczyk agrees— but Korczyk offers no process for how or when Brinker would be able to test those allegations, or how Brinker could do so without having to conduct innumerable individualized inquiries.[69]

While these unaccounted-for individual differences would be problematic in a single-plaintiff case, in a putative class action, they render the model useless. Korczyk has proposed no mechanism for extrapolating his damage methodology across the class, other than requiring each putative class member to come forward with individualized proof and allowing Brinker to challenge it. At bottom, Korczyk's failure to address or account for these inherently individualized issues or propose a reliable methodology to uniformly measure damages on a class-wide basis reinforces this plain reality: this case simply is not a candidate for class certification. *See Pierson*, 2010 WL 3447496, at *3; *Leeward*, 2006

---

[67] Ex. A-8, The Aftermath of a Data Breach: Consumer Sentiment, Ponemon Institute LLC, at pp. 1, 6, 17.

[68] Ex. A-2, Korczyk Dec. at ¶ 39.

[69] Ex. A-1, Korczyk Depo. at 197:25–199:8.

WL 5163931, at *2–3.

### D.     Out-of-Pocket Damages

To value out-of-pocket damages, Korczyk read ***one*** study he found online to determine that the average out-of-pocket costs associated with a data breach was $38 in 2012–2014.[70] He proposes to award $38 (or maybe some other sum he might calculate later[71]) to all putative class members who "simply attest" that they incurred out-of-pocket damages.[72] ***Again, this purported methodology is no methodology at all.*** Rather, it consists merely of plucking a number out of a random internet source and saying that anyone who raises their hand can have $38. Reflecting the unreliability of that approach, Korczyk does not even know what types of data breaches were at issue in the one study from which he pulled the $38 figure, though he acknowledges that the costs associated with data breaches vary depending upon the types of data stolen.[73]

Moreover, like his other damage elements, Korczyk does not account for the fact that out-of-pocket expenses vary immensely from person to person.[74] Indeed, under this "model," someone who had no out-of-pocket expenses but simply attested that he or she did would receive $38—an amount to which that person is not entitled.[75] And someone who experienced $1 of out-of-pocket expenses would receive a $37 windfall.[76] Meanwhile,

---

[70] Ex. A-2, Korczyk Dec. at ¶ 47.

[71] Ex. A-1, Korczyk Depo. at 217:3–11.

[72] Ex. A-2, Korczyk Dec. at ¶ 47.

[73] Ex. A-1, Korczyk Depo. at 225:12–226:9.

[74] Ex. B, Strombom Dec. at ¶ 48.

[75] *See* Ex. B, Strombom Dec. at ¶ 48.

[76] *See* Ex. B, Strombom Dec. at ¶ 48.

someone with $200 in expenses would be inadequately compensated.[77] This sort of

rickshaw approach cannot be permitted. Korczyk's total disregard of these important facts

renders this opinion inadmissible. *See Pierson*, 2010 WL 3447496, at *3; *Leeward*, 2006

WL 5163931, at *2–3.

**IV.**
**KORCZYK'S METHODOLOGY SHOULD BE EXCLUDED BECAUSE IT DOES**
**NOT PROVIDE THE COURT WITH AN ADMINISTRATIVELY FEASIBLE**
**CLASS-WIDE MODEL**

In class actions, Plaintiffs bear the burden of coming forward with a way to

administer damages on a class-wide basis. And class certification must be denied when

Plaintiffs fail to carry that burden. *See, e.g., Brown v. Electrolux Home Prods., Inc.*, 817

F.3d 1225, 1240 (11th Cir. 2016) (quoting *Klay v. Humana, Inc.*, 382 F.3d 1241, 1260

(11th Cir. 2004) (predominance cannot be established if computing individual damages

"will be so complex, fact-specific, and difficult that the burden on the court system would

be intolerable."); *Comcast Corp. v. Behrend*, 569 U.S. 27, 30 (2013) (plaintiffs must show

that damages are "measurable on a class-wide basis through use of a common

methodology."); *Randolph v. J.M. Smucker Co.*, 303 F.R.D. 679, 698 (S.D. Fla. 2014)

("Plaintiff failed to present sufficient evidence of a viable damages model capable of

estimating damages on a class-wide basis as is required by *Comcast*.").

Korczyk's opinions do not help Plaintiffs carry their burden on this point. To the

contrary, the approach Korczyk has proffered actually crystalizes why Plaintiffs' proposed

nationwide and state-wide classes should not be certified. Korczyk's own methodology

---

[77] *See* Ex. B, Strombom Dec. at ¶ 48.

-24-

contemplates that—for two of his four damages elements—putative class members would have to come forward with additional proof of their own individualized circumstances. For instance, Korczyk's Declaration states that anyone who spent time dealing with the fallout of the Data Incident would need to present evidence (through "affidavits or other, sworn testimony") of the number of hours expended.[78] Similarly, Korczyk says that putative class members who would like to recover the $38 he affords them for out-of-pocket expenses "would simply need to attest to whether they had incurred out-of-pocket expenses."[79] Far from explaining how these individualized proof proffers would work, Korczyk acknowledges that there would have to be a process for Brinker to challenge putative class members' hours and expenses, but he cannot provide any information about how that process would work in practice.[80]

This too dooms Mr. Korczyk's opinions and his deeply-flawed methodologies.

## V.
## CONCLUSION

For these reasons, Brinker requests that the Court strike and exclude all opinions proffered in the Declaration of Daniel J. Korczyk [Dkt. No. 132-1] and any testimony he may attempt to offer in support of Plaintiffs' motion for class certification.

---

[78] Ex. A-2, Korczyk Dec. at ¶ 39.

[79] Ex. A-2, Korczyk Dec. at ¶ 47.

[80] Ex. A-1, Korczyk Depo. at 197:25–199:8.

Respectfully submitted,

By: */s/ Jason K. Fagelman*
    Jason K. Fagelman

**NORTON ROSE FULBRIGHT US LLP**

Jason K. Fagelman (Admitted *Pro Hac Vice*)
Barton W. Cox (Admitted *Pro Hac Vice*)
Nicholas J. Hendrix (Admitted *Pro Hac Vice*)
Sarah Cornelia (Admitted *Pro Hac Vice*)
2200 Ross Avenue, Suite 3600
Dallas, TX 75201
Telephone:   (214) 855-8000
Facsimile:    (214) 855-8200
jason.fagelman@nortonrosefulbright.com
beau.cox@nortonrseofulbright.com
nick.hendrix@nortonrosefulbright.com
sarah.cornelia@nortonrosefulbright.com

*- and -*

**LOWNDES,        DROSDICK,        DOSTER,
KANTOR & REED, P.A.**

W. Drew Sorrell
Florida Bar No. 160903
Lowndes, Drosdick, Doster, Kantor & Reed, P.A.
215 North Eola Drive
Post Office Box 2809
Orlando, Florida 32802-2809
Telephone:     (407) 843-4600
Facsimile:      407-843-4444
drew.sorrell@lowndes-law.com
litcontrol@lowndes-law.com
carole.moore@lowndes-law.com

*Attorneys for Defendant Brinker International, Inc.*

-26-

## **CERTIFICATE OF SERVICE**

I hereby certify that on this 30th day of October, 2020, I served the foregoing document in accordance with the Federal Rules of Civil Procedure.

*/s/ Sarah Cornelia*
Sarah Cornelia

## **CERTIFICATE OF CONFERENCE**

Pursuant to Local Rule 3.01(g), I hereby certify that counsel for Defendant Brinker International, Inc. has conferred with counsel for Plaintiffs regarding the relief sought herein. Plaintiffs' counsel indicated they do not agree to the relief sought in this Motion.

*/s/ Nick Hendrix*
Nick Hendrix